UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TERRI SMITH,

      Plaintiff,

v.

CITY OF LAKELAND, FLORIDA,

      Defendant
_____/

**PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT**

Defendant has moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss all claims of Plaintiff Terry Smith (hereinafter "Sgt. Smith"), arguing that each of them fails to state a claim upon which relief can be granted. (Doc. 20 at 1). Sgt. Smith demonstrates herein that the Amended Complaint states facially plausible claims for relief, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**I. Allegations of the Amended Complaint**

Sgt. Smith began employment with Defendant's police department (hereinafter "LPD") as a sworn police officer on April 17, 1995, and was promoted to Sergeant on December 29, 2002. (Doc. 18 ¶ 5.) In 2004, she created a new Crime Analysis Unit, and after she did so, was placed in charge of the unit and the four employees assigned to it. (Doc. 18 ¶ 6.)

In January 2017, LPD hired a young male, Sean Patterson, for an entry level position in Sgt. Smith's Unit. (Doc. 18 ¶ 7.) Patterson resisted attempts of an older female Crime Analyst,

Brenda Wallace, to mentor and train him as Wallace was assigned to do; failed to complete assignments; and spent many working hours visiting with male staff, including Sgt. Smith's superior officers, Lt. Steven Sealey and Capt. Hans Lehman, complaining about Sgt. Smith and Wallace.  (Doc. 18 ¶8.)

In June 2017, Sgt. Smith asked her supervisor, Lt. Steven Sealey, to make it clear to Patterson that he was required to follow instructions given by herself and Wallace.  (Doc. 18 ¶ 9.)  Lt. Sealey met with Patterson and Sgt. Smith together, and during the meeting allowed Patterson to verbally attack Sgt. Smith, accusing her of resisting needed change and "running off" a former male crime analyst; endorsed his going over her head to Lt. Lehman and other male superiors to complain about her management of the Unit; acquiesced in his refusal to complete tasks he did not like; and permitted him to defy her order to leave the meeting so that she could confer privately with Lt. Sealey.  When Sgt. Smith asked why Lt. Sealey allowed Patterson to be insubordinate to her in the meeting, Lt. Sealey said he did not find Patterson's comments to be insubordinate, and that his own conversations with Patterson had been very positive, "like a father talking to his son."  (Doc. 18 ¶ 10.)

Lt. Sealey on several occasions thereafter told Sgt. Smith she had to tolerate Patterson's insubordination and treat "millenials" such as Patterson more favorably than employees of other age groups.  This was not a single isolated remark but, rather, an ongoing series of statements over time ("several occasions") (*id.*) up until the time when Sealey ceased speaking to her on February 9, 2018. (Doc. 18 ¶ 21.)

In January 2018, Sgt. Smith completed performance evaluations of her staff, giving Wallace an excellent rating and Patterson a rating of "standard performance," which is typical for

an LPD employee who has completed only one year of service. (Doc. 18 ¶ 12.) Lt. Lehman objected to the ratings, stating that Sgt. Smith had rated Wallace too high and Patterson too low. (Doc. 18 ¶ 13.) After Sgt. Smith responded that she believed the evaluations were accurate, Lehman summoned her to a meeting in his office. (Doc. 18 ¶ 14.)

When Sgt. Smith arrived for the meeting on January 11, 2018, she was confronted there by three male officers – Capt. Lehman, Lt. Sealey and Assistant Chief of Police Mike Link. (Doc. 18 ¶ 14.) Lt. Lehman handed her an eight-page, single spaced write-up, which she attempted to skim while the three male superior officers glared at her. (*Id.*) The write-up was addressed to Assistant Chief Link. (Doc. 18 ¶14). It criticized Sgt. Smith for not giving Patterson a higher evaluation, stating that there was a "generational conflict occurring that cannot be resolved" between Patterson and Sgt. Smith; and referring to Patterson as a "young" employee with a "refreshing" approach, while referring to Sgt. Smith as "stuck in her ways." (*Id..*)

Previously, LPD had rated Sgt. Smith's performance as head of the Crime Analysis Unit as superior. (Doc. 18 ¶ 17.)

Hauling Sgt. Smith before a group of superior officers in this situation was highly irregular and intended to humiliate and intimidate Sgt. Smith, which it did. (Doc. 18 ¶ 15.) Moreover, a member of Sgt. Smith's unit, in a declaration to the EEOC, testified that Lt. Sealey and Capt. Lehman "encouraged and supported [Patterson] in his aggressive and insubordinate behavior toward Sgt. Smith." (Doc. 18 ¶ 15.)

Lt. Lehman gave a copy of the eight-page write-up to Patterson, and this further undermined Sgt. Smith's authority over Patterson's supervision. (Doc. 18 ¶ 16.) It also emboldened Patterson to file a frivolous internal complaint and then an EEOC charge against Sgt.

Smith. (Doc. 18 ¶ 16.)

On February 7, 2018, Lt. Sealey issued his annual performance evaluation of Sgt. Smith, rating her at 4.76 on a scale from 1.00 to 7.00, lower than she had ever been rated as supervisor of the Crime Analysis Unit and significantly lower than her evaluation of 6.72 for the previous year. (Doc. 18 ¶ 17.) The evaluation made several negative references to Sgt. Smith's supervision of Patterson. (*Id.*.)

On the following day, Sgt. Smith filed a complaint of hostile work environment based on her age and gender with the Defendant City of Lakeland's Human Resources Department, which is independent of LPD. (Doc. 18 ¶ 18 .)[1]

Rather than allowing Defendant'sHR department to handle the investigation, LPD took over responsibility for investigating the complaint and exonerated the alleged perpetrators. (Doc. 18 ¶ 19.) Officers in the department treated Sgt. Smith's complaint as a joke, and one of the accused taped the complaint to the front of his desk in view of any person entering his office. (Doc. 18 ¶ 19.). She requested that during the pendency of the investigation, she not be required to report to Lt. Sealey and Captain Lehman, who were named in the complaint, but that request was denied. (Doc. 18 ¶ 18 .)

After Sgt. Smith filed her hostile work environment complaint with Human Resources on February 8, 2018, Lt. Sealey refused to speak to her for the duration of her employment, a period of eight months, even though he remained her supervisor. (Doc. 18 ¶21.)

---

[1]Defendant erroneously asserts that Plaintiff alleges her performance evaluation caused her to file her complaint. (Doc. 20 at 3.) There is no such allegation in the Amended Complaint, and the fact that she named both Lt. Sealey and Capt. Lehman, the latter being the person who authored the eight-page write-up and gave a copy of it to Patterson, but did not do her evaluation, indicates that the complaint was not limited to her evaluation.

Lt. Sealey also began surveilling and keeping a log of Sgt. Smith's comings and goings, and checking up on whether she was actually at the meeting or appointment on her schedule by contacting sources at the meeting or appointment. (Doc. 18 ¶ 20.) This included official meetings and conferences as well as personal medical appointments for treatment of a serious work-related injury to her knee and Achilles tendon. (Doc. 18 ¶ 20.) Next to each entry was Lt. Sealey's notation as to LPD policy that he allgedly believed the listed conduct may have violated. (Doc. 18 ¶ 20.)

On July 28, 2018, Lt. Sealey e-mailed his log of Sgt. Smith's activities and alleged offenses, which had grown to 29 pages, to 35 LPD employees, including non-supervisory employees, members of Sgt. Smith's Crime Analysis Unit and other employees with whom she had to work. (Doc. 18 ¶ 22.) The log contained not only inflammatory and untrue accusations of shirking work, but also confidential medical information regarding her leg injury. (*Id..*) This humiliated Sgt. Smith and made her the subject of further ridicule at LPD. (*Id..*)

Sgt. Smith complained to Chief Giddens, who told her that Lt. Sealey had sent the e-mail attaching his notes "by mistake" and had attempted to delete it. (Doc. 18 ¶23.) However, members of her unit told Sgt. Smith that they had received the e-mail but had not received any notice that it had been withdrawn or sent by mistake. (*Id..*) Lt. Sealey never apologized, never claimed to Sgt. Smith that the e-mail had been sent in error, and never addressed the matter with her in any way. (*Id..*)

After this, Sgt. Smith had to face and interact with the recipients of Lt. Sealey's e-mail and was overwhelmed with humiliation. She asked Chief Giddens to assign her to another supervisor but he refused. He told Sgt. Smith her only options were to accept a demotion to

patrol duty or apply for any open position just like any other employee. (Doc. 18 ¶24.)

Patrol duty is considered a demotion and is more physically strenuous than office assignments that were available within LPD. It is unlikely Sgt. Smith could have performed patrol duty with her lingering leg injury. (Doc. 18 ¶ 25.)

After Chief Giddens denied Sgt. Smith's request for transfer to another supervisor, her undersigned counsel wrote to Chief Giddens seeking relief on July 30, 2018, and when no action was forthcoming, wrote to Defendant's City Attorney, Tim McCausland, on August 9, 2018. (Doc. 18 ¶ 26.) The August 9 letter indicates that the attorneys were in negotiations regarding Sgt. Smith's hostile work environment and retaliation claims. (Exhibit 1.)[2] During this time, Sgt. Smith was off work recovering from surgery to repair her knee and Achilles tendon. (Doc. 18 ¶ 20; Exhibit 2 at pages 3-4.)[3]

On September 6, 2018, Sgt. Smith and her attorney met with Chief Giddens and City Attorney McCausland to discuss Sgt. Smith's request for a transfer to another chain of command, but the only option offered was a demotion to patrol. (Doc. 18 ¶ ¶ 24-26; Exhibit 2 at page 3.)

When no corrective action was taken, Sgt. Smith concluded that she could no longer

---

[2]On a motion to dismiss, the court may consider documents directly referred to in the complaint, and doing so will not convert the motion to one for summary judgment. *Rhodes v. Omega Research, Inc.*, 38 F. Supp. 2d 1353, 1357–58 (S.D. Fla. 1999).

[3]Exhibit 2 is an exchange of e-mails between Plaintiff's undersigned attorney and Defendant's City Attorney. It shows that Sgt. Smith did not immediately resign in the face of the intolerable harassment because (1) a resolution was under discussion between the attorneys, and (2) she was at home recovering from surgery and thus not working in the hostile environment at that time. As the court held in *Speaker v. U.S. Department of HHS*, 623 F.3d 1371, 1379 (11th Cir. 2010), "In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." Here the document is essential to Plaintiff's claim that her work environment was intolerable.

tolerate this hostile work environment. Even though she was just short of 25 years' service, which would have resulted in increased pension benefits, and even though she had no new employment lined up, she terminated her employment with Defendant on September 10, 2018. (Doc. 18 ¶ 27; Exhibit 3.)[4]

On September 17, 2018, Sgt. Smith filed a Charge of Discrimination with the EEOC alleging, inter alia, that she terminated her employment because her working conditions were intolerable and not going to change. (Exhibit 4.)[5] After investigation, the EEOC on August 20, 2019, issued a Letter of Determination, finding reasonable cause to believe that Defendant subjected Sgt. Smith to a hostile work environment because of her age and sex, and constructively discharged her because of her age and sex, and in retaliation for her protected activity. Amended Complaint (Doc. 18) ¶ 30.) EEOC determinations are "ordinarily admissible" as findings of fact, regardless of whether they contain factual opinions or conclusions. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1288 (11th Cir. 2008).

## II. The Amended Complaint Sufficiently States a Claim of Sex- and Age-Based Hostile Work Environment

---

[4] Exhibit 3 is Plaintiff's letter of resignation. It is essential to her claim that her work environment was so intolerable that she resigned on September 10, 2018, shortly after her attempts to change that environment failed. *Speaker*, 623 F.3d at 1379. The Amended Complaint erroneously alleges that Sgt. Smith resigned on October 25, 2018; this is not in fact her date of resignation, but instead is the date when she applied for retirement benefits. Should this claim survive the motion to dismiss, Plaintiff will seek leave to amend the Amended Complaint to correct this error.

[5] Exhibit 4 was referred to in the complaint, and so considering it will not convert the motion to dismiss to a motion for summary judgment. *Rhodes v. Omega Research, Inc.*, 38 F. Supp. 2d 1353, 1357–58 (S.D. Fla. 1999). It is included to show that as of September 17, 2018, the date she signed the EEOC charge, Sgt. Smith had already resigned her position, and that therefore, the October 25, 2018 termination date in the Amended Complaint is erroneous.

> To prove a hostile environment claim, a plaintiff must show:
>
> (1) that she belongs to protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment was based on a protected characteristic; (4) that the harassment was sufficiently severe or pervasive to alter terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan*, 277 F.3d 1269,1275 (11th Cir. 2002) (citing *Mendoza v. Borden*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*)).

Defendant's central argument is that the allegations of the Amended Complaint do not meet the fourth element. Motion to Dismiss (Doc. 20) at 8-11. Specifically, Defendant argues that the harassment consists of six incidents over 13 months, too infrequent to constitute "pervasive" harassment. (Doc. 20 at 8-9.)

However, in evaluating whether employer conduct is severe or pervasive, "the analysis cannot carve the work environment into a series of discrete incidents and measure the harm adhering in each episode. Rather, a holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes." *Robinson v. Jacksonville Shipyards*, 760 F.Supp. 1486, 1524 (M.D.Fla. 1991); *accord Horne v. Holder*, 2019 WL 7900139, at *8 (S.D. Fla. 2019). "Workplace conduct is not measured in isolation. Rather, the evidence of harassment is considered both cumulatively and in the totality of the circumstances." *Reeves v. C.H. Robinson Worldwide*, 594 F.3d 798, 808 (11th Cir. 2010) (*en banc*) (citations and internal quotation marks omitted). In evaluating a hostile work environment claim, courts must keep in mind that "[t]he real social impact of workplace behavior

often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore services*, 523 U.S. 75, 81-82 (1998).

Here the cumulative effect of the harassment was substantial. First came the jarring meeting of June 2017, where instead of reinforcing Sgt. Smith's authority to direct Patterson's work, Sealey endorsed Patterson's insulting and degrading statements that he had gone to "higher-ups," all of them men, about the supposed need for change in Sgt. Smith's unit and accused her of "running off" a former male crime analyst. Subsequently, the harassment accumulated in Sealey's repeated directives to Sgt. Smith that she must tolerate Patterson's insubordination and treat millenials more leniently than others. It redoubled in intensity after Lehman objected that Sgt. Smith's evaluation of Patterson's performance as "average" was not good enough, prompting Lehman to summon her to a meeting which included the Assistant Chief of Police, where he handed her an eight-page, single-spaced memo to the Assistant Chief, describing her as "stuck in her ways" and responsible for creating an unresolvable "generational conflict." It again cumulated when Lehman gave a copy of the write-up to Patterson, effectively giving Patterson a free pass to continue to humiliate Sgt. Smith and irreparably undermining her authority to manage her unit. Less than a month later, Lt. Sealey poured on the pressure with a punitive annual evaluation of Sgt. Smith, starkly discordant from the glowing evaluations she had previously received as head of the Crime Analysis unit. Then Sgt. Smith's harassment complaint to City of Lakeland HR was taken over by LPD and treated as a joke, with the accused, including Lehman and Sealey, being absolved. It became even more overtly hostile, with no pretense of neutral behavior, when Sgt. Sealey, while continuing to serve as Sgt. Smith's supervisor, refused

to speak to her from the time she filed the complaint to her last day of work some eight months later. It finally became unbearable when Sgt. Sealey e-mailed his 29-page document, documenting his surveillance of Sgt. Smith and alleging improper conduct, to 35 of Sgt. Smith's co-workers.

The upshot of these acts was that Sgt. Smith had to bear the cumulative weight of harassment by the entirely male hierarchy from Assistant Chief Link down through Captain Lehman and Lieutenant Sealey, who endorsed and empowered Sean Patterson's daily insubordination and refusal to complete tasks assigned by her.

Defendant's assertion that the harassment was limited to "five (5) incidents over the course of thirteen (13) months" is not only incorrect, but fails to meet the test of evaluating the acts "cumulatively and in the totality of the circumstances." *Reeves, supra,* 594 F.3d at 808. Moreover, there is no "magic number" of instances of harassment; rather, it is "repeated incidents of verbal harassment that continue despite the employee's objections [that] are indicative of a hostile work environment." *Miller*, 277 F.3d at 1276 (11th Cir. 2002) (citing *Shanoff v. Illinois Dep't of Human Servs.*, 258 F.3d 696, 704 (7th Cir. 2001). In *Miller*, the instances of harassment occurred every day, but only for the one- month period when Miller and the harasser were both employed by Kenworth. *Id.* at 1276. Here, the harassment continued for more than a year.

Defendant errs in suggesting that Smith must show the harassment was "severe and pervasive" enough to alter the terms and conditions of her employment, when the actual requirement is to show that the harassment is sufficiently severe *or* pervasive. *Reeves*, 594 F.3d at 808 ("Either severity *or* pervasiveness is sufficient to establish a violation of Title VII.").

In any event, a threshold question is whether the harassment was objectively severe, which includes these considerations: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Miller,* at 1266. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not constitute actionable harassment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Here Lt. Sealey's allowing Patterson to verbally attack Sgt. Smith, Lt. Lehman's hauling Sgt. Smith before a panel of male officers including the Assistant Chief and springing on her the eight-page write-up, Lt. Sealey's giving Patterson a copy of the write-up, Lt. Sealey's giving Sgt. Smith a punitive performance evaluation, Lt. Sealey's refusal to speak to her for 8 months after she complained about the harassment, and Lt Sealey's distribution of his surveillance notes to 35 employees, taken alone or together, were not "simple teasing" or "offhand comments." Taken together, they were not "isolated incidents."

The harassment does, however, check all the boxes for objective severity. It was (1) frequent, in that in addition to the several discrete instances of harassment, it included Lt. Sealey's repeated instructions to Sgt. Smith that she must tolerate insubordination and hostility from Patterson, and treat younger employees more favorable than older employees, and his refusal to speak to her for eight months after she made a complaint of harassment. It was (2) severe, in that endorsing Patterson's verbal attacks on Sgt. Smith; hauling her before a panel of male officers and presenting her with an eight-page write-up which she had not previously seen, giving a copy of the write-up to her subordinate, and distributing Lt. Sealey's log of her activities to 35

employees were highly irregular, offensive and intimidating. It was (3) humiliating, in that these offensive acts were done in front of other employees, or in the case of the 29-page list of her alleged offenses, transmitted to other employees. And it (4) unreasonably interfered with Sgt. Smith's performance of her job, in that acts such as Capt. Lehman's giving Patterson a copy of the write-up made it impossible for Sgt. Smith to properly supervise Patterson, and Lt. Sealey's refusal to speak to her for eight months interfered with her ability to work effectively as part of the unit under his direction.

The harassment here was much more severe and pervasive than the harassment alleged in *Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012), a case in which summary judgment dismissing a hostile work environment claim was reversed by the Eleventh Circuit Court of Appeals.

In *Jones*, an African American employee alleged he was subjected to a hostile work environment based on the following: (1) a trainer's statement that he knew how to train "you Indians," to which Jones responded that he was not an Indian, prompting the reply, "I don't care what race you are, I trained your kind before;" (2) three occasions when Jones found banana peels or banana fragments on his truck; and (3) one occasion when three white employees came to work wearing shirts and caps depicting the confederate battle flag. *Id.* at 1289-90. After Jones reported these incidents to management, the wearing of confederate clothing ceased, but he did find a banana on his truck one more time and reported it. 683 F.3d 1289-91. When two of the white employees approached him in a threatening manner and asked if he was the one who reported the confederate flag shirts to management, Jones reported that to his supervisor and told her he was thinking of quitting his job. Later that day, Jones resigned his position. *Id.* at 129-91. The

District Court granted UPS's motion for summary judgment, but the Court of Appeals reversed, holding that a reasonable jury could find that the cumulative effect of these seven incidents created a hostile work environment. Even though none of the incidents included "any overt reference to Mr. Jones's race," the Court of Appeals held that a jury could reasonably find that the association of bananas with monkeys, and monkeys with racial slurs against African Americans, created an actionable hostile work environment for Jones. *Id.* at 1297-98, 1303-04. In doing so, the Court applied the principle set out in *Oncale* that it "must consider the totality of circumstances, keeping in mind that '[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 1302 (quoting *Oncale*, 523 U.S. at 81-82).

Here LPD harassed Sgt. Smith using overt and coded ageist language and behavior. In his letter to the Assistant Chief, Capt. Lehman referred to Sgt. Smith as "stuck in her ways," holding back a "young" employee with a "refreshing" approach, and accused her of causing a "generational conflict" that "cannot be resolved."  Capt. Lehman and Lt. Sealey regularly reminded Sgt. Smith that they wanted her to treat "millennials" more favorably than other employees. The term "millennials" refers to persons born between 1981 and 1996[6] which, as of 2017 would place them in the 21 to 36 age group. This obviously is a very young group of employees, so young that they are excluded by statute from protection against age discrimination under the ADEA. 29 U. S. C. § 631(a). Lt. Sealey's and Capt. Lehman's directives about millennials were in effect mandates to discriminate in favor of younger employees like Patterson

---

[6]https://en.wikipedia.org/wiki/Millennials (last visited 7-29-2020).

and against older employees like Wallace. This was exemplified by Capt. Lehman's insistence that Sgt. Smith reduce the performance rating she gave Wallace, and increase the rating she gave Patterson.

With regard to sex-based harassment, empowering a young male to be disrespectful and insubordinate to Sgt. Smith, blowing off her objections by stating that Lt. Sealey's own conversations with the insubordinate male were "like a father talking to his son," ordering her to raise the insubordinate male's performance rating, ordering her to reduce his female mentor's evaluation, hauling Sgt. Smith before an all-male panel of her superiors to confront her with an eight-page write-up, further empowering the male subordinate by giving him a copy of the eight-page write-up, refusal of her male supervisor to speak to her for the last eight months of her employment, and the male supervisor's malicious distribution of his 29-page list of her alleged infractions to 35 of her co-workers had the cumulative effect of beating her down and creating an gender-hostile work environment.

Consideration of the cumulative effect of the age-based and gender-based hostile acts does not proceed independently; rather, they are considered together in determining whether, based on the totality of the circumstances, they created an actionable hostile work environment. *Hafford v. Seidner*, 183 F.3d 506, 514-15 (6th Cir. 1999). Hafford was an African American Muslim who alleged he was subjected to a hostile work environment based on his race and religion. The court of appeals held that when considering the cumulative effect of the harassment, it "would not be right to require a judgment against Hafford if the sum of all of the harassment he experienced was abusive, but the incidents could be separated into several categories, with no one category containing enough incidents to amount to 'pervasive' harassment." *Id.* at 515. The appeals court

directed that although there was enough evidence for the racial harassment to stand on its own, the district court on remand should consider whether the racial bias of Hafford's harassers was augmented by their bias against his religion. *Id.* Put another way, "Title VII does not permit plaintiffs to fall between two stools when their claim rests on multiple protected grounds." *Shazor v. Professional Transit Management*, 744 F.3d 948, 958 (6th Cir. 2014) (involving race and sex discrimination claims by African American woman). To the same effect are *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416-17 (10th Cir. 1987) (race and sex), and Judge Marcus's decision in *Cardin v. Via Tropical Fruits,* 1999 WL 945324, at *10 (S.D. Fla. 1993).

In the case at bar, the use of clearly age-based comments makes the age claim more obvious, but based on the above authorities, the gender-based harassment should also be considered as part of the "totality of the circumstances" in determining whether the harassment was severe or pervasive.

**Retaliation**

Defendant erroneously argues that in order to state a claim of retaliation, Sgt. Smith must show that she suffered "an adverse employment action" in the form of an "ultimate employment decision." (Doc. 20 at 11-12) (citations omitted.) This is precisely the argument rejected by the Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), which held that rather than requiring a showing of an "adverse employment action," a victim of retaliation need only show that she suffered an action which a reasonable employee would have found to be "materially adverse," in that "it well might have dissuaded her from making or supporting a charge of discrimination." *Id.* at 68 (citation and internal quotation marks omitted).

Defendant proceeds from its discredited proposition to argue that there is no retaliation claim because Sgt. Smith has not pled that her employment was terminated, that her compensation or duties or other conditions of her employment were changed, or that she was otherwise deprived of employment opportunities. (Doc. 18 as 13.)

When the controlling law as established by *Burlington Northern* is applied, it is clear that Sgt. Smith has stated a claim by alleging that she engaged in protected activity by filing a claim of discrimination with Defendant City's HR office, and that after she made the complaint, Lt Sealey, her immediate supervisor, refused to speak to her for the remaining eight months of her employment and began a surreptitious log of her comings and goings. These allegations state a prima facie case of retaliation, consisting of (1) protected activity, (2) in response to which she suffered action which a reasonable employee would have found materially adverse, and (3) a causal connection between the two. The causal connection is shown by the close temporal proximity of the protected activity and the adverse action. *Shannon v. BellSouth Communications*, 292 F.3d 712, 715 (11th Cir. 2002); *see, e.g.*, *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (proximity of one month is generally sufficient to show causal connection).

Employer conduct similar to Defendant's retaliation against Sgt. Smith has been recognized as actionable post-*Burlington Northern* and includes such actions as creating a hostile work environment for the employee, *Gowski v. Peake,* 682 F.3d 1299, 1311-12 (11th Cir. 2012),[7]

---

[7] In *Monaghan v. Worldpay US*, 955 F.3d 855 (11th Cir. 2020), a panel of the Eleventh Circuit disagreed with *Gowski's* applying Title VII's hostile-work-environment standard for discrimination claims in determining the existence of a retaliatory hostile work environment rather than *Burlington Northern's* less demanding "well might have dissuaded" standard. *Id*. at 862. Applying *Burlington Northern* in the case before it, *Monaghan* found evidence of an

or heightened scrutiny of plaintiff's work performance after filing of complaint. *Upshaw v. Ford Motor Company*, 576 F.3d 589-90 (6th Cir. 2009).  Thus a reasonable employee in Sgt. Smith's position would have found a supervisor's refusal to speak to her for eight months and his starting a list of her alleged daily infractions to be materially adverse, and well might have been deterred from complaining.

### Constructive Discharge

As in its discussion of retaliation, Defendant makes its case for dismissal of Sgt. Smith's constructive discharge claim without reference to the controlling Supreme Court decision on the issue.  (Doc. 18 at 14-16.)

In *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004), as here, the plaintiff alleged that she was constructively discharged from her job in a police department when her supervisor subjected her to a hostile work environment which became intolerable.  The Court held that beyond meeting the test for proving a hostile working environment, "to establish 'constructive discharge,' the plaintiff must make a further showing: She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Id.* at 134. Moreover, the employer may raise the *Farragher-Ellerth* affirmative defense[8] "by showing both (1) that it had installed a readily accessible and effective policy for reporting and resolving

---

employer's threats of termination, statements that it was training another person to take the plaintiff's job, and statements that the plaintiff "better watch it" because they knew where she and her boyfriend lived sufficiently stated a claim of retaliation claim. *Id.* at 862-63.  682-83.  However, *Gowski's* use of a stricter standard than required does not affect the viability of either *Gowski* or *Monaghan* as support for denial of the motion to dismiss in the case at bar.

[8] *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, (1998); and *Faragher v. Boca Raton*, 524 U.S. 775 (1998).

complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus." *Id.*

Here the Amended Complaint supports a claim that Defendant subjected her to a hostile working environment that became so intolerable that her resignation qualified as a fitting response, and that the facts do not support a *Farragher-Ellerth* defense.

The allegations of a hostile work environment are set out at pages 1-7 above.

Sgt. Smith filed a complaint of hostile work environment based on her age and gender with the City of Lakeland's Human Resources Department, which is independent of LPD. (Doc. 18 ¶ 18 .) However, LPD took over the investigation from the City HR Department, and exonerated the alleged perpetrators. (Doc. 18 ¶ 19.) Defendant denied Sgt. Smith's request that during the pendency of the investigation, she not be required to report to Sealey and Lehman, who were named in the complaint. (*Id.*) This alone is evidence that Defendant's "investigation was inadequate and that [it] did not take reasonable measures to correct or prevent the harassment." *Hatley v. Hilton Hotels Corp.*, 308 F.3d 473, 475-76 (5th Cir. 2002).

Defendant did not take any effective action to address Sgt. Smith's complaint, and Sgt. Smith continued under Lt. Sealey's supervision for eight additional months, until the harassment became so intolerable that she resigned. Moreover, during this time the harassment ramped up, as Lt. Sealey stopped speaking to her after she made the complaint, and continued to do so for the remaining eight months of her employment. The last straw was discovering that Lt. Sealey had started keeping a detailed record of her comings and goings, with notations of his alleged opinion as to what policies they might violate. She made this discovery when she learned that Lt. Sealey had e-mailed this 29-page detailed log to 35 of her co-workers, including her subordinates in the

Crime Analysis Unit.  This was the tipping point at which Sgt. Smith concluded she could no longer continue working under Lt. Sealey in this unit.  She went to Chief Giddens, who blew her off by dismissing the distribution of the 29-page log as a "mistake," without addressing the damage it had done, even in the unlikely event that it was accidental.  She requested a transfer to another unit, but was offered only a demotion to "patrol," a generally inferior job to the jobs she had been doing[9] and one that she likely could not perform due to her leg and Achilles injuries.  She exhausted every reasonable avenue to remain with LPD, including letters from her attorney to Chief Giddens and the City Attorney, and a meeting with those individuals, but got no relief from the harassment.

Left with no alternative but to return in disgrace to Lt. Sealey's chain of command and endure his ongoing hostility, or accept a transfer to a miserable job she could not perform, Sgt. Smith gave her notice effective September 10, 2018, four days after the unsuccessful meeting with Chief Giddens and the City Attorney.

Where an employee defers her resignation while she searches for an alternative job, this can be evidence that the mistreatment by the employer was not so intolerable.  This was the case in *Lebofsky v. City of Philadelphia*, 2009 WL 1507581 *21 (E.D. Pa. May 29, 2009), aff'd, 394 Fed. Appx. 935 (3d Cir. 2010), where the plaintiff held onto his position and did not complain about the allegedly intolerable work environment until he had secured an alternative job at a higher level of pay.  Similarly, in *Zephr v. Ortho MacNeil Pharmaceutical*, 62 F.Supp.2d 599 (D.Conn.1999), the fact that the plaintiff did not resign until he had secured a better position with

---

[9]Patrol is generally considered a strenuous and undesirable job, *Hicks v. City of Tuscaloosa*, 870 F.3d 1253, 1257 (11th Cir. 2017), such that it was found to be a violation of the Pregnancy Discrimination Act to assign a pregnant woman to do it.

another employer was found to be "pertinent to why Zephyr left OMP and further undermines his claim of constructive discharge." 62 F.Supp.2d at 609.

Here Sgt. Smith had no job lined up, and faced reduced future pension losses by not remaining an additional few months to reach the 25-year threshold. She tendered her resignation within four days of the unsuccessful meeting with Chief Giddens. (Doc. 18 ¶ 27). The timing of her resignation is not inconsistent with the assertion that she resigned because Defendant's harassment and retaliation became intolerable.

WHEREFORE, Plaintiff Terri Smith respectfully requests that Defendant's Motion to Dismiss be denied.

Respectfully submitted,

  s/ Peter F. Helwig
Peter F. Helwig
Trial Counsel for Plaintiff
Florida Bar No. 0588113
Harris & Helwig, P.A.
6700 South Florida Avenue, Suite 31
Lakeland, FL  33813
Telephone:  (863) 648-2958
Facsimile:  (863) 619-8901
Email: pfhelwig@tampbay.rr.com

**ATTORNEY FOR PLAINTIFF**

**Certificate of Service**

I hereby certify that the foregoing was filed on August 3, 2020 with the ECF system which will provide an electronic copy to the mediator and to counsel of record.

*/s/ Peter F. Helwig*

Peter F. Helwig