**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

TERRI SMITH,

      Plaintiff,

v.                           Case No.: 8:20-cv-41-MSS-JSS

CITY OF LAKELAND, FLORIDA,

      Defendant.

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, CITY OF LAKELAND, FLORIDA (the "City"), pursuant to Federal Rule of Civil Procedure 56, hereby moves the Court to enter summary judgment on all counts of Plaintiff's Amended Complaint (Doc. 18).

Plaintiff brings claims for age- and gender-based harassment and retaliation and attempts to classify her resignation as a constructive discharge. The claims stem from a personality conflict she had with Sean Patterson, a younger male direct report, and the mistaken belief that her superiors, Lt. Stephen Sealey and Capt. Hans Lehman, did not do enough to support her desire to fire Patterson. Omitted from her narrative is that her conflict with Patterson disrupted the entire department and resulted in Patterson making complaints that Plaintiff was treating him differently because of his gender and age. Both Patterson and Plaintiff made accusations of harassment and retaliation, leaving the City to attempt to resolve the dispute. Patterson wanted a different supervisor and Plaintiff wanted

Patterson fired. The City attempted to resolve the dispute by counseling Plaintiff that it was her job to mentor and supervise Patterson even if he was a "problem" employee, and instructing Patterson that Plaintiff was his supervisor and he was required to follow her directives and respect her authority and that if he did not he would be subject to discipline. Neither Plaintiff nor Patterson were satisfied with the City's handling of the matter, but that dissatisfaction does not create either a discriminatory hostile work environment, retaliation for the complaints that were made, or a constructive discharge. The charges both Plaintiff and Patterson brought were thoroughly investigated by the City. The investigation into Plaintiff's allegations of gender- and age-based discrimination and harassment exonerated the persons Plaintiff accused; however, the same investigation substantiated that Patterson was insubordinate to Plaintiff and found other employees had committed conduct unbecoming in the manner in which each reacted to Plaintiff's complaint; the latter resulting in discipline.

At no time during Plaintiff's allegations did Plaintiff sustain any type of adverse employment action—she was never disciplined, nor did she ever receive a demotion or a decrease in pay. When Plaintiff injured her knee and Achilles tendon on the job she received all the leave available to her and, even when she ran out, she was provided additional leave. It is impractical that Plaintiff was treated with the hostility for a hostile work environment, retaliation, and/or a constructive discharge when most of the period of time in question she was either on leave or only working part-time because of her injury.

The City did not engage in any illegal conduct, but rather attempted to deal, as best it could, with two complaining employees.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. At all relevant times, Plaintiff was employed by the LPD at the rank of sergeant, and was responsible for overseeing the Crime Analysis Intelligence Center Unit ("CAIC"). (Ex.2 at 115:7-9, 140:20-24).

2. Just before Plaintiff's resignation on September 10, 2018, the CAIC consisted of the following individuals: (1) Plaintiff, a white female aged 63; (2) Gang Liaison Officer Darlene Thompson, a white female aged 54; (3) crime analyst Brenda Wallace, a white female aged 56; (4) crime analyst Lindsey Morris, a white female aged 33; (5) crime analyst Sean Patterson, a white male aged 28; (6) felony intake officer Kelly Boone, a white male aged 49; and (7) felony intake officer Nicole Cain, a white female aged 45. (Ex.7 ¶ 4).

3. Plaintiff alleges Patterson was treated favorably by Defendant because of his age. (Ex.1 at 55:21-56:6).

4. On January 9, 2017, the City hired Patterson as a crime analyst and assigned him to the CAIC Unit. (Ex.8 ¶ 3). Plaintiff voted in favor of Patterson's hiring. (Ex.2 at 56:22-57:15).

5. On April 12, 2017, Plaintiff while on-duty tripped on a leaf-covered tree stump and thereby injured her right leg. (Ex.7 ¶ 6; Ex.9 at 1-3).

6. After her injury, Plaintiff was placed on "Light Duty" for block periods of time. (Ex.7 ¶ 7; Ex.18 at 34-35, 90-101). Plaintiff either would only work four

hours a day, had modified assignments, or simply missed work. (Ex.18 at 31-35, 90-101; Ex.7 ¶ 7).  At all times, the City accommodated Plaintiff's injury, including reduction in hours, modified assignment, and/or days off. (Ex.7 ¶ 7; *see* Ex.18).

7.    Plaintiff underwent knee surgery on March 13, 2018, to repair a meniscus tear related to her fall, and also underwent an Achilles tendon repair surgery on May 16, 2018. (Ex.7 ¶ 8).

8.    Sealey was Plaintiff's direct supervisor. (Ex.3 at 12:4-23).  As her Supervisor Sealey, was expected to keep notes of his supervisees' absences and the reasons therefore, because it would be problematic for an employee to not show up for work without a good excuse. (Ex.5 at 75:2-10).

9.    When a LPD employee requires time off due to a medical issue, the employee is responsible for informing their timekeeper of the need for sick leave so that the timekeeper can complete and submit a sick slip on that employee's behalf. (Ex.5 at 75:2-10). At all relevant times in this case, Lt. Sealey was Plaintiff's timekeeper and was responsible for submitting sick slips for her. (Ex.7 ¶ 5; *see* Ex.10 at 22, 23).

10.    In the last two years of Plaintiff's employment, in addition to the half-days that she was in the office, she was absent from the CAIC for months or weeks at a time for various reasons, including *inter alia* medical treatments, surgeries, post-operative recovery, doctors' appointments, physical therapy sessions, vacations, and unscheduled call-ins. (Ex.7 ¶ 9). Specifically, from March 1, 2018 through September 10, 2018, Plaintiff was out on leave 77.3% of the time, of the

22.7% of the time Plaintiff did work during March 1, 2018 through September 10, 2018, only 8 days were full time. (Ex. 21).

11. Plaintiff's frequent absences caused a lack of continuity in the CAIC. (Ex.7 ¶ 13; Ex.8 ¶ 13).

12. When Plaintiff was out on leave for her, nobody subjected Plaintiff to harassment, retaliation, or discrimination. (Ex.1 at 60:15-61:16).

13. After Patterson was hired, various work-related conflicts arose between Patterson, Plaintiff, and Wallace. (*See* Ex.13).

14. On May 31, 2017, Lt. Sealey convened a meeting with both Plaintiff and Patterson to address the work-related conflicts occurring in the CAIC. (Ex.3 at 20:17-28:12; Ex.8 ¶ 8). At that meeting, Plaintiff demanded that Patterson be fired and commanded Patterson to leave the meeting. (Ex.3 at 20:17-28:12; Ex.8 ¶ 8).

15. Sealey did not fire Patterson; instead, Sealey reinforced Plaintiff's authority over Patterson by telling Patterson that (1) he needed to respect all of his supervisors, including Plaintiff and Wallace (Ex.3 at 71:20-72:17; Ex.8 ¶ 10), and (2) that he needed to do his job or Sealey would fire him, meaning start the paperwork to request that he be fired (Ex.3 at 26:4-14, 38:22-39:2, 85:16-23, 135:11-15; Ex.8 ¶ 10). Sealey requested that Plaintiff provide written proof of Patterson's alleged misconduct, of which Plaintiff had none, for future documentation. (Ex.3 at 51:17-20; Ex.8 ¶ 8).

16. On December 13, 2017, Plaintiff completed performance evaluations for Wallace and for Patterson. (Ex.12). Similar to Plaintiff, Wallace had conflicts

with Patterson which were brought at times to Sealey's attention. (Ex.14 at 2-13). Despite this, Plaintiff gave Wallace a "7" (i.e., "outstanding performance"), the maximum possible score, on every category of her evaluation, including "team work;" yet gave Patterson a "3" (i.e., "standard performance") on each category. (Ex.12).

17.     The evaluations came to the attention of Lehman, the Captain over the CAIC, for his review; he believed the evaluations were not reflective of the conflicts that existed in the CAIC amongst Plaintiff, Wallace, and Patterson. (Ex.13 at 2; Ex.4 at 16:9-12, 19:6-20:13).  Lehman questioned how Wallace could get "outstanding performance" on team work and Patterson get "standard performance" when there was friction between them in the unit with Wallace charged with mentoring Patterson. (Ex.13 at 3-4, 5-6; Ex.4 at 20:11-13). Although Lehman did not question that Wallace was an excellent employee, he believed the evaluations to be inconsistent. (Ex.13 at 3-4, 5-6; Ex.4 at 20:11-13). Lehman issued a memo to this effect (Ex.13, the "Lehman Memo") and attached it to Wallace's and Patterson's evaluations. The memo was not disciplinary action towards Plaintiff and did not in any way affect either Wallace or Patterson's employment monetarily.

18.     On February 6, 2018, Sealey completed a performance review for Plaintiff, giving her an overall rating of 4.76. (Ex.9 at 4-7). This rating was down from the previous year's overall rating of 6.72 but did not affect Plaintiff monetarily. (Ex.9 at 8-10).

19.     On February 13, 2018, Plaintiff filed a harassment complaint. (Ex.14 at 15-47). The investigation was later joined with a similar complaint by Wallace and was titled "EIR-18-006". (Id. at 1, 2-14). Plaintiff's complaint alleged gender and age-based harassment by each of Asst. Chief Link, Lehman,  Sealey, Sgt. James Roberts, Sgt. Jason Perez, and Patterson in connection with the handling of the complaints against Patterson and perceived preferential treatment towards Patterson. (Id. at 16-25). As part of the investigation, Sgt. LeRon Strong issued a Notice of Investigation and a Notice of Retaliation/Hostile Work Environment (Notice) to each officer. (Id. at 82-83, 95-96, 108-09, 119-20, 130-31, 143-44).

20.     While the investigation was pending, the City discovered on March 5, 2018, that Sgt. Roberts had taped his Notice to the front of his desk. (Id. at 55, 100-01). The City then added an additional complaint against Sgt. Roberts for this posting of the Notices. (Id. at 55, 100-01). The City added similar complaints against Sgt. Perez and Lt. Sealey regarding their Notices. (Id. at 54, 56).

21.     In the over five-month course of EIR-18-006, the City interviewed fifty-five witnesses and reviewed many emails and other documents. (Id. at 48). Several of the witnesses answered that "not only was CA Patterson a hard worker, but in their opinion, he was the victim of verbal and mental abuse from CA Wallace and Sgt Smith" whose supervisory approach was "my way or the highway". (Id. at 51, 347 - 349).  Ultimately, none of the harassment claims were sustained, and each individually exonerated. (Id. at 57-81). The added allegations against Lehman, Sealey, Roberts, and Perez regarding posting the notices were each sustained, and

each was disciplined. (Id. at 62-64, 66-68, 70-73, 75-77). Each of these conclusions was signed by Chief Giddens by July 2, 2018. (Id. at 57-81, 94, 107, 118, 128, 141).

22.    On April 26, 2018, Patterson submitted a harassment complaint regarding Plaintiff and Wallace ("EIR-18-022"). (Ex.15; Ex.8 ¶ 16). Therein, Patterson accused Plaintiff and Wallace of *inter alia* harassing him on the basis of his age and gender and trying to get him punished or terminated. (Ex.15). These allegations were investigated, and both Plaintiff and Wallace were determined to be exonerated of the workplace harassment charges on July 3, 2018. (Ex.16).

23.    Patterson filed a similar EEOC Charge of Discrimination on May 7, 2018, complaining of a hostile work environment due to his gender. (Ex.17; Ex.8 ¶ 17). In both charges, Patterson alleged that Plaintiff used the terms "millennial" and "young hotshot" in support of his age-based discrimination claim. (Ex.16 at 1; Ex.17; Ex. 8 ¶¶ 6, 7, 17).

24.    On April 23, 2018, Asst. Chief Link and Lehman inquired to Sealey as to the out-of-county travel schedules of Plaintiff and Thompson. (Ex.10 at 8). On April 24, 2018, Sealey emailed Plaintiff regarding the same, and also discussed the same with Thompson, who provided her out-of-county travel schedule. (Id. at 8). Plaintiff interpreted this request as retaliatory. (Id. at 10).

25.    From April 30 to May 11, 2018, Plaintiff took 84 hours (10 full days) of vacation leave. (Ex.18 at 15; Ex.7 ¶ 10; *see also* Ex.18 at 99). Thereafter, Plaintiff was on various forms of leave from April 30, 2018 through the date of her resignation on September 10, 2020. (Ex.18 at 99-101).

26.     On May 3, 2018, Sealey received an automatic message from Plaintiff which stated: "I will be out of the office beginning 4/30/18 and returning 8/15/18. I will be checking my email off and on, but for the most part I am unavailable during this time." (Ex.10 at 14-15). The message further stated that Sgt. Doty should be contacted if a supervisor were needed. (Id. at 15).

27.     As a result of Plaintiff's absences, Sgt. Doty was temporarily assigned as active supervisor of the CAIC Unit to oversee its day-to-day operations from April 30, 2018, until further notice. (Ex.7 ¶ 11; Ex.5 at 28:18-22, 29:5-9; Ex.1 at 91:12-15; Ex.10 at 12, 15). Because Plaintiff had failed to communicate with Sealey regarding her hours and medical appointments, which behavior had already become typical of Plaintiff, Lt. Sealey did not know how long Plaintiff would be away or what leave she was requesting. (Ex.10 at 15; Ex.7 ¶ 15).

28.     While Sgt. Doty was in charge of the CAIC, Plaintiff simply stopped responding to calls, texts, and emails from Sgt. Doty. (Ex.10 at 22). When Doty needed answers from Plaintiff, his only option was to try and figure it out himself, often in collaboration with Wallace. (Id. at 22).

29.     During the pendency of the EIR-18-006 as well as the Patterson discrimination complaint, Sealey was ordered to not talk to Plaintiff about the EIR-18-006 investigation or the 2018 Timeline incident. (Ex.3 at 113:12-22, 117:25-118:24; *see also* Ex.5 at 29:15-18). In the few times that Plaintiff was actually in the office, Sealey still had discussions with Plaintiff as were necessary to conduct

business. (Ex.3 at 117:25-118:24). Sealey was also instructed to document everything. (Ex.3 at 76:1-4).

30.    On June 26, 2018, Chief Giddens decided that Doty would remain in charge of the CAIC until Plaintiff became able to work a full 8.4 hours per day. (Ex.10 at 23). Chief Giddens made this decision for the sole purpose of facilitating Sgt. Smith's return to health, and not for the purpose of disciplining or discriminating against Plaintiff on the basis of her gender or age. (Id. at 23-24). In response, Plaintiff told Chief Giddens that she would probably continue to take afternoons off for at least a couple of weeks. (Id. at 24).

31.    On July 28, 2018, Sealey attempted to send a routine call-out email to various people and unintentionally attached a document containing his timeline regarding Plaintiff (Ex.10 at 2-30). (Ex.3 at 102:6-19, 103:17-104:1, 105:23-25, 116:6-20, 137:4-14). As a matter of habit, Sealey immediately reviewed the email he received and, upon opening the attachment, realized that he had unintentionally sent the wrong document. (Id. at 102:13-20, 137:4-14). Sealey immediately called over Det. Scott Hutton, a younger employee more familiar with computers than Sealey, to help him recall the email since Sealey did not remember how to do so. (Id. at 102:21-103:1). As Hutton was coming over to Sealey's desk, Sealey figured out how to recall the email and twice attempted to do so. (Ex.3 at 103:3-5, 109:8-12, 137:17-22). The email was first recalled around 77 seconds after it was sent. (Ex.10 at 1, 70; Ex.3 at 103:5-7). The email was recalled as to all named

recipients except for Plaintiff, Lehman, Asst. Chief Link, Wallace, Sealey himself, and 15 others. (Ex.10 at 40-78; *see* Ex.3 at 103:7-17, 107:19-108:9, 110:7-15).

32.     On or about August 2020, Plaintiff requested a transfer out of the CAIC upon her return from leave. In response, Chief Giddens offered Plaintiff the opportunity to either transfer to patrol or apply for any open position at LPD.  The transfer to patrol would have not have been a demotion, as Plaintiff would still have remained at the rank of sergeant and would have kept the same salary and benefits.[1] (Ex.3 at 120:16-122:3).

33.     Regarding the opportunity to apply for any open position at LPD, there was at the time an open posting for the position of "Police Sergeant" for which Plaintiff could have applied. (Ex.11). Chief Giddens lacked the authority to unilaterally transfer Plaintiff to that position because the well-established policies and procedures of LPD required persons at the rank of sergeant or below seeking a lateral transfer (1) to possess the qualifications necessary for the position, (2) to complete a "lateral transfer request" for that position, and (3) depending on the number of applicants for that position, to proceed before a "lateral transfer board," which would rank and ultimately select a suitable candidate for the position. (Ex.5 at 33:5-35:2; Plaintiff did not follow this procedure.

34.     Instead of pursuing either of these two options, Plaintiff on August 20, 2018, requested an additional two weeks of leave for her leg injury. (Ex.19 at 1).

---

[1] Lt. Sealey later followed this same path, except as a patrol lieutenant instead of a patrol sergeant. (Ex.3 at 121:23-122:3).

The City allowed her two weeks of personal leave with a return-to-work date of September 7, 2018. (Ex.19 at 1; Ex. 18 at 101).

35.    Plaintiff failed to return to work on September 7, 2018, at which time she was placed on paid administrative leave at the City's expense. (Ex.19 at 2). On September 10, 2018, Plaintiff submitted a resignation letter without providing any advance notice. (Ex.20). Therein, Plaintiff sets out the basis for her resignation as primarily the 2018 Timeline incident. (Id. at 2-3). Plaintiff also states her belief that (1) "supervision ... [is] looking for any small detail or policy violation so that they can stick it to me," (2) that the 2018 Timeline incident was intentional, and (3) that the LPD is a "good ole' boy" system. (Id. at 2-3).

36.    From the time Patterson was hired (January 9, 2017) through the date of Plaintiff's resignation (September 10, 2018), Plaintiff had never received a demotion, a decrease in pay, or a write-up for a violation of the City's policies.

**ARGUMENT**

Plaintiff's claims fall within three main categories: (I) gender- and age-based hostile work environment harassment, in Counts I, II, III, and IV; (II) retaliation, in Counts V, VI, and VII; and (III) constructive discharge, in Counts XIII, IX, and X. The counts within those categories are brought pursuant to a different statutory authority, but each of those authorities is, for all purposes relevant here, subject to the same legal standard and analysis. Ashkenazi v. S. Broward Hosp. Dist., 607 Fed.Appx. 958, 965 (11th Cir. 2015) (FCRA anti-discrimination claims generally follow the respective federal case law: i.e., Title VII and the ADEA; Medearis v. CVS

*12*

Pharmacy, Inc., 646 Fed.Appx. 891, 898 n.4 (11th Cir. 2016) (standard for constructive discharge is the same under both Title VII and the ADEA).

## I. The Record Fails to Show Gender- or Age-Based Hostile Work Environment Harassment (Counts I, II, III, and IV)

To state a *prima facie* claim for hostile work environment harassment, a plaintiff must plead that (1) the plaintiff belonged to a protected group; (2) the plaintiff was subjected to unwelcome harassment; (3) the harassment complained of was based on the plaintiff's membership in the protected group; (4) the harassment was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under either a theory of vicarious or of direct liability. Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012) (quoting Edwards v. Prime, Inc., 602 F.3d 1276, 1300 (11th Cir. 2010). As this Court has previously noted, "proving a hostile work environment is a heavy burden—one that cannot be met merely by showing unprofessional encounters and harshly worded emails." (Doc. 27 at 3 (quoting Elite Amenities, Inc. v. Julington Creek Plantation Cmty. Dev. Dist., 784 F. Ap'x 750, 752 (11th Cir. 2019))).

### a. Plaintiff Was Not Subject to Unwelcome Harassment

The U.S. Supreme Court has consistently held that harassment does not include "simple teasing, offhand comments, and isolated incidents (unless extremely serious)," as those "will not amount to discriminatory changes in the

'terms and conditions of employment.'" <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998).

Plaintiff alleges that the following five actions over a thirteen-month period caused her to file her internal complaint for hostile work environment based on age and gender: (1) Patterson was insubordinate towards Plaintiff (Doc. 18 ¶¶ 5, 7-8); (2) when Patterson was hired, when Plaintiff met with Lt. Sealey and Patterson about Patterson's alleged insubordination, Lt. Sealey appeared to take Patterson's side of the argument (Doc. 18 ¶¶ 9-10); (3) another six months later, Plaintiff's superiors met with Plaintiff about Plaintiff's evaluations of Patterson and Wallace[2], wherein Plaintiff received a memorandum correcting Plaintiff's evaluation (Doc. 18 ¶ 14); (4) shortly thereafter, Plaintiff's superiors provided Patterson with a copy of the memorandum, and Patterson unsuccessfully brought a charge of discrimination with the EEOC against Patterson (Doc. 18 ¶ 16); and (5) in February of 2018, Patterson received an unusually low performance evaluation due to the above incidents stemming from Plaintiff's mismanagement of Patterson (Doc. 18 ¶ 17).

Those events would not satisfy the second element of hostile work environment harassment. Faced with allegations similar to those in the instant case, the Southern District Court of Florida found in <u>MacKenzie v. City of Miami</u>

---

[2] Plaintiff has given Patterson a lower evaluation in part because of his failure to follow directions and for Wallace a higher evaluation connected to her supervision of Patterson.

<u>Beach</u> that it was "hard-pressed to see how [rescinded disciplinary actions, one mediocre performance evaluation, and one disciplinary meeting] by Defendant could constitute harassment." 2008 U.S. Dist. LEXIS 129171, at *45 (S.D. Fla. 2008). The <u>MacKenzie</u> Court considered in particular the length of time over which the alleged harassment occurred and whether the employer-defendant's agents or employees "acted in a hostile or abusive matter toward [the employee-plaintiff]," and found the employee-plaintiff's allegations above insufficient to constitute harassment. *Id.* at *45. Instead, these are the sort of ordinary tribulations of the workplace which Title VII does not prescribe. *Id.* at *45 (citing <u>Faragher</u>, 524 U.S. at 788).

### b. None of the Alleged Harassment Was Based on Plaintiff's Gender or Age

Even if the Court were to find that any of the five aforementioned events to be "unwelcome harassment" as a matter of law, the record evidence does not show that any of the alleged harassment was based on Plaintiff's gender or age. Nowhere in the record evidence is there any indication that any of these five events was based on Plaintiff's gender or age. Instead, the record shows only that this was an ongoing supervisor-supervisee dispute between Plaintiff and Patterson, who were obviously at odds with each other and having difficulty working together.

Nor is there any record evidence showing that the Lehman Memo was based on Plaintiff's race or gender. Instead, the only record evidence is that Capt. Lehman wrote the Lehman Memo to address what he saw as a discrepancy in the teamwork

scores Plaintiff gave to each of Wallace and Patterson in light of the ongoing workplace disputes between them.

Nor is there any indirect evidence of discrimination, as Plaintiff has failed to name a similarly-situated individual as a comparator. Plaintiff has not shown and simply cannot show that either a sergeant aged less than 40 or a male sergeant, when placed in the same circumstances, was treated differently than Plaintiff.

The only reasonable conclusion from the record evidence is that Plaintiff's claims are based simply on the fact that she is a woman over the age of 40 and that management did not agree with her on how to resolve an ongoing dispute she had with her direct supervisee. Plaintiff fails to show that a younger male in her position would have been treated differently.

### c. None of the Alleged Harassment Was Severe or Pervasive Enough to Support a Hostile Work Environment Claim

Harassment is only sufficiently severe and pervasive if a reasonable person would perceive the working environment to be hostile or abusive: i.e., the workplace is "permeated with discriminatory intimidation, ridicule, and insult." Jones, 683 F.3d at 1299. This objective determination consists of four main factors "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Miller, 277 F.3d at 1276 (11th Cir. 2002).

First, the record evidence does not show that the five Patterson events were frequent enough to support a claim for hostile work environment harassment. As the Northern District of Alabama noted in <u>Dexter v. Amedisys Home Health, Inc.</u>, "[t]he Eleventh Circuit considers an incident a week to be sufficiently frequent to bolster a plaintiff's [harassment] case but considers an incident every two months to be insufficiently frequent to do so." 965 F.Supp.2d 1280, 1290-91 (N.D. Ala. 2013) (collecting Eleventh Circuit cases on the frequency of harassment sufficient to support a hostile work environment claim). Here, assuming *in arguendo* that each of the above incidents constitutes an instance of harassment, Plaintiff alleges essentially five incidents over the course of thirteen months, all of which arise from a single employee's purported insubordination against Plaintiff and Plaintiff's subsequent interactions with her superior officers addressing her role as the employee's supervisor. Altogether, the alleged instances of harassment are objectively too infrequent under both the Eleventh Circuit's standard as identified by <u>Dexter</u>, and thus they do not support Plaintiff's claims for hostile work environment.

Second, the record evidence does not show that the alleged harassment was sufficiently severe as a matter of law. Of the five Patterson incidents, Plaintiff only alleges that some form of legally cognizable harm (i.e., intimidation and humiliation) resulted from a single incident: the January 11, 2018 meeting where Plaintiff allegedly received her superiors' employee evaluations memo. (Doc. 18 ¶ 15). Then, nearly seven (7) months thereafter and nearly six (6) months after

Plaintiff filed her internal hostile work environment complaint, Plaintiff allegedly felt humiliated and ridiculed due to Lt. Sealey emailing a log of Plaintiff's "comings and goings" to Plaintiff's co-workers. (Doc. 18 ¶ 22, 24). In order to constitute actionable harassment, these temporally remote and isolated incidences of alleged harassment must have been "extremely serious." Faragher, 524 U.S. at 788. However, Plaintiff's subjective feelings of intimidation and humiliation from reading a critical memo in front of her superiors comes nowhere close to the level of "extremely serious" recognized in this Circuit. Hall v. Franklin Cnty., No. 3:13-CV-137, 2015 U.S. Dist. LEXIS 132195, at *13 (M.D. Ga. Sep. 30, 2015) (collecting cases) (footnotes omitted). The same conclusion applies to Lt. Sealey inadvertently emailing a log of Plaintiff's "comings and goings" to Plaintiff's co-workers nearly six (6) months after Plaintiff filed the internal hostile work environment complaint. Accordingly, Plaintiff has failed to allege sufficiently severe instances of harassment to support Plaintiff's claims for hostile work environment.

Third, the record evidence does not show that any of the events were objectively "physically threatening or intimidating" as opposed to a "mere offensive utterance." Plaintiff can point to no record evidence showing any threat or intimidation, physical or otherwise, directed to her by any of her superiors. The Lehman Memo was going to be attached to the evaluations for Patterson and Wallace regardless of whether Plaintiff revised her evaluations of Wallace and Patterson, nor was the Lehman Memo disciplinary.

Fourth, the record does not show that any of the five Patterson events or the 2018 Timeline incident unreasonably interfered with Plaintiff's job performance. While the City admits that Plaintiff's job performance suffered in 2018, the reasons are non-discriminatory and are amply justified by the record evidence: (1) Plaintiff's inconsistent attendance at work, and only for half-days; (2) Plaintiff's repeated failure to communicate with her chain of command regarding her hours, location, time off, and leave requests; and (3) Plaintiff's prolonged absences for vacation and surgery.[3] Sgt. Doty was accordingly assigned in May of 2018 to cover the CAIC until Plaintiff could return to work full-time, which ultimately never occurred. The 2018 Timeline incident occurred on June 28, 2018, after the decision to assign Sgt. Doty had already been made and effected.

Accordingly, there is no record evidence showing any harassment that was so severe and pervasive as to substantiate a hostile work environment claim. Accordingly, summary judgment is due in the City's favor and against Plaintiff on those counts.

## II.  The Record Fails to Show Retaliatory Harassment (Counts V, VI, and VII)

To state a *prima facie* claim for retaliation, a plaintiff must plead that "(1) she engaged in statutorily protected conduct; (2) she suffered an adverse

---

[3] The fact that these absences were often due to medical reasons is ultimately irrelevant, as there is no reason that Plaintiff could not have consistently communicated her hours and doctor's appointment schedules with Lt. Sealey in a timely manner, as she had done a number of times throughout 2018.

employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action." Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 798 (11th Cir. 2000). "An adverse employment action is an ultimate employment decision, such as a discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" Minifield v. City of Birmingham Dept. of Police, 791 Fed.Appx. 86, 90 (11th Cir. Oct. 30, 2019). To rise to the level of an adverse employment action the conduct must impact the Plaintiff's job in a real and demonstrable way. Minifield, 791 Fed.Appx at 90. Alternatively, "mistreatment based on retaliation for protected conduct...is actionable whether or not the mistreatment rises to the level of a tangible employment action, but only if the mistreatment might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." Monaghan v. Worldpay US, Inc., 955 F.3d 855, 861 (11th Cir. 2020).

Because retaliation can only occur after the protected conduct has already occurred, the only relevant allegations of the Amended Complaint are those that aver misconduct after Plaintiff filed a complaint of hostile work environment with the City's Human Resources Department on February 8, 2018. (Doc. 18 at ¶ 18). The only allegations of misconduct after February 8, 2018, are that one of the officers Plaintiff complained of taped her internal complaint to the front of his desk, (Doc. 18 at ¶ 19), and that Lt. Sealey began to keep a log of Plaintiff Smith's

"comings and goings" and emailed that record to various other employees nearly six (6) months after Plaintiff filed the hostile work environment complaint, (Doc. 18 ¶¶ 18, 20, 22).

First, Plaintiff complained that the nature of the investigation issued by the City to its employees was taped by some employees to their desk. When the City found out about the conduct, the notices were ordered to be taken down and the City cited each employee with conduct unbecoming an officer. Accordingly, the posting of the Notices of Investigation cannot serve as a basis for a retaliation claim against the City.

Nor does the creation and inadvertent dissemination of the 2018 Timeline serve as direct or indirect evidence of retaliation. As for its creation, Lt. Sealey had an objectively unimpeachable reason for keeping notes of Plaintiff's comings-and-goings in the 2018 Timeline: Lt. Sealey was Plaintiff's timekeeper during the relevant time period, and he needed to properly keep track of her hours for purposes of payroll and leave, and to be able to inform other LPD employees of her schedule and whereabouts when she is needed.[4] (Ex.7 ¶ 12; *see* Ex.10 at 22, 23). However, Plaintiff's conduct caused difficulties: Lt. Sealey often found Plaintiff absent from the office or was unable to contact her when other LPD employees (*e.g.*, Lt. Cain, Sgt. Strong, Sgt. Doty) needed her (*See*, *e.g.*, Ex.10 at 7-8, 12, 20, 22), and Plaintiff's repeated failures in communicating to her chain of command

---

[4] It goes without need of citation that a superior's attempts at maintaining accountability in a subordinate's scheduling are not retaliation or harassment.

(i.e., Lt. Sealey) or Risk Management the dates when she would be absent on sick leave (e.g., doctor's appointments, surgery) (*see*, *e.g*., Ex.10 at 16-19). (Ex.7 ¶ 14). That many of the events Lt. Sealey logged appeared to be LPD policy violations is an indictment of Plaintiff's conduct, not of Lt. Sealey's. As for the dissemination of the 2018 Timeline, that cannot be the basis for retaliation because it was unintentional. Were the law to consider unintentional retaliation as actionable, then no employer would ever conduct an investigation into an employee's allegations of discrimination for fear of accidental disclosure of gathered facts.

Accordingly, Plaintiff has no viable claim for retaliation, and thus summary judgment should be entered in the City's favor on Counts V, VI, and VII of the Amended Complaint.

### III.   The Record Fails to Show Constructive Discharge (Counts VIII, IX, and X)

To state a *prima facie* claim for constructive discharge under Title VII, a plaintiff must plead that "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign. <u>Bryant v. Jones</u>, 575 F.3d 1281, 1298 (11th Cir. 2009); <u>Fitz v. Pugmire Lincoln-Mercury, Inc.</u>, 348 F.3d 974, 977 (11th Cir. 2003). The standard for constructive discharge is objective. <u>Doe v. Dekalb County Sch. Dist.</u>, 145 F.3d 1441, 1450 (11th Cir. 1998) ("In assessing constructive discharge claims, we do not consider a plaintiff's subjective feelings about his employer's actions.").

As the Court previously noted, "[i]n the Eleventh Circuit it is extremely difficult to establish a constructive discharge" and "establishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim." (Doc. 27 at 5 (quoting Soloski v. Adams, 600 F.Supp.2d 1267, 1307 (N.D. Ga. 2009); Bryant, 575 F.3d at 1298)). Title VII and other anti-discrimination statutes are not "general civility code[s]" intended to proscribe "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher, 524 U.S. at 788. The conduct complained of must be "[so] extreme [as] to amount to a change in the terms and conditions of employment." *Id.* at 788. Put another way, adverse employment actions under Title VII are actions which "deprive[] [the employee] of compensation which he otherwise would have earned." Bass v. Bd. of County Comm'rs, Orange City, Fla., 256 F.3d 1095, 1118 (11th Cir. 2001) (citing McCabe v. Sharrett, 12 F.3d 1558, 1564 (11th Cir. 1994)).  Before a finding of constructive discharge is made, the Court requires a showing of a high degree of deterioration in an employee's working conditions, approaching the level of intolerable.  Hill vs. Winn-Dixie Stores, Inc., 934 F.2d 1518, 1526-27 (11th Cir. 1991); Palmer vs. McDonald 624 F. App'x 699, 704 (11th Cir. 2015)(the following allegations were insufficient to make out a constrictive discharge—the plaintiff's supervisor hastily gave verbal instructions, yelled at the plaintiff, spoke to him in loud voice, implied he was incompetent, scolded him, laughed out loud by his cubicle and did not help in first thing in the morning).

Here, the record evidence does not show that Plaintiff's work environment was so unbearable that a reasonable person in her position would be compelled to resign.  At no point was Plaintiff demoted, had her compensation reduced, had her job responsibilities reduced, involuntarily reassigned to degrading work or asked to resign.  To the contrary, the record evidence shows that Plaintiff was not only allowed to remain in her supervisory position but also was afforded the option to either accept a transfer to patrol sergeant or, as was possible for any other employee seeking a transfer, apply for any open position. *See* Robinson v. Sappington, 351 F.3d 317, 337 (7th Cir. 2003) (Plaintiff's decision to resign resulted from official action of transferring her to a judge who resisted her being placed on his staff and thus constituted a constructive discharge). The potential transfer to patrol would not have affected Plaintiff's rank or pay and Plaintiff could have performed the essential aspect of the job as it was a sedentary position.

Further, the argument that Plaintiff's working conditions in the six (6) months prior to her resignation were intolerable are contradicted by the record; specifically, that Plaintiff was out on medical leave because of an injury to her leg. It belies logic that Plaintiff can claim the working conditions at the City were intolerable when Plaintiff was either on full medical leave recovering from her injury, was using her accrued leave to recover from her injury or was working only part time while she recovered from her injury.  Plaintiff's absence from the work place belies that the conditions were so intolerable that she had to resign.

The Eleventh Circuit considered a similar circumstance in <u>Fitz</u>, wherein the plaintiff alleged constructive discharge based on race:

> Fitz states that after he voiced his allegation of racial discrimination, Pugmire offered Fitz the opportunity (but did not require him) to leave his F&I position and become the dealership's sales manager. We simply cannot understand how an opportunity to transfer to another managerial role could amount to an intolerable working condition.

348 F.3d at 978. Of one mind with the Eleventh Circuit in <u>Fitz</u>, the City simply cannot understand how the opportunity to accept a lateral transfer or to apply for any open position could amount to an intolerable working condition, especially when Plaintiff would have resumed her supervisory role upon returning to full-time work.

In review of the record evidence, the working conditions required for a constructive discharge do not exist. Plaintiff cannot show that she was placed in a position to have to resign because of resistance to her continued employment. Rather, Plaintiff was allowed to apply for an open position as required by LPD Policy. Accordingly, summary judgment is due in the City's favor and against Plaintiff on the constructive discharge counts.

## CONCLUSION

WHEREFORE, Defendant, CITY OF LAKELAND, FLORIDA, respectfully requests that the Court enter final summary judgment in its favor and against Plaintiff, TERRI SMITH, on each count of Plaintiff's Amended Complaint.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed on this 19th day of May, 2023 with the Clerk of Court using CM/ECF which will send an electronic copy to Peter F. Helwig, Esq. at pfhelwig@tampabay.rr.com.

> CAMPBELL TROHN
> TAMAYO & ARANDA, P.A.
>
> */s/ Robert Aranda*
> ROBERT J. ARANDA
> Florida Bar No. 998324
> r.aranda@cttalaw.com
> p.roop@cttalaw.com
> EDWARD B. KERR
> Florida Bar No. 1018861
> e.kerr@cttalaw.com
> Post Office Box 2369
> Lakeland, Florida  33806-2369
> (863) 686-0043
> (863) 616-1445 Fax
> Attorneys for Defendant