Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.:  8:20-cv-41-MSS-JSS

TERRI SMITH

   Plaintiff,

vs.

CITY OF LAKELAND, FLORIDA

   Defendant.

DEPOSITION OF TERRI SMITH

Taken on Behalf of Defendant

VOLUME II

DATE TAKEN:   1/5/2023

TIME:     9:39 A.M. - 1:38 P.M.

PLACE:   WASILEWSKI COURT REPORTING
   2005 SOUTH FLORIDA AVENUE
   LAKELAND, FLORIDA 33803

Examination of the witness taken before:

Julia P. Rowan-Barton
Certified Shorthand Reporter - CA
Registered Professional Reporter

Page 2

APPEARANCES

Counsel for Plaintiff:

PETER F. HELWIG, ESQ.
Harris & Helwig
6700 S. Florida Avenue, Suite 31
Lakeland, Florida 33813
863-648-2958
pfhelwig@tampabay.rr.com

Counsel for Defendant:

ED B. KERR, ESQ.
Campbell, Trohn, Tamayo & Aranda, P.A.
1701 South Florida Avenue
Lakeland, Florida 33803
863-686-0043
e.kerr@cttalaw.com

Page 3

I N D E X

| WITNESS | PAGE |
|---|---|
| Called by the Defendant: | |
| TERRI SMITH | |
| Direct Examination by MR. KERR | 5 |
| Cross Examination by MR. HELWIG | 142 |
| Redirect Examination by MR. KERR | 144 |

Page 4

E X H I B I T S

Plaintiff's Exhibits

| Exhibit No. | Description | Offered |
|---|---|---|
| 1 | Interrogatory answers | 143 |

Page 5

1    THEREUPON, the following proceedings were had
2  and taken at 9:39 a.m.:
3    THE COURT REPORTER:  Do you solemnly swear or
4  affirm that the testimony you are about to give will
5  be the truth, the whole truth, and nothing but the
6  truth?
7    THE WITNESS:  Yes.
8         Terri Smith,
9  called as a witness by the Defendant, having been first
10  duly sworn, was examined and testified as follows:
11         DIRECT EXAMINATION
12  BY MR. KERR:
13    Q.  Good morning, Ms. Smith.  My name is Edward
14  Kerr on behalf of Campbell, Trohn, Tamayo & Aranda, the
15  Defendant in this case, The City of Lakeland.  I believe
16  that you had your deposition taken once before by my --
17  I suppose I should call them boss -- Robert Aranda;
18  right?
19    A.  I'm not sure who it was, but, yes, I had a
20  deposition taken before.
21    Q.  You do recall having your deposition taken?
22    A.  Yes.
23    Q.  I believe I saw before the deposition you were
24  referring to the transcript of that, weren't you?
25    A.  Yes.

Page 6

1    Q.  Okay.  Is there anything you feel that you need
2  to change about your prior deposition testimony before
3  we begin today?
4    A.  Not that I can think of.  I didn't really read
5  it thoroughly.
6    Q.  Okay.  Since you've already been deposed before
7  do you think I need to go over with you the basic ground
8  rules or do you remember those?
9    A.  I'm good with it.
10    Q.  Okay.  The first thing today I'd like to know
11  is a little bit more about Ms. Brenda Wallace.  How long
12  have you known her?
13    A.  Since she started working at the department,
14  which was -- well, it was 14 years when I retired, so I
15  guess it would be 2004 and she came to work there.
16    Q.  Okay.  And was she always in your division?
17    A.  Yes, until I left.
18    Q.  Okay.  Do you know if she's still working with
19  the Lakeland Police Department?
20    A.  Yes, she is.
21    Q.  And were you good friends?
22    A.  No.  We were work associates up until the time
23  that I retired.  I had never been to her house for
24  dinner, never gone out to dinner, never did anything
25  socially with her.

Page 7

1    Q.  Did you do any of those things with anybody
2  that you would have worked with?
3    A.  In my unit, no.
4    Q.  Okay.  Outside of your unit?
5    A.  I'm not sure I understand the question.
6    Q.  Well, you said that you did not do anything
7  like that inside your unit.  Did you do anything like
8  that with anyone outside your unit?
9    A.  No, that was all inclusive of everybody.  It
10  was all of them were work relationships only and it was
11  a very good work relationship.  There was a lot of
12  respect and camaraderie, but we weren't socially friends
13  or anything like that.
14    Q.  Okay.  So strictly business?
15    A.  Correct.  Now, with Darlene being the intel
16  officer, we had been on the law enforcement Olympics and
17  things like that together.  We had been on a team
18  together and stuff where we practiced, but we didn't
19  never travel together or stay together or anything like
20  that.  It was only for work.  It was only work only.
21    Q.  Who was Darlene?
22    A.  She is the intel officer in my unit.
23    Q.  Did you know her last name?
24    A.  Miller.
25    Q.  All right.  How long was she in your unit?

Page 8

1    A.  I can't really recall.  She came on when, I
2  guess, Dan Jonas retired, which is probably 2011 maybe.
3  I'm not really sure about that date.
4    Q.  And you mentioned an Olympics of some kind.
5    A.  Law enforcement Olympics.  That was all prior
6  to her coming to work in my unit.
7    Q.  What are the law enforcement Olympics?
8    A.  I don't know if they have them anymore.  They
9  used to have them.  It's for police officers, sworn
10  people that they meet someplace in the state and they
11  compete in various activities like track, swimming,
12  shooting, a lot of shooting, stuff like that.
13    Q.  Like clay shooting, target shooting?
14    A.  Well, concealed weapon shooting, shotgun, clay
15  shooting, all kinds of shooting.
16    Q.  So this is strictly sports or does it have any
17  practical application to work?
18    A.  No, no application to work.  It's more of a
19  camaraderie thing.  Although, they did give us the
20  ability to go to it on duty, but I can't recall.  That
21  was years ago though.  That was before the crime
22  analysis unit was formed.
23    Q.  And what was -- would you give me a brief
24  history of Brenda's ranks since she started working with
25  the Lakeland Police Department as far as you know them.

Page 9

1  A.  She was a crime analyst.
2  Q.  The whole time from when she started until you
3 resigned?
4  A.  Yes, she was a civilian.  She was not sworn.
5  Q.  And I believe that you said that your
6 relationship was respectful.  Did I understand that
7 correctly?
8  A.  Yeah.
9  Q.  Can you describe what you mean by that for me.
10  A.  With just Brenda specifically or everyone in
11 the unit?
12  Q.  With Brenda specifically.
13  A.  Well, she was dependable, she showed up for
14 work on time, she did anything that you asked her to do,
15 she was willing to help everyone, she did an excellent
16 job, she was a great employee.  Still is, I'm sure.
17  Q.  All right.  What did she -- what was her job?
18 What did she usually do as a crime analyst?
19  A.  That's a very broad topic.
20  Q.  Okay.  Let me try and narrow it down a little
21 bit and let me preface this by saying when we talk about
22 your unit, we're talking about the CAIC; correct?
23  A.  Yes.
24  Q.  Do certain crime analysts in the CAIC
25 specialize in different areas of investigation or

Page 10

1 analysis?
2  A.  Well, traditionally a crime analysis unit --
3 the job descriptions of a crime analyst is anything your
4 department wants them to be.  It depends on a lot of
5 different variables such as location, the staff, the
6 size of different units, what there is a need for and
7 not a need for.
8  Q.  Sure.  I am talking specifically about what
9 your unit, the CAIC that you were supervising.
10  A.  In our unit at that time -- we've had changes
11 and stuff during the years, but at that time, you know,
12 I have to -- I believe Brenda -- we had the city split
13 up into the areas and we had different analysts
14 responsible for different areas because, you know, it's
15 better if they know what's going on in their area, they
16 read the reports, they stay on top of what's happening.
17 It gives them the ability to develop suspect
18 information, then they talk to each other so -- because
19 suspects often don't stay in those areas.  They travel
20 to different parts of the city, so they can put things
21 together and figure out if they have mutual suspects
22 that are committing the same crimes and things of that
23 nature.
24  Q.  Right.  So cooperation between the analysts in
25 the different areas of the city is pretty important to

Page 11

1 the good functioning of the unit; right?
2  A.  Right.  And they work as a team so that if
3 somebody is gone, somebody can jump in and help.  You
4 know, they try to help each other out so nobody gets too
5 much, you know, dumped on basically with the workload.
6  Q.  Was there a hierarchy of who would help or who
7 was, I guess what you call, like the de facto lead when
8 somebody left or was out for whatever reason?
9  A.  No, not really.  I mean they all just jump in
10 and try to pick up the slack.  They all worked together.
11 They were all pretty much cross-trained.
12  Q.  What does that mean, cross-trained?
13  A.  It means that they knew each other's jobs.
14  Q.  Okay.
15  A.  North side, south side is pretty much the same,
16 just they have different -- but the work description was
17 pretty much the same.
18  Q.  All right.  And which area was Ms. Wallace
19 assigned to?
20  A.  I can't remember if it was north or south at
21 this point in time.  It's been four or five years.  I
22 don't remember.
23  Q.  The area of the city, whichever analyst was
24 responsible for, would that change?
25  A.  Sometimes, but --

Page 12

1  Q.  Would it change often like maybe once a year or
2 would your analysts generally stay in the same area of
3 the city?
4  A.  I don't remember that they changed.  I don't
5 think that they did change.  I mean if they wanted to,
6 they could have requested it, but they get comfortable
7 in the area because they understand what's going on and
8 they know, you know, this point last year this area was
9 targeted, so they watch it, you know, they get familiar
10 with the officers, the detectives, the people in the
11 businesses, all those names and everything.
12  Q.  Did the detectives work in the same building as
13 the CAIC?
14  A.  They did at the time I retired.  When I first
15 began they did not.  We were out at the special
16 investigations where they investigate the drugs.  It's a
17 whole different location.
18  Q.  Okay.  When did that move occur?
19  A.  Now, I don't remember exactly.
20  Q.  That's fine.  General dates are okay.
21  A.  I think it was maybe 2008.  We moved into the
22 patrol area on the first floor of the department and
23 then I think two years later, two or three years later,
24 we moved upstairs into the CIS.
25  Q.  So at least during all the relevant times for

**Page 13**

1  this particular litigation they were in the same
2  building with you?
3  A. Right.
4  Q. The detectives were?
5  A. Yes.
6  Q. How about the officers, were they in the same
7  building as you?
8  A. They are, but on a different floor.
9  Q. Okay.
10  A. You don't see them as often, but if they have a
11  need to come up there, we would see them.
12  Q. How much percentage-wise would you say that it
13  was an investigator's job to coordinate with the
14  detectives and the officers?
15  A. Well, it kind of varies. It depends on what's
16  going on. Sometimes they didn't have a lot of contact
17  and sometimes they did. Just depending on what was
18  happening. You can't really -- I don't think you can
19  say a percentage.
20  Q. Okay. But just to give some ballparks, would
21  it be maybe more than half or less than half?
22  A. I really don't -- I don't think I can answer
23  that question. It's just kind of -- you know, if they
24  want a photo pack the officers will come over and
25  request a photo pack. If they want a bulletin they'll

**Page 14**

1  request a bulletin. Sometimes it came from patrol.
2  Sometimes it came from the detectives. Stats and things
3  like that I usually handle, but they could pull -- you
4  know, somebody from city hall wanted some numbers or
5  something, they could request them. So it's just --
6  it's hard to say. It was ongoing and they did do a lot
7  of support work for the officers. But as far as
8  contact, I'm not sure exactly what you mean.
9  Do you mean did they send them -- email them a
10  request and they fulfill it or did they come in and talk
11  to them, you know, ask them for things or -- I'm not
12  sure exactly what you mean.
13  Q. Okay. Well, maybe then it's good that we
14  clarify our terms. I was trying to base my question off
15  the term that you used and I might have messed that up.
16  So if I did, my apologies. Coordinating with the
17  detectives and the officers, so what would be some
18  examples of activities that aren't coordinating with the
19  detectives and the officers?
20  A. Doing the crime stats report, which is basic --
21  well, they're basic -- what they basically do is they
22  monitor ongoing crime. So in the morning they get the
23  nightly report that tells them what kind of crimes
24  happen. They put them in there -- each analyst or at
25  one time we had it broken into four different areas.

**Page 15**

1  They would do -- pull them in, document them, see what
2  happened, do a synopsis, prepare a report so that the
3  administration and other officers see where the crime
4  was, sometimes they do some maps. They would see if
5  there were any suspects. If the officers requested
6  things from them like a photo pack or background check
7  or any of that kind of stuff, they complete that.
8  You know, we also get a lot of requests from
9  every place in the city, not just the officers, and
10  people want to know about traffic crashes at
11  intersections, they want to know about how many Baker
12  Acts that we do. I mean there's all kinds of things
13  that they ask us about.
14  Q. Okay. It sounds to me -- and correct me if I
15  am wrong -- the crime analyst job is mostly done at the
16  desk; is that right?
17  A. For the most part, yes. They're support for
18  officers and detectives.
19  Q. Can you give me an example of sometime when a
20  crime analyst might have to leave their desk to do
21  something as part of their job.
22  A. Attend meetings.
23  Q. Anything else?
24  A. Go to training.
25  Q. Anything else?

**Page 16**

1  A. Somebody wants to talk to them or something
2  like that. That's about all I can think of.
3  Q. Okay.
4  A. Maybe take a BOLO to somebody or go ask them
5  about a photo pack or something like that.
6  Q. Okay. So there are some reasons why a crime
7  analyst might be away from their desk; right?
8  A. Not a lot of them, but there are a few.
9  Q. Okay.
10  A. It wouldn't be a lot during the day.
11  Q. I'm hoping you can tell me more about -- we
12  talked about the crime analyst -- what your job as
13  supervisor of the CAIC was.
14  A. Well, everything that goes out goes through me,
15  would go through me. It's a position that's very
16  important because if you give things to the public or to
17  the media -- a lot of times we did reports for the
18  media -- it has to be correct. Because if it's not,
19  that's -- you're either incompetent or you don't know,
20  you know, you're lazy, you don't have the numbers right
21  and neither one of them is a good look for the
22  department; so things need to go out correctly.
23  So everything goes through me before it goes
24  out, before it's dispensed outside of the department
25  unless it's something routine to somebody in-house. You

Page 17

1  know, I monitor their hours, you know, when they come,
2  when they go, I do the payroll, I tried to get them into
3  different trainings, tried to help them develop their
4  skills as an analyst.  If they had questions I would
5  answer them.
6  Q.  Okay.  You had mentioned that you kept track of
7  when they would come in and keep track of their hours;
8  right?
9  A.  Uh-huh.
10  Q.  How was that done while you were the
11  supervisor?
12  A.  Well, if they wanted time off they would submit
13  a slip and I would sign it, they would call in sick,
14  they report it to me and I'd prepare a sick leave slip,
15  vacation requests.
16  Q.  How would you check if somebody, say, you know,
17  came in earlier, came in late or left early or left
18  late?
19  A.  Well, if they were going to come in early for
20  some reason, they needed to let me know and -- but
21  most -- they just did their own -- you know, they had a
22  schedule that they followed and that's, you know --
23  Q.  Was there a sign-in sheet?
24  A.  No, we did not have a sign-in sheet.
25  Q.  Were they supposed to come and talk to you, all

Page 18

1  right, I'm here for the day?
2  A.  Well, we know they were here or not because if
3  they weren't, somebody would say where's so and so,
4  they're not there.  But you could tell if they weren't
5  there, they wouldn't be sitting at their desk.
6      It wasn't like an officer on patrol.  They were
7  supposed to be at their desk in the morning, come in.
8  Q.  Was that a matter of policy that they were
9  supposed to be at their desk at the start of the day?
10  A.  They're -- well, they're supposed to be at work
11  at the start of the day and if they're not going to be
12  at their desk, then they should let me know where they
13  are so I know that they're actually here, they were
14  actually there.
15  Q.  Did the crime analysts have to tell you every
16  time they left their desk?
17  A.  No.
18  Q.  How are lunch breaks handled?
19  A.  They took their lunch during the day.
20  Q.  And how would they report to you this is when
21  I'm taking lunch?  Would they even do that?
22  A.  They picked a time that they wanted.  Like if
23  they wanted to go from 12 to 1, some of them wanted to
24  go 11 to 12 and some of them wanted to go 1 to 2 and as
25  long as they -- there weren't any issues with -- look,

Page 19

1  like if we had training or a meeting or something like
2  that they needed to be at, then they'd have to adjust
3  that and if they were to deviate from that, they would
4  need to tell me.
5  Q.  Okay.  So they would tell you.  Would it be a
6  day by day they'd have to tell you or it would carry
7  over every week?
8  A.  It would be a day by day.  If they were going
9  to change it for a week, they would need to tell me they
10  were going to change it for a week.
11  Q.  Maybe my question wasn't clear in hindsight.
12  Would they have to tell you when they were taking lunch
13  every day, day after day they came in?
14  A.  Not as long as they were taking it when they
15  were supposed to.
16  Q.  Okay.  And that was based on when they told you
17  they were going to take their lunch; is that right?
18  A.  Yes.
19  Q.  So don't let me put words in your mouth.  They
20  would establish a time to take lunch.
21  A.  Yes.
22  Q.  And then if they wanted to deviate from that
23  usual time that they had told you beforehand, then they
24  would have to tell you that; right?
25  A.  Yes.

Page 20

1  Q.  Okay.  All right.  I think we're on the same
2  page now.
3      You had also mentioned that your role as a
4  supervisor of the CAIC was to develop skills of an
5  analyst.  Did I recite that correctly?
6  A.  Yes.
7  Q.  What are the skills of an analyst?
8  A.  Well, they have to be able to use Excel, they
9  have to be able to run queries, they have to be able to
10  analyze crime, they have to be able to do statistics
11  and, you know, tables of where crime is, they have to
12  understand the different kinds of analysis.  There are
13  so many things they need to learn.
14  Q.  Is there a training course for these skills?
15  A.  There is.  FDLE used to have an academy that
16  lasted six months and -- wait.  It was one week.  I
17  can't remember if it's one week a month for six months.
18  I think it was six weeks.  You just went for six weeks
19  I'm pretty sure.  And there was also training that we
20  did in Excel, you know, Excel schools and Access and
21  Word and, you know, they needed to know how to do that
22  to do their job.
23  Q.  Okay.
24  A.  We used Excel a lot.
25  Q.  So how was -- and this is Microsoft Excel;

Page 21

1  correct?

2    A.  Yes.

3    Q.  How was Microsoft Excel used in the CAIC?  What

4  was it used for?

5    A.  Prepare spreadsheets, you'd use it for

6  distribution lists, tallying up different crimes.  I had

7  a master spreadsheet set up where everybody had their

8  own.  As they would enter their statistics they would

9  combine them into totals.  It's just used a lot.  We use

10 a lot of numbers.

11   Q.  Would those Excel spreadsheets go into some

12 sort of database so that other crime analysts or other

13 agents of the police department could look at it?

14   A.  Yes.

15   Q.  Okay.  What was that database, if you recall?

16   A.  Well, we just kept them on the master file, but

17 there is a -- that's really a complicated question

18 because it changed so much throughout the years of how

19 everything was done and the computers that we used for

20 our computerated dispatch system would change and every

21 time that changed, everything changed; so it's kind of

22 an -- it was kind of a fluid thing, I guess you can say,

23 over the years.

24       But we kept on top of our stats, then we would

25 put it in a crime status report and that would show all

Page 22

1  the numbers and everything.  Those were available on a

2  system we used to have, which was an intranet system

3  called Crime Report, I think, and all officers had

4  access to that.  We had it set up for a while so they

5  can put tips in there and things like that, but they can

6  go in there and access any of those reports that they

7  wanted or they could request them from us.

8       A lot of times they would just request the

9  specific information they wanted because it was a

10 specialized request.  You know, it wasn't something they

11 would look up there and see.  So we did stuff for the

12 community service unit too when they would go out and

13 meet people.  It's just a lot of different things that

14 the unit did; gangs, all of that.

15   Q.  When you use the term computerated dispatch

16 systems --

17   A.  Yeah.

18   Q.  --is that commonly referred to as a CAD?

19   A.  Yeah.  Good.

20   Q.  Well, we do represent the police department and

21 Sheriff of Polk County.  I never knew what the acronym

22 meant.  Good to learn that.

23   A.  Our system was tied in with theirs when I left.

24 Before that it was a standalone.  When I first started

25 it was completely written and designed by an in-house

Page 23

1  computer tech who used to work for NASA prior to coming

2  to our agency and we had no connection with the county.

3  Then they got a different system where we could see each

4  other's reports and things.  And I understand now

5  they've not only changed to a different computer system,

6  but it's a whole different crime reporting system as

7  well.  So, you know, it always changes.  That never

8  stays the same.

9    Q.  Is it more convenient when you all in the

10 sheriff's office are on that same -- you can see each

11 other's CAD reports?

12   A.  It was and it wasn't because it was convenient

13 for them, but they benefitted from it much more than we

14 did because they got -- we're a big piece of their

15 puzzle because their jurisdiction is over the county as

16 well as the city, so they're interested in things going

17 on in the city.  But for us, we don't have a lot of

18 interest in what's going on outside the city except for

19 how it relates to crime in the city and also they were

20 the ones that controlled the system.

21       So when I tried to set up certain things I

22 would have to get them to do it.  You know, we'd have to

23 always go through them and they'd have to come and set

24 it up and sometimes, you know, depending on their

25 workload, you know, it was nice to have our own system

Page 24

1  where we can just go in and do what we wanted when we

2  wanted.

3    Q.  All right.  Now, if you would, I would like you

4  to give me a brief rundown, let's say, for the maybe

5  five or ten years -- let me be specific -- ten years

6  before you retired.  What were some of the changes that

7  occurred to the Excel reporting system?

8    A.  To the what?

9    Q.  To the Excel reporting system.  You know, you

10 log stuff into Excel and you put it in a master file;

11 right?

12   A.  As far as I know they still use Excel to do

13 that.  I mean they still --

14   Q.  Was there any change in, like, where it was

15 sent or how things were entered into?  Were there any

16 new forms made or anything like that?

17   A.  I really don't remember.  I mean I just know

18 that we've always used Excel a lot.

19   Q.  If there were any changes to the way that

20 the -- you know, anything was reported through Excel or

21 any queries run or anything like that, would those have

22 to be approved by you before they were put into place as

23 supervisor of the CAIC?

24   A.  No.  Well, you mean changes to it?

25   Q.  Sure.  If you were changing the system of how

Page 25

1  the job was done would that go through you?
2      A.  I should know about it, yes.
3      Q.  Did you have a say as to whether those were
4  implemented or not?  Could you just say no and they
5  wouldn't be implemented?
6      A.  Well, it depends on what it was.  You know, I
7  don't have any control over the computerated dispatch.
8  They set up people to go look at those and decide what
9  they're going to do.  That's beyond my control; so you
10  just have to adjust to it.  I can always -- I could
11  always use Excel and, well, it's always a problem
12  because when you're trying to run reports and they
13  change, you have to marry up.  If you're trying to get a
14  certain historical on something, comparison to what's
15  going on today, you have to marry up the old system to
16  the new system to pull out the numbers and that becomes
17  real problematic.  So it's kind of a -- you kind of have
18  to, you know, limp along until you get far enough ahead
19  that you don't have to worry about doing that.
20      But we've always -- crime analysis is pretty
21  much -- depending on what tools you use, it still is
22  pretty much the same thing; developing suspect
23  information, watch for trends, seeing where the activity
24  is, monitoring things like, you know, trying to get
25  ahead of it if you can; so it really doesn't change that

Page 26

1  much in that respect.
2      Q.  Okay.  I'm not sure -- let me try asking it
3  this way:  Do you recall there being any changes to how
4  you all would, you know, log things in Excel or put them
5  into the master file or anything like that during the
6  time that you were supervisor of the CAIC?
7      A.  Not off the top of my head.
8      Q.  Do you remember anybody suggesting that there
9  should be some changes?
10      A.  No, I don't.  I'd have to go back and refresh
11  myself because it's been so long.
12      Q.  Okay.  What is an RMS system while we're on the
13  topic of technology?
14      A.  RMS.  Oh, that's -- drawing a blank on that.
15  RMS.  Is it a messaging system?
16      Q.  I'm not allowed to answer any questions I'm
17  afraid.
18      A.  I have to look it up because I don't remember.
19      Q.  Okay.  Did the CAIC while you were supervisor
20  use an RMS system, do you recall that?
21      A.  I don't recall that.  I'd have to look it up,
22  see what it is first.
23      Q.  Okay.  Did the CAIC have any training courses
24  on the new CAD systems whenever they came in?
25      A.  Oh, they always do.  They're supposed to, yeah.

Page 27

1  They have to.
2      Q.  How often were those training courses?
3      A.  I can't remember.  I mean it was -- generally
4  they would do them before they implemented the system,
5  of course, and sometimes they would pilot them, other
6  people would pilot them to see how they worked.
7  Sometimes we were involved with that; sometimes not.  It
8  varies.
9      Q.  So was it like a recurring yearly training or
10  when they brought in a new system?
11      A.  Only when they brought in a new system.
12      Q.  Okay.  What is an IOP?
13      A.  I have no idea.  I have to look that one up
14  too.
15      Q.  Okay.  I assume that means you're not sure if
16  the CAIC used an IOP in any --
17      A.  ILP as in Lima?
18      Q.  Yes, ILP, correct.
19      A.  That's your -- that's your Internet address.
20  Your ILP is your identity on the Internet.
21      Q.  So like an IP address?
22      A.  Yeah, isn't it?
23      Q.  Again, I'm not allowed to answer any questions,
24  so --
25      A.  It's been a long time.

Page 28

1      Q.  So do you know one way or the other whether the
2  CAIC used ILP?
3      A.  I'd have to go back and look.
4      Q.  Okay.  I also am curious about something called
5  and E-S-R-I.
6      A.  ESRI?
7      Q.  Sure.
8      A.  Yeah, that's the ArcView system.
9      Q.  What is the ArcView system?
10      A.  It's a system that used -- that uses lats and
11  longs, geographical information system.  GIS is what
12  that's called.  It makes maps and does all kinds of
13  stuff.  It's a very huge system, very complex, and we
14  had problems with that in our using that because the --
15  for GIS technology the center lines that they used on
16  the ArcView system were different than what the city
17  used, so we had to figure out a way somehow to convert
18  our GR lats and longs that we used to comply with
19  ArcView so we can map things and that was -- you know, I
20  know that because my son does that.
21      Q.  I believe we went over your son, what does he
22  in the first deposition; right?
23      A.  Yep.
24      Q.  Okay.  Don't need to revisit that.
25      I'm sorry, I might have missed part of your

Page 29

1  answer.  Who had a different mapping system than you all
2  did for the lines that wouldn't add up?
3      A.  ArcView.  ArcView.
4      Q.  So the CAIC had a different mapping system than
5  the ArcView did?
6      A.  The City of Lakeland had a different map --
7  different center lines.  I was trained on ArcView in
8  grad school.  It was an ArcView 3.  Now I think they're
9  up to a 13 or something like that.  ArcView 14.  It's a
10 huge program and it's very, very expensive and depending
11 on what you do with it, you really only use a very small
12 percentage of the whole program.  You know what your
13 needs are.  But it accommodates a lot of different
14 people that want to do a lot of different things.  It's
15 probably the number one tool that business, big
16 businesses, anybody, surveyors, environmentalists,
17 contractors, probably all of them use that because you
18 can map underground pipes and lines and fire hydrants,
19 you know, all different kinds of things like that.
20      We -- I used it.  I would import what's called
21 the TIGER files, which is the -- which comes from the
22 census.  It would import a polygon that had the blocks
23 of the city so you could then put your information in it
24 and you would draw out it different numbers by block
25 group, by block, and you could put the blocks into

Page 30

1  groups so you can do comparison to crimes over different
2  parts of the city.  That's a free thing that you could
3  get online called the TIGER files.
4      But the problem with the city is they didn't
5  use the same -- I call it center line, but it's the
6  marks.  Their system was different than the city system
7  so you had to figure out a way to convert our data to
8  fit their program and I just -- it was just always
9  coughing up issues.  And the city used theirs in a whole
10 different way because they were concerned with the
11 blocks and the underground stuff and the drains and all
12 of that stuff.
13      Q.  Was that problem ever fixed while you were
14 supervisor?
15      A.  I think -- well, Susan Nash who was the first
16 one that designed the first system, of course, she was a
17 genius, and she had -- she did a conversion program on
18 it like in about five minutes, but after she left, you
19 know, it changed.  I don't know that -- I don't know if
20 anybody -- it would take a GIS technologist to come in
21 and do it, which is beyond my level, and it would have
22 to be a programer.  And I think they did start getting
23 some maps out of it, but I'm not sure about that.
24      Q.  How long ago did Susan Nash make this
25 conversion program, do you recall?

Page 31

1      A.  She left in about 2008.  She also wrote our
2  whole intranet too.
3      Q.  Impressive.
4      A.  She was very impressive.  She was very smart.
5      Q.  So it would be sometime before 2008 then?
6      A.  Yeah.
7      Q.  Did anyone ever try to make a new conversion
8  program or fix the ArcView programs?
9      A.  Well, we had it installed and I think we had an
10 analyst there, Johnny To, that he did some work on it
11 and he was starting to get it to work.
12      Q.  When was this?
13      A.  That would be probably -- he was there only for
14 a year maybe, maybe two, maybe just one year.  Probably
15 2015 or '16.
16      Q.  And he was working on something.  Did he ever
17 finish it?
18      A.  I can't remember if he did or not.
19      Q.  Was it still a pain to use the ArcView program
20 while, you know, in the last couple years as a
21 supervisor, as you were a supervisor?
22      A.  I think -- I don't ever think it was used to
23 its full potential.
24      Q.  And you used the terms lats and longs before.
25 Does that mean latitude and longitude respectively?

Page 32

1      A.  Yes.
2      Q.  What sort of case management tools does CAIC
3  have while you were supervisor?
4      A.  I don't know what you mean.  We didn't really
5  have cases.
6      Q.  Okay.
7      A.  We didn't work cases.  We just -- we were
8  support.
9      Q.  Okay.  So is there some equivalent of a case --
10 am I just using the wrong word -- like a task or
11 assignment you would get from an officer or another
12 agent or a detective?
13      A.  Well, they didn't actually give us assignments.
14 They would request help and they would go to whatever
15 analyst that worked their area and request assistance
16 for something and the analyst would complete it and I
17 would approve it.  We didn't really -- I know they kept
18 track of it individually.  I can't remember exactly how
19 that was kept track of, but they just took care of their
20 own stuff really.  We're support.  We didn't actually
21 work cases, you know.
22      Q.  So the analysts -- sorry, I did not mean to
23 interrupt you.
24      A.  That's it.
25      Q.  Okay.  So the analysts kept track of what

Page 33

1 they'd done individually and then you looked at their
2 work product and approved it or sent it back for
3 corrections?
4 **A.   Right.   I proofread it and if I had questions I**
5 **asked questions, you know, and sent it back.**
6 Q.   Kind of like the editor of a newspaper maybe?
7 **A.   Yeah, sort of or just like the supervisor of a**
8 **crime analysis unit.**
9 Q.   Fair enough.
10 **A.   What any supervisor does really.**
11 Q.   Just making sure I understand the hierarchy
12 correctly.
13    What were the positions like, the ranks within
14 the CAIC?
15 **A.   Well, I had three to four analysts, I had two**
16 **felony intake detectives, and I had one intel detective.**
17 Q.   Okay.   And then you were the supervisor; right?
18 **A.   Yes.**
19 Q.   Okay.   And that's all that was in the CAIC?
20 **A.   Yes.**
21 Q.   And who was directly above you?   Who were you
22 accountable to?
23 **A.   Before I left?**
24 Q.   Yes.
25 **A.   Lieutenant Steve Sealey.**

Page 34

1 Q.   Okay.   And who was there before Lieutenant
2 Sealey?
3 **A.   Well, before Sealey I always reported to --**
4 **there's different times I reported to a captain and not**
5 **a lieutenant and then before that I reported to an**
6 **assistant chief; so it was a different hierarchy.   So it**
7 **would have been Captain Taylor I directly reported to.**
8 **I think that's right.   And then before that it was**
9 **Captain White.   Before that it was ACOP LaPere, I think.**
10 Q.   So after -- was it Captain Taylor -- was there
11 some sort of policy shift that put now a lieutenant in
12 charge, you know, over you?
13 **A.   I think maybe -- I think they just decided**
14 **since we were in CIS they were going to -- there was a**
15 **lieutenant right there because the captains -- see, I**
16 **can't remember who the captain was.   Captain Paula**
17 **Castro was another one.   I guess they just decided they**
18 **were going to change it.**
19 Q.   So let's go to the -- let's go to the very
20 beginning of the series of events that you claim is the
21 base of the lawsuit.
22    When was that?   What was the starting event?
23 **A.   The starting event was within the first month**
24 **that Sean was hired.   Brenda was having issues with him**
25 **disappearing, not telling her where he was, not doing**

Page 35

1 **his work as directed, wandering around the building.**
2 Q.   Sorry about that.   Continue.
3 **A.   That was it.   Just within the first 30 days.**
4 Q.   All right.   Was Ms. Wallace his trainer?
5 **A.   Yes.**
6 Q.   Is there a particular title for that?   Is
7 trainer not the right word?
8 **A.   That's what she was.**
9 Q.   Was there any reason that she was his trainer
10 as opposed to anyone else in the CAIC?
11 **A.   Because she had the most experience.   She had**
12 **been there 14 years.   She trained everybody coming in**
13 **and she knew the job inside and out.**
14 Q.   Okay.   Was she the same rank as Sean Patterson?
15 **A.   They were both crime analysts, yes.   It's kind**
16 **of like when you come on as an officer you have an FTO.**
17 **You're the same rank, but that FTO tells you what to do**
18 **and you do it.**
19 Q.   Is an FTO -- what does that stand for?
20 **A.   Field training officer.**
21 Q.   Okay.   Thank you.   I realize some of the
22 answers to the questions may seem obvious.   I want to
23 make sure everything is crystal clear, if possible.
24 **A.   That's fine.**
25 Q.   She was the -- Ms. Wallace was the most

Page 36

1 experienced person in the unit.   She had been there 14
2 years?
3 **A.   Correct.**
4 Q.   Would you often talk about how the unit was
5 working, how everyone was cooperating?
6 **A.   With?**
7 Q.   With Ms. Wallace.
8 **A.   Yeah, she would ongoing, you know, tell me what**
9 **was going on.**
10 Q.   About how often was that?
11 **A.   I don't know.   It varied.   Once a day, once a**
12 **week, you know, whatever, you know, she would let me**
13 **know.   It's difficult.   It's a lot to ask of somebody.**
14 **She not only had to do her job, she had to show him how**
15 **to do his job, which took a lot of time, plus do his job**
16 **and look over everything until he learned how to do it**
17 **and so that's a lot.**
18 Q.   And she had done this for all the rest of the
19 crime analysts before; right?
20 **A.   Well, she did it for Lindsey and she did it for**
21 **Johnny.**
22 Q.   And Johnny, is that Johnny To that you
23 mentioned earlier?
24 **A.   Right.**
25 Q.   Who's Lindsey?

Page 37

1  A.  Lindsey was hired before Johnny.  She had been
2  there -- let's see, she had been there for a while.  She
3  was there before Johnny.
4  Q.  Okay.  Was she still there when you retired?
5  A.  Yep.  She's not anymore.  She transferred out.
6  Q.  Do you know where?
7  A.  To SIS to work out there.
8  Q.  What is SIS?
9  A.  Special investigation section.
10  Q.  Was there anyone else that you consulted with
11  about how the unit was going on a day-to-day or
12  week-to-week basis?
13  A.  I don't remember.  I don't recall.  Well, I
14  guess, Captain Taylor.
15  Q.  Okay.  And he was your superior; right?
16  A.  Yes.
17  Q.  Okay.  Was this before Lieutenant Sealey became
18  your direct report that you directly reported to him?
19  A.  Yes, I believe so.  I have to look back and
20  see, but I'm pretty sure.
21  Q.  So after Lieutenant Sealey became your, for
22  lack of a better term, boss, was there anyone else
23  besides Ms. Wallace that you would consult about, you
24  know, how the unit was doing, how you supervised,
25  et cetera?

Page 38

1  A.  I don't recall consulting with anyone.
2  Q.  Did you consult with Johnny about that, Johnny
3  To?
4  A.  Johnny wasn't there.
5  Q.  Okay.  How about Ashley?
6  A.  Lindsey?
7  Q.  Or excuse me, Lindsey, correct.
8  A.  No.  Well, she had come to me with some
9  complaints, but that wasn't -- that was later on.
10  Q.  Okay.  Nobody else besides Ms. Wallace that you
11  can remember?
12  A.  Right.
13  Q.  Okay.  I recall from your previous deposition
14  testimony that you were injured at some point; correct?
15  A.  Yes.
16  Q.  And that involved both your knee and your
17  achilles; is that right?
18  A.  Yes, but at the initial time it was just
19  achilles.  They failed to diagnose the knee until almost
20  a year later.
21  Q.  All right.  And this was in around April 2017;
22  is that right?
23  A.  Yes.
24  Q.  Okay.  And when I say "this," I mean the
25  initial injury.  So around, what, April of 2018 would

Page 39

1  have been when they diagnosed the knee issue; right?
2  A.  Right.
3  Q.  Somewhere around there?
4  A.  A little before then.  I think I kept
5  complaining about it since the injury and they did an
6  MRI and said there's nothing wrong with it and I still
7  complained about it so they did a contrast MRI and they
8  found torn meniscus on both sides of the knee so they
9  did that surgery first, I believe, and then they did the
10  achilles surgery.
11  Q.  And then you were put on light duty, weren't
12  you, by your physicians?
13  A.  Yeah, but I was -- really what I did was light
14  duty.  I mean it was a desk job.
15  Q.  Okay.  So not really that much of a change?
16  A.  Right.  The first year before the surgery
17  actually was really hard because they didn't do the
18  surgery for almost a year and I was in a lot of pain and
19  I had to wear a boot.  It was awful.
20  Q.  Did you drive with the boot on?
21  A.  Yeah.
22  Q.  Did you drive with the boot on?
23  A.  Yeah.
24  Q.  Were there times when you'd come to work when
25  you didn't drive?

Page 40

1  A.  Not -- you mean --
2  Q.  At any time after this injury.
3  A.  Well, after the surgery, before I could drive,
4  they brought me.  Somebody picked me up for work because
5  I was in a wheelchair.
6  Q.  Who was that usually that would come to pick
7  you up?
8  A.  Darlene.
9  Q.  I'm sorry?
10  A.  Darlene.  They asked Darlene if she would do
11  it.  They asked her.
12  Q.  And that's the Darlene that you referenced
13  earlier; right?
14  A.  Yes.
15  Q.  Was she always the one who picked you up?
16  A.  Yes.
17  Q.  And again I don't want to rehash too much of
18  what was covered in the last deposition, so I apologize
19  if these seem a bit repetitive.
20  But how many hours were you working a week
21  generally after this accident or this injury, I should
22  say?
23  A.  After the injury?
24  Q.  Yes.
25  A.  Oh, boy, you know, I know for a while it was

Page 41

1    four hours a day and I think beyond that I can't -- I
2    can't remember.  I mean there was a time, I think, when
3    I was working all day.  I don't know.  The records will
4    speak for themselves on that.  I am sure they have the
5    records.  I just don't remember.  It's been five years.
6        Q.  Sure, and I don't remember is a perfectly fine
7    answer.
8        A.  Yeah.
9        Q.  That is, of course, if you don't actually
10   remember.  I'm not implying anything.
11       A.  No, I know.  I truly don't.  I know there was
12   times I worked part time, times I worked full time.  You
13   know, I just don't remember.
14       Q.  So you defer to the payroll?
15       A.  Correct.
16       Q.  Okay.
17       A.  There was rehab and doctors' appointments and I
18   don't know if you count that or I don't know.
19       Q.  Well, you weren't working while you were at
20   rehab or doctors' appointments, were you?
21       A.  No.
22       Q.  Okay.  So during the times that you were
23   working these -- just call them half days -- were you
24   doing sort of work or taking phone calls or anything
25   like that during the time, the half day that you weren't

Page 42

1    working?
2        A.  Yeah, I worked in this unit since the time I
3    began.  I was available 24/7.  I took calls on weekends,
4    at night, when I was out on sick leave, for a surgery to
5    my wrist, I did completed assignments at home because
6    they needed to be done.  I've always fulfilled my job.
7        It really was a precursor to what we have
8    today, which is remote working.  We were at a computer.
9    All you had to do was call or email.  I approved things.
10   They'd send things to me, I'd approve them.  I carried
11   on with my job no matter what for the whole time I
12   supervised the unit.  I think anybody in there will tell
13   you that.
14       Q.  Okay.  So I'm trying to understand the nature
15   of the half days.  So it would be, what, a half day
16   you're still working, but you're at home and the other
17   half you would be in the office; is that how it worked?
18   Have I mistaken something?
19       A.  I believe that was it.  Half day I would be at
20   home or I'd be at work and then I'd leave.  A lot of
21   times that first year I'd have a lot of problems with
22   swelling on my foot, you know, and the only way I could
23   really get rid of it was to lay down and so it was just
24   painful, painful time.  But like you do today, you can
25   sit at home and talk on the phone and approve things

Page 43

1    and, you know, so I'd always done it that way.
2        Q.  Were there any other times that you were at the
3    four hours a day in the office and you had a swelling
4    problem and needed to go home?
5        A.  Yeah, there was one I remember.  I went in and
6    talked to Sealey and showed him my foot and he said go
7    home.  I couldn't wear a back on my shoe.  If I put a
8    back on my shoe my foot would balloon out and sometimes
9    it did anyway.  I don't know why.  Because it was torn
10   and obstructing the blood flow, I'm sure that's what it
11   was, but it did not -- it wasn't corrected until after I
12   had the surgery.
13       MR. KERR:  Can we go off the record for just a
14   second?
15       (Discussion held off the record)
16       MR. KERR:  Back on the record.
17   BY MR. KERR:
18       Q.  Both those half days you were at home they
19   weren't like time off, they weren't like vacation time
20   or anything, they were just, you know, you're still
21   expected to work those four hours; right?
22       A.  You know, I -- it was workman's comp is
23   what it was because it was an injury that occurred
24   during the day and for part of it my doctor had put me
25   on that schedule, I believe; so it would have been

Page 44

1    workman's comp time off.
2        Q.  Okay.  I'm not particularly questioning, you
3    know, the specific designation of the time.  I guess I'm
4    more getting at if for whatever reason, let's say -- and
5    I'm not saying this happened, but was there an
6    expectation that you in those half days that you were at
7    home, were still doing your job as supervisor, you were
8    expected to do that?
9        A.  As far as I know.  I would have to -- until the
10   point where I filed -- I can't remember.  They put
11   somebody else in charge of my unit.  I can't remember
12   exactly when that was now.  But in the beginning, yes, I
13   was expected to do my job.  I always had.
14       Q.  Were there any parts of your job that you
15   couldn't do at home?
16       A.  They just -- I would just approve things and
17   that was basically it.  Yeah, no, I had a computer.  I
18   could remote into my desk.
19       Q.  Did you have any meetings that you had to
20   attend during the time period you were on these half
21   days?
22       A.  Nothing that I had to attend.  I mean there
23   might be meetings, but I don't know.  I don't recall
24   specifically anything.
25       Q.  Okay.  So you could have done your job just as

Page 45

1  well at home as you could have done in the office; is
2  that right?
3      **A. I believe so, yes.**
4      Q. Does that also apply to the crime analysts or
5  just the supervisor position?
6      **A. It's all one in the same.**
7      Q. Were you also a crime analyst?  Let me re-ask
8  that.  As a supervisor were you also still doing the
9  crime-analyst-type activities as part of your work?
10     **A. Yes, I also attended FDLE academy to become a**
11  **certified crime analyst by the State of Florida and I**
12  **was valedictorian of the class too.**
13     Q. I believe you went over that in your prior
14  depo.
15     **A. I like to mention it.  I'm proud of it.**
16     Q. Fair enough.
17         So no particular reason that you need to be at
18  your desk?
19     **A. No.**
20     Q. Okay.
21     **A. It always worked before.**
22     Q. Is there a policy that you have to be at your
23  desk to do a crime analyst job or anything like that?
24     **A. Not that I'm aware of.**
25     Q. Is there any sort of policy you got to show up

Page 46

1  at a certain time or leave at a certain time?
2      **A. Well, it's just regular work hours like**
3  **everybody else has.**
4      Q. I mean is there like a hard written policy
5  you're going to show up at this time and leave at this
6  time?  I know we talked about lunch breaks earlier.  I'm
7  talking about when you show up and when you leave.
8      **A. You have a scheduled time that you work, yes,**
9  **but, I mean, it's flexible depending on what's going on.**
10     Q. Okay.  And who was in charge of determining the
11  schedules of the crime analysts?  Who's job was that?
12     **A. Mine.**
13     Q. Okay.
14     **A. And, you know, I was easy to get along with.**
15  **You know, if people needed to flex their time -- I know**
16  **Lindsey, she went to a college for a while.  You know, I**
17  **was always willing to work with people that wanted to**
18  **flex their time.  If they had a reason and it didn't**
19  **interfere with the work of the unit as a whole.  And the**
20  **same way with lunch, if they had a doctor's appointment**
21  **or something I didn't have a problem with it and no one**
22  **questioned me either until all this started with Sean.**
23     Q. What do you mean no one questioned you?
24     **A. Nobody questioned where I was or what was or**
25  **wasn't getting done or how I did performance evaluations**

Page 47

1  or anything like that.
2      Q. Okay.  Was that something that -- in talking
3  prior to Sean Patterson, is that something that you'd
4  have conversations about with your subordinates, for
5  lack of a better term, you know, you guys are showing up
6  late or you're showing up and you're not taking your
7  lunches; right?
8      **A. No, we didn't have any problems.  I had -- one**
9  **time Darlene when she came up to the unit she was**
10  **helping with a case and she worked straight through**
11  **lunch and she told me she had worked through lunch and**
12  **she wanted to go home early and I told her "No, you**
13  **can't do that.  You have to get pre-approved to work**
14  **through lunch.  You have to come to me and get it**
15  **approved before you can do that."  So she stayed and**
16  **worked until the end of the day.**
17     Q. Okay.  Did she ask you at that time for
18  approval?
19     **A. After she had done it.**
20     Q. Oh, afterwards.  I see.
21     **A. Yeah.  Yeah, she came and asked me.  I said,**
22  **no, no, everybody would like to do that.  Who wouldn't**
23  **want to work straight through on a Friday especially and**
24  **go home early.  Anybody would want to do that, but you**
25  **can't.**

Page 48

1      Q. Why can't you?
2      **A. Because then everybody wants to do it and there**
3  **would be nobody there at 4:00.**
4      Q. Surely -- I say surely, but maybe you can
5  probably set up some sort of schedule like you get to
6  leave early on this Friday, one crime analyst does, next
7  Friday you're on until 5.  You couldn't set up a system
8  like that?
9      **A. No.  Why?  Why would I do that?  Everybody has**
10  **regular hours.  All the other units in the department**
11  **have regular hours.  Now, somebody had a special thing,**
12  **you know, like they were going on vacation and trying to**
13  **get home and get packed or something like that, but you**
14  **got to be careful with that because you have to treat**
15  **everybody the same or people start getting upset.  You**
16  **have to be fair and you also have to make sure there's**
17  **people there.  You don't want the chief to call down**
18  **there at 4:30 on Friday and nobody is there because they**
19  **all worked through lunch.**
20     Q. Sure.  I'm just floating a hypothetical policy,
21  which I presume and I supposed will be my next question
22  afterwards.  This is whether you could decide or not.
23  You could say, right, it's Friday at 4:00, we can be at
24  least one man down and that one person each week can go
25  home early and work through lunch?  Can you do that?

Page 49

1    A.  You don't know what's going to happen.  It's
2 not like we have a job that we know what's going to
3 happen today.  It's a lot -- the same as it is with the
4 officers, you know, somebody leaves at 4 and you have a
5 bank robbery and somebody gets shot, you need all hands
6 on deck and you know they're going to be there until
7 5:00 because that's when the administration leaves.  I
8 mean that's just the way it is.  It's always been that
9 way.
10    Q.  Can you tell me how lunch hour would work, what
11 were the requirements to take lunch.
12    A.  Well, if they wanted to adjust lunch schedule,
13 like if somebody wanted to go from 11 to 12 or, you
14 know, things like that, I would allow that.  But if we
15 had training or we had a meeting or something like that,
16 they would have to comply with that and be there for
17 that, so they'd have to adjust it back.
18    Q.  So what's the difference between that and what
19 I suggested?
20    A.  Because it's lunch.  Everybody can be gone for
21 lunch.
22    Q.  Even if there is a bank robbery at 12:15?
23    A.  Well, there could be a bank robbery at 12:15
24 and everybody was at lunch.
25    Q.  Right.  So that's what I am asking, what would

Page 50

1 lunch be like for a crime analyst?  Were there certain
2 rules; you can't leave the building, you have to bring
3 your lunch with you?
4    A.  No, they're free to go -- for their lunch hour
5 they can go where they want, but if something like that
6 happens and I call them, they'll come back in.  If it's
7 something like that, they would come back in, but that's
8 lunch.  You know, you're there.  You start at 8 and end
9 at 5 and somewhere between there you go to lunch, but
10 you're there until 5 and at lunch you're coming back.
11 If you leave at 4 or 3, you're not coming back.  You're
12 gone.
13    Q.  Do you recall around when Sean Patterson
14 started working?
15    A.  Do I?  January of 2017.
16    Q.  And that was before your injury; right?
17    A.  Yep.  Yes.
18    Q.  And I believe you mentioned earlier that it was
19 Ms. Wallace who was reporting to you that at least in
20 the initial months that Patterson was having some
21 difficulties with his job or something to that effect;
22 right?
23    A.  Yes.
24    Q.  Okay.  What did she report to you, do you
25 recall?

Page 51

1    A.  That he was disappearing, you know, not at his
2 desk, she'd tell him to do something, she'd turn around
3 and he would be gone and he wouldn't be back for an
4 hour, he would go to lunch, he wouldn't come back until
5 two or three hours later.  You know, he was flippant and
6 rude to her.  When she'd ask him to do something he
7 wanted to question why he had to do it and he made
8 comments about how he thought it was menial and it
9 should have already been done and it's a secretary's job
10 and things of that nature.
11    Q.  Okay.  And that's what she told you he said?
12 Just making sure.
13    A.  Yes.  And I witnessed some of it also.
14    Q.  And what in particular did you witness?
15    A.  Well, once I talked to Captain Taylor about it
16 and he said I needed to pull him in and talk to him and
17 I asked him if he was going to come and he directed me
18 to have Brenda come with me, so I called Sean in and he
19 was rude right in front of me.  He pointed to her with
20 his thumb and he said, "Why is she here" in a rude voice
21 and said that -- he tried to tell me that he's the kind
22 of person that has to know why he has to do something
23 and, you know, just things of that nature.  And I told
24 him that sometimes we'll tell him why, sometimes we
25 won't, but it's a job and he's supposed to do as he's

Page 52

1 directed and Brenda is his trainer.
2    She also came to me at one point and said, "I
3 just can't do this anymore."
4    And I said, "Well, there's nobody else that can
5 train him.  You know, he needs somebody to train him."
6 So she hung in there despite the way that he was
7 behaving.
8    Q.  Did you ever try to train him?
9    A.  I talked to him on certain things, but some of
10 that stuff on their job they are the only ones that know
11 how they do it.  They have their own systems and he has
12 to learn from them, from her.  I mean I understand what
13 they do, but I don't understand how they do it.  I would
14 have to -- just ridiculous.  There was no reason why he
15 couldn't sit there and learn his job.  It's only because
16 he didn't want to.
17    Q.  Do you know if Ms. Wallace ever did explain to
18 him why certain tasks were being asked of him?
19    A.  Well, I am sure that she did, but he also would
20 say this is not how you should do it.  This isn't real
21 crime analysis.  He just questioned everything.  He was
22 just rude.  He wanted to do what he wanted to do.  I
23 think when he took that job he had the idea in his head
24 that it was like CSI that you see on TV, that he thought
25 you'd be going to crime scenes, you'd be interviewing

Page 53

1  witnesses, you'd be taking fingerprints, doing all of
2  this kind of stuff, and when he got there he did not
3  accept what the job was.  He wanted to make it what he
4  wanted it to be.
5      And I don't believe, in my opinion at least, at
6  the time that I left he had learned how to do crime
7  analysis because he didn't ever focus on it or put any
8  effort into it.  I don't think he really understood it.
9      Q.  And just to make sure, that's not anything that
10 you've heard him express to you.  That's just your
11 opinion of him?
12     A.  Well, he wanted to do ride-alongs with the
13 detectives, he wanted to witness an autopsy, he wanted
14 to go down for interviews with them.  You know, that's
15 not what crime analysts do.
16     Q.  So what part of the crime analyst job was he
17 not doing?  You had mentioned that you know some things
18 he wasn't doing.  What were those?
19     A.  He wasn't doing -- he wasn't doing the drug
20 tips, that's something -- there's a couple of things
21 like Crime Stopper tips, I think it was.  They all take
22 a turn with them.  They rotate that around because it's
23 menial and nobody wants to do it.  So Sean was supposed
24 to do it and he could never get it done.  He's the only
25 analyst that's ever worked there that's had any problem

Page 54

1  with getting that done.
2      And then the gang -- you know, when he first
3  started working there we have the people that have been
4  qualified as gang members and you have to enter them
5  into the system and we gave him that to do because he
6  wasn't trained or qualified to do anything else yet and
7  it gave him an opportunity -- it was a good opportunity
8  to get to know some of these names of some of these gang
9  members so when he read a report he would see it and
10 know what it was and he never could get those done.  He
11 complained about it.  He didn't want to do it and some
12 of the other stuff.  There's a lot of stuff.
13     He didn't accept the fact that it was something
14 that you have to learn.  You can go to school for it,
15 but you have to do it for a while because it's like when
16 you got out of law school I'm sure you knew a lot about
17 law school, but you didn't know -- took you a while to
18 figure out what to do while you were in the courtroom.
19 It comes with experience.  Same way with a cop.  Same
20 way with a doctor.  Anybody.  Although, they do pretty
21 extensive residential stuff.  But with Sean he did not,
22 he was not willing to roll up his sleeves and do all the
23 work that everybody else did.  We all did it.  We all
24 did menial labor.  Nobody complained.  We just did it.
25 He wanted to do the fun stuff, what he thought was fun.

Page 55

1      Q.  Okay.  What were those?
2      A.  Well, basically he wanted to go around and talk
3  to everybody, he was always trying to -- he'd go up on
4  the third floor and want to try to talk to the
5  administrators, that basically was why -- I think that
6  was the time when Captain Taylor asked me to talk to him
7  because he had been up on the third floor wandering
8  around and not at his desk and so we told him that, you
9  know, you don't just go up there and wander around.  You
10 need to stay at your desk and learn your job.
11     Q.  What's on the third floor at that time?
12     A.  The administrators, the chief of police, the
13 assistant chiefs.  He'd go up there and wander around
14 and try to talk to them.
15     Q.  Okay.  Was there anything else on the third
16 floor at that time besides the administrators?
17     A.  No, just the administrators.  Administrative
18 offices.  And also with the reports, you know, in his
19 area when you get -- sometimes, you know, you do the
20 nightly -- the calls for service come in the night
21 before and you enter them into your ongoing report of
22 the crime and the reports aren't completed yet, so you
23 keep that.  And as you go on with your week or whatever,
24 as time goes by and those reports get completed, you go
25 back in and update them.  Well, Sean wasn't doing that.

Page 56

1  So if that -- if somebody wanted to put that report out,
2  then they would have to go look up the reports in his
3  area.  And we continuously had to remind him to do that
4  and he continuously failed to do that and, you know, he
5  just wasn't focused on his job.
6      Q.  You didn't have any authority to hire, fire,
7  take any employment action against anybody who was a
8  crime analyst in your unit; right?
9      A.  Well, I did performance evaluations on him.  He
10 was on probation, so I would document, you know, these
11 things in his performance evaluations.
12     Q.  Okay.  But, you know, my question is, you know,
13 you weren't the person who could say, right, he's not
14 going to be here anymore, he's going to be somewhere
15 else?  Your decision would be binding.  That wasn't you,
16 was it?
17     A.  What do you mean "he's going to be somewhere
18 else"?
19     Q.  I don't want him here, I want to transfer him
20 to some other department.  You couldn't do that?
21     A.  No.
22     Q.  Did you choose who got hired as part of the
23 CAIC?
24     A.  I was part of it who sat in on the interview.
25     Q.  Yours was -- how did that process work?

Page 57

1    A.  Well, there were several of us that sat in on
2  interviews for the position and then we all selected a
3  person for the job and then they did the backgrounds and
4  all of that stuff and that's the last I had, part that I
5  had in it until he was hired.
6    Q.  So it's like you have a vote?
7    A.  Yep.
8    Q.  Okay.  So whatever the majority decision is who
9  gets hired?
10    A.  Yes.
11    Q.  Do you recall being on the panel that decided
12  whether Mr. Patterson was going to be hired or not?
13    A.  Yes.
14    Q.  Okay.  Do you recall how you voted?
15    A.  I voted for him.  He gave a good presentation,
16  but I did catch him in a lie, which now I would have
17  said more about it, but --
18    Q.  And what's that?
19    A.  I asked him if he knew about ArcView and he
20  said he did and I asked him another question, a simple
21  question, and he did not know the answer.
22    Q.  Okay.  What was that question, do you remember?
23    A.  I don't remember.
24    Q.  How long was Sean Patterson on probation,
25  probationary period for new hires?

Page 58

1    A.  A year.
2    Q.  And while you were supervisor of the CAIC you
3  weren't his supervisor, like his trainer?  That was
4  Brenda; right?
5    A.  I was his supervisor.  Brenda was his trainer.
6  Just like the FTO program still have a sergeant, but you
7  have an FTO.
8    Q.  Sorry.  Again, I might ask questions that are
9  fairly obvious, so I apologize about that.  I'm not as
10  familiar with the military terminology.
11        You've been in the police office for quite
12  sometime, so I guess it's second nature for you.
13    A.  Yeah.
14    Q.  So you'll forgive me if I ask pretty basic
15  questions about those things.
16    A.  That's okay.
17    Q.  All right.  Just to make sure I'm clear -- I
18  might have asked you this already.  So when you would
19  supervise his work, that would be the -- he would send
20  his work to you, you would look at it and send it back
21  if changes were needed or send it out if it was okay to
22  go; right?
23    A.  Yes.
24    Q.  Anything else?
25    A.  Brenda would approve it first, of course, and

Page 59

1  then I would approve it.
2    Q.  Okay.  So it went -- so his work went through
3  Ms. Wallace first, then she would send it to you?
4    A.  Yeah -- well, I can't remember if she sent it
5  or gave it back to him to send.  I can't remember.  But
6  I was the final approval.  Of course, she would look at
7  it to make sure it was correct.
8    Q.  Were there any times that you were handed or
9  sent, I guess I should say, something from Mr. Patterson
10  that you sent back saying this needs to be changed?
11    A.  Yes, that happened with all the analysts.
12    Q.  Okay.  Including Ms. Wallace?
13    A.  Yes, all of them.  They all make mistakes.  I
14  make mistakes.
15    Q.  So who performed the, I guess, checking
16  function for your output?
17    A.  My output I would probably -- well, nobody
18  looked over my -- if I did a BOLO or something like
19  that, is that what you mean?
20    Q.  I am not entirely sure.  Because you said you
21  also had duties or tasks that you would perform as a
22  crime analyst, so who would check your work?
23    A.  It would be a captain or a lieutenant.
24    Q.  Okay.  So like Captain Taylor or Lieutenant
25  Sealey?

Page 60

1    A.  Yeah, if it was a bulletin or something like
2  that I would just send it back to one of the analysts,
3  can you proof this, did I make a typo or anything, but I
4  mean that was me.  I know what I can and can't send out,
5  but they would send all of theirs to me to approve and
6  proof.
7    Q.  Is there a typical person that you would ask to
8  do your proofing of your work?
9    A.  No, just whoever wasn't busy.
10    Q.  Sometimes that could be, like, Johnny or
11  Lindsey?
12    A.  Yeah, any of them.
13    Q.  Brenda.  Even Sean?
14    A.  Probably not Sean.
15    Q.  Why not Sean?
16    A.  Because he was on probation.
17    Q.  Did he ever leave probation before you retired?
18    A.  Yeah, in 2018.
19    Q.  Okay.
20    A.  But I don't think I did -- I didn't do BOLOs
21  after that.  I mean I didn't do anything I would send
22  back to him after that.
23    Q.  So after Sean left probation you didn't, like,
24  do the sort of work that you would ask another crime
25  analyst to proof for you?

Page 61

1    A.  No.  And that's not a big deal anyway.  It's
2  just looking for a typo.  Anything that was proofed for
3  accuracy and as far as content would be sent to one of
4  my supervisors.
5    Q.  So mostly just semantics or syntactical issues?
6    A.  Yes.
7        MR. HELWIG:  When you get to a stopping point
8  let's take a break.
9        MR. KERR:  How long would you like?
10       MR. HELWIG:  Five minutes.
11       MR. KERR:  Let's be back here in five.
12       (Recess 11:06 a.m. - Resume 11:11 a.m.)
13       (Record read)
14       MR. KERR:  Back on the record.
15  BY MR. KERR:
16    Q.  So in your first depo and this depo too we
17  discussed quite a bit about what you thought Sean
18  Patterson did wrong about his job or what he didn't do
19  correctly.  I'd like to take a second to talk about
20  what, if anything, he did do correctly in your opinion
21  or did well.  So what would those be, if anything?
22    A.  He was good at technology, he knew how to do
23  Excel very well and he was not -- he was pretty on top
24  of that.  I'd have to look at his performance reviews.
25  I mean it's been a long time, but I know he did that

Page 62

1  well.
2    Q.  Did you keep any personal notes that would say
3  something like, okay, you did this thing good today or
4  this thing bad today outside of your evaluation,
5  performance evaluation?
6    A.  I think you've got my notes, pretty much all of
7  my notes.  I turned them in.
8    Q.  Okay.  I guess what I'm asking is would there
9  be any notes outside of the performance evaluations
10  where we would see comments about how he was performing,
11  like today he did this thing or that was good or bad?
12    A.  Well, if there's -- I really don't have any,
13  but I was fair with him.  His problem was if he didn't
14  get his way, he would go around me.  He would talk to
15  people above my head.  He would do what he wanted to do.
16  And when Captain Lehman came down, he just flagrantly
17  just disregarded me like I wasn't -- you know, didn't
18  have any say in anything, did what he wanted to do.
19        And later on I found out that he and Captain
20  Lehman had considerable history before he came into the
21  unit of communicating with each other via email that I
22  knew nothing about and so he already had felt like he
23  had something over me, which he did.
24    Q.  When was Captain Lehman, when did he get put
25  into that position?

Page 63

1    A.  In June of 2017.
2    Q.  That would have been half a year after
3  Patterson was hired?
4    A.  Uh-huh.
5    Q.  Okay.  Do you have any idea why Captain Lehman
6  was put in that position?
7    A.  Well, they routinely changed the -- they rotate
8  around captains because they want them to all get
9  rounded and experience in different areas and Captain
10  Lehman, he had never, to my knowledge, been involved in
11  investigations until that point.  He didn't -- in
12  narcotics or criminal investigations.  He had only
13  worked traffic over his entire career, so there was a
14  learning curve for him and --
15    Q.  Is that fairly typical they're trying to round
16  out the captains or whoever is heading up these
17  particular divisions they would come in with not too
18  much experience, kind of learn as they went?
19    A.  Some of them.  It just depends.  They do have
20  experience like Chief Taylor, who's the chief now, that
21  was just made chief of police, he worked in
22  investigations, so he understands how they work.  So if
23  he did come into our unit for a while, I think it was as
24  a captain or lieutenant and he knew what was going on
25  and was -- it was familiar to him, so he understood the

Page 64

1  process and how you work and how it's done and all of
2  that.
3        Captain Lehman did not.  And instead of
4  consulting with experienced tenured people in that area,
5  he chose to rely on the most inexperienced,
6  uneducated -- well, untrained and inexperienced member
7  of the unit for guidance, I guess, or input without ever
8  calling us in and talking to us and asking us what we
9  thought.  You know, I had been there -- I had started
10  that unit.  Brenda had been there four years.  Lindsey
11  had been there, I want to say, five years, maybe six.
12  And Sean had been there for less than six months.
13        And when I requested those emails and got them
14  and saw what was going on, then I realized that's what
15  was happening, they were communicating.  Sean had gone
16  out and Googled crime analysis and came up with the
17  definition of it and sent it to Lehman and said this is
18  what we need to do.  This is -- I think this is the
19  direction the unit needs to go.  And Lehman being
20  inexperienced probably thought that Sean had -- you
21  know, that he knew what he was talking about.  He
22  Googled it.  That was the old IACA website that was
23  around when I started the unit that had certain
24  definitions and things like that.  You know, it's
25  just -- so he thought that Sean knew what he wanted to

Page 65

1  do and had a vision and all Sean did was Google things
2  all the time.  He'd never been trained in any of that.
3  He had no experience in crime analysis.
4      Q.  Besides his training, I guess we'll call it,
5  with Ms. Wallace, right --
6      A.  Right.
7      Q.  -- that he got on the job --
8      A.  Yeah.
9      Q.  Okay -- did you ever set up a meeting with
10 Captain Lehman to discuss, you know, the purpose of the
11 unit, what it was for, what it was doing, you know, give
12 him the rundown?
13     A.  With Captain Lehman?
14     Q.  Yes.
15     A.  Generally you don't set up meetings with the
16 top brass on that kind of a matter.  That would be
17 something they would ask you.  I mean they have busy
18 schedules and stuff.  I mean he came in and talked to me
19 and what he wanted to do was he wanted to get traffic
20 information into his computer so he could see it and he
21 was interested in the D-EDAX, which is how traffic is a
22 precursor, an indicator of crime in an area.
23         When you have a high level of traffic, it
24 probably means that there's a high level of crime and
25 that's because he came from the traffic.  That's what he

Page 66

1  knew was traffic.  But I don't think it was ever really
2  used for anything.  I did get it on his computer for him
3  so he could see it.
4      Q.  Was that -- was the D-EDAX a tool that was
5  something that the crime analysts knew how to use as
6  part of their job?
7      A.  We knew what that was.  We never really used it
8  because, quite frankly, when I had looked at it before,
9  it really did not seem like a strong indicator in our
10 area because it was -- most of it was in an area where
11 we already knew there was a lot of crime.  You know, it
12 wasn't -- did not -- didn't really help us in that area.
13     Q.  What tools would the -- what tools would the
14 CAIC use to determine what areas were high crime?
15     A.  Reports.  And you have to know what you're
16 doing with that too, but reported crime.  Generally most
17 police work is response to crimes, that's how you
18 determine where the crimes are.  You don't really go
19 into -- well, when you get into special investigations,
20 narcotics and things like that, you go into prey mode
21 basically because you're trying to find the crime and
22 wherever you're working, areas that you're working is
23 where you're going to find those crimes because you're
24 going to those.  The crimes exist, but you're going to
25 those areas and working them.  Sometimes it's an

Page 67

1  indication of actual crime there depending on how much
2  crime you get.  Sometimes it's you've chosen that area
3  and next year you work on that area with special
4  investigations because people are using drugs all over
5  the place, but where you focus your unit is where you're
6  going to come up with stats.
7          With reporting, people report their crime, you
8  have a burglary, you call in and report it, so you pull
9  the stats and you see where are the most burglaries
10 occurring, where are the -- who are the suspects, are
11 there similarities in the MOs of one suspect, is he a
12 serial burglar, does it seem like it's juveniles or
13 whatever.  So that's where -- then you develop a plan,
14 you know, which is what crime stats is.  You develop a
15 plan to address a crime in those areas.  Not us, but the
16 administrators, the captains, lieutenants, they look at
17 those stats and decide how they're going to deploy their
18 officers to address it.
19     Q.  Did you ever tell Captain Lehman you didn't
20 think the D-EDAX was very helpful?
21     A.  No.
22     Q.  Or suggested that he didn't use it?
23     A.  Pardon?
24     Q.  Or suggest that he shouldn't use it.
25     A.  No, I mean, if he would have asked me.  He

Page 68

1  wanted it on his computer.  He was interested in it, so
2  I put it on there so he could look at it.
3      Q.  And again I apologize if I asked you this
4  already.  There wasn't any other place besides your
5  performance evaluation that you would note whether any
6  of the people that you were supervising did things well
7  or did things poorly in your opinion?
8      A.  No, I had only -- I didn't have that many
9  people I supervised.  I didn't have to keep those kind
10 of notes.  I knew what they were working on, what they
11 were doing.  You also call them in usually ahead of time
12 for their annual performance review and they're supposed
13 to -- there's a place where they can put in goals they
14 want to complete for the next year and, you know, that
15 kind of stuff.  You do a little bit of that.
16         I always tried to develop them as best I could
17 and I always told them that my goal is to develop you
18 and give you tools to improve and maybe outgrow beyond
19 this job on to something else, you know.  But that was
20 the detectives as well as the civilians that I
21 supervised.
22     Q.  Did anybody besides Sean Patterson ever file an
23 internal complaint or grievance or anything like that
24 against you?
25     A.  No, I don't believe so.

Page 69

1   Q.  Do you know -- same question as to Ms. Wallace.

2   A.  No.  I do not believe I've ever had anything on

3   my record other than a traffic crash years prior to

4   that.  I'd never been in any -- had any problems with my

5   supervisors or -- never, you know.  I always got high

6   reviews, not got any problems in 23 years.

7   Q.  Were there any employees -- I'll just use the

8   term employees, folks that were hired to your crime

9   analysis unit after Sean Patterson but before you

10  retired?

11  A.  No.

12  Q.  He was the last one?

13  A.  Yes.

14  Q.  Who was the employee who was hired right before

15  Sean Patterson?

16  A.  I believe that was Johnny To.

17  Q.  Okay.  And how about before him?  I assume it's

18  a him.

19  A.  Yes.  Before him was -- well, there were two

20  pretty close together; Tiffany Dwyer and Sue Eberle.

21  Q.  Was there -- was there an employee named Ashley

22  at some point in the CAIC?

23  A.  Ashley, no.

24  Q.  Okay.  I'm sorry, you said there was -- before

25  Johnny there was Sue Eberle and who?

Page 70

1   A.  Tiffany Dwyer.

2   Q.  Can you tell me a little bit about them, when

3   were they hired.

4   A.  Well, Tiffany -- well, Brenda was hired -- she

5   was the first one hired in 2004.  What we did, we had a

6   testing process where they were required -- through the

7   city where they were required to perform certain

8   functions on Excel, create a BOLO, that kind of thing

9   and once they -- and it was graded and whoever got the

10  highest grade we'd go down the list.  Well, Brenda

11  actually worked for the city over in the electric

12  department and they had come over and asked me if --

13  they had did away with that job.  They were

14  reformulating over there and they asked me if she could

15  work for me and I said, well, she can take the test and

16  we'll see how she does.

17  Q.  I'm sorry, who's "she" that we're referring to?

18  A.  Brenda.

19  Q.  All right.

20  A.  So she took the test and she scored the highest

21  on the test and I said bring her on.  And then Tiffany,

22  I think -- well, Sue Eberle had worked for risk

23  management, same thing, you know, they wanted her to

24  come work on our unit and then I think Tiffany might

25  have also been with the city as well, but they both took

Page 71

1   the test and they both scored really high and so they

2   all came on to the unit that way and with Tiffany --

3   well, Tiffany and Sue -- I don't know if you were here

4   when they had that big sex scandal with the City of

5   Lakeland.

6   Q.  I'm not allowed to answer questions.  Sorry.

7   A.  Well, it was in all the papers and everything

8   and there was a crime analyst that was having sex with

9   multiple officers and ranking officers in the

10  department, that was Sue Eberle and Tiffany Dwyer also

11  was implicated in that to the point they had nude photos

12  of her or something; so those two ended up leaving.

13  Now, Sue Eberle had had sex on duty in the office.

14  Q.  Maybe we should not go into the lurid details.

15  A.  You wanted me to describe them.

16  Q.  Specifically when they were hired.

17  A.  Okay.  The reason I'm saying this is to make

18  the point that after that happened we were very

19  sensitive of about where people are in our department,

20  in our unit.  When they're not at their desk, when they

21  leave and gone for an hour or two and we don't know

22  where they are, that's not good.  We don't want that to

23  happen again.  So that was another factor in why we did

24  not want Sean to just be up wandering around and not

25  know where he was.

Page 72

1   Q.  When were they hired?

2   A.  They were hired in between 2004, Brenda, and

3   then I think right after that 2005 or 6 Sue and Tiffany.

4   And they were all good analysts.  They all did a very

5   good job of -- very good job all of them.

6   Q.  How old was Sean when he started, do you

7   recall?

8   A.  How old he was?

9   Q.  Yes.

10  A.  25, 26, something like that.

11  Q.  Okay.  Did you have anybody else working for

12  you around that age range mid-20's?

13  A.  Johnny was that age.

14  Q.  Okay.

15  A.  I don't know how old Lindsey is -- was that

16  age, around that age, and I don't know about Sue.  She

17  might have been around that age.  Maybe Tiffany was.

18  I'm not sure.

19  Q.  Okay.  And if I recall correctly, Lindsey's

20  still there and Johnny is not, right, still there in the

21  unit?

22  A.  Lindsey is.  She transferred out to SIS.

23  Q.  You're right.  My mistake.

24  A.  After I left.  And I think probably because of

25  Sean, but I don't know that for sure.

Page 73

1    Q.   What makes you think that?

2    A.   Because she had complaints about him before she

3    left and I'm sure that nothing changed with him.

4    Q.   How did you learn that she had complaints about

5    Sean?

6    A.   She came to me when I was still there.

7    Q.   Around when were these exchanges or was there

8    only one exchange?

9    A.   Well, there were a few that I remember.  One

10   was that he wasn't doing his job.  He was always in

11   the -- another detective or sergeant's office with the

12   door shut laughing and talking about television shows

13   and things like that and not doing his job, and then he

14   would come to her and want help and she said that she

15   wasn't going to do it.  You know, she said she would

16   help anybody if they really needed it, but if he was

17   messing around like that and not doing his job she

18   wasn't going to help him and she felt bad about it

19   because she likes to help people, but she says I'm not

20   going to be a doormat.

21        And another one was when she told him that she

22   was -- he was off running around doing something.  She

23   told him that he better be back by 3 because she had

24   leave, you know, vacation time and she was leaving at 3

25   and he said he would and he still wasn't back at 3:30,

Page 74

1    so she called me and I called Sean and he showed up

2    about 15 minutes after that.  He just -- you know, he

3    just had that attitude he could do whatever he wanted,

4    that he didn't have to answer to me, specifically he

5    didn't have to answer to me, I didn't have any authority

6    over him, and if I told him no, he'd just go around me

7    and get what he wanted; so I pretty much had no

8    authority over him.

9    Q.   Over the kind of things that he wanted that you

10   would say no to, how many of them can you remember is

11   what I'm asking?

12   A.   He was always wanting to do overtime on

13   weekends and that was problematic because Sean took off

14   every hour leave time he had since the day he started

15   and he was always taking leave time, like on days he

16   knew were really busy, so he didn't have to do his work

17   and he didn't care that somebody else had to jump in and

18   do it for him and so he would -- he wouldn't get it done

19   and he would say he wanted to come into work on the

20   weekend to do something.  No other analyst had ever had

21   to do that.  So that's number one.

22        Number two, he's gone during the week on

23   vacation time or sick time and then he wants to work

24   during the weekend and if he does that he gets -- well,

25   he'll get time and a half comp time which means if he

Page 75

1    goes in there on a Saturday and works for eight hours he

2    gets 12 hours of leave time.  If he does the same thing

3    on Sunday he gets 24 hours of leave time, so then he can

4    take, you know, a day off during the week of comp time

5    and gets paid for three days for only working two.  He

6    was playing the system is what he was doing and so I

7    would tell him no, he couldn't do that, and then he

8    would go ask Hans or Sean and they'd authorize it, you

9    know.

10   Q.   I'm sorry, you said Hans or Sean?

11   A.   Yeah, he'd go to Hans and Hans would authorize

12   it or -- not Sean.  Steve.

13   Q.   Okay.  That's Steve Sealey?

14   A.   And I think Steve knew Hans would if he didn't.

15   And it causes a lot of problems in the unit.  It causes

16   morale to go down when you have the other two analysts

17   sitting there at their desk doing their job and getting

18   everything done and then you have Sean not doing his

19   job.  They're having to pick up the slack because not

20   only is he not doing his job, he's gone a lot and then

21   he's getting overtime on the weekends.  You know, that's

22   not good.

23   Q.   Well, I suppose I am a bit confused on how the

24   hours system works.  You just get overtime or time and a

25   half if you worked on the weekend regardless if you say,

Page 76

1    well, I'd like to work on the weekend, but not Monday

2    and Tuesday, for example?

3    A.   That's not what he did.

4    Q.   I'm not asking whether that's what he did or

5    not.  I'm just asking if that is possible.

6    A.   Normally it's not possible.  There's no reason

7    to work on the weekend and not work on Monday or

8    Tuesday.  I mean you can get everything done on Monday

9    or Tuesday.  If you work on the weekends when nobody is

10   there how does anybody know that you're working?

11   There's nobody around.  Who knows if he's there when he

12   says he is.  Who knows if he leaves on Saturday and

13   Sunday.  Who knows what he's doing when he's there.

14   There's nobody around.  But also if he works that -- if

15   it's an end of a time period and he works during the

16   weekend, then he has a whole extra day off so he can

17   take off two days the next week, you know, from instead

18   of working regular hours.  That gives him extra time

19   off.

20   Q.   Right, that's what I am trying to understand.

21   Why are the weekend hours automatically considered time

22   and a half, do you know?

23   A.   It would be during the week as well.  If you

24   worked overtime during the week, anything you work over

25   40 hours is time and a half; so if it's overtime it goes

Page 77

1  into time and a half.

2  Q.  Okay.  I see what you're saying.  All right.

3  A.  And so instead of taking overtime pay, he would

4  take comp time, which means he would get four hours in

5  addition to the eight hours he worked if he worked

6  overtime if it's over 40 hours.  So if he works and his

7  time is over for Friday and then he works on the weekend

8  eight hours, that puts him into 48 hours.

9  Q.  Okay.

10  A.  He did that consistently.

11  Q.  And that was signed off on by the folks above

12  you; right?

13  A.  Uh-huh.  One particular one was for a project

14  he was assigned by Hans that they conferred on.  That's

15  another thing, Hans was doing that.  I found out through

16  the emails he was sending a lot of things to Sean via

17  email, all kinds of stuff.  None of the other analysts,

18  not the intel detective, just Sean, not me.  And he

19  asked him if he wanted to do a spring training analysis

20  on Tiger Marchant Stadium, if Sean wanted to do it.

21  Sean said, yes.  So he sends an email to Steve and

22  copies me and assigns it to Sean.  Sean produces it and

23  it's horrible.

24     And at this point in time I know I can't really

25  say anything too critical because Hans will jump down my

Page 78

1  throat, but I did say one thing about just the way it

2  was kind of set up or something like that and Hans comes

3  right back and jumps on me.  I did say some good things

4  about it in there, like you said, but Hans came right

5  back and jumped on me and, you know, intervened for Sean

6  like he always did.  And the product that they produced

7  is something that I felt was laughable.  I would never

8  have let that go out.

9     It was just a ridiculous waste of time as far

10  as I am concerned and that's the truth.  It didn't tell

11  you anything.  It didn't -- when you run the numbers on

12  it they had two burglaries in that area at night at the

13  convenient stand, so why would you do this whole thing

14  on it?  There's no crime there.  But -- and the other

15  part of that is Sean wanted to go work on it on the

16  weekend and I told him no.  I said this is something

17  that can wait until the next week.  Then Hans intervened

18  and said, no, Sean, I approved that overtime.  So that's

19  another thing Sean got to go in there and do on the

20  weekend.

21  Q.  All right.  Do you know of any sort of -- I

22  guess for lack of a better term -- I believe in other

23  documents you called this special treatment.  Do you

24  find we use that term to describe that sort of

25  relationship that you're alleging.

Page 79

1  A.  Well, he was always -- he was -- you have a

2  list of the emails back and forth.  I think I have it

3  here if I can look at it.

4  Q.  I'm just trying to determine some terminology

5  that we can use to make things a little simpler so I

6  don't have to repeat over and over again.

7  A.  He was asking things of Hans, Sean was, that I

8  felt were inappropriate for him to be asking him that

9  should have gone through me in the first place like --

10  Q.  It's not really -- I don't mean to interrupt

11  you.  It's not really an answer to my question, so let

12  me try to ask a question.

13  A.  Okay.

14  Q.  So --

15  A.  Here, you can see the list of all these emails

16  back and forth to --

17  Q.  Can I take a look at that?

18  A.  Sure.  You have it.  It's in one of the --

19  things.

20  Q.  And who made this?

21  A.  I requested the emails after -- before I left,

22  before I resigned and all of that came out, then I could

23  see it made sense that why -- because before that people

24  had asked me who is this guy, who does he know, does he

25  have a relative that works here, because it was so

Page 80

1  obvious that he was getting preferential treatment and I

2  was like I don't think he does, but then when I saw

3  these emails I could see, yes, there was inappropriate

4  communication between Sean and Hans before Sean even --

5  before Hans even came over and became a supervisor of

6  the unit he was sending him all kinds of stuff.  And

7  standing on its own is not so bad, but it was ongoing

8  and consistent.  And then you have the fact that he was

9  sending things just to Sean, not anyone else in the

10  unit.

11  Q.  I think I might need to take a break, make a

12  copy of these if that's all right.

13  A.  Yeah, that's fine.  And a --

14  Q.  Again, I don't think I have a question pending.

15  A.  Okay.

16  Q.  So in that answer you were giving you mentioned

17  the term preferential treatment.  Is that the term that

18  you used to describe that relationship?

19  A.  Uh-huh.

20  Q.  So when I use that term I'll understand that's

21  what you're talking about?

22  A.  Talking about the emails.  I'm talking about

23  Sean constantly being in Hans' office.

24  Q.  What you were just talking about; right?

25  Right?

Page 81

1    A.  Well, the emails is one.  Him being in his
2    office is another, yeah.
3    Q.  Okay.  Do you know of any similar sort of
4    preferential treatment from anybody above you to Johnny
5    To?
6    A.  No.
7    Q.  Do you know of any sort of that sort of
8    preferential treatment to Lindsey?
9    A.  No.
10    Q.  Okay.  And Lindsey was a woman; right?
11    A.  Yes.
12    Q.  And Johnny was a man?
13    A.  He still is.
14       MR. HELWIG:  As far as we know.
15       THE WITNESS:  Yeah.
16       MR. KERR:  Fair play.
17    BY MR. KERR:
18    Q.  All right.  And then you gave as part of your
19    job as supervisor various evaluations of Sean Patterson,
20    didn't you?
21    A.  Yes.
22    Q.  I'm not asking you to recall the specific
23    numbers you gave him offhand, but fair to say you
24    weren't particularly pleased with his performance?
25    A.  Well, it doesn't matter if I was pleased or

Page 82

1    not.  I was not pleased, but I still gave him fair and
2    accurate evaluations.
3    Q.  All right.  And I believe --
4    A.  And they weren't that bad.  You know, it's very
5    common for someone that's been there only a year to get
6    3s on their evaluations.  That just means they have a
7    lot to learn.  I did downgrade him in areas that were
8    appropriate, but I didn't ever downgrade him to the
9    point where he would not receive a merit increase or his
10    job would be in jeopardy, which I could have.  I
11    certainly was warranted in it.
12    Q.  And why didn't you?
13    A.  Well, one reason is because in the beginning I
14    wanted to give him a chance and then towards the end I
15    knew that, you know, it would never go anywhere because
16    as soon as I gave him a performance review, Hans would
17    surface and want me to change it.  He would complain
18    about it, thought it was too low.  And the second one
19    they came back and demanded that I write something that
20    tells me how I'm going to help him succeed as an
21    employee, which I did write something, but in my opinion
22    to succeed as an employee he needed to do his job and
23    accept direction.  That's all I wanted him to do and he
24    refused to do it.
25    Q.  I recall you mentioning earlier that there were

Page 83

1    at least a few things he was good at, mostly Excel and
2    the technology stuff; right?
3    A.  Right.  But if he won't take direction and he's
4    not accountable for himself and he doesn't learn his
5    job, that's pretty irrelevant.  You have to be able to
6    do those things to succeed as an employee.
7    Q.  When jobs came into the CAIC who would they go
8    to if somebody made a request for, you know, anything
9    that you all are responsible for?
10    A.  Whose ever area it was, whoever was there that
11    day.  You know, sometimes they'd walk up and say, you
12    know, does anybody have time to do a photo pack and
13    somebody would offer to do it.  I mean until Sean came
14    there everybody worked as a team, everybody had
15    everybody's back, nobody dumped on anybody, you know.
16    Even those analysts that were involved in the illicit
17    affairs still did their job very well and got everything
18    done, didn't call in sick or -- you know, a lot of times
19    it seemed as if he was doing that because he wanted to
20    avoid work; so his performance review reflected that.
21    And on the very last one I think it was documented in
22    there when I wrote it I had two separate supervisors
23    look at it.  One was, I believe, Sergeant Doty or maybe
24    it was Captain Taylor and another one was Assistant
25    Chief Victor White and they read it and they said it

Page 84

1    sounded very fair and very accurate.  They did not see
2    any problems with it.
3        And Hans, of course, thought it was terrible,
4    and that's the one they wrote the memo on or maybe that
5    wasn't the one.  I don't know.  But that is the only
6    tool I have to really document what's going on is the
7    performance review and a performance review is up to the
8    supervisor, not the captain, not the assistant chief,
9    but the supervisor and I thought it was fair and
10    accurate.
11    Q.  Did the folks that you had reviewed, whichever
12    performance review that was, it was what, Sergeant --
13    was it Sergeant Doty or the and the assistant chief as well,
14    do you know if they had any experience with the CAIC day
15    in and day out?
16    A.  Assistant Chief White was the captain of CIS
17    and supervised our unit and Sergeant Doty was also
18    involved in -- he had been there for a long time and he
19    supervised other detectives in the unit and, of course,
20    Captain Taylor -- I can't remember.  I think it was
21    Doty, but it might have been Taylor, he was also the
22    captain and he's the one that was there for a while when
23    Sean was there; so they're all familiar with the unit
24    and all knew about Sean.
25    Q.  So before Captain Lehman I believe came into

Page 85

1  the position it was -- it was Taylor, wasn't it?

2    A.  Yes.

3    Q.  Okay.  Did Taylor also approve any sort of

4  weekend overtime things?  Was that sort of the -- what

5  you call preferential treatment earlier?

6    A.  No.  And Taylor, he moved over to GSS and he

7  had issues with Sean.  He'd come in there and Sean would

8  be sitting around talking to people and he'd have to

9  tell him to leave and Assistant Chief White as well.

10  They could see there was issues with him.

11    Q.  Just a moment ago you had mentioned that

12  Captain Lehman had written something in response to one

13  of your performance evaluations.  Do you recall that

14  particular document?

15    A.  Well, they called me in and gave me kind of a

16  counseling form for a shout-out and during that time

17  they had -- well, there was a couple of them.  They

18  had -- he had something in there about -- I'm getting

19  confused.  One was that he wanted me to raise Sean's

20  score by one percent or lower Brenda's by one percent

21  for team work because it takes two to tango, he said,

22  and I told him with all respect I wasn't willing to do

23  that because Brenda was his -- was training him.  That's

24  a whole different relationship than just sitting next to

25  somebody working.  She is responsible for him, she's

Page 86

1  teaching him and he's supposed to do as she asks him to

2  do and he wasn't; so you can't say it's the same.  And

3  also Brenda has been getting high marks forever.

4  She's -- she comes to work on time, she sits there and

5  she works all day long until she goes home, and she

6  takes call-out, she'll drop what she's doing and come

7  in.  I mean she is a dedicated employee and I wasn't

8  willing to lower her score.  What I saw there was no

9  reason.

10      Sean was the problem, not Brenda.  And so

11  that's when Hans wrote an eight-page memo about how I

12  was a bad supervisor, Brenda was a bad analyst, and Sean

13  was a savant or -- you know, just unbelievable in me

14  that he would do that eight pages on because I wouldn't

15  lower -- he threatened me, told me if I didn't do it he

16  would have to write a memo and I said, "Well, you can

17  write a memo, but I don't think that's right and I'm not

18  willing to lower that score."  The other part of that is

19  that Hans had no idea what Brenda did.  He had never

20  come in and sat down with her and talked to her.  He

21  never observed her work ethic.  He had no idea what she

22  did.  He spent all of his time with Sean and yet he

23  wanted to criticize her evaluation without -- with the

24  lack of that based on probably what Sean said.

25    Q.  Do you know if he ever talked with Ms. Wallace

Page 87

1  about that relationship, the trainer-trainee

2  relationship?

3    A.  Never.  Never had one conversation with her.

4  He never had a conversation with Lindsey.  He did take

5  Brenda and I to lunch one day because I kept telling him

6  you don't even know -- you never even talked to her.  He

7  took us to lunch one day.  That was it.  It was the

8  complete total sum of his involvement with her.

9    Q.  And when was that lunch, do you recall?

10    A.  Boy, it's somewhere in the notes.  It would be

11  probably before 2017, before I filed the complaint, but

12  I'm not sure.  I'd have to look it up.

13    Q.  Do you recall what was discussed at that lunch?

14    A.  It was just small talk.  It wasn't --

15    Q.  Nothing work related?

16    A.  Well, there was some work related, but not -- I

17  can't remember.  It wasn't anything goal setting or

18  anything like that.  In fact, I don't think it was

19  really much work related discussed.

20    Q.  As part of your role as supervisor of this unit

21  could you not have set up like a system saying that, you

22  know, you know, this certain analyst is good at this

23  thing so they handle more of these and this one is not

24  so good at that so they handle less of these, was that

25  within your authority to do as a supervisor?

Page 88

1    A.  Well, it was, but that wasn't the case.  If

2  you're referring to Sean, Sean had to learn what an

3  analyst does, he has to learn the job of analyst.  He

4  came in and wanted to change all these things and he

5  didn't understand the job and you can't do that in what

6  we do.  It's sensitive information, it's confidential.

7  I've sat him down and told him this many times that

8  there's reasons that we do these things that you're not

9  aware of right now.  We have policies, we have state

10  law, we have CALEA standards, we have FDLE standards.

11      Hans and Sean came up with this idea that they

12  wanted to start putting the tips line that came into our

13  department -- that's another thing we did.  We would get

14  tips, we would log them, and they traded those off as

15  well, I believe, so everybody got a chance to do the

16  crappy work, you know.  Sean wanted to put it into the

17  Crime Stoppers server, have them report these tips to

18  Crime Stoppers and have detectives enter in stuff in

19  Crime Stoppers.  And him and Sean ran all the way with

20  this without having a conversation with somebody that

21  knew about why you couldn't do this.

22      And after they had it all set up in their mind

23  what they were going to do, then they find out, oh, we

24  can't do that for obvious reasons.  If they would have

25  asked somebody in the beginning it would have saved them

Page 89

1  a lot of time and energy.  That was the ongoing thing,
2  instead of consulting with somebody in the unit and
3  asking about these things when they were flushing them
4  out, for some reason Hans chose to listen to Sean who
5  was the most inexperienced person in the unit and run
6  with -- the ball with it.
7      Q.  Got it.
8      So what I want to do now is read a part from
9  this memo in response -- by Captain Lehman in response
10 to your performance review, the one we've been
11 discussing, and I want to ask if you understand what it
12 is that's being discussed in this paragraph here.
13     So it states "Additionally, since his arrival
14 he," and he is referring to Sean Patterson, "created a
15 case management tool based on what CIS was currently
16 using.  The CMTs and MS Excel that runs through a
17 database that he created.  Now every unit reports on
18 this one document instead of having multiple documents
19 for CIS.  This CMT also has a better searchable database
20 for CIS as it is all inclusive, yet none of this was
21 mentioned" --
22     THE COURT REPORTER:  I'm sorry, could you slow
23     down a little bit when you're reading.  It's hard to
24     write.
25

Page 90

1  BY MR. KERR:
2      Q.  "This CMT also has a better searchable database
3  or CIS as it is all inclusive, yet none of this was
4  mentioned in his evaluation as part of using his skills
5  in support of the organization."
6      Do you have any idea what that's referring to,
7  what system that's referring to?
8      A.  Yes.
9      Q.  Could you explain that to me then.
10     A.  Yes.  That was something they came up with for
11 the detectives to report -- to keep track of who was
12 working on what cases and it was done in Excel.  Sean
13 didn't know enough about how that would operate because
14 he was just new there, so Captain Taylor and I got
15 together and we decided it would be a good project for
16 him to work on.  So what I did, I flushed it out for
17 him.  I did a diagram showing him how it should be laid
18 out, what should go where, where the totals should add
19 up, what we're measuring.  Sean didn't design that part
20 of it.
21     When he went in and started to try to design,
22 he couldn't figure it out, so he went to Jason Leggett,
23 who was the computer tech at LPD and Jason is the one
24 who actually designed it and helped get all of that
25 going so that it worked, then Sean took credit for it

Page 91

1  for the whole thing.  So that's what -- he typically did
2  that a lot, he would try to take credit for -- I think
3  there were other things of Jason's that he tried to take
4  credit for.  He would talk to him and tell him about
5  something that he was working on and then Sean would go
6  to the administration and present it as his own idea and
7  say we're going to do it and Jason had no idea he was
8  doing that; so I think Jason pretty much cut ties with
9  him after that.
10     Q.  Did you ever tell this to anybody else besides
11 this deposition?
12     A.  It's in the Internal Affairs deposition.  Jason
13 Leggett was deposed and, yeah, it's in the stuff
14 somewhere.  Now, I will say that Sean was good with
15 technology and you'll find that in his report, but I am
16 certainly not going to give him credit for something
17 that he didn't do all by himself.  And since you asked
18 me if I ever conferred with him previously, after that,
19 that product was made, it had -- it was getting bigger
20 and had a lot of problems, you know, just as things do
21 when they start -- people start using it a lot, and I
22 actually went to Sean and told him that he had done a
23 good job on that.
24     In fact, there is an email, I believe -- but
25 that I could see it was growing and maybe extending

Page 92

1  beyond his ability to manage it and that at some point
2  we would probably want to get a programer involved and
3  that, you know, come to me and we'll get something like
4  that figured out.  I mean -- and I do have an email to
5  that effect as well somewhere.
6      Q.  Did he ever come to you to get that figured
7  out?
8      A.  No, I don't believe he did.  I think they --
9  I'm not sure, but I think they kind of stopped using it
10 because it kind of outgrew itself, but I am not sure
11 about that.  But it was a good project for him to work
12 on.  And I do give them extra projects like that, but
13 they still all have to share in the workload.
14     Q.  So you did actually end up giving him more of
15 those sort of technological projects; right?
16     A.  That's one that I recall.  I can't remember --
17 I mean I just don't remember.  I am sure that I did.  I
18 know Hans wanted him to work on ArcView, but he just --
19 in the first month he was there -- I think it was in
20 February -- we got an email saying they wanted somebody
21 to come and represent the city, like a round table
22 meeting with the people down town that, you know, the
23 district -- I can't remember what it's called, but it's
24 city.  It's a bunch of people in the community and Sean
25 wanted to go and do that and I said, "Sean, you've only

Page 93

1  been here a little over a month, you're not experienced
2  enough to do that, you don't know."  You know, I
3  couldn't believe that he would even volunteer to do that
4  with the amount of experience he had at that point.  He
5  didn't have a realistic view of his -- what he was
6  capable of doing.  He didn't accept that he had to
7  learn.  He had to learn the job.
8         He released numbers to -- Hans called him from
9  city hall wanting numbers on Baker Acts or something and
10  Sean sent them over without having them approved and
11  they were wrong.  And I don't know if they gave them out
12  to, like, the mayor and all of that kind of stuff, but
13  once again he knew he was not supposed to do that and he
14  just does it anyway.  And that was a big concern of mine
15  that he was, you know, somebody that does that.  It's
16  just -- it's like a catastrophe waiting to happen.  If
17  he sends the wrong numbers to the wrong person, like the
18  media, that says we had twice as many homicides as we
19  have or half as many as we have and they follow up and
20  they find that's incorrect, that comes back on the whole
21  department.  You have to follow these rules for reasons
22  and he just did what he wanted most of the time and if I
23  wouldn't tell him yes, he would go to Hans or any male
24  supervisor that would listen to him.
25      Q.  Were there any female supervisors besides

Page 94

1  yourself?
2      A.  Cheryl Kimball.
3      Q.  Also if you give the rank at the time, if you
4  know it.
5      A.  I think Cheryl was a sergeant at the time.
6  Maybe she was a lieutenant.  I don't remember.  But
7  there were others, but I can't remember right now who
8  was where doing what.  I can't remember.
9      Q.  Do you know who ended up replacing you as
10  supervisor once you retired?
11      A.  Jasper Igarza.  Yeah, I have no idea how to
12  spell it.
13      Q.  Was that somebody who was in the CAIC at the
14  time that you retired?
15      A.  I'm not sure if he was there or not.  I think
16  so, but I'm not sure.
17      Q.  Would it be typical for someone outside of the
18  CAIC to become a supervisor of it?
19      A.  Well, it would have to be somebody because I am
20  the only one that really -- that was another problem
21  with that position that I had is it was so specialized
22  and so technical that very few people aside from maybe
23  Jason Leggett really understood what we did.  You can
24  tell somebody that you were working on something for
25  eight hours that took five minutes and they wouldn't

Page 95

1  know the difference because they don't know how fast it
2  takes us to do our job or exactly what's all involved in
3  many aspects of our job and I don't know of anyone --
4  there might be a few that are a little bit text savvy
5  that could have stepped in, but it's hard because, you
6  know, I studied in grad school and I went to the academy
7  so I knew what crime analysis was about.  And Dave Doty
8  is pretty good at technology and I believe he caught
9  Sean doing some stuff, but --
10      Q.  When did you go to grad school?
11      A.  I graduated 2004 at UCF.
12      Q.  Going back to the -- what we'll call the
13  Captain Lehman memo.
14      A.  Uh-huh.
15      Q.  How did that memo affect your employment with
16  the city?
17      A.  It was devastating to me and devastating to
18  Brenda because Sean received a copy of that memo and
19  Brenda received a copy of that memo and now that memo is
20  attached to their performance evaluations and it's
21  public record so anybody can get it.  If Brenda goes to
22  get a job, another job there, and they request that,
23  they'll get that memo.  She tried to have it removed and
24  they said they couldn't because it's been made public
25  record so they can't remove it.

Page 96

1         And I know that many people in the department
2  saw it, you know, and basically that removed any
3  authority that I had over Sean.  I tried to write a
4  performance review on him and a captain gets involved
5  and writes an eight-page memo and by that time there
6  were a lot of people that knew that Sean was, you know,
7  not -- that he had some issues.
8      Q.  Who knew that you know of?
9      A.  Sergeant Doty, Captain White, Assistant Chief
10  White, Captain Taylor, just probably anybody that worked
11  around him would see it.  If you read the IA from the
12  Internal Affairs report you'll see the assistant, the
13  chief's assistant knew it.  She said she had to just cut
14  him off because every time she saw him it was woe is me,
15  nobody will listen to my ideas.  Several people.
16      Q.  So when I asked you how it affected your
17  employment I would get a couple answers how it might
18  have impacted Ms. Wallace.  I'm more interested in how
19  it impacted you personally.
20      A.  Well, it was embarrassing because all those
21  guys -- Sean and I had the same situation with Sergeant
22  Roberts and Sergeant Perez and, you know, walking around
23  with their chest puffed out, you know, they all know
24  about it.  It's embarrassing and it's humiliating and
25  it's totally unacceptable and unwarranted.  I was trying

Page 97

1  to document an employee that had some serious behavioral
2  issues and they were not corrected until the time he
3  left.
4      Q.  Are you contending that this memo was
5  retaliatory?
6      A.  Yes.
7      Q.  In what way?
8      A.  Because Captain Lehman told me that if I didn't
9  lower Brenda's score by one point he was going to have
10 to write a memo and he wrote a memo like that.  Not only
11 did he write that memo, they called me into a meeting
12 for it.  I wasn't told what it was about and there were
13 three high ranking officers in there that surrounded me
14 and started asking me about it before I even had a
15 chance to read it.  I looked at it and I thought -- it
16 was so thick I thought there was performance reports
17 evaluations attached to it and that's why it was so
18 thick.  I did not even get a chance to read it before
19 they started in on me and it's just they told me that --
20 you want me to go on?
21     MR. HELWIG:  Go ahead, if you want to finish.
22     THE WITNESS:  That Sergeant Sealey told me
23 that, you know, he couldn't understand how Brenda
24 and Lindsey sit at their desk all day like, you
25 know, that's just secretarial work, that's horrible.

Page 98

1  And Assistant Chief Link told me that he doesn't
2  care if Sean walks around and talks to everybody and
3  networks and this and that.  And I said, "I don't
4  either as long as it's not affecting his job, but
5  he's not getting his work done."  And I even asked
6  ACOP Link what would you do if you told somebody to
7  do something and they just flatly didn't do it and
8  did what they wanted, and he said, "They'd be in my
9  office and we'd be having a nose-to-nose meeting."
10     Well, I tried to pull Sean in with Lieutenant
11 Sealey, but it didn't work that way.  I was told I
12 was defensive and just totally ignored about it.  So
13 once again I have no authority over this guy.  He
14 can just run around, get up from his desk, do what
15 he wants, take sick leave, take leave time, get
16 overtime.  He also was wanting to spend all of his
17 time in the violent crimes unit and not doing his
18 job.  If he would have been in the FTO program -- if
19 he would have been an officer he wouldn't have
20 lasted a month.  He would have been kicked out
21 because they don't put up with it.  Why they put up
22 with it because he is a civilian, I don't know.  But
23 what he did was not right.
24 BY MR. KERR:
25     Q.  So what is this memo in retaliation for?

Page 99

1      A.  Because I would not lower Sean's performance
2  evaluation.  I would not allow him to do whatever he
3  wanted, I guess.
4      Q.  Anything else?
5      A.  Just, I guess, that was what it was and they --
6  I think it's because Hans, number one, he has an issue
7  with women, he has an issue with age, and he's -- I
8  don't know.  I mean he just wanted to get rid of me, I
9  think.
10     Q.  What do you base those allegations on that he
11 has an issue with women and age?
12     A.  Read the memo.  It's all in there.
13     Q.  I'm not asking what the memo says.  I'm asking
14 what you think.
15     A.  If you look in the memo he refers to Sean was
16 young and fresh and we need to embrace young employees
17 and that I think he says -- uses the term that I was
18 stuck in my ways and, I mean, it's just -- it's the
19 whole thing is full of it.
20     Q.  Okay.  So besides the memo itself and the
21 language therein, was there anything else that's forming
22 the basis for that accusation?
23     A.  Well, he just had monitored his performance
24 reviews, he was communicating with Sean, he was sending
25 Sean emails that were only going to other supervisors,

Page 100

1  he was sending them to him separately.  Just the ongoing
2  stuff.  But, I mean, I think anybody that reads that
3  memo and the counseling form, clearly that's retaliation
4  on Hans' part.
5      And Sealey even told me when he did my
6  performance review, he handed that to me on a Microsoft
7  Word document, which it just had the categories in, it
8  didn't have any scores on it, "I've never gotten one
9  like that before" and he told me himself that when I did
10 Sean's review, that Hans had told him that he read it
11 and he said, "She ripped him apart again" and Sealey
12 said, "I was sitting there thinking I wonder what she
13 said."  And he said, "I got your evaluation and I read
14 it and I thought it's not that bad."  But he said,
15 "Hans, he's going to make my evaluation, he's going to
16 bring it down to about a 5, so maybe Hans won't write
17 another memo" is what he told me.
18     Q.  And I believe you later filed some sort of
19 grievance against Sealey; right?
20     A.  Yeah, because even though he did that, he
21 wasn't looking out for me.  He didn't stand up for me.
22 He was doing -- that was wrong.  I didn't deserve that.
23 I never had a bad evaluation in my entire career.  I
24 always got along with my supervisors.
25     Q.  I'd like for you to explain to me in your words

Page 101

1  since you're claiming harassment how this memo was
2  harassing.
3      A.  Because it had untruthful statements in it, it
4  referenced age, gender, it incorrectly addressed another
5  analyst and myself as being, I guess you'd say,
6  unprofessional and I don't know what -- I'd have to read
7  it again to see all of it, but -- and it was giving me
8  the message that I needed to accept Sean as he was and
9  do whatever -- you know, it was overstepping his bounds.
10  He wasn't really in charge of the performance review
11  like that and certainly to write a memo that's eight
12  pages long that's going to be available to the public
13  like that is harassment.  That's not just something that
14  goes in a file.  That's public record.
15      Q.  So you think that he did this to deliberately
16  target you as a woman --
17      A.  Yes.
18      Q.  -- who's aged, so to speak?
19      A.  Yep.  Yes, I do.
20      Q.  And you believe that all of that is contained
21  in this memo?
22      A.  There's references to all of it in there.  I
23  mean just the whole facts of not consulting with me or
24  somebody -- I hope that's not my phone.
25      MR. HELWIG:  It's mine.

Page 102

1      THE WITNESS:  -- who's a subject matter expert
2  in the area of crime analysis and listening to a new
3  untrained, you know, inexperienced white male that
4  comes in to the unit.  And, you know, Chip Roberts
5  wanted to give him a laptop and let him work from
6  home.  He hasn't been here long enough to do that.
7  You can't just give him a laptop.  What about the
8  other analysts that have been here longer?  They're
9  much more qualified to assist you in investigations.
10      You know, there's a little bit of a hierarchy
11  in the police department with seniority and when you
12  have someone that's been there 14 years, it kind of
13  is a trickle-down thing.  You know, they get asked
14  first and then so on because that's all they have.
15      When they remodeled the offices, what we
16  normally do when that happens is the senior analyst
17  gets to choose their spot, then it goes from there
18  by seniority.  We've always done that.  Well, Hans
19  told Sean to go ahead and pick where he wanted to be
20  without consulting with anybody else, so he got
21  first pick.  I mean it's like being cut apart by a
22  thousand little swords.  Every time you look around
23  it's something else.  It's just a hit, a hit, a hit
24  everyday till you get to the point where you don't
25  want to come into work because everybody is looking

Page 103

1  at you, everybody knows what's going on, you know,
2  you can tell people are talking about it.
3      That place is just -- it's a gossip mill and if
4  one officer knows about it, everybody knows about
5  it.  Somebody sends out an email like Sealey sent
6  out, everybody knows about it.  How can you hold
7  your head up when you go in there?  Everybody knows
8  that you're being looked upon as being a bad
9  employee and it's hard enough already when you are a
10  woman in a job that's dominated by men to get any
11  kind of equal standing in there as a supervisor and
12  now  there's no way.  Hans has removed that.
13  BY MR. KERR:
14      Q.  You were the supervisor of the CAIC for how
15  long again?
16      A.  I started the unit in 2004.
17      Q.  That was right after you graduated; right?
18      A.  Uh-huh.  I was -- actually my advisory at
19  college kind of forced me into it.  I didn't want to do
20  that, but he forced me into it, said this is the wave of
21  the future, you need to take this, it's all this
22  computer stuff and everything; so I did it.  And then
23  when I graduated, low and behold they started a crime
24  analysis unit and I was really the only one who knew
25  anything about it besides Chief LePere who had just kind

Page 104

1  of studied up on it a little bit.
2      Q.  I'm going to read a brief statement to you from
3  this Captain Lehman memo and I'll ask you a question
4  about it afterwards.  The sentence is "Ms. Wallace is an
5  excellent employee and valued member of this
6  organization."
7      Does that sentence sound like a sentence that
8  would come out of someone who's biased against women?
9      A.  Well, I'm sure there is a but after that.  But
10  and then he goes on throughout there to tell about to
11  discredit her.
12      Q.  To explain why he believes that her evaluation
13  should be lowered by one point; right?
14      A.  Yeah, he did.
15      Q.  Why his opinion is that her evaluation should
16  be lowered by one point, is this what this memo is
17  about, isn't it?
18      A.  Yes, because from what he told me, he felt like
19  she wasn't a team player and that's not true.  He
20  doesn't even know if she is or not.  He's never spent
21  any time with her, observed her in the workplace, he
22  doesn't know.  And second of all, there's -- I had so
23  much information on Sean and what he's doing and it's
24  not like they're co-workers.  She is his FTO.  She went
25  to great lengths to try to help him and train him and

Page 105

1  started getting frustrated when -- I mean if you picture
2  yourself you tell somebody who's new on the job I want
3  you to do this and then you turn around and they're gone
4  and they don't come back for an hour and you're training
5  them, what would your reaction be?  That happened day
6  after day after day with him.  He'd just get up and walk
7  off and nobody knew where he was.  Wandering around.
8        And like I said before, we had been through
9  that with that big sex scandal and we did not -- we're
10 sensitive to that at that point.  And when I would --
11 you know, we had a clipboard for a while where we told
12 him if you're going to be gone longer than 15 minutes,
13 tell somebody, write it down because it causes problems
14 within the unit because somebody comes up and wants
15 somebody and it's in Sean's area and they look over
16 there, nobody at his desk.  Now if they know he's going
17 to be only gone for 15 minutes they can tell that person
18 he stepped away from his desk, he'll be back in a few
19 minutes if you want to, you know, bring it back to him.
20 But when he doesn't show up and we don't know where he
21 is and when he comes back now they're saddled with
22 having to figure out where is he, is he going to be able
23 to do it, you don't know, I mean it causes problems all
24 the way through.
25        So he would sign that clipboard, but then he

Page 106

1  would walk by my office and lean in there and he'd say
2  "I'm going to the bathroom" and he would keep walking,
3  then he would come by and lean in and say "I'm going to
4  get a drink from the drinking fountain," just taunting
5  me like that.  Malicious compliance is what it is.  Like
6  I follow his every move and, no, it's just that we want
7  to know where he is.  He is accountable for that.  He
8  has to let us know.
9        MR. HELWIG:  This is a fine time to take a
10 bathroom break.
11        (Recess 12:27 p.m. - Resume 12:33 p.m.)
12        MR. KERR:  Back on the record.
13 BY MR. KERR:
14 Q.  Did you ever write a formal discipline for Sean
15 Patterson?
16 A.  No.
17 Q.  Did you ever write a counseling form or
18 otherwise write him up in any way?
19 A.  I wrote -- sent an email to him about working
20 through lunch after he violated the directive not to do
21 that for the third time.
22 Q.  Is that, like, a formal directive?
23 A.  It's just an email.  He filed a complaint
24 against me and said I was harassing him.
25 Q.  I mean when you refer to a directive, are you

Page 107

1  referring to an official policy of the police department
2  or the city or are you referring to, like, a policy that
3  you have or that the CAIC has?
4  A.  It's a policy you can't just take your lunch
5  whenever you want.  You can't on your own as an employee
6  decide you're going to work through lunch and then go
7  home early.  We talked about this earlier.
8  Q.  Yeah.
9  A.  He did it for the third time.
10 Q.  Just to clarify, who sets that policy?
11 A.  It's always been that way.  It's common sense.
12 Q.  If someone --
13 A.  You can't as an employee alternate your hours
14 without permission from a supervisor.
15 Q.  So it's more of an informal policy than a
16 formal one?
17 A.  I believe it's addressed in policy.
18 Q.  If someone wanted to change that policy do you
19 know who that -- the proper person would be, what their
20 rank or position would be?
21 A.  You mean to change the policy that you can go
22 to lunch whenever you want and leave whenever you want?
23 Q.  Yes.  Well, to change lunch policy, yes.
24 A.  No, I don't.  It's never come up.
25 Q.  And I believe that you had also mentioned that

Page 108

1  there was an email that went around by Lieutenant
2  Sealey.  How did that affect your pay, your title, your
3  position as a supervisor of the CAIC?
4  A.  It caused me to forfeit my job and have to walk
5  off because I couldn't work there anymore.  That was the
6  final straw for me.  Although, there was a lot leading
7  up to it, but everybody in the department knew about
8  that and when I came to work they were all talking about
9  it and it was embarrassing because I said I'd been a
10 good employee for 23 years and now all of a sudden this
11 goes out that a supervisor is watching my every move and
12 making derogatory statements about myself and Brenda.
13 Q.  What derogatory statements are you referring
14 to?
15 A.  Oh, he called us team Brenda and Terri and, you
16 know --
17 Q.  In what way is team Brenda and Terri
18 derogatory?
19 A.  If you read the memo, that's how I took it,
20 that's how I am sure it was intended.  He wouldn't speak
21 to me.  My supervisor wouldn't speak to me.  Since the
22 time I filed the complaint he wouldn't talk to me.  If I
23 saw him in the hall he wouldn't say hello, he wouldn't
24 speak to me.  That's pretty hostile, I think.
25 Q.  Did you or counsel on your behalf ever request

Page 109

1  that Lieutenant Sealey be removed --
2     A.  Yes.
3     Q.  -- from position above you?
4     A.  Yes, on more than one occasion.
5     Q.  When was that?
6     A.  Oh, boy, I know just after the Sealey they sent
7  out that email at that time it occurred.  But I believe
8  before that, after I filed the complaint, it occurred.
9  Maybe even before then.  I'm not sure exactly when.
10 It's not a landmark in my head because it was denied.
11    Q.  Let me make sure I understand.  Don't let me
12 put words in your mouth.  If what I say is not correct,
13 just let me know.
14       You wanted and had requested for Lieutenant
15 Sealey to be removed from his position.
16    A.  Yes.
17    Q.  Then you were upset or thought it was improper
18 when he wouldn't talk to you; is that right?
19    A.  He wouldn't talk to me from the time that I
20 filed the complaint against him.  He wouldn't speak to
21 me.  That was from -- I think it was March 2018 until I
22 left.  I think that's when I filed the complaint.  But I
23 believe that the request was made to remove them --
24 well, I went to get an attorney.  I consulted with an
25 attorney after the -- I think it was the memo that did

Page 110

1  it.
2     Q.  And I don't want to know the content of
3  attorneys on this.
4     A.  No, I'm not.
5     Q.  Just reminding you.
6       MR. HELWIG:  She knows.
7       THE WITNESS:  It was in July of 2017 that I got
8  that memo that Hans had written.  I said this is
9  ridiculous, this is not going to go away, it's going
10 to continue, I can't take it anymore, so I went and
11 spoke to an attorney.  Well, first thing I did, I
12 went to city hall.
13 BY MR. KERR:
14    Q.  I don't mean to cut you short.  I'm just trying
15 to stick to the questions.  We don't have that much time
16 left.
17       MR. HELWIG:  We have plenty of time.
18 BY MR. KERR:
19    Q.  All right.  I just want to stick on the issue
20 of Sealey, right, and -- Lieutenant Sealey.  And the
21 question was so you wanted him removed and you had
22 requested him to be removed from a position in the chain
23 of command above you and I believe you responded yes;
24 right?  That's a request that you had had --
25    A.  Yes.

Page 111

1     Q.  -- right?
2     A.  And with him I'm sure it was after I filed the
3  complaint because I got along with him.  Except for the
4  fact that he was not standing up for me and doing his
5  job I got along with him okay, but after I filed that
6  complaint he wouldn't talk to me.
7     Q.  Are you contending in this lawsuit that
8  Lieutenant Sealey was discriminating against you on the
9  basis of your gender?
10    A.  Well, he's in the good-old-boy system and,
11 yeah, he did.  He would talk to me and say I had a
12 meeting -- you want me to go on with this?  It's
13 concerning him.
14    Q.  Go for it.
15    A.  When I called Sean in to talk to Sealey based
16 on Sean's behavior and I started to, you know, tell Sean
17 that he needed to sit down and do his job, this was
18 after the meeting I had with Brenda where he was so
19 arrogant and rude and flippant and argumentative, I set
20 one up with Steve and brought him in there and basically
21 trying to get him back on track and trying to let him
22 know, look, Sean, you got to cut this stuff out, you
23 can't just wander around, you got to do what you're told
24 to do.  Well, Steve instead of -- Sean started making
25 even more remarks to me like "You ran off Johnny To, the

Page 112

1  last crime analyst."
2       And I said, "Sean, you don't even know him.
3  You're engaging in gossip obviously."
4       And he says "Well, the higher-ups say nothing
5  is going to change as long as you're here."
6       And I said again, "Sean, that is
7  inappropriate."  Well, Sealey had an opportunity to
8  protect me or to back me up and what he did was say, oh,
9  don't -- and Sean said, "I know I am going to get fired
10 because I said this."
11       And Sealey said, "Don't worry.  Nobody is going
12 to get fired, Sean.  I got your back."  Well, here I am,
13 how am I going to get this guy to -- now Sealey's
14 telling him you can talk to her in this way.  He would
15 never let a man -- he would never do that to a male, I'm
16 telling you.  He would never.  But because I am a female
17 when I talked to him later, I'm being defensive with
18 Sean.
19       And with Chief Link I said -- he said he'd have
20 a nose-to-nose conversation.  Well, I go in and just try
21 to set the record, get Sean back on track and, you know,
22 I'm being defensive.  But a man, he would never do that
23 with a man in there.
24    Q.  What evidence or proof or conversations or
25 anything do you know of that indicates what you just

Page 113

1  told me?
2      A.  Because I know Steve.  I've been around him a
3  long time.  I've been around those guys a long time and
4  I have put up with this kind of thing in small doses
5  over the years and I know what it is.  But I've never --
6  it's never been to the point where I felt that I had to
7  file any kind of complaint on it.
8          When I first went into SIS as a detective they
9  had nude photos of women on the walls.  One of the
10 detectives there had his girlfriend dressed in a leotard
11 with a collar and leash on her on his wall.  They used
12 to change their clothes in front of me down to their
13 underwear.  That's what -- and, you know, I did not
14 complain about that because I wanted to, you know, I
15 wanted to be a cop.
16         I had one of the detectives there tell me he
17 couldn't be my partner because his wife would get
18 jealous.  That's unacceptable.  If you go to a job, no
19 matter what it is, you're supposed to work with who's
20 working there.  Because your wife will get jealous you
21 can't be my partner at work?  You know, I've never had
22 any kind of relationship with anybody in the department
23 that was anything other than professional.
24     Q.  Are you contending that any of those things
25 that you just mentioned are currently ongoing?

Page 114

1      A.  No, but I'm just giving you the experience of
2  what I know about the men in this department and the
3  good-old-boy system and how they -- how the sex was
4  there and the gender bias and, you know, I was told
5  that -- a lot of them would tell me you shouldn't be a
6  cop because you're a woman, a woman can't take a punch
7  like a man.  What would you do if you stopped a car and
8  there were three men in it?  I said, "What would you do?
9  Are you going to fight three men?"  It was just ongoing.
10 That was the atmosphere there to a certain extent.
11         But when it rises to the level of this where
12 I'm trying to get this unit back on track and Lieutenant
13 Sealey decides he's not going to assist me, he's going
14 to -- and he told me that talking to Sean he felt it was
15 like a father talking to his son and he made statements
16 like, you know, it's the -- he's younger and quicker and
17 they're going to come nipping at your heels, you got to
18 understand these younger people and all of this.  And
19 I'm like "Steve, I don't care how old he is.  I don't
20 care if he is younger.  He is an employee.  He's got to
21 do his job like everybody else.  That's irrelevant to
22 me."
23         He also would take Sean in his office and
24 counsel him or mentor him for hours several times on
25 several occasions and nobody knew where he was.  One

Page 115

1  time when I called Sean because we were trying to figure
2  out where he was, Sean answered the phone and told me
3  "Be back in 15 minutes."  He was in Sealey's office.  He
4  never even told me that's where he was.  I mean it's the
5  good-old-boy system.  That didn't happen with the female
6  analysts.
7      Q.  You were the supervisor of the CAIC, weren't
8  you?
9      A.  Yes.
10     Q.  Was the CAIC a good-old-boys club?
11     A.  No, because we had men and women in that club
12 and I treat all employees equally regardless of their
13 age or their sex.  I try to be fair to all of them, I
14 try to help all of them, I try to provide training for
15 all of them.  And I think if you ask any of them, except
16 for Sean, they'll tell you that except maybe -- I don't
17 know -- but I tried to treat them all fairly.
18     Q.  And you were put into your position as
19 supervisor during the era of the good-old-boys club;
20 right?
21     A.  2001 I think is when I was promoted to
22 sergeant.  In 2004 is when I was in the crime analysis
23 unit.
24     Q.  Okay.  So the time you were promoted to
25 supervisor, the good-old-boys network was in the swing;

Page 116

1  correct?
2      A.  Correct.  And they filed a grievance because
3  another female was, I think, number two on the list and
4  I was number five and there were a lot of SWAT guys that
5  were underneath me on the list, so they tried to file a
6  grievance to block us from being promoted.
7      Q.  But in any event, at the end of the day you got
8  the job?
9      A.  Yeah, but still that's the environment.  They
10 couldn't believe that a woman could be a SWAT guy.  I
11 don't know.
12     Q.  And then you did your job for how long?  14
13 years or longer in the supervisor position and I believe
14 you never got a grievance besides the ones that we are
15 here today.  They never moved you, tried to fire you,
16 you got demoted or reduced in pay?
17     A.  Correct.
18     Q.  I understand it's a compound question.
19     A.  But you got to work twice as hard as the men to
20 do that.
21     Q.  What evidence do you have to substantiate that
22 for that turn of phrase?
23     A.  I worked 24/7, I worked in the street crimes
24 unit, I worked and I worked and I worked.  I was called
25 out on weekends and nights.  I always answered my phone.

Page 117

1   **You have to work hard if you're a female and I had no**
2   **family member, husband, boyfriend that was a police**
3   **officer. It was all -- I was independent on my own. I**
4   **had to earn whatever I got without any help.**
5   Q.  So what I'm trying to figure out here is
6   outside of, you know, you saying that, I'm trying to
7   look for something that can be -- that can be proof of
8   that.  What are you going to use to substantiate that
9   allegation?  You understand what I am asking for?
10  **A.  The allegation that --**
11  Q.  That there is a good-old-boys network, that
12  there's just casual discrimination by sex in the
13  organization.  I understand that is your allegation.
14  **A.  Well, we had the sex scandal.  That was a**
15  **pretty good example.**
16  Q.  Was that discrimination against women?
17  **A.  They were high-ranking officers that were in**
18  **supervisor roles with this female.  They were having**
19  **sexual relations with her on duty.**
20  Q.  Okay.  Let's talk about incidents involving you
21  then.
22  **A.  Well, that was my unit, so that involved me.**
23  Q.  Were you ever demoted?
24  **A.  No.**
25  Q.  Did you ever receive a reduction in pay?

Page 118

1   **A.  No.  I wasn't demoted officially, but I was**
2   **demoted in the environment because I really didn't have**
3   **any supervisory role there.  I wasn't respect -- I**
4   **wasn't treated like a supervisor.  Sean didn't really**
5   **answer to me.**
6   Q.  Were the crime analysts still sending their
7   materials to you as part of your supervisory job?
8   **A.  They were.  There was a period of time where**
9   **they were told that they couldn't send -- discuss any**
10  **business with me, that only they could discuss -- have**
11  **personal conversations.**
12  Q.  Is that the time that you were out for your
13  surgery?
14  **A.  I don't recall exactly when that was.  It was**
15  **around that time.  I don't know if it was -- because**
16  **when I came back, I still wasn't supervising them even**
17  **when I came back part time.  They were still --**
18  Q.  The crime analysts simply wouldn't send you
19  their materials anymore?
20  **A.  They couldn't.  They were told not to.**
21  Q.  By whom?
22  **A.  There's an email on it.  I can't remember**
23  **exactly who sent me the email.**
24  Q.  And who told you that they weren't allowed to
25  talk to you about business?  Which of your crime

Page 119

1   analysts -- let me be more specific.  Who informed you
2   of that?
3   **A.  I can't remember if that came from an analyst**
4   **or it was from an email.  I can't remember.  I was**
5   **thinking it was from an email from one of them, but I**
6   **have to look back and see.**
7   Q.  Is it normal for employees of the city or the
8   police department in general to work while they're on
9   vacation?
10  **A.  It's not normal.  Some of them do.  I worked**
11  **when I was on sick leave too.**
12  Q.  I recall from your prior deposition that you
13  had taken some leave almost immediately prior to you
14  ending up leaving the city's employ.  It was like a week
15  or two weeks.  Do you recall that leave?  Was it one
16  week or two weeks?
17  **A.  I think -- I have to look back.  I am thinking**
18  **it was two weeks, but I can't say a hundred percent**
19  **positive.  I have to look back and see.**
20  Q.  Okay.  And then did you return to work after
21  that leave, so it should be early September of 2018?
22  **A.  I think I worked the last week, close to last**
23  **few days.  I don't remember.  I don't specifically**
24  **remember.**
25  Q.  So help me understand.  If none of your crime

Page 120

1   analysts were giving work to you because they were told
2   not to, what work were you performing?
3   **A.  I was working on UCR.**
4   Q.  What is UCR?
5   **A.  Uniformed crime report.**
6   Q.  And you don't need any of your other crime
7   analysts to give you anything to do that, that's your
8   own thing?
9   **A.  Repeat that.**
10  Q.  You don't have any of your crime analysts send
11  you anything regarding that, that's something you do on
12  your own?
13  **A.  It's something I do on my own unless I have**
14  **problems sometimes they have to help.  It's a report**
15  **that's done twice a year.  It's done semi-annual.  It is**
16  **due in February 1st and then the annual report -- or**
17  **maybe it's the other way around.  It might be the other**
18  **way around.  The annual report is due in August and it's**
19  **a very complex, complex report.  It involves all of our**
20  **stats, all the money, all the crime classifications.**
21  **It's very, very complicated.  And we had a computer**
22  **system that you couldn't just -- it was like doing --**
23  **you had to go in and solve the puzzle to get it done**
24  **because the computer system didn't work accurately and**
25  **you had to query and run all the numbers.**

Page 121

1  I had done it for so long I could look at the
2  numbers and know if they are right or not, these are way
3  off, it can't be right, and I could spot check things,
4  but you had to take all of the money, all of the
5  property -- it was broke down into three separate areas.
6  It was millions of dollars.  It all had to reconcile to
7  the penny.  They had -- all the crime categories were
8  broken down.  They all had to reconcile by arrests and
9  all of this stuff, so it was very complicated.
10       And when I did -- when I was working on that
11  report you have to just focus on that.  You can't be
12  interrupted a lot during that period because you get so
13  involved in it.  If you lose your place, then it takes
14  you forever to get back mentally to where you were
15  trying to figure it all out.  You know what I am talking
16  about?  I'm telling you this so you understand how
17  complicated it was.
18       Q.  It was my question.  I understand.
19            So did you finish that report?
20       A.  Yes, I never failed to finish it no matter
21  what.
22       Q.  And what else?  Right after you finished that
23  report did you do anything else before you resigned?
24       A.  I think -- I don't -- well, I finished the
25  report.  That was right around when Sealey sent out that

Page 122

1  thing.  I remember that.  And that really was difficult
2  for me to get that done.  Then after that I think I just
3  had to take some time off.  I was just totally
4  demolished by that last thing.  I mean many things
5  leading up to that, but that was just -- I just can't do
6  this anymore.  I can't handle it.
7       Q.  And it was at that time that you did not show
8  up to work?
9       A.  Well, I showed up for work when I had to.  I
10  mean I didn't just not go, but I took time off -- I
11  can't -- you know, it's hazy for me at that time because
12  mentally I was so distraught.  I can't remember the very
13  specifics at the final end.  It was so difficult to get
14  through a day because I had been there for so long and I
15  felt so much betrayal.  The rug was pulled out from
16  under me.  I was just -- it was just a horrible time.  I
17  can't even describe what it was like.
18       Q.  So from the time that you -- from the time that
19  you had stopped receiving these messages from your -- or
20  these tasks from your crime analysts until your
21  retirement, what did you do besides the UCR report?
22       A.  I can't tell you today.  It's five years ago.
23  I mean I am sure there were some things that I did.  I
24  just don't remember anymore.
25       Q.  Were you able to do the very complex UCR

Page 123

1  reports on your half day, half day setup?
2       A.  Yes.  I could remote into my computer from
3  home, my desktop computer, and work from home and for
4  that it was the best thing to do.  Like I said, you have
5  to give it a hundred percent of your concentration.
6       Q.  Are you claiming that Sergeant David Doty
7  discriminated against you on the basis of age or gender?
8       A.  I never claimed that about Sergeant Doty.
9       Q.  Are you claiming that he's harassed you?
10       A.  No.
11       Q.  Are you claiming that he's retaliated against
12  you?
13       A.  No, he was one of my partners in special
14  investigations.
15       Q.  Just so I am clear, who are the individuals you
16  are alleging who harassed or retaliated against you?
17       A.  Steve Sealey, Hans Lehman, Larry Giddens,
18  G-I-D-D-E-N-S, Mike Link, Jason Perez, James, quote,
19  "Chip" Roberts.
20       Q.  Okay.  What discriminatory conduct are you
21  alleging of Chief Giddens?
22       A.  Well, he -- I approached him -- I approached
23  him to try to get some help to resolve the situation
24  with Hans and he wouldn't -- he left Steve as my
25  supervisor, somebody who wouldn't even talk to me.  He

Page 124

1  didn't seem to see anything wrong with that.
2       Q.  So you're claiming that is affirmative evidence
3  of him discriminating against you on gender?
4            MR. HELWIG:  Object to the form.
5            MR. KERR:  What is the objection?
6            MR. HELWIG:  She didn't say anything about
7       affirmative, whatever that means.
8  BY MR. KERR:
9       Q.  Okay.  Again, if I ask you a question and I say
10  something incorrectly, please correct me, of course.
11            Do you have knowledge of any conversations or
12  any other instances or events that would support your
13  accusation that Chief Giddens had discriminated against
14  you on the basis of your gender?
15       A.  Well, I think he was one of the good old boys
16  and Steve Sealey was the godfather of his children, so
17  he wouldn't do anything.  He tried to protect Steve.  He
18  wouldn't do his job and either straighten Steve up or
19  move him.
20       Q.  I'm asking for specific instances of things
21  that you have witnessed or heard about --
22       A.  That was it.
23       Q.  -- not allegations.  Here is an event that I
24  know occurred, that I heard occurred that shows to me
25  Chief Giddens is discriminating against me on the basis

Page 125

1  of my gender.  That's what I am asking about.  Do you
2  know of any?
3      A.  He's just one of the good old boys.
4      Q.  So he is a male.  Let me -- what do you mean by
5  the good old boys?  Let me ask you in a different way
6  and again correct me if I am misstating this, but what I
7  understand from when you said good-old-boys network, the
8  men look out for each other?
9      A.  Uh-huh.
10     Q.  Okay.  So a man in a supervisory position above
11  you is deciding something?
12     A.  Right.  The men look out for each other and to
13  do that that means they put the men above the women.
14  The women aren't part of that group and so when anything
15  happens -- you know, it's so irrational and unbelievable
16  to me that they could observe the conduct of this young
17  white male that came to work at the department and take
18  his side or protect him over me who's been there for 23
19  years and had a great career.  They know me, they know I
20  am trustworthy, they know I am honest, they know I got
21  my work done, they know me and I have the experience.
22  I've demonstrated my abilities in this area and yet they
23  are taking up for this young white male who has no
24  experience and is committing all of these -- doing all
25  of these things.  It's just -- I can't even -- I'll

Page 126

1  never understand why that happens.
2      Q.  So your explanation for that is because Sean is
3  younger they're discriminating against you based on your
4  age; is that right?
5      A.  Because of his -- because he is a male, his
6  gender as well.
7      Q.  I believe Sean Patterson also filed a grievance
8  against you for some sort of discrimination, didn't he?
9      A.  Yeah, for writing him an email correcting him
10  for taking lunch without authorization for the third
11  time.  He'd go to whatever supervisor and he did it
12  again and then he got in trouble and he went to Dave
13  Doty and he did it again and also when I read the
14  internal complaint he lied in that complaint.  He was
15  completely untruthful.
16     Q.  What specific events -- do you know of events,
17  conversations, et cetera that indicate to you that
18  Michael Link has discriminated against you on the basis,
19  of your gender or your age?
20     A.  Well, he signed that memo and he thought that
21  was okay.  That's pretty bad.  I can't -- if somebody
22  brought that to me and I read that, I would not sign it
23  if I was supposed to sign it that I approved of it.
24  That would go back to him or go in the garbage can.
25  It's ridiculous.

Page 127

1      Q.  Is that the only instance?
2      A.  That's the only instance for him.  He supported
3  that.  He supported them.
4      Q.  I believe you also mentioned --
5      A.  He was in that meeting as well.
6      Q.  I believe you also mentioned that Perez --
7      A.  Uh-huh.
8      Q.  -- is that right?  What specific events or
9  conversations or anything do you know of that you're
10  basing your claim of discrimination on regarding him?
11     A.  Well, there was a shout-out, but that was more
12  for Brenda and for giving Sean all the accolades for a
13  case that he did a small part of the work on and not the
14  other, not all of them.  But I also filed a complaint
15  against him and he took the subpoena and he put it up on
16  the wall in his office for everybody to see.
17         Chip Roberts taped it to the front of his desk
18  and Steve Sealey put it up on his wall so everybody
19  could see it mocking me.  Hans Lehman went in and saw it
20  on Sealey's wall and did nothing, so they all got
21  written up for it.  Not by me.  Internal Affairs wrote
22  them up for it and they were all -- I think they
23  sustained some kind of discipline for it, but that
24  definitely was harassment.
25     Q.  Wouldn't that -- the fact that they were

Page 128

1  disciplined for what you've alleged is some sort of
2  discrimination on the basis of age or gender, wouldn't
3  the fact that the City took some disciplinary action
4  against them indicate to you that there is some
5  accountability, that's not allowed, it's being
6  disciplined?
7      A.  They had no choice in something like that.
8  Plus they still didn't move them.  Steve was still my
9  supervisor, Hans was still my supervisor.  And when I
10  was going out on sick leave Steve Sealey wanted to put
11  Jason and Chip in charge of my unit while I was gone and
12  I said, "No."  I said, "We're having issues with them.
13  There's three other sergeants in there.  Any of those."
14         And he said, "Well, they're always talking
15  about it.  Let them see how easy it is.
16         "Steve, that's not what you make that decision
17  based on.  That's putting everyone else in the unit in a
18  bad situation to have to deal with all of that, you
19  know."  So at any rate I don't even know how it got
20  changed, but I think it got changed when they got
21  written up for posting the subpoena on the wall.
22     Q.  How are you claiming that you were harmed by,
23  as you put it, being forced to retire?  I'm asking more
24  specifically about financials, so let's talk numbers.
25  Where were you looking at as far as, you know, what

Page 129

1  you're believing that you're owed?
2      A.  Well, I left before I had 25 years in, which I
3  would have done that easy and that would have completely
4  increased my pension by quite a bit, and then I was
5  going to go on to the drop, which would -- you know,
6  five years in drop.  I don't know if I would have done
7  all five years, but I hoped to and that would also
8  increase my salary.  I don't have the numbers right in
9  front of me.  They'd have to be tabulated, but it's a
10  significant amount.
11      Q.  What was your last year's salary?
12      A.  I don't have that in front of me anymore.
13      Q.  Can you give an estimate.
14      A.  I don't really know.  I know we had -- he had
15  some kind of papers at the last depo.  I think it was
16  maybe -- I want to say 80,000 a year, but I'm not sure.
17      Q.  All right.  Besides, you know, you're claiming
18  that you would have gone into drop and you would have
19  continued working those other two years, are there any
20  other damages you're claiming?
21      A.  Well, there would have been overtime possibly.
22      Q.  Did you work overtime normally?
23      A.  Sometimes I did.  Depends what was going on.
24  During one part I was a public information officer for
25  several years, went out to scenes and was on -- talked

Page 130

1  to the reporters on camera, on TV and stuff.
2      Q.  And your last year as a supervisor of the CAIC
3  did you work any overtime?
4      A.  Not my last year, no.
5      Q.  How about the year before?
6      A.  You know, I can't tell you.  I am sure I did.
7      Q.  So, you know, would you defer to the payroll
8  records on that?
9      A.  Yeah.
10      Q.  Okay.  Besides overtime, those two years in the
11  drop, what else are you alleging as damage in this
12  lawsuit?
13      A.  Well, for financial?
14      Q.  Yes.  Yes, financials.
15      A.  Insurance.  I had to pay more insurance.
16      Q.  You have to pay more insurance how so?
17      A.  When I retired I wasn't 65 and I had to pay
18  more insurance for healthcare that was previously paid
19  by the department.
20      Q.  Is that part of the drop?
21      A.  I think it's part of the drop.  Well, just
22  regular wages is part of that and then I'm not sure how
23  much it is in the drop.  I think there is -- it's still
24  paid for, I believe, in the drop because you're still
25  employed, but you don't -- you start out -- I don't

Page 131

1  think you get sick time.  I don't know all of the
2  parameters of that.  Plus I lost all of that time, all
3  that sick leave when I was just mentally incapable of
4  coming to work, you know, I just couldn't face it
5  anymore.  I still can't believe that happened.  I just
6  never been in that situation.
7      Q.  Anything else damage-wise you haven't
8  mentioned?
9      A.  Just my mental state, the damages having to see
10  a psychiatrist, not being able to sleep at night, being
11  diagnosed with PTSD.
12      Q.  Who diagnosed you with PTSD?
13      A.  Dr. Montero.
14      Q.  When was that diagnosis made?
15      A.  2017.
16      Q.  Okay.  And what triggering event did he claim
17  caused your PTSD?
18      A.  I am not specifically sure.  It's in the
19  records.  And Dr. Karen Heston at Watson Clinic also.
20      Q.  All right.  2017 was before you had filed your
21  grievance; right?
22      A.  Right.
23      Q.  Okay.  Had you already been visiting that
24  psychiatrist before 2017?
25      A.  No, huh-uh.  Never.

Page 132

1      Q.  Had you ever visited a psychiatrist before
2  2017?
3      A.  Nope.  Never.  I mean you have to understand
4  the whole picture of being injured, being in pain all
5  the time.  Because, first of all, they missed the knee
6  diagnosis until almost a year, so it was very difficult.
7  I mean it's just a lot of pain, going through all this
8  other stuff.  I live by myself.  I don't have anybody
9  helping me so I had to go home and take care of the
10  house, do everything by myself, go to work and all of
11  that and then dealing with this on top of that it
12  destroyed me, completely destroyed me.  I was just -- by
13  the time I quit, I couldn't have gone on.  I just
14  couldn't have done it.  I couldn't walk in there and
15  face all those people.
16      Q.  Could you continue to work from home?
17      A.  Pardon?
18      Q.  Could you have continued to work from home as
19  you had done previously on your day in and day off?
20      A.  No, it had gone too far.  It took me a long
21  time to bounce back from that.  I still don't think
22  time's completely there.  I cannot drive by the police
23  department, you know.  I feel sick.  I can't go to
24  funerals.  I can't face those people.  I can't go to the
25  annual luncheon.  I can't face those people.  I am so

Page 133

1  ashamed.

2  Q.  What are you ashamed of?

3  A.  That they were all talking about me, that they

4  read that thing that Steve sent out.  You know, one of

5  the things I prided myself on was my reputation and work

6  ethic and they completely took that away and, you know,

7  it's just I can't face them.  I can see one on one, you

8  know, if I run into them, but I can't go to those

9  gatherings or anything.  I just can't do it.

10  Q.  Have you ever tried to explain to any of those

11  people your side of the story?

12  A.  People that agreed with me and people that saw

13  it, but it's just the rumor.  It's the officers, it's

14  all the other people.  And even if you go -- they wanted

15  to put me back in patrol.  If you go back in patrol,

16  first of all, it's viewed -- perceived as a demotion,

17  whether it is or not, that you didn't succeed, that they

18  kicked you out of there because you did something wrong.

19      Second of all, all those people are scattered

20  throughout the department and I am going to have to work

21  around them and they're also going to be continuing on

22  is what I thought with all of that stuff.  You know,

23  there's just no -- you can't escape it at some point.

24  The only thing that would have -- if they would have

25  taken steps to remedy it, resolve it, moved Sealey out

Page 134

1  of there, you know, changed the chain of command which

2  was in their control to do that would have sent a

3  message because what I did was not wrong.  I was not

4  wrong and everybody knew it and nothing happens to it,

5  it makes you look even -- I mean a lot of people knew it

6  was wrong and nobody does anything about it.  It really

7  makes you look like you have no value at all as a human,

8  as a person.

9  Q.  What makes you -- let's talk some names.  Who

10  have you heard from tell you that they thought it was

11  wrong?

12  A.  Well, people that I work with; Rick Taylor,

13  Victor White.  There's just other people that I know.

14  Pat Giddy.

15  Q.  Let's name as many as you can remember.

16  A.  You know, I think it was just obvious that once

17  it got out, once that thing was released -- I know

18  Darlene thought it was wrong, I know Brenda thought it

19  was wrong.  She filed a complaint too.  And then on top

20  of that when you file a complaint like that, why is it

21  investigated by your own personal police department

22  where the investigators are under the supervision of

23  those people being investigated?  How is that right?

24  Why was that not investigated by FDLE or some outside

25  agency that could give it -- you know, look at it that

Page 135

1  didn't have to answer to one of those people for

2  promotions and things like that?

3  Q.  Are you claiming that that's proof that you

4  were discriminated against based on gender or age or

5  harassed or retaliated against?

6  A.  I'm just saying that's a reasonable thought

7  that they're not going to be looking out for you.

8  They're going to be, you know, trying to find evidence

9  to support their superior officer that they answer to.

10  Q.  Okay.

11  A.  Why isn't it not shipped out to FDLE?  I filed

12  a complaint all the way up to the chief of police.

13  Q.  Wasn't there a -- we had talked about earlier

14  that there was a complaint about the officers who had

15  put the subpoena on their wall and that they had been

16  disciplined as a result of that.  Do you recall that;

17  right?

18  A.  Uh-huh.  Well, that they still -- they didn't

19  find anything wrong with Steve Sealey sending out that

20  35-page memo and whether they believe he did it

21  accidentally or not, it was still negligence.  He still

22  should have had something -- some kind of discipline for

23  that.  He didn't.  They didn't find anything wrong with

24  what happened to me with Sean, you know, which is wrong.

25  They should have.  And I believe if it would have been

Page 136

1  at another agency they would have found wrongdoing

2  there.

3  Q.  And you believe that they ignored you because

4  you were higher in age and because you were a woman; is

5  that right?

6  A.  Who?  The Internal Affairs?

7  Q.  Yes.  You believe that they looked at your

8  application, said it's an older woman, we're just going

9  to gloss it over; is that your position?

10  A.  I believe that Internal Affairs did it because

11  they were answering to their superior officers.  It's

12  just -- I think it's ludicrous that they have those

13  people in that agency investigating that.  That puts

14  them in a bad situation.  You know, Steve Sealey used to

15  be in IA and his best friend, somebody from the State

16  Attorney's Office, a prosecutor, filed a complaint

17  against him and Steve Sealey did the interview.  Steve

18  Sealey was removed from Internal Affairs because he

19  treated that prosecutor like a prosecutor and not a

20  victim.  There's no sense.

21      You know, they just -- you shouldn't have

22  somebody -- it just doesn't make sense.  They're good

23  people, but they're human and it doesn't make sense that

24  you would have -- would you want to be in a position

25  where you're investigating your boss?  I don't think

1  anybody would. It's just not reasonable. But that's
2  just not -- you know, with all the information that we
3  had, they still didn't do that.
4      In fact, when I went over there, I went to city
5  hall, I didn't file a complaint there, but I was told I
6  had to go file it to -- with the LPD because the
7  Officers Bill of Rights; so I did. But they could at
8  that point farm it out to FDLE or PCSO or some other
9  agency to do the investigation, but they didn't and it
10 should when it involves a high-ranking officer.
11     Q.  Who was the prosecutor that you mentioned
12 before?
13     A.  I don't remember his name, but Ralph Schrader
14 was the -- he was the lieutenant in CIS and his -- the
15 prosecutor was dating his ex-wife and Schrader was
16 stalking him and doing all of this stuff. He ended
17 up -- I don't know. He was texting his wife like 130
18 times a day in CIS and they still let him sit there even
19 though he wasn't doing anything, then it got to the
20 point where he really acted out and they had to arrest
21 him, but they coddled him up there instead of telling
22 him he had to get help, he had to cut it out or
23 whatever.
24     There was another case with a lieutenant that
25 got in a domestic with his girlfriend, that was a

1  detective, and took a gun and held it to his head and
2  held her head on the other side and threatened to kill
3  them both. And when they called and reported it Hans
4  went out to her house and didn't treat her like a
5  victim, he didn't gather any evidence, he didn't -- you
6  know, it was a domestic. You're supposed to do it by
7  the book. They didn't even do a report. They did a
8  memo and because he was a good old boy they didn't even
9  take his gun. They didn't do -- they just let him go
10 back to work and he had had previous complaints of that
11 kind of behavior. I got the whole report if you want to
12 read it.
13     Q.  I may ask for it in discovery.
14     A.  Yeah. Hans was involved in that. That was, I
15 think, after -- after I filed my complaint or before.
16 There's other things they do. They don't -- they put up
17 with stuff from the good old boys. They don't from
18 anybody else. I was an example. The female detective
19 was an example.
20     There is a black sergeant that worked with us
21 that they put him on paid administrative leave for a
22 sexual case of some kind and wouldn't tell him what it
23 was and turned out that it was a woman from the jail
24 that had complained that an officer had picked her up
25 and took her to his house and had sex with her and that

1  he had sleeved tattoos. And so not only did they not
2  have evidence to do this to this guy, they had evidence
3  exonerating him. He doesn't have sleeve tattoos. It
4  couldn't have been him. They did a photo pack and she
5  picked out -- of all the black officers in the
6  department she picked out a different officer.
7      Q.  Is race a part of your claim?
8      A.  No, but I'm just saying this is what they do.
9  If it's a different race, it's a good-old-boy system and
10 they're all good old boys.
11     Q.  Let me make sure. So you're claiming that the
12 Lakeland Police Department has a good-old-boys network
13 of white male officers who discriminate against elder
14 people in favor of younger people, but you're not making
15 a claim based on race. Have I recited that correctly?
16     A.  Yes, I am just giving you an example that
17 they're an all-inclusive discriminatory agency in many
18 cases.
19     Q.  Why did you continue to work for them?
20     A.  Because I was a single woman. I had a family
21 to support and it was a job that I could pay my bills
22 with. When I first went into that job market there
23 wasn't a lot of jobs that women could get that would pay
24 equal to men and I liked the work. I enjoyed it.
25     Q.  And you said, I believe, that you were forced

1  into it by your advisor; is that right?
2      A.  I was forced into crime analysis taking that as
3  part of my graduate degree.
4      Q.  Okay. I see the distinction, okay.
5      A.  Yeah, he talked me -- I didn't want to do it
6  and he pushed me, but I was glad I did. I enjoyed it
7  after I got into it.
8      Q.  Is Ms. Wallace still working there at the
9  police office?
10     A.  Yes. You already asked me that.
11     Q.  Yeah, again I apologize if I repeat questions.
12     A.  I'm getting tired.
13     Q.  It's been a while and I think I am probably
14 almost out of time. I don't really have much more to
15 ask. Let me look over my notes and see, then your
16 attorney will ask you some questions after that, if he
17 wants to.
18     MR. HELWIG:  Uh-oh.
19 BY MR. KERR:
20     Q.  You were promoted to the position of
21 supervisor; right?
22     A.  I was promoted to sergeant.
23     Q.  Okay. You were promoted to sergeant, okay.
24     A.  And the unit is supervised by a sergeant.
25     Q.  Okay. Were you appointed to that specific

Page 141

1  unit, the CAIC unit, once you were promoted?
2      A.  They do like -- they do all transfers -- you
3  know, they advertised a job position and I put in for
4  it, but I was told to put in for it too by someone
5  because of my credentials for it, so I don't think I had
6  any competition for it.
7      Q.  While you were on leave or, you know, during
8  the time where you weren't working but at home I believe
9  as a result of your surgeries, did you experience any
10  sort of what you're alleging or discrimination,
11  harassment or retaliation of any kind?
12     A.  I think they pretty much left me alone.  Of
13  course, they had to, you know, when I had the surgeries,
14  but they did harass me some for the rehab stuff.  They
15  started --
16     Q.  I believe we've been over that in your first
17  deposition, the rehab.
18     A.  Right.  Yeah, wanting me to do rehab at night
19  and stuff.
20     Q.  And none of this was ever a problem before Sean
21  Patterson was hired?
22     A.  No, never a problem.
23     Q.  It was only the interactions with -- that arose
24  out of the Sean Patterson issues that --
25     A.  Yes.

Page 142

1      Q.  -- you're claiming are the gender and the age
2  discrimination, harassment and retaliation -- let me
3  finish my question, please -- the gender, age
4  discrimination, and the harassment, retaliation, none of
5  that before Patterson, but all after; is that right?
6      A.  That's right.  I had worked with Hans before
7  that, not for him, and I didn't have any problems with
8  him.  I always got his numbers for him on DUIs and stuff
9  and didn't have any problem.
10     Q.  And he never talked with you cross-wise or made
11  you feel like he was harassing or retaliating against
12  you for anything?
13     A.  Not when we were peers.
14     Q.  All right.  Well, that's all I have then.
15         MR. HELWIG:  Okay.  I just have maybe five, ten
16  minutes worth of questions unless there is any
17  re-questions.
18         CROSS EXAMINATION
19  BY MR. HELWIG:
20     Q.  We've talked -- you've testified a lot today
21  about the last email that Sealey sent out on July 28th,
22  2018 that went to numerous employees.  Did Lieutenant
23  Sealey ever apologize to you for that?
24     A.  No.
25     Q.  Did he ever explain to you how it happened?

Page 143

1      A.  No.
2      Q.  Did he ever discuss it with you in any way?
3      A.  No, he wouldn't speak to me.
4      Q.  Did Lehman ever apologize to you for that
5  happening?
6      A.  No.
7      Q.  Did he explain to you why it happened or how it
8  happened?
9      A.  No.
10     Q.  I'm going to hand you what we're going to mark
11  as Plaintiff's Exhibit 1.  It's interrogatory answers.
12         (Plaintiff's Exhibit 1 marked for i.d.)
13  BY MR. HELWIG:
14     Q.  I'm going to show you on page 3 item six which
15  asks you to describe every event which you contend made
16  the department a hostile work environment.  Do you see
17  that?
18     A.  Yes.
19     Q.  Did you list those events?
20     A.  Yes.
21     Q.  And they go from page 3 to page 8; is that
22  correct?
23     A.  Yeah, there's still more on -- oh, yeah.
24     Q.  Okay.
25     A.  Well, yes.  Sorry.

Page 144

1      Q.  It's okay.  Take your time.
2      A.  Yes.
3      Q.  Do you stand by what you've written here?
4      A.  Yes.
5      Q.  That's all I have.
6          REDIRECT EXAMINATION
7  BY MR. KERR:
8      Q.  I see in the interrogatory response that was
9  just mentioned on page 7 in particular there's a
10  statement here about "Chief Giddens who told me that
11  Lieutenant Sealey had sent the email attaching his notes
12  about me, quote/unquote, 'by mistake' and had attempted
13  to delete it."
14         Are you claiming Lieutenant Sealey
15  intentionally sent out that email?
16     A.  I don't know.
17     Q.  And if so --
18     A.  Only he knows that.  But on the time that he --
19  that they did this, they called me and Brenda to the 2nd
20  floor and they all came in and Sealey -- no, not Sealey,
21  but Giddens, Link, I can't remember who else was there,
22  Chico maybe, and tried to get us to drop the complaint,
23  brow beat me.  I even told Chief Giddens "you're brow
24  beating me."  He wanted me to drop that complaint and I
25  refused to and he tried to tell me that Steve sent it by

Page 145

1  mistake and I said, "He didn't tell me that. It's nice
2  that he came up and talked to you and apologized to you,
3  but he didn't say anything to me about it."
4       But I don't know. Who knows? You have to ask
5  him and then just decide what you think. I don't know.
6  Q.  So these quotation marks here aren't claiming
7  that he did it intentionally or unintentionally, that is
8  just saying what you were told?
9  A.  Correct.
10 Q.  All right.
11 A.  If it's a mistake I think you would go to the
12 person that was the most hurt by the mistake and
13 apologize to them.
14 Q.  There's no question pending.
15 A.  I was adding on to your last one.
16 Q.  Okay. That's all I have.
17      MR. HELWIG:  Same here. Done.
18      MR. KERR:  All right. Will you be reading or
19 waiving?
20      MR. HELWIG:  Why don't you read.
21      THE WITNESS:  Read.
22      MR. HELWIG:  That answers that. I suppose
23 nothing further then. Thank you all for coming out.
24      MR. KERR:  Ordering transcript.
25      (End of proceeding 1:38 p.m.)

Page 146

1       CERTIFICATE OF REPORTER OATH
2
3  STATE OF FLORIDA
4  COUNTY OF POLK
5       I, Julia P. Rowan-Barton, Certified Shorthand
6  Reporter(CA), Registered Professional Reporter, and
7  Notary Public in and for the State of Florida at large,
8  hereby certify that the witness named herein appeared
9  before me on January 5, 2023, and was duly sworn.
10      WITNESS my hand and official seal this
11 January 9, 2023.
12
13       Julia Rowan-Barton
14 _____
15      JULIA P. ROWAN-BARTON, CSR, RPR
16      NOTARY PUBLIC - STATE OF FLORIDA
17      MY COMMISSION NO. GG338815
18      EXPIRES:  5-27-23
19
20
21
22
23
24
25

Page 147

1            CERTIFICATE OF REPORTER
2  STATE OF FLORIDA
3  COUNTY OF POLK
4       I, Julia P. Rowan-Barton, Certified Shorthand
5  Reporter(CA), Registered Professional Reporter, do
6  hereby certify that I was authorized to and did
7  stenographically report the examination of the witness
8  named herein; that a review of the transcript was
9  requested; and that the foregoing transcript is a true
10 record of my stenographic notes.
11      I FURTHER CERTIFY that I am not a relative,
12 employee, or attorney, or counsel for any of the
13 parties, nor am I a relative or employee of any of the
14 parties' attorney or counsel connected with the action,
15 nor am I financially interested in the outcome of this
16 action.
17      DATED THIS January 9, 2023 at Lakeland, Polk
18 County, Florida.
19
20       Julia Rowan-Barton
21      JULIA P. ROWAN-BARTON, CSR, RPR
22
23
24
25

Page 148

1       UNITED STATES DISTRICT COURT
        MIDDLE DISTRICT OF FLORIDA
2            TAMPA DIVISION
3
4  IN RE:  DEPOSITION OF TERRY SMITH
        TAKEN JANUARY 5, 2023
5  TO:  PETER F. HELWIG, ESQ.
        Harris & Helwig
6       6700 S. Florida Avenue, Suite 31
        Lakeland, Florida 33813
7       863-648-2958
        pfhelwig@tampabay.rr.com
8
9
10
11      The referenced transcript has been completed
   and awaits review and signing of the errata sheet.
12      Thank you for agreeing to handle the reading
   and signing process. Today's date is _____.
13 Please complete the reading and signing by _____.
14      The original transcript of this deposition has
   been delivered to Ed Kerr, and the errata sheet, once
15 completed, should be forwarded to all ordering parties
   as listed below.
16      Thank you.
17
18      Julia P. Rowan-Barton, CSR, RPR
19
   cc: Ed B. Kerr, Esq.
20
21
22
23
24
25

Page 149

1        ERRATA SHEET
         DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS PAGE

2
         IN RE:  SMITH VS. CITY OF LAKELAND
         CASE NO.:  8:20-cv-41-MSS-JSS
3        DEPOSITION OF TERRI SMITH
         TAKEN JANUARY 5, 2023
4

5        PAGE #/LINE #   CHANGE           REASON

6

7

8

9

10

11

12

13

14

15

16

17

18

19   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
20   are true.

21   _____    _____

22   TERRI SMITH               DATE

23   cc: Ed B. Kerr, Esq.

24

25

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

TERRI SMITH,

     Plaintiff,

v.                                                                Case No.: 8:20-cv-41-MSS-JSS

CITY OF LAKELAND, FLORIDA,

     Defendant.

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES

     1.    What is the name and address of the person answering these Interrogatories and, if applicable, the person's official position or relationship with the party to whom the Interrogatories are directed?

**RESPONSE:** Terri Smith, 421 Florence Circle, Lakeland, FL 33813

     2.    Please list all former names and when you were known by those names, as well as all addresses where you have lived for the past five (5) years; the dates you lived at each address; your Social Security Number; your date of birth; and, if you are or have ever been married, the names of your current and former spouse or spouses.

**RESPONSE:**     Terri Woodruff, maiden name
                Terri Bennett, 1979-1982
                Terri Smith, 1985 to present

                Addresses: 421 Florence Circle, Lakeland FL 33813

                SSN: 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

                Former spouses: Tom Bennett and Kevin Smith.

                No current spouse



**EXHIBIT**

1

SMITH 1/5/23

3.     Have you ever been convicted of a crime, other than any juvenile adjudication, which under the law under which you were convicted was punishable by death or imprisonment in excess of one year, or that involved dishonesty or a false statement regardless of the punishment? If so, please state as to each conviction the specific crime and the date and place of conviction.

**RESPONSE:**   No.

4.     Please list all of the times you sought medical care for injuries to your knee and Achilles tendon, including the dates, the persons involved or present, how and to whom you communicated needing such care, the treatment or medication taken, and the type of care and the nature of the care, treatment or medication you received.

**RESPONSE:**     Comprehensive records of the dates of Plaintiff's medical treatment are likely in possession of Defendant and will be requested by Plaintiff in a request for production. The information below is derived from Plaintiff's incomplete records of that treatment which are produced in response to Defendant's Request for Production No. 21.

| | |
|---|---|
| 5-19-17 | Physical therapy instructions by Christy L. Ryan, DPT, OCS, Cert/ MDT |
| 6-7-17 | Medical Profile Questionnaire re: achilles tendonitis |
| 6-7-17 | Initial Evaluation by Daniel Wiernik, DPM |
| 6-7-17 | Lower Extremity Function Test |
| 6-7-17 | Examination by Christi L. Ryan at Orthopedic Physical Therapy Associates |
| 6-9-17 | Physical Therapy treatment plan |
| 6-9-17 | Examination by Christy L. Ryan, |
| 6-13-17 | Physical therapy at Orthopedic Physical Therapy Associates |
| 6-13-17 | Examination by Christy L. Ryan |
| 6-13-17 | Mileage Reimbursement Form by Terri Smith |
| 7-20-17 | Exam notes of Daniel Wiernik, DPM |
| 11-28-17 | Order for MRI by Jeffrey Rosen, M.D. |
| 11-28-17 | Workers' Compensation Reporting Form by Jeffrey Rosen, M.D. |
| 12-4-17 | Ledger of Services Provided by Orthopedic Physical Therapy Assn. Re: Left ACL1- |
| 1-22-18 | Surgical Scheduling Form re: left knee arthroscopy |
| 1-22-18 | Workers' Compensation Reporting Form by Jeffrey Rosen, M.D. |
| 1-23-18 | Functional Limitations re: Achilles Repair by Joseph Funk, D.P.M. |
| 3-13-18 | Patient Summary Information by Dr. Rosen |
| 8-13-18 | Medical treatment for knee/ankle injury |
| 3-13-18 | Post Operative Knee Arthroscopy -- Home Instructions by Dr. Rosen |
| 4-16-18 | Workers' Compenation Status Report and Order for Physical Therapy by Dr. Rosen |
| 5-3-18 | Email from Link to Giddens re: Terri Smith surgery date |
| 5-7-18 | Email From Link to Giddens re: duration of absence for Terri Smith |

2

| | |
|---|---|
| 5-17-18<br>D.P.M. | Order for Home Health Care of Right Achilles Tendon by Daniel L. Wiernik, |
| 6-25-18 | Workers' Compensation Status Report by Dr. Rosen |
| 7-17-18 | Therapy Request For For Right Ankle and Foot by Daniel L. Wiernik, D.P.M. |
| 7-17-18 | Workers' Compensation Reporting form by Daniel L. Wiernik, D.P.M. |
| 5-27-18 to 9-01-18 – City of Lakeland Pay Stubs for Terri Smith | |
| 8-14-18 | Medical treatment for knee/ankle injury |
| 8-15-18 | Medical treatment for knee/ankle injury |
| 8-16-18 | Medical treatment for knee/ankle injury |
| 8-16-17 | Plan to discharge to home therapy |
| 8-17-18 | Medical treatment for knee/ankle injury |
| 8-18-18 | Medical treatment for knee/ankle injury |
| 9-12-18 | City of Lakeland Wage Statement for Terri Smith, 5-27-18 to 8-25-18 |
| 9-13-18 | Workers' Compensation Reporting form by Daniel L. Wiernik, D.P.M. |

5.     Please list any and all steps that you took to search for, apply for, and otherwise pursue new employment opportunities, either in a different position with the Lakeland Police Department or with a different employer. For each prospective employer, please indicate the date range in which you pursued that employment opportunity, the persons with whom you communicated in pursuit of that employment opportunity, the outcome of your employment pursuit (e.g., hired, not hired), and the reason for that outcome.

**RESPONSE:** On or about July 30, 2018, I requested a transfer to a comparable position outside Lt. Sealey's chain of command. The request was made in person to Chief Giddens. Chief Giddens denied this request.

On August 9, 2018, my attorney wrote to City Attorney Tim McCausland and requested a transfer to a comparable position outside Lt. Sealey's chain of command. I received no response.

On September 6, 2018, my attorney and I met with Chief Giddens and City Attorney McCausland and again requested a transfer to a comparable position outside Lt. Sealey's chain of command. The request was denied.

6.     Please describe in detail each and every event which you contend made the Lakeland Police Department a hostile work environment or compelled you to terminate your employment with the Lakeland Police Department. For each event, include the date, the persons involved or present, the details of the event itself, the reason the event contributed to the hostility or compulsion, and the nature of the alleged discrimination (e.g., based on sex, age, religion, ethnicity, etc.).

**RESPONSE:** To the best of my recollection, these are the events that contributed to the hostile work environment:

3

On or about January 9, 2017, Defendant hired Sean Patterson, a 26-year-old male to work as a Crime Analyst in my unit. Patterson had no experience in crime analysis and I assigned Brenda Wallace, a very experienced Crime Analyst, to serve as his mentor. Ms. Wallace and I are women over 40 years of age.

Patterson resisted our direction and guidance and attempted to go over my head with male managers outside my unit. He was frequently absent from his workstation and failed to timely complete required tasks. His excuse was that he was meeting with the male "higher ups" and discussing proposed changes in my unit. The male "higher ups" including my supervisor, Lt. Steven Sealey and his supervisor, Capt. Hans Lehman, both of whom encouraged and enabled Patterson's insubordinate behavior.

Patterson was rude and insubordinate to Ms. Wallace and me. When we met with him to discuss some performance issues he blurted, "why is she here," derisively thrusting his thumb at Ms. Wallace. On another occasion when I reminded him that he had to take direction from her on his daily activities, he countered that he had been talking with "some of the guys" and they told him they did not go to Ms. Wallace for assistance because they "don't like her either."

In June of 2017, I asked Lt. Sealey to make it clear to Patterson that he was responsible for following my instructions and was accountable to me as his supervisor. Lt. Sealey scheduled a meeting with Patterson and me together for June 2, 2017. At the meeting Patterson verbally attacked me, stating that he had complained to "higher ups" in the LPD that I was resisting needed change in the unit, and that the "higher ups" agreed with him. Patterson also accused me of "running off" a male former crime analyst. Lt. Sealey failed to intervene to admonish Patterson that these statements were inappropriate and insubordinate in a hierarchical, quasi-military organization like ours which required employees to honor the chain of command.    I asked Patterson to leave the room so that I could speak with Lt. Sealey, but Patterson refused comply with this direct order from me, his supervisor, until, after some delay, Lt. Sealey asked him to leave and stated that he would talk to him later.

After Patterson left the room, I asked Lt. Sealey why he had allowed Patterson to go off on me and had not admonished him for insubordination.   Lt. Sealey responded that he believed I was being "defensive," that he did not believe Patterson had been insubordinate, and that his own interactions with Patterson had been very positive, "like a father talking to his son."

On several occasions Lt. Sealey instructed me that I should treat "millennials" such as Patterson differently from older employees, giving them more latitude to work

4

independently and jump the chain of command, and that I should tolerate their resistance to close supervision. Jumping the chain of command was inconsistent with the normal mode of operation of the LPD which, like most police departments, emphasizes the importance of honoring the chain of command.

In January of 2018, Captain Lehman informed me that my evaluation of Patterson rated his performance too low, and my evaluation of Wallace was too high. Capt. Lehman stated that he would have to "write a memo" if I did not reduce Wallace's rating. My evaluation of Wallace was the same as the laudatory evaluations I had given her for the previous years. I responded that Wallace was an experienced, high-performing member of the unit and that her rating was accurate.

On January 11, 2018, Captain Lehman summoned me to a meeting with himself, Assistant Chief Mike Link, and Lt. Sealey. Captain Lehman handed me eight-page, single-spaced memorandum, which was entitled Clarification of Employee Evaluations by Sgt. Smith and was addressed to Lt. Sealey and Assistant Chief Link. I then attempted to skim the memo in the glaring presence of the three male superior officers. The memo admonished me for not giving Patterson a higher evaluation, stating that there was a "generational conflict occurring that cannot be resolved" between Patterson and me, referring to Patterson as a "young" employee with a "refreshing" approach, while referring to me as "stuck in her ways." It went on to state that "our young employees need members that will embrace them." I was humiliated and overwhelmed by the confrontational nature of the meeting with the three male superior officers but explained my actions and declined to change the evaluations.

As one sworn officer in my unit stated in her Declaration to the EEOC, Lt. Sealey and Capt. Lehman "encouraged and supported [Patterson] in his aggressive and insubordinate behavior toward Sgt. Smith."

Shortly thereafter, Capt. Lehman gave a copy of the eight-page memo to Patterson, thereby undermining any authority that I had over his supervision. Emboldened by the superior male officers' disparagement of me, Patterson then filed an internal complaint of discrimination against me and I was forced to defend myself before my peers. When that was unsuccessful, Patterson filed a Charge of Discrimination with the EEOC, complaining about my treatment of him, but it was dismissed after investigation.

On February 7, 2018, Lt. Sealey issued my annual performance evaluation, rating me at the level of 4.76 on a scale of 1.00 to 7.00, lower than I have ever been rated in my position and in particular lower than the previous year's rating of 6.72. The evaluation document made frequent references to my allegedly overly critical management of Patterson.

5

On February 8, 2018, I reported this gender- and age-based hostile work environment to the City of Lakeland's Human Resources Department, and responsibility for investigation of the complaint was turned over to the Defendant LPD. Among the perpetrators identified in the complaint were Lt. Sealey and Capt. Lehman. I requested that during the pendency of the investigation, I not be required to report to Lt. Sealey and Captain Lehman, but that request was denied, and I had to work under direct supervision of these men.

Although he remained my immediate supervisor, Lt. Sealey refused to speak to me after I filed the complaint. Before this my regular practice was to stop by his office regularly to update him on what was going on in my unit and catch up on department news. But now when I attempted to do this Lt. Sealey refused to speak to me. When I was out of the office for a meeting, physical therapy or some other reason Lt. Sealey would ask question other employees about my whereabouts and download videos of me arriving and leaving the LPD parking lot rather than just calling me on my cell phone. When I passed him in the hallway and said "hello" or "good morning" he would not respond and would look the other way.

Male officers in the department treated the complaint as a joke, and one of the accused officers taped the complaint to the front of his desk as a form of ridicule, in view of any person entering his office. This tactic was effective and made me the laughingstock of the office among several male employees.

On June 29, 2018, the investigation ended and Chief of Police Giddens determined that Lt. Sealey and Capt. Lehman had committed minor violations. Among the disciplinary options were termination, demotion, suspension, written reprimand, and counseling. Chief Giddens ordered only counseling.

No apology or affirmative relief was ordered for me. I was required to continue under direct supervision of Lt. Sealey, who continued to refuse to speak to me.

Instead, Sergeant James "Chip" Roberts, one of the perpetrators of the harassment who was named in my complaint, filed a complaint against me, alleging that I had made "untruthful and/or incomplete" statements in my complaint. Although Roberts's complaint was clearly unfounded, Chief Giddens ordered an investigation of the complaint, during which I was required to submit to interrogation under oath. In the end, the investigation concluded that I had done nothing wrong. No discipline or other corrective action was taken against Roberts for filing his false charges against me.

On July 26, 2018, Lt. Sealey sent a memorandum to me stating that the issues between Wallace and Patterson "must be resolved" by me. The memorandum

6

criticized my performance evaluation of Patterson because I rated him as "needs improvement" in two areas. It also criticized me for commending the work of Wallace, Detective Darlene Thompson and Patterson in contributing to a crime investigation because I gave too much credit to Wallace and Thompson and not enough to Patterson. The memorandum concluded: "[i]f this problem continues, other actions may be pursued" pursuant to department policies.

Meanwhile, Lt. Sealey had begun to keep a written log of my comings and goings, including my attendance, daily arrival and departure times, time spent at medical appointments and other activities. I had numerous medical appointments because I was recovering from surgery to repair a serious work-related injury to my knee and Achilles tendon, and Lt. Sealey recorded the time spent at all of them. The records also included notes of Lt. Sealey's phone calls to doctor's offices to confirm times of my appointments, and of oral and written requests to LPD staff members to confirm that I had attended meetings and other events listed in my time records. Next to each entry was Lt. Sealey's notation as to the LPD policy which he believed the listed conduct may have violated.

On July 28, 2018, Lt. Sealey e-mailed this 29-page log of my activities and alleged offenses to 35 LPD employees, including non-supervisory employees, members of my Crime Analysis Unit and other employees with whom I had to work. The log contained not only inflammatory and untrue accusations of shirking work, but also confidential medical information regarding my medical treatment. This was beyond humiliating and made me the subject of further ridicule at the LPD. People would avert their eyes, and some would smirk, when they passed by me in the office. They avoided engaging with me and made me feel like I was regarded as poison.

I complained to Chief Giddens, who told me that Lt. Sealey had sent the e-mail attaching his notes about me "by mistake" and had attempted to delete it. However, members of my unit told me that they had received Lt. Sealey's e-mail but had not received any notice that it had been withdrawn or sent by mistake or deleted. Lt. Sealey never apologized, never claimed to me that the e-mail had been sent in error, and never discussed the matter with me in any way.

After this, I had to face and interact with the recipients of Lt. Sealey's e-mail and was overwhelmed with humiliation. Lt. Sealey continued to refuse to speak to me. I again asked Chief Giddens to assign me to another supervisor but he refused. He told me I could accept a demotion to patrol duty or apply for any open position just like any other employee.

7

Patrol duty is more physically strenuous than office assignments which were available within the LPD. I could not have performed patrol duty due to my medical condition.

As my level of stress continued unrelieved, my attorney on July 30, 2018 wrote to Chief Giddens, outlining the course of the sex- and age-based harassment and bullying by Lt. Sealey and others, and requesting that I be assigned to a different supervisor. No corrective action was taken.

When no corrective action was forthcoming my attorney wrote to Lakeland City Attorney Tim McCausland, again requesting that I be reassigned to a different chain of command. Again no corrective action was taken.

I was so humiliated and upset that I saw Ferrica Walker, a licensed mental health counselor, who concluded that I was in "marked distress," and on August 18, 2018 completed a Family Medical Leave form, reporting that I was suffering from depressive disorder, general anxiety disorder and PTSD and needed to take medical leave. Psychiatrist Emilio Montero concurred in the PTSD diagnosis on August 27, 2018, and so informed Defendant.

During August and September 2018 my attorney continued to press for a transfer away from Lt. Sealey, but Chief Giddens denied those requests. When no corrective action was taken, I concluded that I could no longer tolerate this hostile work environment. Even though I was just short of 25 years' service which would have resulted in increased pension benefits, I terminated my employment on October 15, 2018.

7.     For each request in the City's First Request for Production (served concurrently herewith), please state if you are aware of any documents that would be responsive to the request but which you either cannot or will not produce and, for each of those documents identified, explain in detail the reason that you cannot produce that document (e.g., the document is not within your possession, custody, or control; the document was lost or destroyed; the document is confidential or privileged).

**RESPONSES:**  Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 1 of Defendant's First Request for Production because Request 1 seeks employment documents that Defendant already has in its possession; and the all-inclusive demand in Request 1 for "any and all" documents reflecting Plaintiff's employment with Defendant is oppressive, unduly burdensome, and so broad that it potentially could include attorney-client privileged communications between Plaintiff and her counsel. As stated in the response to the Request, Plaintiff accordingly limited her search and production to available nonprivileged

documents reflecting her employment with Defendant that have not previously been produced in discovery in this case and are relevant to the facts, claims, and defenses asserted in this case.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 2 of Defendant's First Request for Production because Request 2 is a boilerplate request not directed to the facts, claims, or defenses of this case and thus is outside the scope of permissible discovery; it seeks employment documents and correspondence that Defendant already has in its possession; and the all-inclusive demand for "any and all" documents and correspondence that Defendant or any of its employees gave to Plaintiff "in connection with her employment" is oppressive and unduly burdensome. As stated in the response to Request 2, Plaintiff accordingly limited her search and production to available documents that Defendant gave to her in connection with her employment that have not previously been produced in discovery in this case and are relevant to the facts, claims, and defenses asserted in this case.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 3 of Defendant's First Request for Production because Request 3 is a boilerplate request not directed to the facts, claims, or defenses of this case and thus is outside the scope of permissible discovery; it seeks employment documents and correspondence that Defendant already has in its possession; and the all-inclusive demand for "any and all" documents and correspondence that Plaintiff gave to Defendant or any of its employees "in connection with her employment" is oppressive and unduly burdensome. As stated in the response to Request 3, Plaintiff accordingly limited her search and production to available documents that she gave to Defendant in connection with her employment that have not previously been produced in discovery in this case and are relevant to the facts, claims, and defenses asserted in this case.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 4 of Defendant's First Request for Production because the all-inclusiveness of "any and all" documents "pertaining to" Plaintiff's resignation from Defendant renders Request 4 oppressive and so broad that it potentially could include attorney-client privileged communications between Plaintiff and her counsel. As stated in the response to Request 4, Plaintiff accordingly limited her search and production to available nonprivileged documents relevant to her claims and allegations regarding her resignation from Defendant.

As to Request 5 of Defendant's First Request for Production, Plaintiff is not aware of such documents.

9

As to Request 6 of Defendant's First Request for Production, Plaintiff has the requested tax returns but declined to produce them pursuant to her objections to Request 6.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 7 of Defendant's First Request for Production because Request 7 itself is overly broad and oppressive in seeking "any and all" documents supporting the facts alleged at Paragraph 8 of the amended complaint. As stated in her response to Request 7, Plaintiff accordingly searched for and produced documents available to her that support any of the facts alleged in Paragraph 8

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 8 of Defendant's First Request for Production because Request 8 is overbroad and oppressive in seeking "any and all" documents supporting the facts alleged at Paragraph 9 of the amended complaint. As stated in her response to Request 8, Plaintiff accordingly limited her search and production to documents available to her that support any of the facts alleged in Paragraph 9.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 9 of Defendant's First Request for Production because Request 9 is overbroad and oppressive in seeking "any and all" documents supporting the facts alleged at Paragraph 10 of the amended complaint. As stated in her response to Request 9, Plaintiff accordingly limited her search to documents available to her that support any of the facts alleged in Paragraph 10.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 10 of Defendant's First Request for Production because Request 10 is overbroad and oppressive in seeking "any and all" documents supporting the facts alleged at Paragraph 11 of the Amended Complaint. As stated in her response to Request 10, Plaintiff limited her search and production to documents available to her that support any of the facts alleged in Paragraph 11.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 11 of Defendant's First Request for Production because Request 11 is overbroad in seeking "any and all" performance evaluations that Plaintiff completed during her employment with Defendant. Furthermore, Defendant already would have any performance evaluations that Plaintiff conducted. As stated in her response to Request 11, Plaintiff limited her search and production to the relevant 2018 performance evaluations referenced in the Amended Complaint.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 12 of Defendant's First Request for Production because Request 12 is overbroad and oppressive in seeking "any and all" documents supporting the facts alleged at Paragraph 12 of the Amended Complaint. As stated her response to Request 12, Plaintiff accordingly limited her search and production to documents available to her that support any of the facts alleged in Paragraph 12.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 13 of Defendant's First Request for Production because Request 13 itself is objectionable. Request 13 is overbroad and oppressive in seeking "any and all" documents supporting the facts alleged at Paragraph 13 of the Amended Complaint. As stated in her response to Request 13, Plaintiff accordingly limited her search to documents available to her that support any of the facts alleged in Paragraph 13.

As to the inquiries in Interrogatory 7 concerning Request 14: Plaintiff is not aware of such additional documents.

As to the inquiries in Interrogatory 7 concerning Request 15: Plaintiff is not aware of such additional documents.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 16 of Defendant's First Request for Production because Request 16 is overbroad and oppressive in seeking "any and all" documents supporting the facts alleged at Paragraph 16 of the Amended Complaint. As stated in her response to Request 16, Plaintiff accordingly limited her search and production to documents available to her that support any of the facts asserted in Paragraph 16 of the Amended Complaint.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 17 of Defendant's First Request for Production because Request 17 is overbroad and oppressive in seeking "any and all" documents "related to" Patterson's internal complaint and EEOC charge alleged at Paragraph 16 of the Amended Complaint, and, also, because Defendant would have access to any documents within the exceedingly broad scope of the request. As stated in her response to Request 17, Plaintiff accordingly limited her search and production to the documents available to her that support of any of the facts alleged in Paragraph 16.

Regarding Interrogatory 7 in relation to Request 18 of Defendant's First Request for Production, Defendant has and produced the documents sought in the

request.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 19 of Defendant's First Request for Production because Request 19 is overbroad and oppressive in seeking "any and all" documents "related to" Plaintiff's hostile work environment complaint lodged with Defendant's HR department. As stated in her response to Request 19, Plaintiff accordingly limited her search and production to documents available to her that support the factual allegations of Paragraph 19 of the Amended Complaint.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 20 of Defendant's First Request for Production because Request 20 is overbroad and oppressive in seeking "any and all" documents "regarding" Sealey's written record of Plaintiff's coming and goings, and "any and all" forwards and replies to Sealey's July 28, 2018, email to 35 employees. As stated in her response to Request 20, Plaintiff accordingly limited her search and production to responsive documents available to her.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 21 of Defendant's First Request for Production because the all-inclusive demand for "any and all" documents regarding Plaintiff's serious work-related injuries to her knee and Achilles tendon is oppressive and unduly burdensome and so broad that it potentially could include attorney-client privileged communications between Plaintiff and her counsel. Request 21 is overbroad and oppressive in seeking "any and all" medical records relating to Plaintiff's work-related Achilles tendon and knew injuries. As stated in her response to Request 21, Plaintiff accordingly searched for and produced nonprivileged responsive available to her regarding those injuries.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 22 of Defendant's First Request for Production because the all-inclusive demand for "any and all" documents or correspondence forming the factual basis for or otherwise supporting Smith's averment that "[i]t is unlikely Sgt.Smith could have performed patrol duty with her lingering leg injury" is oppressive and unduly burdensome and so broad that it potentially could include attorney-client privileged communications between Plaintiff and her counsel. Plaintiff accordingly limited her search and production to nonprivileged responsive documents available to her.

As to the requests in Interrogatory 7 concerning Request 23, Plaintiff is

unaware of such additional documents.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 24 of Defendant's First Request for Production because the "any and all" inclusiveness of Request 24 renders the request oppressive and overly broad, and potentially intrusive of the attorney-client privilege. As stated in Plaintiff's response to Request 24, Plaintiff accordingly limited her search and production to nonprivileged responsive documents available to her.

Plaintiff objects to the inquiries of Interrogatory 7 in regard to Request 25 of Defendant's First Request for Production because the "any and all" inclusiveness of Request 25 renders it oppressive and overly broad. Plaintiff accordingly limited her search for documents available to her that support the facts asserted in Paragraph 28 of the Amended Complaint.

As to the requests in Interrogatory 7 concerning Request 26, Plaintiff is unaware of such additional documents.

8.      Please state if you have ever been a party to a lawsuit other than the present matter, and, if so, state whether you were a plaintiff or defendant, the nature of the action, and the date and court in which such suit was filed.

**RESPONSE:**

Plaintiff in divorce action in Oklahoma dissolving marriage to Tom Bennett in approximately 1982.

Plaintiff in divorce action in circuit court in Dade City, Florida dissolving marriage to Kevin Smith in approximately 1987.

9.      Do you intend to call any expert witnesses at the trial of this case? If so, please state as to each such witness the name and business address of the witness, the witness's qualifications as an expert, the subject matter upon which the witness is expected to testify, the substance of the facts and opinions to which the witness is expected to testify, and a summary of the grounds for each opinion.

**RESPONSE:**   Not at this time.

10.     Have you heard or do you know about any statement or remark made

13

by or on behalf of any party to this lawsuit, other than yourself, concerning any issue in this lawsuit? If so, please state the name and address of each person who made the statement or statements, the name and address of each person who heard it, and the date, time, place, and substance of each statement.

**RESPONSE:** None other than those identified in this Response.

I declare under penalty of perjury under the laws of the United States of America

that the foregoing answers to interrogatories are true and correct to the best of my

knowledge.

_____
(Signature of Declarant)

Executed on February 1, 2022

**Certificate of Service**

   I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via email this first day of February, 2022, upon Robert J. Aranda at r.aranda@cttalaw.com, p.roop@cttalaw.com; and Edward B. Kerr at e.kerr@cttalaw.com.

/s/ Peter F. Helwig