**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:20-cv-41-MSS-JSS

TERRI SMITH,

    Plaintiff,

vs.

CITY OF LAKELAND, FLORIDA,

    Defendant.

DEPOSITION OF ASSISTANT CHIEF HANS LEHMAN

Taken on Behalf of the Plaintiff

DATE TAKEN:   January 12, 2023

TIME:   10:05 a.m. - 1:27 p.m.

PLACE:   Wasilewski Court Reporting, LLC
2005 South Florida Avenue
Lakeland, Florida 33803

Examination of the witness taken before:

Tami Cline
Registered Merit Reporter
Certified Realtime Reporter
Florida Professional Reporter

**Page 2**

## APPEARANCES

Counsel for Plaintiff:

    PETER F. HELWIG, ESQ.
    Harris & Helwig, PA
    6700 South Florida Avenue
    Suite 31
    Lakeland, Florida 33813-3312
    863-648-2958
    Pfhelwig@tampabay.rr.com

Counsel for Defendant:

    ROBERT ARANDA, ESQ.
    Campbell, Trohn, Tamayo & Aranda, P.A.
    Attorneys at Law
    1701 South Florida Avenue
    Lakeland, Florida 33803
    863-686-0043
    R.aranda@vcttalawyers.com

Also Present:

    Terri Smith

**Page 3**

## I N D E X

WITNESS                                    PAGE

Called by the Plaintiff:

ASSISTANT CHIEF HANS LEHMAN

  DIRECT EXAMINATION BY MR. HELWIG            6

  CROSS-EXAMINATION BY MR. ARANDA            126

## E X H I B I T S

PLAINTIFF'S EXHIBIT                        PAGE

Exhibit 1   1/11/18 Memo, Subject           16
    "Clarification on Employee
    Evaluations by Sgt. Smith"

Exhibit 2   Google definition entry for     49
    "millennial"

Exhibit 3   6/28/17 Memo, Subject "IAU File 53
    Number 18-006," Bates No.
    CityofLkld001440 - CityofLkld001452

Exhibit 4   Notice of Final Agency Action,  66
    Bates No. CityofLkld001458 -
    CityofLkld001459

Exhibit 5   Employee Complaint Form, Bates No. 69
    CityofLkld001025 - CityofLkld001026

**Page 4**

## E X H I B I T S

PLAINTIFF'S EXHIBIT                        PAGE

Exhibit 6   7/3/18 Memo, Subject IAU File   69
    Number 18-022, Bates No. P00646 -
    P00655

Exhibit 7   Charge of Discrimination, Bates No. 74
    P00572

Exhibit 8   7/28/18 Email and Attachments,  77
    Bates No. CityofLkld002120 -
    CityofLkld002150

Exhibit 9   3/18/19 Memo, Subject Explanation 80
    for Sending Email, Bates No.
    CityofLkld005164 - CityofLkld005165

Exhibit 10   11/17/18 Manager Evaluation, Bates 91
    No. CityofLkld001835 -
    CityofLkld001838

Exhibit 11   1/9/19 Manager Evaluation, Bates 101
    No. CityofLkld001406 -
    CityofLkld001409

Exhibit 12   4/12/19 Incident Report, Bates No. 102
    CityofLkld001460 - CityofLkld001461

Exhibit 13   4/23/19 Incident Report         104

Exhibit 14   5/2/19 Incident Report, Bates No. 105
    CityofLkld001438 - CityofLkld001439

**Page 5**

1    E X H I B I T S
2    PLAINTIFF'S EXHIBIT                    PAGE
3    Exhibit 15   5/10/20 Manager Evaluation, Bates    107
4         No. CityofLkld001061 -
5         CityofLkld001064
6    Exhibit 16   7/11/18 Letter, Bates No. P00557 -   108
7         P00569
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 6**

1        THEREUPON, the following proceedings were had
2    and taken:
3        THE COURT REPORTER:  Would you raise your
4    right hand, please.
5        Do you solemnly swear or affirm the testimony
6    you give in this cause will be the truth, the
7    whole truth, and nothing but the truth.
8        THE WITNESS:  Yes, ma'am.
9        ASSISTANT CHIEF HANS LEHMAN, called as a
10   witness by the Plaintiff, having been first duly
11   sworn, testified as follows:
12        DIRECT EXAMINATION
13   BY MR. HELWIG:
14   Q.  Good morning, Chief Lehman.
15   **A.  Good morning.**
16   Q.  Am I pronouncing your name correctly?
17   **A.  Yes.**
18   Q.  Good.  Can you tell us your date of birth?
19   I'm asking since age is an issue in this case.
20   **A.  Did you need age?**
21   Q.  Age is fine if you'd rather give that.
22   **A.  Fifty-one.**
23   Q.  Okay.  And your current position?
24   **A.  Assistant chief.**
25   Q.  And is there more than one assistant chief?

**Page 7**

1    **A.  There's three.**
2    Q.  Three.  And who are the other two?
3    **A.  Steve Pacheco and Marvin Tarver.**
4    Q.  Marvin Tarver is it, did you say?
5    **A.  Yes, sir.**
6    Q.  T-a-r-v-e-r?
7    **A.  Yes, sir.**
8    Q.  Are your responsibilities divided up in any
9    structural way?
10   **A.  Yes.**
11   Q.  How does that work?  What are you responsible
12   for?
13   **A.  I'm currently over what's called special**
14   **services bureau, which has two divisions.**
15   Q.  Okay.  Which are?
16   **A.  First division is special services -- or,**
17   **sorry, support services division, which is hiring,**
18   **training, background, investigations, fleet,**
19   **facilities, things like that.  And then the other**
20   **division is special operations division, which is**
21   **SWAT, traffic, specialized equipment, DUI, motors,**
22   **and then school resource.**
23   Q.  It's a lot of stuff.
24   **A.  Yes.**
25   Q.  And when did you become assistant chief?

**Page 8**

1    **A.  January 31st or February 1st of 2020.**
2    Q.  Okay.  And what's the chain of command
3    descending?  I assume you report to the chief; is
4    that right?
5    **A.  Yes, sir.**
6    Q.  And descending from you, what's the chain of
7    command in that position?
8    **A.  Captain, lieutenant, sergeant.**
9    Q.  Okay.  Do you meet regularly with people in
10   your chain of command?
11   **A.  Yes.**
12   Q.  Down to the level of sergeant?
13   **A.  Yes.**
14   Q.  Okay.  Do you meet with other people in their
15   units?
16   **A.  I'm not --**
17   Q.  For example, ranking below the sergeant who
18   report to the sergeant?
19   **A.  As far as what kind of meeting?**
20   Q.  For general meetings to discuss employment
21   issues, that sort of thing.
22   **A.  We have -- currently I have a weekly team**
23   **meeting with one group in particular that's**
24   **everybody in the team from background investigator**
25   **all the way up through the captain.  They're all in**

Page 9

1 one room.
2 Q. Okay. Is that -- are there people in one
3 particular unit?
4 **A. Yeah. That's one. That's just an example.**
5 Q. Okay. And what's that unit?
6 **A. It's general services section.**
7 Q. And what's included in that?
8 **A. Hiring and background.**
9 Q. Okay. Thank you.
10    Did you graduate high school?
11 **A. Yes.**
12 Q. And what high school?
13 **A. Kathleen.**
14 Q. And did you have further education beyond
15 that?
16 **A. Yes.**
17 Q. What was that?
18 **A. Bachelor's from Stetson University, Master's**
19 **in criminal justice administration from Troy.**
20 Q. Is that in Georgia?
21 **A. Alabama.**
22 Q. Alabama.
23 **A. And then a Master's in emergency management**
24 **from University of Florida.**
25 Q. Okay. What was your first job out of high

Page 10

1 school?
2 **A. I don't remember. I'm trying to think. I**
3 **had a family business, so I worked a lot down there.**
4 Q. What was that?
5 **A. Jimbo's Pit Bar B-Q.**
6 Q. I'm a fan.
7    MR. ARANDA: Yes. Me too.
8    THE WITNESS: It is good.
9 BY MR. HELWIG:
10 Q. What's the first job for a non-family
11 employer that you recall?
12 **A. Delivered pizza for Domino's when I was in**
13 **college for a short period of time over in DeLand.**
14 Q. And after that?
15 **A. Volunteer firefighter for Volusia County Fire**
16 **Rescue. And when I graduated college, I came back**
17 **and worked at Polk County EMS, which merged into**
18 **Polk County Fire Rescue.**
19 Q. And after that?
20 **A. Went to the police academy, then Polk County**
21 **Sheriff's Office, and Lakeland Police Department.**
22 Q. About when did you go to the sheriff's
23 office?
24 **A. That was January/February '95 to August '96.**
25 Q. And then from there to the Lakeland Police

Page 11

1 Department?
2 **A. To Lakeland, yes, sir.**
3 Q. In '96. Okay. And what was your progression
4 or where did you start? What was your starting
5 position at Lakeland?
6 **A. Officer.**
7 Q. Patrol? Was it a patrol officer?
8 **A. Yes, sir.**
9 Q. Did you actually work patrol?
10 **A. Yes.**
11 Q. And what came after that?
12 **A. As an officer or --**
13 Q. The next position after that.
14 **A. Sergeant.**
15 Q. And when was that approximately?
16 **A. '02 to '09.**
17 Q. And in '09 what happened?
18 **A. Promoted to lieutenant.**
19 Q. Okay. And then?
20 **A. That was '09 to '15. Then captain was '15 to**
21 **January 2020.**
22 Q. And you went from captain to assistant chief?
23 **A. Yes, sir.**
24 Q. Thank you. And during your time as captain,
25 is that when Lieutenant Sealey reported to you?

Page 12

1 **A. Yes.**
2 Q. And Sergeant Smith reported to Lieutenant
3 Sealey?
4 **A. Yes.**
5 Q. Okay. Did you meet regularly with the
6 criminal analysis -- the crime analysis unit that
7 Ms. Smith had?
8 **A. I met with the group on occasion, yes.**
9 Q. How often would you say?
10 **A. I don't recall. Probably at least once a**
11 **month.**
12 Q. And were these meetings just to discuss
13 routine matters or were they only called when there
14 was a specific issue in front of you?
15 **A. A lot of it -- to my recollection, a lot of**
16 **it was check-in type meetings, see what we were**
17 **working on, things like that.**
18 Q. And you know who Sean Patterson is, correct?
19 **A. Yes.**
20 Q. When did you first meet him?
21 **A. I don't recall. It was when he got hired.**
22 **At some point after he was hired here.**
23 Q. And our records that we have from the police
24 department indicate that he was hired on January 9,
25 2017. Does that sound about right?

Page 13

1   A.  I believe so, yes.

2   Q.  And you came into responsibility for the --

3   for Sergeant Smith's unit somewhat after that; is

4   that right?

5   A.  I believe it was July of '15 -- I'm sorry,

6   July of '17.

7   Q.  And did you meet Patterson prior to becoming

8   responsible for Ms. Smith's unit?

9   A.  Yes.

10   Q.  What were the circumstances of that?

11   A.  Prior to that I was the patrol captain, so I

12   tried to meet everybody in the department that we

13   hire.

14   Q.  So you were the patrol captain, and were you

15   responsible for the officers who were patrol

16   officers?

17   A.  Yes, sir.  Uniform patrol division.

18   Q.  Okay.  And Patterson was not a uniform patrol

19   officer, correct?

20   A.  Correct.

21   Q.  So what led to your beginning to interact

22   with him?  How did that come about?

23   A.  I don't remember my specific first

24   interaction with him.

25   Q.  How often did you meet with him prior to

Page 14

1   his -- prior to -- let me withdraw that.

2       Prior to your becoming responsible for the

3   crime analysis unit, how often would you believe

4   that you met with Patterson?

5   A.  I don't know.

6   Q.  Would it possibly be weekly?  Is that a good

7   estimate?

8   A.  Oh, no, it wouldn't have been anywhere near

9   that.

10   Q.  And he was not in your chain of command at

11   that time, was he?  Or am I mistaken?  Was he in

12   your chain of command before you became responsible

13   for criminal analysis?

14   A.  No.  As a patrol captain you're in charge of

15   the biweekly crime stat meeting in deploying your

16   crime units as the crime data shows you.  So you

17   have some interaction with the crime analysis unit.

18   Q.  And would that connection be through Sergeant

19   Smith who was in charge of the unit?

20   A.  It was generally through e-mail or at the

21   crime stat meetings.

22   Q.  And when you communicated with criminal

23   analysis through e-mail, is that with Sergeant

24   Smith?

25   A.  I don't recall.

Page 15

1   Q.  Did you communicate also with Patterson

2   during that time before you were directly

3   responsible for their unit?

4       MR. ARANDA:  Objection to form.

5   BY MR. HELWIG:

6   Q.  You can go ahead and answer.

7   A.  I'm sure I communicated with everybody in the

8   crime analysis unit when I was patrol captain.  I

9   don't have specific numbers.

10   Q.  So you communicated with Brenda Wallace?

11   A.  I'm sure at some point there was questions

12   when I was patrol captain that -- they have -- they

13   had a general e-mail too.  I think it was -- I

14   forget what the e-mail was, but you would send that

15   and it would go to all of them.

16   Q.  During this period before you were in charge

17   of crime analysis, did you speak with Patterson in

18   your office?

19   A.  I don't recall if I did or not.

20   Q.  Did you come down and speak with him at his

21   work station?

22   A.  I did not go up to CID very often as a patrol

23   captain.

24   Q.  So it's up, not down?

25   A.  Upstairs, yes, sir.

Page 16

1       (Exhibit 1 was marked for identification.)

2   BY MR. HELWIG:

3   Q.  This is Exhibit 1 in front of you.  Take all

4   the time you need to review it.  When you're ready,

5   I'm going to ask you if you can identify what that

6   is.

7   A.  This was my memo that was attached to

8   evaluations of Brenda Wallace and Sean Patterson.

9   Q.  And what prompted this e-mail from you?

10   A.  A review of both of their evaluations.  I

11   believe I saw discrepancies that I felt rose to the

12   level of clarification.

13   Q.  And I misspoke.  It's not an e-mail.  It's a

14   memo.  You understand what I'm saying.

15       MR. ARANDA:  I thought you said e-mail.

16       MR. HELWIG:  Yeah.  Yeah.  Let's just clear

17   that up.  Nobody's claiming it's an e-mail.

18       MR. ARANDA:  E-mail, memo.

19       MR. HELWIG:  Do we still have memos anymore?

20   I guess we do.  Thank you.

21   BY MR. HELWIG:

22   Q.  And what prompted that?  You just answered

23   that, I think.

24       And these were evaluations that were done by

25   Sergeant Smith?

Page 17

1   A.  **Correct.**
2   Q.  And did -- who was her immediate supervisor?
3   A.  **Lieutenant Sealey.**
4   Q.  Did he address this issue with her?
5   A.  **As far as what issue?**
6   Q.  The issue about this Exhibit 1.
7   A.  **I believe we met on it, yes.**
8   Q.  But he didn't -- you and he met, correct, you
9 and Sealey?
10   A.  **I believe at some point in time all of us**
11 **met.**
12   Q.  But prior to issuing this memo, did Sealey
13 address these issues with Sergeant Smith?
14   A.  **I don't remember if he did or not.**
15   Q.  Now, normally that would be his
16 responsibility as their supervisor, correct?
17     MR. ARANDA:  Objection.  Predicate.  I'm
18 objecting for the record for later on.  You answer
19 his question.
20   A.  **Say that again, sorry.**
21   Q.  Sure.  I think we covered this, but
22 Lieutenant Sealey was her immediate supervisor,
23 correct?
24   A.  **Correct.**
25   Q.  And would it be his responsibility to do

Page 18

1 performance evaluation?
2     MR. ARANDA:  Objection.  Predicate.  Go
3 ahead.
4 BY MR. HELWIG:
5   Q.  Go ahead.
6   A.  **Sergeant Smith would have done their**
7 **evaluations.  Lieutenant Sealey would have done**
8 **Sergeant Smith's evaluations.**
9   Q.  And then you would have done Sealey's
10 evaluation?
11   A.  **Correct.**
12   Q.  So why didn't Sealey address this issue with
13 Patterson -- or with Sergeant Smith as her immediate
14 supervisor?
15   A.  **Like I said, I believe we met on it and**
16 **discussed it, but he had already signed the eval, to**
17 **my recollection, and I felt that I needed to write**
18 **this to address it.**
19   Q.  And Patterson had come to you about this
20 e-mail, correct?  Or this evaluation?
21   A.  **About what?**
22   Q.  About the evaluation that is the subject of
23 Exhibit 1.
24     MR. ARANDA:  I just want to make sure.  The
25 question is did Patterson come to him about his

Page 19

1 evaluation?
2     MR. HELWIG:  Correct.
3     MR. ARANDA:  Is that what you asked him?
4     MR. HELWIG:  Correct.
5     MR. ARANDA:  Okay.  Sorry.  Thank you.
6   A.  **No.  What I recall is seeing both evaluations**
7 **being turned in and seeing discrepancies that I felt**
8 **needed addressing.**
9   Q.  And how did you determine that?
10   A.  **Because I read both of them.**
11   Q.  And were you familiar with Patterson's work
12 performance?
13   A.  **I was familiar with both of their work**
14 **performance.**
15   Q.  And how did you become familiar with
16 Patterson's work performance?
17   A.  **Daily interaction with both of them.**
18   Q.  With Patterson and Wallace?
19   A.  **Yes.  I was right by -- my office was right**
20 **by theirs, so I saw them both working every day.**
21   Q.  And when you said "daily interaction," do you
22 mean communication, conversation or that sort of
23 thing?
24   A.  **It could have been anything from hi, how you**
25 **doing, to asking a question about something.**

Page 20

1   Q.  And did you have interactions with Patterson
2 in your office?
3   A.  **On occasion, yes.**
4   Q.  And with Brenda Wallace, did you have
5 interactions with her in your office?
6   A.  **I don't recall her coming in.  I had an**
7 **open-door policy, so...**
8   Q.  And you called this meeting because you
9 thought Wallace was -- Wallace's evaluation was too
10 high; is that right?
11   A.  **Because of what was going on in the unit, I**
12 **believed a 7 for team work was not appropriate, so**
13 **that's why I -- we discussed it.**
14   Q.  And I used the word "meeting" without -- and
15 I want to establish that there was a meeting,
16 correct, to discuss this with Sergeant Smith?
17   A.  **Yes, I believe there was.**
18   Q.  And the meeting was attended by -- I believe
19 it says -- it was attended by Assistant Chief, at
20 that time, Link; is that right?
21   A.  **There was, yes.**
22   Q.  Is he still employed by the Lakeland Police
23 Department?
24   A.  **No, sir.  He's retired.**
25   Q.  And was Lieutenant Sealey present as well?

Page 21

1  A.  For that meeting, yes.

2  Q.  And it was at that meeting that you presented

3  Sergeant Smith with Exhibit 1; is that correct?

4  A.  I believe so, yes.  That's what my memo says.

5  Q.  And it was not provided to her prior to that;

6  is that correct?

7  A.  That's -- where are you seeing that in the

8  memo?

9  Q.  I'm not -- I'm not asking you where it is in

10  the memo.  I'm just asking if that's correct.  The

11  first time she saw it was at the meeting?

12  A.  To my knowledge, yes.

13  Q.  What was your thinking in deciding to hand

14  her this eight-page memo while you and Assistant

15  Chief Link and Sealey sitting there, this memo she

16  hadn't seen previously?  What was the reason for

17  that?

18  A.  What was the reason for what?

19  Q.  Why did you do that?

20  A.  Do what?

21  Q.  Invite her the meeting and give her the first

22  time, hand this memo to her, Exhibit 1?

23  A.  I felt that that was the appropriate time to

24  provide the memo.

25  Q.  Did you expect her to read the memo in front

Page 22

1  of all of you?

2  A.  I don't know that I had an expectation for it

3  to be read then or later.

4  Q.  Did you ask her to address the issues in the

5  memo?

6  A.  I believe I did.

7  Q.  Is this -- in terms of the supervision and

8  evaluation processes of the department at that time,

9  was this considered a reprimand?

10  A.  I didn't see it as a reprimand.

11  Q.  Was it considered to be a performance

12  evaluation?

13  A.  No.

14  Q.  Where did you believe it fit in the

15  department's supervision system of documenting

16  evidence?

17  A.  I believe it fit in there to clarify what I

18  thought I saw discrepancies in two evaluations.

19  Q.  Is there anything in the -- or was there at

20  that time anything in the department's supervision

21  and evaluation policies that provided for such a

22  memo?

23  A.  You're allowed -- employees are allowed to

24  make comments on their evaluation, so, yes,

25  there's...

Page 23

1  Q.  But that's on their own evaluations, correct?

2  A.  Correct.

3  Q.  So this wasn't you making comments on your

4  evaluation?

5  A.  Correct.

6  Q.  So how does this fit in with the supervision

7  practices and rules of the department?

8  A.  The evaluations had already been completed,

9  and they weren't going to be changed.  So to me it

10  rose to the level that a memo needed to be generated

11  to clarify some discrepancies that I believe were

12  there.

13  Q.  Was this -- did you consider this to be

14  disciplinary?

15  A.  No.

16  MR. ARANDA:  Objection.  Asked and answered.

17  BY MR. HELWIG:

18  Q.  Have you ever written such a memo to anyone

19  else in your chain of command?

20  A.  I don't believe I have ever had a situation

21  other than this that there were discrepancies in

22  side-by-side evaluations.

23  Q.  So then no, you have not ever other than this

24  one?

25  A.  For -- in this instance, yes, you're correct.

Page 24

1  Q.  Have you ever given anyone in your chain of

2  command a memo that contained written feedback on

3  their performance other than a formal evaluation?

4  A.  Yeah.  I mean, as a field training officer we

5  gave feedback on a daily basis to officers, and

6  essentially an FTO is a supervisor.

7  Q.  And was that in writing or oral?

8  A.  Yeah.  Those were on daily observation

9  reports.

10  Q.  And after you were no longer in charge of

11  that unit, when you were now in charge of criminal

12  crime analysis, was there any occasion when you

13  wrote such a memo giving feedback to an employee?

14  A.  Other than employee evaluations, no.

15  Q.  Okay.  I want to ask you to look at page 2,

16  and as you suggested in the first full paragraph,

17  you take up the question of Brenda Wallace getting

18  ratings of 7, right?

19  A.  Correct.

20  Q.  And one of the areas you identified was job

21  knowledge, that you had a concern about Brenda

22  Wallace being rated as a 7 in job knowledge; is that

23  correct?

24  A.  Correct.

25  Q.  What was your concern there?  She had been a

Page 25

1   long-service employee; is that right?
2   A.  Correct.
3   Q.  And you felt that she was still lacking job
4   knowledge?
5   MR. ARANDA:  Objection to the form.  The
6   document speaks for itself.  Go ahead.
7   BY MR. HELWIG:
8   Q.  You can answer.
9   A.  So ask again.
10  MR. HELWIG:  Would you read the question
11  back?
12  (Reporter reads question as follows:  "And
13  you felt that she was still lacking job
14  knowledge?")
15  A.  I think we always have the ability to learn.
16  I'm not going to say lacking job knowledge
17  completely, but everybody has the ability to learn,
18  and there were some things that we were changing in
19  the unit that I believe she could learn.
20  Q.  So there were new things that were being
21  changed in the unit?
22  A.  There was computer programs that we were
23  looking at, yes.  It's on the top of page 3.
24  Q.  And had those been implemented at this time?
25  A.  We were working on them.  I don't know if

Page 26

1   they had been fully implemented or not.
2   Q.  And would you be training on those things
3   once they were implemented?
4   A.  Yes.
5   Q.  On the next paragraph, the last sentence --
6   MR. ARANDA:  Which -- I'm sorry, which
7   paragraph?  The next paragraph on page 3?
8   MR. HELWIG:  No.  Page 2.
9   MR. ARANDA:  Sorry.
10  MR. HELWIG:  Let's make sure we're clear.
11  Back to page 2.
12  MR. ARANDA:  Okay.
13  MR. HELWIG:  Second full paragraph.
14  MR. ARANDA:  Starting with "Ms. Wallace"?
15  MR. HELWIG:  Yes.
16  MR. ARANDA:  Okay.  Thank you.  Sorry.
17  BY MR. HELWIG:
18  Q.  The last sentence says, "Part of the issue
19  appears to be a generational gap."
20  What did you mean by that?
21  A.  Well, if you look in the workforce, in any
22  workforce right now, you've got several different
23  generations.  And if you look at HR and things like
24  that, the ability to try to have all those work
25  together is something that you read about and you

Page 27

1   learn about.  And the way I police and the way I was
2   brought up as a police officer could be different
3   than a new patrol officer we hire now.  I never -- a
4   new police officer now has a cell phone in his -- he
5   was born with a cell phone in his hand basically.
6   We didn't have them back then, so the style of
7   policing is changed.  And so that can create those
8   gaps that we have to learn to work around and make
9   them better.
10  Q.  So in the case of Brenda Wallace, what was
11  the result of this, quote-unquote, generational gap
12  that you referred to?  What was it that she was
13  missing?
14  MR. ARANDA:  Objection to the form.
15  BY MR. HELWIG:
16  Q.  You can go ahead and answer.
17  A.  Just we were -- I'm not sure how to answer
18  your question there.
19  Q.  What can I do to clarify or help you answer?
20  A.  You're asking what the generational gap was?
21  Q.  Yes.  In terms -- as it relates to
22  performance.
23  A.  Well, Mr. Patterson came in, and his
24  knowledge of certain programs appeared to me to be
25  stronger than hers, so there's a knowledge thing

Page 28

1   there.  And not that she didn't want to learn it,
2   but that was there.  And, in my opinion, work ethics
3   are different between different age groups, and so
4   that can create those kind of gaps.  And when I say
5   "generational gap," there's different philosophical
6   differences on how people come to work, and that's
7   what I was seeing between the two.
8   Q.  Okay.  The first thing I think you mentioned
9   was differences in there were new programs, correct?
10  A.  Correct.
11  Q.  Were these programs that had already been
12  implemented by the police department?
13  A.  Some.  And then some were upgrades.
14  Q.  So there were some planned upgrades in the
15  programs?
16  A.  I'm not sure where you're -- I'm not sure
17  what you're trying to ask there.
18  Q.  Okay.  Let me try to be more clear.  You
19  mentioned that there would be generational
20  difference in knowledge of programs; is that
21  correct?
22  MR. ARANDA:  Objection to form.
23  BY MR. HELWIG:
24  Q.  And if that's not correct --
25  A.  Yeah.  I'm not -- I guess I'm not

Page 29

1  understanding what you're trying to ask.
2      Q.  I'm trying to ask what you meant by this
3  generational gap reference.  That's what I'm trying
4  to ask.  And you mentioned that there were
5  differences with respect to programs and with
6  respect to work ethics, right?  So what were you
7  referring to when you said there were differences
8  with respect to programs?
9          MR. ARANDA:  Objection.  Asked and answered.
10  Go ahead.
11      A.  Like, for instance in the paragraph above
12  that or it was on the one -- I just saw it.  Hold
13  on.  There was one program called RGIS, which is a
14  mapping software program that required enhanced
15  training, and he had already had some of that.  And
16  I know that Brenda had some of it, too, but I was
17  wanting to get to the next level of it.  That was
18  one program in particular.
19      But the gap and the difference there is
20  there's different ways of doing things, and not all
21  of them are wrong.  And what I was seeing is there
22  was a couple different ways to get something done,
23  and it was creating some strife among those two, and
24  that was the differences that I was talking about.
25  You know, flexible versus not flexible.  Should we

Page 30

1  try it again to see if it works, things like that.
2      Q.  So that goes into work ethics as well, does
3  it not?
4      A.  Correct.
5      Q.  And any other issues in terms of the
6  generation gap that you perceived as to work ethics?
7          MR. ARANDA:  Objection to the form.
8          MR. HELWIG:  What's the objection?
9          MR. ARANDA:  Well, you're picking and
10  choosing from the sentence.  It says,
11  "Generational gap and philosophical differences."
12  You're choosing just to a generational gap I guess
13  because I think it helps your case better.  The
14  whole sentence is what the whole sentence says.
15  BY MR. HELWIG:
16      Q.  I'm comfortable with the whole question.  Go
17  ahead and answer.
18          MR. ARANDA:  I'm comfortable with my
19  objection.
20          THE WITNESS:  So do I answer?
21          MR. ARANDA:  Yes.  You always answer.
22      A.  Okay.  What was the question again?
23      Q.  With respect to issues regarding generational
24  gap, what were those with respect to work ethics, if
25  you have not already described them?

Page 31

1          MR. ARANDA:  Objection.  Asked and answered.
2      A.  Well, generational gap and philosophical
3  differences is that there's two lines of thinking
4  there, and that's what I was seeing is the way
5  Ms. Wallace saw and did something was different than
6  the way Patterson saw and did something.  And
7  neither one was wrong, was completely wrong, but is
8  there a better way to do it?  And they both could be
9  set in their thoughts and not be flexible at times,
10  and that's what I was trying to portray in that.
11      Q.  So where does the generational gap part come
12  in?
13          MR. ARANDA:  Objection.  Asked and answered.
14  Go ahead.
15      A.  There's -- she's an extremely tenured
16  employee that does a good job and is set in doing
17  things those ways as we do and was brought up in
18  that workforce.  Patterson came from the private
19  sector where things are done a lot different, and he
20  was younger and recently out of college.  And so he
21  had ideas, and to me that was a barrier there.
22      Q.  Looking at the paragraph two-thirds of the
23  way down that begins "During this meeting," do you
24  see that?
25      A.  Yes.

Page 32

1      Q.  There's a statement you make that says,
2  "Sergeant Smith stated the issues were with
3  Mr. Patterson even after I gave her an example of an
4  incident that I saw firsthand in which Ms. Wallace
5  had a 'no' reason for any possible change to the way
6  we do tips when I was discussing the idea with
7  Ms. Wallace and Mr. Patterson one afternoon."
8      Do you recall that incident that you're
9  describing when you were discussing it?
10          MR. ARANDA:  Did you find where he's reading?
11          THE WITNESS:  Yes.
12          MR. ARANDA:  Okay.
13      A.  So what?
14      Q.  So the sentence that I read?
15      A.  Correct.
16      Q.  That says you gave her an example of an
17  incident in which Ms. Wallace had no reason, do you
18  remember what that example was or what that
19  conversation was?
20      A.  Yeah.  Well, in particular that dealt with
21  tips, Crime Stopper tips.  And when I got up to
22  investigations, pretty much all the tips were being
23  managed through Excel spreadsheets.  And the tip
24  software is web-based.  It was called P3-something,
25  but it was web-based where you could manage tips

Page 33

1  through the software instead of doing spreadsheets.
2  And I thought that could be a more efficient way of
3  doing that, and I at least wanted to try and see
4  how it worked.  And that's what I'm referencing
5  there when Ms. Wallace had said, "No, that won't
6  work and the way we're doing it is fine," is
7  essentially what was said.
8      Q.  So it wasn't just no.  She explained her
9  reason?
10     A.  Yeah.  To my recollection, yes.  But the
11  flexibility wasn't there, and I wanted to try the
12  web-based approach for managing tips.
13     Q.  I want to ask you to turn to page 4, please.
14  On the paragraph immediately below the heading
15  "Mr. Sean Patterson Evaluation," the
16  paragraph immediately below that.
17     A.  Okay.
18     Q.  You say, "Mr. Patterson's evaluation is all
19  3's or standard performance."  And you say that you
20  understand Patterson is a one-year employee and a 3
21  in these categories is not a major issue.  You said
22  that?
23     A.  Correct.
24     Q.  And do you still believe that?
25     A.  Yes.

Page 34

1      Q.  On page 5, second paragraph, in the middle of
2  the paragraph it says, "I have seen Mr. Patterson
3  work extremely well with other co-workers and be
4  very supportive of the organization."
5          Whom did you see him working well with?
6      A.  Where?  Can you --
7      Q.  Sure.  Page 5 under "Category -
8  Organizational Support."
9          MR. ARANDA:  I think he's -- it's in the
10  middle of the sentence.  It says, "However, I have
11  also" --
12         MR. HELWIG:  Yeah.  That's it.
13         MR. ARANDA:  He's reading right there.
14         THE WITNESS:  I was at the top.  Okay.  I'm
15  sorry.  Say that again, please.
16  BY MR. HELWIG:
17     Q.  So I asked you, who were those other
18  co-workers that you saw him working extremely well
19  with?
20     A.  One that sticks out to me is violent crimes
21  unit.  He was working -- one particular instance he
22  was working well with the detectives on a -- I don't
23  remember if it was a homicide or robbery.  It was a
24  violent crimes case, but he was working well with
25  them.

Page 35

1      Q.  Who was that that he was working well with?
2      A.  I don't remember if it was Tammy Hathcock or
3  Russ Hurley, I think.
4          MR. ARANDA:  Can you give me those names
5  again?
6          THE WITNESS:  Tammy Hathcock or Russ Hurley.
7  BY MR. HELWIG:
8      Q.  And you don't know which one of those it was?
9      A.  It may have been both.
10     Q.  Okay.  Any others?
11     A.  That's just one particular instance.  I mean,
12  it seemed like he got along -- it seemed like both
13  of them got along with everybody for the most part
14  upstairs.
15     Q.  What was Ms. Hathcock's -- she's a female,
16  right?
17     A.  Yes, sir.
18     Q.  What was her age approximately to the best of
19  your knowledge?  Was she over 60?
20     A.  No.  She was a detective.
21     Q.  Was she over 50?
22     A.  I don't believe so.
23     Q.  Okay.  How about Russ Hurley?
24     A.  I think he's over 50.  I would have to
25  double-check that.

Page 36

1      Q.  Okay.  At the bottom of that page the
2  sentence that begins, "Further in the evaluation,"
3  do you see that?
4      A.  Yes, sir.
5      Q.  It says, "Sergeant Smith cites that
6  Mr. Patterson needs to let his co-workers know when
7  he'll be gone for periods more than 15 minutes."
8  And you go on to say that, "This is not a
9  requirement in policy and is a personal preference
10  by Sergeant Smith."
11         Do you see that?
12     A.  Yes, sir.
13     Q.  Did she have the authority to apply that
14  rule?
15     A.  I believe so.
16     Q.  Still on that page, which is now page 6,
17  under "Category - Accountability," the second
18  sentence says, "Mr. Patterson has had a bit of an
19  adjustment learning the chain of command structure
20  in a police organization."
21         MR. ARANDA:  I'm old.  I got lost.
22         MR. HELWIG:  Let's get you found.
23         MR. ARANDA:  Just tell me what
24  paragraph again.
25         MR. HELWIG:  Under "Category -

Page 37

1   Accountability."
2        MR. ARANDA:  Gotcha.
3        MR. HELWIG:  First paragraph into the second
4   line.
5        MR. ARANDA:  Found it.  Sorry.
6   BY MR. HELWIG:
7   Q.  Do you see that?
8   **A.  Yes, sir.**
9   Q.  What did you have in mind there?
10  **A.  Well, I had in mind that entire sentence, not**
11  **just the part of that sentence.  But, like I said**
12  **earlier, Patterson came from the private sector, so**
13  **he had never been exposed to a paramilitary**
14  **organization with a chain of command like we have.**
15  Q.  So it's the case that Patterson would go to
16  you instead of his immediate supervisor with
17  questions and ideas during his employment, correct?
18  **A.  There was times he came to me with ideas,**
19  **yes.**
20  Q.  Is that what you're referring to here?
21  **A.  What, his independent thinking?**
22  Q.  Adjustment -- he needed -- he has a bit of
23  adjustment learning the chain of command structure.
24  **A.  So what are you asking?**
25  Q.  I'm asking --

Page 38

1   **A.  -- about his adjustment?**
2   Q.  I'm asking if that's what you were referring
3   to, his coming directly to you.
4   **A.  No.  No.**
5   Q.  What were you referring to?
6   **A.  If nobody has worked in a police organization**
7   **and we hired them tomorrow, there's an adjustment**
8   **period working in law enforcement, and that's what I**
9   **was citing there.**
10  Q.  Okay.  I understand that, but what in
11  particular about Patterson's activities did you have
12  in mind when you said he's had a bit of an
13  adjustment learning the chain of command structure?
14  **A.  Well, like you just asked just before that**
15  **about him not -- or him checking in every 15 minutes**
16  **or if he's gone more than he needs to let**
17  **Sergeant Smith know, just like you said that, that's**
18  **the kind of adjustment stuff.  Because in the**
19  **corporate world there's -- there are places where**
20  **they're not like that.**
21  Q.  So was he resistant to Sergeant Smith
22  instructing him to check in if he's going to be gone
23  more than 15 minutes?
24  **A.  This is my opinion.  I don't know that he was**
25  **resistant, but I know that it was an adjustment.**

Page 39

1   Q.  Moving to the next page?
2        MR. ARANDA:  We're on page 7?
3        MR. HELWIG:  Page 7, correct.
4        MR. ARANDA:  Thank you.
5   BY MR. HELWIG:
6   Q.  The first paragraph, the third sentence.
7   **A.  First full one?**
8   Q.  Yes, first full one.
9   **A.  Okay.**
10  Q.  Third sentence, "When Sergeant Smith is not
11  working, he will speak with me or Lieutenant Sealey
12  or he will speak with me directly when working on
13  something with me."
14       Do you see that?
15  **A.  Yes.**
16  Q.  During this time there was someone who was
17  filling in for Sergeant Smith and within the unit
18  itself, was there not?
19  **A.  I believe at some point in time Sergeant Doty**
20  **assisted with some of the sergeant duties.**
21  Q.  So that should be his first stop when looking
22  for guidance, correct?
23  **A.  Yes.  The second half of that sentence where**
24  **"directly worked with me when working on something"**
25  **is there was a crime analysis module within the**

Page 40

1   **report writer that we had that I had been working**
2   **with a couple folks from the sheriff's office to get**
3   **that up and running.  And he had knowledge of that,**
4   **so he was working directly with me trying to get**
5   **that module up and running.**
6   Q.  Did you notify Sergeant Smith that he was
7   working with you on that project?
8   **A.  I believe I did.**
9   Q.  And did you ask her whether that would
10  interfere with his duties in her unit?
11  **A.  I believe I did, but I don't recall if I did**
12  **or not.**
13  Q.  And going down to the third full
14  paragraph which begins "Further."
15  **A.  Yes, sir.**
16  Q.  In the middle of the second line it says, "I
17  have taken on the challenge to help develop and
18  mentor him, as he is an asset to this organization
19  and should be set up for success."
20       Do you see that?
21  **A.  Yes.**
22  Q.  What did that entail, taking on the challenge
23  of developing and mentoring Mr. Patterson?
24       MR. ARANDA:  Objection to the form.  The
25  document speaks for itself.  Go ahead.

Page 41

1  A.  Exactly -- exactly that.  I knew that there
2  was -- there were ideas that I believed we could
3  make the agency better and a little more efficient
4  on certain things, and he had never been exposed to
5  a paramilitary organization and things like that.
6  So to teach -- to teach and have him learn some of
7  that, that's where I helped try to develop that and
8  mentor that and be a resource for him.
9  Q.  During your time as a captain, have you
10 worked directly with any other employee on projects
11 where that person was not -- did not report to you
12 in the chain of command?
13 A.  I'm sure there is.  I would have to think
14 about that one.
15 Q.  Take a minute if you'd like.
16 A.  There's -- we have committees on certain
17 things that we may share or we're all part of a
18 committee, and sometimes those committees are
19 cross-bureau.  So I would work with other people on
20 things like that.
21 Q.  And they would be cross-bureau type things?
22 A.  Yes.
23 Q.  Would those people be in your chain of
24 command?
25 A.  Not necessarily.

Page 42

1  Q.  On the last full paragraph -- there's two
2  paragraphs at the bottom which begin
3  "Mr. Patterson."
4  A.  Okay.
5  Q.  I'm going to ask you about the first of those
6  two.  The second sentence you say, "Sergeant Smith
7  has told me she explains things to him but he does
8  not listen.  I have also had to remind him of a
9  couple of things on occasion."
10    Do you remember what those things were?
11 A.  No, I don't remember specifically, but that
12 was also part of learning and maturation process
13 too.
14 Q.  Did you think that Sergeant Smith's statement
15 was accurate, that she has explained things to him
16 but he doesn't listen?
17 A.  I don't doubt that she explained things to
18 him.  I'm sure she explained things to him.  So
19 whether he listened or not, I mean, she believes he
20 didn't listen, so, I mean, that...
21 Q.  Okay.  Go to page 8, the last page, under
22 "Conclusion."  Do you see that?
23 A.  Yes, sir.
24 Q.  The second paragraph.  You say, "Sergeant
25 Smith needs to embrace this challenge or issues

Page 43

1  could continue."
2    And the challenge you're referring to is in
3  the previous paragraph?
4  MR. ARANDA:  I'm sorry, you're asking him if
5  that sentence "needs to embrace the challenge"
6  refers to the paragraph above it but below the
7  title "Conclusion"?
8  MR. HELWIG:  Correct.
9  MR. ARANDA:  Okay.  Sorry.  Thank you.
10 MR. HELWIG:  Thank you.
11 A.  You're going to have to ask that again
12 because --
13 Q.  I'll be happy to.
14 A.  Okay.
15 Q.  In the first paragraph under "Conclusion,"
16 you say, "Mr. Patterson is a young employee and
17 needs to be mentored and coached."  And then you
18 say, "Lieutenant Sealey and I have accepted the
19 challenge in the afternoons when Sergeant Smith
20 leaves work."
21 A.  Correct.
22 MR. ARANDA:  I'm sorry, where did you read?
23 MR. HELWIG:  From the first paragraph under
24 "Conclusion," the last two sentences.
25 MR. ARANDA:  Okay.  Gotcha.

Page 44

1  BY MR. HELWIG:
2  Q.  And what did that entail, accepting the
3  challenge in the afternoons to work with Patterson?
4  A.  Managing the unit.  And I tried to let
5  Lieutenant Sealey do all that as much as I could.
6  Q.  And Patterson continued to meet with you in
7  your office during this time, correct?
8  A.  He would meet with me on things like the
9  crime analysis module.  Or if an idea popped off,
10 sometimes he would stick his head in there and relay
11 an idea, but so did a lot of other people in my
12 entire career.  People have came in and gave me
13 ideas.  It's part of my open-door policy.
14 Q.  Okay.  Going to the next paragraph, you say,
15 "Sergeant Smith needs to embrace this challenge or
16 issues could continue."
17    Do you see that?
18 A.  Yes.
19 Q.  What issues are we talking about here or are
20 you talking about?
21 A.  I'm talking about everything that I noted in
22 the prior seven pages.
23 Q.  Got it.  And then you say, "Currently there
24 is a generational conflict occurring that cannot be
25 resolved."

Page 45

1   Do you see that?
2   A.  Yes.
3   Q.  What did you mean by that?
4   A.  Well, at that time it didn't seem like
5   Sergeant Smith was willing to embrace, coach or
6   teach Mr. Patterson based on the things that I was
7   seeing, and that's what I meant by that.
8   Q.  So when you say "cannot be resolved," where
9   does that lead?
10  A.  It's going to reach a point where something's
11  got to be done.
12  Q.  And that could include relieving Sergeant
13  Smith from her position?
14  A.  That could -- that could be a whole bunch of
15  things.
16  Q.  Is that one of them?
17  A.  If the chief determined that, yes.
18  Q.  The next paragraph beginning with "Lieutenant
19  Sealey," do you see that?
20  A.  Yes.
21  Q.  "Lieutenant Sealey and I will discuss with
22  Sergeant Smith and provide a copy of this memorandum
23  so the concerns are clear."
24  Do you see that?
25  A.  Yes.

Page 46

1   Q.  And did you do that?
2   A.  To my recollection, it was done.
3   Q.  Okay.  And you provided copies to
4   Mr. Patterson, a copy of this memo to Mr. Patterson?
5   A.  Copies were attached to their evaluations.
6   Q.  And their -- and they were given the
7   evaluations, correct, physically given the
8   evaluations?
9   A.  Yes.  Once the evaluations were completed, I
10  attached my memo.  It went up the chain of command.
11  And once it's processed, they get a final copy of
12  the evaluation, and that's when they would have
13  gotten the memo.
14  Q.  Thank you.  What message did you think this
15  memo would send to Mr. Patterson?
16      MR. ARANDA:  Objection.  Predicate.
17  A.  You would have to ask him.
18  Q.  Well, what was your intention?
19  A.  My intention was to document the issues and
20  try to get this resolved.
21  Q.  Did you recognize a risk that Patterson would
22  read this memo in saying that he doesn't have to pay
23  attention to Sergeant Smith anymore?
24      MR. ARANDA:  Objection to the form.  Go ahead
25  and answer.

Page 47

1   A.  I didn't interpret it that way.
2   Q.  Did you recognize the risk that that could be
3   one result of this?
4       MR. ARANDA:  Objection.  Predicate.
5   A.  I didn't think of that as a risk.
6   Q.  And what was the reason for having Assistant
7   Chief Link present?
8   A.  For what?
9   Q.  For this -- for the meeting where you handed
10  out this memo.
11  A.  I don't remember the time line or the timing,
12  but I believe he was part of it, so the entire chain
13  of command was meeting.
14  Q.  What was the reason for sending the memo
15  directing the memo to Chief Giddens?
16  A.  All evaluations are signed by the department
17  head.
18  Q.  And the department head is whom?
19  A.  Chief Giddens.
20  Q.  The police department head?
21  A.  Yes.  Yes.  Yes.
22  Q.  So at the time this memo was written, had the
23  evaluation been finalized?
24  A.  They were both completed, yes.
25  Q.  Looking at page 8 of this exhibit at the

Page 48

1   bottom where it begins "Regardless of rank," in the
2   last full paragraph.
3   A.  Correct.
4   Q.  You say, "Our young employees need members
5   that will be embrace them and be willing to coach
6   and guide them to success."
7   What did you mean by that?
8   A.  That we need to embrace them and coach and
9   guide our members to success.
10  Q.  Did you believe that all employees needed
11  members that will embrace them and be willing to
12  coach them and guide them to success?
13  A.  Yes.
14  Q.  So why the focus on young employees?
15  A.  Because that was part of the issue here.
16  Q.  There's a reference in here on the first
17  page to millennials.  Sorry to jump back, but I want
18  to cover this one last thing.  On page 1 in the
19  paragraph "I have met with Sergeant Smith," and you
20  refer to recommending her -- that she purchase a
21  book "Managing the Millennials"?
22  A.  Correct.
23      MR. ARANDA:  Objection to form.
24  BY MR. HELWIG:
25  Q.  What is your understanding of what the term

Page 49

1  "millennial" refers to?  What age group?
2      A.  I read a lot, so I don't have age groups
3  memorized, but you have the boomers, baby boomers,
4  millennials, gen Z.  You've got the new ones coming
5  out.  You have heard gen X.  So everyone interprets
6  life and society and work differently.  So in that
7  book that I specifically read and recommended, I
8  found it provided me great insight, so I recommended
9  that on top of "The One Minute Mentoring" one that I
10  had purchased for both of them.
11      (Exhibit 2 was marked for identification.)
12  BY MR. HELWIG:
13      Q.  Let me hand you what's been marked as
14  Exhibit 2, which, to be quite honest, is something I
15  just copied off of Google.
16      MR. ARANDA:  Can I?
17      MR. HELWIG:  I have a copy for you.  I'm
18  sorry.
19      MR. ARANDA:  It's okay.
20  BY MR. HELWIG:
21      Q.  It gives a definition of millennial.  Do you
22  see that?
23      A.  Yes.
24      Q.  And under Number 2 it says, "Relating or
25  demoting to people born between the early '80s and

Page 50

1  late '90s."
2      Do you see that?
3      A.  Yes.
4      Q.  Is that consistent with your understanding of
5  the term?
6      MR. ARANDA:  Objection to the form.
7      A.  Yeah.  If you Googled this, you'll probably
8  get several different dates, but that's the general
9  date, so I would say go with that.
10      Q.  Okay.
11      MR. HELWIG:  Let's go off the record.
12      (Discussion off the record.)
13      MR. HELWIG:  Back on the record.
14  BY MR. HELWIG:
15      Q.  When you issued this January 11, 2018, memo
16  which is Exhibit 1, how long had you been a captain
17  in the criminal investigation unit -- or over the
18  criminal investigation unit?
19      A.  Probably six months.
20      Q.  Had you spent -- had you had meetings one on
21  one with Brenda Wallace at that time?
22      A.  I don't recall if I did.  I know there was
23  some team meetings.
24      Q.  Did you ever discuss with her any issues that
25  she had with mentoring Mr. Patterson?

Page 51

1      MR. ARANDA:  Wallace mentoring Patterson?
2      MR. HELWIG:  Correct.
3      MR. ARANDA:  Sorry.  Thank you.
4      A.  I don't remember if I did or not.
5      Q.  Do you know what compensations Wallace
6  received for training and mentoring Mr. Patterson?
7      A.  I believe it was an hour of comp or overtime
8  each day that they were training.  I would have to
9  look, but that's usually what we pay for training.
10      Q.  So that would be the standard arrangement?
11      A.  That's what's normally done for field
12  training officers.
13      Q.  Did Mr. Patterson have specific complaints
14  about Ms. Wallace, to your knowledge?
15      A.  I would have to go back and look through
16  things.
17      Q.  At this point you don't recall any?
18      A.  The general one that comes to mind is that
19  there was some inflexibility.  It was this way or
20  the highway type thing versus could there be a
21  better way to do something.
22      Q.  Did Ms. Wallace ever tell you that she felt
23  Mr. Patterson was resistant to supervision?
24      A.  I believe at some point that was -- I was
25  made aware of that.

Page 52

1      Q.  Did you believe that was accurate?
2      A.  What I believe is that there was resistance
3  on both sides, resistance to -- maybe some
4  resistance to be supervised, but there was also some
5  resistance to try different things.
6      Q.  You mention in this memo "The One Minute
7  Mentoring" book?
8      A.  Yes.
9      Q.  Did you provide that to both Ms. -- Sergeant
10  Smith and Mr. Patterson?
11      A.  Yes, I did.
12      Q.  Did you also provide Patterson with an
13  article on "How Smart People Handle Difficult
14  People"?
15      A.  I may have.  I don't recall.
16      Q.  What would be the relevance of that to his
17  job?
18      A.  As far as what?
19      Q.  How would that -- how would that provide
20  useful guidance to him in his employment at the
21  police department?
22      A.  There were probably some nuggets of info for
23  him to read and learn about.
24      Q.  So was the idea that you and he were the
25  smart people and Ms. Wallace and Ms. Smith were the

Page 53

1  difficult people?
2      MR. ARANDA:  Objection to the form.
3  Predicate.  Argumentative.  Go ahead and answer.
4      A.  No.  There's tons of articles that come out
5  on various publications that talk about dealing with
6  people in general, and if I -- I don't recall that
7  article, but I'm sure it maybe had some nuggets of
8  information that maybe would help him as part of a
9  mentoring process to learn how to get along with
10  folks, because he did come from the private sector.
11     Q.  Okay.  Sergeant Smith and Ms. Wallace made an
12  internal complaint against Mr. Patterson and others;
13  is that right?
14     A.  Yes.
15     Q.  And the others included you, right?
16     A.  Yes.
17     Q.  And that complaint was invented by --
18  investigated by then Captain Sam Taylor?
19     A.  No.
20     MR. ARANDA:  Which one are you talking about?
21  I'm sorry.
22     MR. HELWIG:  Okay.  Let me mark and I'll hand
23  it to you and we'll talk about it.
24     (Exhibit 3 was marked for identification.)
25     MR. HELWIG:  Let's go off the record.

Page 54

1  BY MR. HELWIG:
2      Q.  I'll hand you what's been marked as
3  Exhibit 3.  Now, this is a report dated June 28,
4  2017.  Do you see that?
5      A.  Yes.
6      Q.  I think that should be 2018, and I'm going to
7  direct your attention to page 3, right smack in the
8  middle of that long paragraph.  Do you see where it
9  says, "On February 7, 2018, Lieutenant Sealey
10  completed"?
11     A.  Yes.
12     Q.  Okay.  And then going on it refers to other
13  things that occurred in 2018?
14     A.  Correct.
15     Q.  So would you agree that the year of 2017 on
16  Exhibit 3 is not correct?
17     MR. ARANDA:  Wait.  Hold on.  Page 3 the
18  first full paragraph starting on January 17, 2018?
19     MR. HELWIG:  Right.
20     MR. ARANDA:  That's what you're asking him
21  about?
22     MR. HELWIG:  Yes.
23     MR. ARANDA:  And your question to him is that
24  there are factual inaccuracies in this paragraph?
25     MR. HELWIG:  No.

Page 55

1      MR. ARANDA:  Sorry.
2      MR. HELWIG:  My question is it refers to
3  events that occurred after the date on the front
4  of the memo.
5      MR. ARANDA:  Because it says June 28, 2017,
6  and it starts January 17, 2018?
7      MR. HELWIG:  It doesn't start but includes
8  many things.
9      MR. ARANDA:  Yeah, no, no.  I'm talking about
10  the paragraph.
11     MR. HELWIG:  Oh, sure.
12     MR. ARANDA:  Yes, yes, yes.
13  BY MR. HELWIG:
14     Q.  So June 28, 2017, is an error in some way,
15  right?
16     MR. ARANDA:  Objection to the form.
17  Predicate.  He's not the author of this report,
18  but answer away.
19  BY MR. HELWIG:
20     Q.  As you read -- let me restate the question.
21         As you read this memo, does it appear that it
22  was not issued in 2017?
23     A.  Yes.
24     Q.  Okay.
25     A.  You'd have to ask him about it.

Page 56

1      Q.  Got it.  On page 1, Captain Taylor -- is he
2  the chief now?
3      A.  Yes, sir.
4      Q.  Okay.  In the second paragraph which begins
5  "In January of 2017" --
6      A.  Okay.
7      Q.  -- moving to the sentence that begins on the
8  fourth line, he says, "Sean's training appeared to
9  be moving along on schedule as planned until May 31,
10  2017."
11     A.  I'm not seeing -- oh, okay.  Gotcha.
12     Q.  In the middle of that paragraph a little bit
13  above the middle there's a sentence that says,
14  "Sergeant Smith told Lieutenant Sealey that Sean
15  needs to learn his job first and that he should not
16  be going around talking with others until he knows
17  his job."
18         Do you see that?
19     A.  Yes, sir.
20     Q.  Did Sergeant Smith ever communicate that to
21  you?
22     A.  I believe she told me that, yes.
23     Q.  Okay.  And then at the bottom it says
24  beginning of that paragraph, "Lieutenant Sealey met
25  with Sergeant Smith and Sean Patterson."

Page 57

1   Do you see that?
2   **A.  Yes, sir.**
3       MR. ARANDA:  I'm not there.
4       THE WITNESS:  Hold on.
5       MR. ARANDA:  I got lost.  Tell me how it
6   starts again.
7       MR. HELWIG:  "Lieutenant Sealey met with
8   Sergeant Smith," the bottom paragraph.
9       MS. SMITH:  Keep going down.
10      MR. HELWIG:  It starts on the bottom.
11      THE WITNESS:  Oh the next paragraph.
12      MR. HELWIG:  I should have said that.
13      MR. ARANDA:  Okay.  Got it.
14      THE WITNESS:  I was still in the first
15  paragraph.
16      MR. ARANDA:  I'm there now.  Okay.  Thank
17  you.
18  BY MR. HELWIG:
19      Q.  And the third line Chief Taylor, then
20  captain, says, "The meeting did not go well and
21  ended with Sean Patterson being asked to leave
22  Lieutenant Sealey's office by Sergeant Smith as she
23  believed Sean's responses to her questions were
24  insubordinate."
25      Do you see that?

Page 58

1   **A.  Yes, sir.**
2       Q.  He goes on to say, "Lieutenant Sealey did not
3   believe Sean's actions and responses were, in fact,
4   subordinate at the meeting."
5       Were you informed about this meeting?
6   **A.  I don't remember if I was or not.  I believe**
7   **that was prior to my transfer.**
8       Q.  I see.  Going to the third page, are you with
9   me?
10  **A.  Yes, sir.**
11      Q.  Okay.  The paragraph that begins "On
12  January 17th."
13  **A.  Yes.**
14      Q.  And then a little more than halfway down it
15  states, "On February 7, 2018, Lieutenant Sealey
16  completed Sergeant Smith's evaluation giving her an
17  overall rating of 4.76, which was down from the
18  previous year's rating of 6.72."
19      Do you remember that -- were you on board at
20  that point?
21  **A.  Yes.**
22      Q.  Did Sergeant Smith raise this issue with you?
23  **A.  I believe, as it says in there, she attached**
24  **the response memo to it.**
25      Q.  And did you take any action?

Page 59

1   **A.  I initialed off and sent it up the chain of**
2   **command.**
3       Q.  So no action to -- I'm sorry.  Go ahead.
4   **A.  That's what I believe I did.**
5       Q.  And in his conclusions on page 7, do you see
6   on Chief Taylor sets out his conclusions --
7   **A.  Yes.**
8       Q.  -- for Sean Patterson and sustains the
9   allegation of neglect of duty, correct?
10  **A.  Yes.**
11      Q.  And the reason is, "CRA Patterson was asked
12  if he violated the policy by engaging in personal
13  business where he completed unauthorized work, the
14  changing of the forms for Sergeant Roberts, that
15  caused him to neglect or be inattentive to his
16  assigned responsibility as a crime analyst training,
17  and he replied yes."
18      Do you see that?
19  **A.  Yes, sir.**
20      Q.  Are you aware of that situation?
21  **A.  No, I was not, because I did not review that**
22  **complaint as it went through the chain of command.**
23      Q.  Okay.  On the next page the first bullet
24  states that the code of conduct/interaction and
25  cooperation violation as to Mr. Patterson is also

Page 60

1   sustained, correct?
2       MR. ARANDA:  You're on --
3       MR. HELWIG:  Page 8.
4       MR. ARANDA:  Page 8.  And you're dealing with
5   General Order 3-1.11?
6       MR. HELWIG:  Yes.
7       MR. ARANDA:  Okay.  Thank you.
8   BY MR. HELWIG:
9       Q.  And under that first bullet, he says,
10  "Patterson's responsibility to listen to CA Wallace
11  and Sergeant Smith and do what was asked of him to
12  complete his training in a timely fashion and
13  cooperate with his chain of command."  It goes on to
14  say, "It was Patterson's responsibility to show the
15  requisite respect that his trainer CA Wallace and
16  Sergeant Smith have rendered to this organization,
17  which at times he clearly did not do."
18      Do you see that?
19  **A.  Uh-huh.**
20      Q.  Do you believe that's true?
21      MR. ARANDA:  Do you believe which one is
22  true?
23      MR. HELWIG:  What I just read.
24      MR. ARANDA:  So the last paragraph under
25  General Order 3-1.11?

Page 61

1   MR. HELWIG:  Yes.
2   BY MR. HELWIG:
3   Q.  Specifically -- let me be clear.  I'll
4   withdraw the question and ask it differently.
5   Do you believe -- do you agree with now Chief
6   Taylor's finding that there were times when
7   Patterson clearly did not show the requisite respect
8   for Ms. Wallace and Ms. Smith?
9   **A.  You're asking me to give an opinion on a case**
10  **where I was not the reviewer.  Sergeant -- of Chief**
11  **Taylor was the reviewer of this case.  I know at**
12  **times there was strife in the unit and they all**
13  **didn't get along, and so you're asking me to opine**
14  **on this particular sustained violation that I**
15  **haven't read the case file on.**
16  Q.  So you were aware of the strife in the unit?
17  **A.  That's pretty much what my memo there was**
18  **covering.**
19  Q.  Right.  And so being aware of it, do you
20  agree with the conclusion that Patterson at times
21  clearly did not afford Wallace and Smith the respect
22  they were due?
23  MR. ARANDA:  Objection.  Asked and answered.
24  Go ahead if you have a different answer.
25  **A.  I don't have a different answer.**

Page 62

1   MR. HELWIG:  Robert, that's coaching, and I
2   wish you wouldn't do it.  The last two or three
3   times you have done that you have said, "If you
4   have a different answer," which says to the
5   witness don't answer and that's inappropriate.
6   MR. ARANDA:  No, no, no.  So, okay, let's get
7   our fangs out.  You have asked him now the third
8   time whether he agrees with the allegations that
9   were sustained by Chief Taylor regarding the
10  respect towards Ms. Smith, and he has told you
11  twice now that he can't opine on anything because
12  he didn't do this investigation, which, by the
13  way, if you read the memo says there were 55
14  interviews done.
15  So he's answered it twice.  I'm going to let
16  him answer it the third time, but you're trying to
17  get him to answer something that he's already told
18  you, "I can't because I wasn't the person who did
19  the investigation."
20  MR. HELWIG:  The question was intended to
21  probe beyond the first answer that said he wasn't
22  involved.
23  MR. ARANDA:  It's the same question twice.
24  MR. HELWIG:  Please don't interrupt.
25  MR. ARANDA:  Three times.  You asked --

Page 63

1   MR. HELWIG:  Please don't interrupt.  Please
2   don't interrupt me.
3   MR. ARANDA:  Don't raise your voice at me,
4   and I'm sorry for interrupting you.  I didn't mean
5   to.
6   MR. HELWIG:  At any rate, it was coaching and
7   please don't do it again.
8   MR. ARANDA:  It was not, and don't ask the
9   question three times.
10  MR. HELWIG:  I'll ask the question as many
11  times as I like.
12  MR. ARANDA:  And I will respond
13  appropriately.
14  MR. HELWIG:  As you should.
15  BY MR. HELWIG:
16  Q.  So the question is, are you personally aware
17  of whether Mr. Patterson did not show the requisite
18  respect to, at times certainly and clearly, to
19  Wallace and Smith?
20  MR. ARANDA:  Objection.  Asked and answered.
21  Go ahead.
22  **A.  Like I said before, this -- what Chief Taylor**
23  **is sustaining is on an investigation that I was not**
24  **allowed to review.  I do know that people in that**
25  **unit did not get along, so if you want to call that**

Page 64

1   **respect or -- I was trying to solve some issues with**
2   **that memo and what we were doing, so...**
3   Q.  Let me ask you this:  Do you agree or
4   disagree with that finding?
5   MR. ARANDA:  Objection.  Asked and answered.
6   **A.  I'm not going to opine either way because I**
7   **have not had an opportunity to review that case**
8   **file.**
9   Q.  So you don't know whether you agree at this
10  point?
11  MR. ARANDA:  Objection.  Argumentative.
12  BY MR. HELWIG:
13  Q.  Because if you know, you need to answer.
14  MR. ARANDA:  Objection.  He's answered that
15  question.
16  **A.  I just told you that the way investigations**
17  **work is you investigate a policy violation, and I**
18  **was not a reviewer on this policy violation.  So for**
19  **me to opine, sustain, not sustained, exonerated,**
20  **unfounded policy failure, whatever it is, I would**
21  **need to review that case file.**
22  Q.  And independent of that you don't know?
23  MR. ARANDA:  Objection.  Mischaracterizes his
24  testimony.
25  ///

Page 65

1  BY MR. HELWIG:
2     Q.  Then correct me.  Is it the case that you
3  don't know what the answer to this -- to my question
4  is without reviewing the case file?
5     **A.  Correct.  I would not opine on something that**
6  **I have to review the facts of the case and what was**
7  **presented from Office of Professional Standards.**
8     Q.  Well, the facts are in Exhibit 3 if you would
9  like to review them.
10       MR. ARANDA:  Do you have the 55 witness
11  statements?
12       MR. HELWIG:  Of course not.
13  BY MR. HELWIG:
14     Q.  So you have no opinion basically on that?
15       MR. ARANDA:  Objection.  Asked and answered.
16  Go ahead, sir.
17     **A.  I would give you an opinion if I had reviewed**
18  **all that, but I was not the reviewer on this**
19  **violation and this Internal Affairs case.**
20     Q.  Now, these were people who -- at the time
21  this report was filed, were you their supervisor at
22  the time as of June 28, 2018?
23     **A.  I was the division commander.**
24     Q.  So you must have reviewed Exhibit 3, did you
25  not, at the time?

Page 66

1     **A.  What was Exhibit 3?**
2     Q.  What we're looking at.
3     **A.  No.  This is an Internal Affairs**
4  **investigation, and Chief Taylor -- at the time**
5  **Captain Taylor, now Chief Taylor, was the reviewer**
6  **of that IA case.  I was the subject officer, so I**
7  **didn't -- this is his findings memo, so I had not**
8  **seen this.**
9       (Exhibit 4 was marked for identification.)
10  BY MR. HELWIG:
11     Q.  Let me hand you what's been marked as
12  Exhibit 4.  Take your time and review it.  My
13  question is going to be were you provided a copy of
14  this --
15     **A.  No.**
16     Q.  -- at the time it was issued.
17     **A.  This was issued to Sean Patterson by Chief**
18  **Giddens.**
19     Q.  So you were not privy to disciplinary actions
20  taken against people under your command?
21     **A.  Not until the case is closed by the chief and**
22  **he signs off on it.**
23     Q.  And isn't that what this is, Exhibit 4?
24     **A.  Yes.**
25     Q.  So you would be made aware of it at that

Page 67

1  time?
2     **A.  At some point, yes.  We were all being**
3  **investigated as part of this case, so because I was**
4  **a subject officer at the time, too, I wasn't privy**
5  **to a lot of this stuff until afterwards.**
6     Q.  Okay.  So after you received this, did you
7  take any steps to provide training or supervision of
8  Mr. Patterson so that these violations could be
9  remedied?
10     **A.  I believe the chain of command met and --**
11  **yeah.  The case was closed.  I mean, what are you**
12  **asking?**
13     Q.  I'm asking --
14     **A.  I'm not understanding you.**
15     Q.  You have got these findings that Patterson --
16  it's sustained that Patterson violated three
17  violations of the code of conduct.  Did you meet
18  with Patterson or Sealey or Smith to discuss how he
19  would correct these violations?
20     **A.  Well, if you read in the second paragraph of**
21  **that, it says, "You will receive Education Based**
22  **Discipline.  As directed by Sergeant David Doty,**
23  **you'll be required to complete a research paper on**
24  **leadership team work.  If you don't do it, you'll**
25  **get a written reprimand."  So it appears at that**

Page 68

1  time he may have been answering to Sergeant Doty.
2     Q.  Okay.  But he was under your chain of
3  command, correct?
4     **A.  Yes.**
5     Q.  And so you did not take any steps, other than
6  what Doty did, to see that Patterson corrected this
7  behavior; is that right?
8       MR. ARANDA:  Objection to form.  Go ahead.
9     **A.  I'm not -- I'm not sure what you're trying to**
10  **ask.  When this entire case was closed and he was**
11  **given his discipline, he's doing his EBD and then**
12  **moving forward.  So I'm sure at some point after**
13  **that me and Sealey and Doty discussed moving forward**
14  **and him completing his assignment as directed by**
15  **Sergeant Doty.**
16     Q.  And was there any plan for supervising
17  Mr. Patterson's future behavior in light of this, in
18  light of Exhibit 4?
19     **A.  If I recall correctly, I believe he was**
20  **assigned to Sergeant Doty.**
21     Q.  But that was true before this was issued,
22  correct?
23     **A.  I would have to look at a time line.  I**
24  **don't -- I don't know all the dates when movements**
25  **happened.  It's four and a half years ago.**

Page 69

1    Q.  Based on -- withdrawn.
2        Around this time Patterson filed a complaint
3    himself against Wallace and Sergeant Smith, right?
4    **A.  That's my understanding, yes.**
5        (Exhibit 5 was marked for identification.)
6    BY MR. HELWIG:
7    Q.  I'm handing you what's been marked as
8    Exhibit 5.  Is this the complaint that Mr. Patterson
9    filed?
10   **A.  It appears to be, yes.**
11   Q.  Did you ever get a copy of it, to your
12   recollection?
13   **A.  No.**
14   Q.  Were you made aware that he had filed a
15   complaint?
16   **A.  I believe I was.  I don't remember.**
17   Q.  Okay.
18       (Exhibit 6 was marked for identification.)
19   BY MR. HELWIG:
20   Q.  Let me hand you what's been marked as
21   Exhibit 6.  The memo from Sam Taylor dated July 3,
22   2018, regarding IAU File Number 18-22.  Does IAU
23   stand for Internal Affairs Unit?
24   **A.  Yes, sir.**
25   Q.  Do you see in the second paragraph he says

Page 70

1    that, "CA Sean Patterson alleged that on April 23,
2    2018, Sergeant Terri Smith and CA Brenda Wallace
3    used bullying tactics when he was sent an e-mail
4    that chastised him taking his lunch at the end of
5    his shift to go home early."
6        Do you see that?
7    **A.  Yes.**
8    Q.  If you go to the fourth page, do you see that
9    Sergeant Smith was exonerated, correct?
10   **A.  Yes.**
11   Q.  And if you go to the sixth page -- or not the
12   sixth page, the eighth page which is marked on the
13   bottom page 653 --
14   **A.  Okay.**
15   Q.  -- do you see Ms. Wallace was exonerated,
16   right?
17   **A.  Yes.**
18   Q.  Do you agree with that decision?
19   **A.  Again, that's an entire case file that he did**
20   **a findings memo on, and I was not the reviewer of**
21   **that, so -- before he writes his memo, he reviews**
22   **the entire case from IA, and I haven't had that**
23   **opportunity.**
24   Q.  I believe you testified that both -- all
25   of -- all three of Sergeant Smith and Ms. Wallace

Page 71

1    and Mr. Patterson had difficulties and behaved badly
2    at different times.  Is that a fair summary of what
3    you said?
4        MR. ARANDA:  Objection to form.
5    **A.  I didn't say "behaved badly."**
6    Q.  How would you phrase it?
7    **A.  I would say that at times they did not get**
8    **along.**
9    Q.  And this decision, Exhibit 6, basically
10   exonerates Sergeant Smith and Ms. Wallace from that
11   charge that they were responsible for that, does it
12   not?
13   **A.  That's --**
14       MR. ARANDA:  Objection.  Asked and answered.
15   BY MR. HELWIG:
16   Q.  "That's" what?
17   **A.  Yes, that's what it says.**
18   Q.  Did you discuss this with Sealey?
19   **A.  Discuss what?**
20   Q.  This finding by Captain Taylor that Patterson
21   had -- Patterson's complaint was rejected.
22   **A.  I don't remember.**
23   Q.  Would this Exhibit 6 affect your analysis of
24   who was responsible for the discord between Smith
25   and Wallace and Patterson?

Page 72

1    **A.  Would what now?**
2    Q.  Does this change your opinion of who was
3    responsible for the discord among the three?
4    **A.  No.  I think the unit was dysfunctional, and**
5    **we were trying to fix it.  So they were exonerated**
6    **from a specific allegation, and that's fine.  But,**
7    **you know, that's one allegation.  When you have a**
8    **unit that works, you know, Monday through Friday**
9    **8:00 to 5:00, it's -- this is one incident or**
10   **instance, so, you know, Chief Taylor reviewed it and**
11   **didn't see anything and exonerated them, and that's**
12   **fine.  But the day-to-day personnel interactions are**
13   **different.**
14   Q.  And around the same time the complaint of
15   Sergeant Smith and Ms. Wallace to IA was sustained
16   against Patterson, correct?
17   **A.  Correct.**
18   Q.  Did you see a pattern emerging there?
19       MR. ARANDA:  Objection to the form.
20   Predicate.
21   **A.  Pattern what?**
22   Q.  Pattern of evidence as to who was responsible
23   for the discord.
24   **A.  I think there was discord in the entire unit.**
25   **I'm not going to pinpoint it on one person.  I think**

Page 73

1  everybody had a bite of that.
2      Q.  So these two findings from the IA
3  investigations did not change your view of that?
4      A.  These investigations are on specific
5  allegations.  Like I just said, Monday through
6  Friday 8:00 to 5:00 is when that unit works, and
7  this is a snapshot of what happened in that unit on
8  a daily basis.  So, yes, there was discord in that
9  unit.
10      Q.  And this had all happened since you wrote
11  your January 11, 2018 eight-page memo, correct?
12          MR. ARANDA:  Objection to form.
13      A.  I believe that's what the time line
14  indicates, yes.
15      Q.  So following that memo, the allegations of
16  Smith and Wallace against Patterson had been
17  sustained, correct?
18          MR. ARANDA:  Objection.  Asked and answered.
19      A.  Yes.
20      Q.  And the allegations of Patterson against
21  Smith and Wallace had been not sustained, right?
22      A.  Correct.
23          MR. ARANDA:  Objection to form.  Asked and
24  answered.
25          ///

Page 74

1  BY MR. HELWIG:
2      Q.  And then Patterson filed an EEOC charge
3  against the department, correct?
4      A.  That's my understanding, yes.
5          (Exhibit 7 was marked for identification.)
6  BY MR. HELWIG:
7      Q.  I'll hand you what's marked as Exhibit 7
8  indicating Mr. Sean P. Patterson made this complaint
9  against the Lakeland Police Department; is that
10  correct?
11      A.  That's what it says here, yes.
12      Q.  And in the typed paragraph about two-thirds
13  of the way down, he says, "Since my hire, I have
14  been subjected to a hostile work environment by my
15  immediate supervisor, Sergeant Terri Smith (female)
16  and a female co-worker, Brenda Wallace."
17      That's what he's alleging, correct?
18      A.  That's what it says here.
19      Q.  And in the next to last sentence, he says,
20  "Yet Sergeant Terri Smith has allowed the hostile
21  work environment to exist and has encouraged the
22  harassment to continue by failing to address the
23  issues."
24      Do you see that?
25      A.  Uh-huh.

Page 75

1      Q.  So now the controversy is taken outside the
2  department and put in the hands of the EEOC by
3  Mr. Patterson, correct?
4      A.  I believe both parties filed EEOC complaints.
5      Q.  Did Ms. -- did Sergeant Smith file an EEOC
6  complaint as of this time?
7      A.  I don't know the time line.  I just -- I
8  believe both did.
9      Q.  So at this point what was -- did you have a
10  plan for going forward in terms of how these three
11  people would get along?
12      A.  I mean, I think the plan was to try to sit
13  them all down and talk through it when this was all
14  done, but I believe -- I'd have to look at the time
15  line again.  I don't recall when Sergeant Smith
16  returned to work, because at some point I think that
17  one said that Patterson was directed to answer to
18  Doty or complete his thing.
19      Q.  Did you ever conclude that given the
20  conflicting allegations and the charges filed
21  internally and with a public agency had rendered it
22  impossible for Sergeant Smith and Ms. Wallace and
23  Ms. Smith to work together?
24      A.  Sergeant Smith and Ms. Wallace work together?
25      Q.  Along with Patterson.  I'm sorry if I

Page 76

1  neglected to say that.  That's what I meant to say.
2      A.  Ask the first part again so I make sure I
3  understand.
4      Q.  In light of all these things that occurred,
5  filing cross-complaints with IA and Patterson now
6  taking it outside to EEOC, did you consider whether,
7  in light of these things, it would no longer be
8  possible for Patterson to report to Sergeant Smith?
9      A.  Well, I think at some point Sergeant Smith
10  was out of work, so that's why he went to Sergeant
11  Doty -- or the unit went to Sergeant Doty for a
12  supervisor.  But, yeah, at some point I think you do
13  have to consider can they all work together.
14      Q.  And Sergeant Smith was due at some point to
15  return to full time after she completed her
16  treatment, correct?
17      A.  Yes.  I don't recall the time line.
18      Q.  Did you ever consider transferring either
19  Sergeant Smith or Lieutenant Sealey?
20      A.  I believe there was a request to transfer
21  from Sergeant Smith that was denied by Chief
22  Giddens.
23      Q.  Wasn't there also a discussion with the chief
24  about transferring Sergeant Smith's whole unit to
25  the airport?

Page 77

1 A. I don't recall if there was or not.

2 Q. To be part of the special investigations

3 section?

4 A. If that occurred, I wasn't a part of that

5 discussion.

6 Q. In this context, then, let's get this out.

7 (Exhibit 8 was marked for identification.)

8 BY MR. HELWIG:

9 Q. I'll show you Exhibit 8. In this context

10 then, Exhibit 8 occurred, correct?

11 A. Exhibit 8, yes.

12 Q. What is Exhibit 8?

13 A. It's an e-mail.

14 Q. From Lieutenant Sealey?

15 A. Correct.

16 Q. To 30-some LPD employees, correct?

17 A. Yes.

18 Q. Including you, correct?

19 A. Correct.

20 Q. Some employees who reported to Sergeant

21 Smith, including Lindsey Morris, Ellen Thompson, and

22 Brenda Wallace, correct?

23 A. Yes.

24 Q. To the chief?

25 A. Yes.

Page 78

1 Q. And to Assistant Chief Link?

2 A. Yes, he's in there.

3 Q. And attached to this e-mail was what?

4 A. Looks like a Word document.

5 Q. What Word document?

6 A. Looks like notes.

7 Q. Notes about Sergeant Smith, correct?

8 A. Correct.

9 Q. Notes stating when she arrived and when she

10 left for work, correct?

11 A. Yes.

12 Q. Notes stating alleged infractions by Sergeant

13 Smith, correct?

14 A. It appears to be, yes.

15 Q. And it's on a daily basis beginning April 17,

16 2018, correct?

17 A. Yes, that's when it appears to start.

18 Q. And it continues through July 23, 2018 --

19 actually, July 20, 2018?

20 A. Yes.

21 Q. And do you remember receiving a copy of this?

22 A. I do remember getting the e-mail.

23 Q. What, if anything, did you do when you

24 received it?

25 A. Well, he immediately recalled it, if I

Page 79

1 remember correctly, within a couple minutes of it

2 being re-called -- of it being sent it was recalled.

3 Q. So you did nothing?

4 A. No. I wasn't done answering. I'm trying to

5 remember if it happened in the evening or early

6 morning, because it says 5:57, 05:57, but then it

7 says p.m. But I believe -- I'm almost positive I

8 reached out and called Steve, and right about that

9 time is when he recalled it.

10 Q. When you called him, what did he say? First

11 of all, since you called him, what did you say?

12 A. I believe I called him. I asked him if he

13 had recalled that, because -- I either called him

14 right before or right after if I remember. I don't

15 remember exactly time. But he had recalled it or

16 was about to recall it, and it was -- he was the

17 on-call supervisor, so he was trying to send out

18 that summary for what you see there at the bottom,

19 said 2018-15049. That would have been what he was

20 trying to send out as the case summary, and he said

21 this was an accident and apologized, if I remember

22 correctly.

23 Q. Did you agree that it needed to be taken

24 down?

25 A. Yeah. I mean, it wasn't part of his case

Page 80

1 summary there.

2 Q. And this could be embarrassing and damaging

3 to Sergeant Smith, could it not?

4 MR. ARANDA: Objection to the form.

5 A. Yeah. No, it could be embarrassing.

6 Q. Did you discuss it with anyone else?

7 A. I believe before I had an opportunity, it

8 seems like I was contacted by Chief Link or Chief

9 Giddens about it. I don't remember all the

10 particulars on it, but it was taken down

11 immediately.

12 (Exhibit 9 was marked for identification.)

13 BY MR. HELWIG:

14 Q. Let me hand you what's been marked as

15 Exhibit 9. And you see the first sentence -- in the

16 first sentence Lieutenant Sealey says, "This

17 memorandum has been created to explain an e-mail

18 sent in error by me on Saturday, July 28, 2018 at

19 5:57 p.m."

20 Take all the time to review it, and when

21 you're done I'm going to direct your attention to

22 the second page.

23 MR. HELWIG: Let's take a short break.

24 (A recess was taken from 11:55 a.m. until

25 12:01 p.m.)

Page 81

1    MR. HELWIG:  Back on.
2    BY MR. HELWIG:
3    Q.  All right.  Looking at Exhibit 9 on the
4    second page, about ten lines down it says, "During
5    this time Captain Lehman called me" -- this is
6    Sealey -- "saying that he saw the e-mail and was
7    asking if I was going to recall it."
8        Do you remember is that correct?
9    A.  Yes.
10   Q.  And what if he had said no?
11   A.  I would have told him to recall it.
12   Q.  That's what I thought.  Then the next
13   paragraph about three lines from the end of that
14   paragraph, "At approximately 2:08 p.m." -- this is
15   the next day -- "I received a call from ACOP Link,
16   and he told me he had just left the chief's office
17   and that this e-mail was discussed."
18        Were you at that meeting?
19   A.  No.
20   Q.  He said, "Several people had gone to the
21   chief and IA discussing it."
22        Were you one of those people that went to the
23   chief about it?
24   A.  Sorry.  I'm rereading that.
25   Q.  Sure.  Take your time.  Take your time.

Page 82

1    A.  I'm sorry, sir.  Ask your question again or
2    you may have to.
3        MR. HELWIG:  Can you read it back?
4        (Reporter reads question as follows:  "Were
5    you one of those people that went to the chief
6    about it?")
7    A.  I don't believe I was.  I believe I talked to
8    ACOP Link, and then I think he going to the
9    chief or in some fashion like that.
10   Q.  Okay.  And then jumping to the next
11   paragraph that begins with "I talked with then
12   chief," do you see that?
13   A.  Yes.
14   Q.  And then two lines from the bottom of that
15   paragraph he says, "He" -- referring to the chief --
16   "suggested that I talk with Sergeant Smith and
17   apologize, and I told him I had no problem
18   apologizing but that I was going to wait to hear
19   back from Pacheco."
20        So did you think an apology was appropriate?
21   A.  I mean, I would have apologized.
22   Q.  Did Sealey ever apologize?
23   A.  I don't know if he did or not.
24   Q.  Notice in the last paragraph, second line he
25   says, "I have never talked to Sergeant Smith about

Page 83

1    this error."
2        Do you see that?
3    A.  Yes.
4    Q.  "Because at the time I was under an order by
5    my chain of command not to talk to Sergeant Smith
6    due to her filing a complaint on the entire chain of
7    command."
8        Do you know anything about that?
9        MR. ARANDA:  About the order not to talk?
10       MR. HELWIG:  Yes.
11   A.  Yeah.  I believe that came from either Chief
12   Giddens or Internal Affairs, if I recall.
13   Q.  I'm sorry, I didn't get that.  Either who?
14   A.  I believe it came from Chief Giddens or
15   Internal Affairs, if I recall correctly.
16   Q.  It wasn't from you, though?
17   A.  No.
18   Q.  Did you ever talk to Sergeant Smith about it?
19   A.  No.
20   Q.  So Sealey told you that he had sent this
21   e-mail by accident, correct?
22   A.  Correct.
23   Q.  Did he explain how that happened?
24   A.  Basically, like, how his memo is what I
25   remember that -- your investigative summary is an

Page 84

1    attached Word document that normally you send out.
2    Apparently he -- they crossed paths or he did
3    something and attached the wrong document and it got
4    sent out.
5    Q.  So did you believe him that he sent it by
6    accident?
7    A.  I do, yes.
8    Q.  So at most he was careless, negligent, that
9    sort of thing, but not intentional?
10       MR. ARANDA:  Objection to the form.
11   A.  I don't think there was any intent behind it.
12   Q.  Okay.
13   A.  I think it was an accident.
14   Q.  But it was careless, correct?
15       MR. ARANDA:  Objection to form.
16   A.  You're -- you know, there's accident and then
17   there's careless.  I mean, that's -- you know,
18   you're -- are you playing on words or semantics?
19   But, you know, should he have opened it back up and
20   looked at it?  Maybe.  I mean, he's the one that was
21   doing the investigative summary, so you'd have to
22   ask him.  I think it was an accident based on what
23   was conveyed to me.  I don't think there was any
24   intent behind it.
25   Q.  Did you consider whether he should have

Page 85

1  looked at the identification of the attachment?
2  **A.  I mean, I think in my past I have attached**
3  **wrong attachments and had to recall them and put the**
4  **right attachment on it.  But, I mean, it happens.**
5  Q.  Was Sealey disciplined in any way for issuing
6  this e-mail?
7  **A.  I don't believe he was.**
8  Q.  And you're his direct supervisor, right?
9  **A.  Correct.  But I believe the chief and IA was**
10  **already involved in this, so it would have -- it**
11  **would have been above my pay grade at that time.**
12  Q.  But you would know if he was disciplined?
13  **A.  In the end, yes, yes.**
14  Q.  What if -- so was it important that Sealey
15  had tried to recall the e-mail?
16  MR. ARANDA: Objection.  Predicate.
17  **A.  I mean, I think it was important that he**
18  **recalled it.**
19  Q.  What if he hadn't tried to recall it?
20  MR. ARANDA: Objection.  Calls for a
21  hypothetical.  Speculation.  Go ahead.
22  BY MR. HELWIG:
23  Q.  Would you have a different view of his
24  culpability?
25  MR. ARANDA: Objection.  Calls for a

Page 86

1  hypothetical and speculation.  Facts not in
2  evidence.
3  MR. HELWIG: Done?  Come on.  You've got some
4  more.
5  MR. ARANDA: Don't do that.  You're trying to
6  pick a fight with me.
7  MR. HELWIG: No, I'm not.
8  MR. ARANDA: I'm objecting very succinctly
9  and in a manner that puts it forth before the
10  judge and you know that.
11  MR. HELWIG: It was meant to be a
12  lighthearted comment.
13  MR. ARANDA: Then I apologize because you
14  meant it lighthearted.
15  MR. HELWIG: I did truly.
16  MR. ARANDA: Then it was funny.
17  MR. HELWIG: Thank you.  We're all good now.
18  So I wonder what the heck I asked.  Can you help?
19  (Reporter reads question as follows: "Would
20  you have a different view of his culpability?")
21  **A.  If he had not.**
22  Q.  Tried to recall it?
23  **A.  I mean, the right thing to do was to recall**
24  **it.  So if he didn't, then I think -- I mean, we can**
25  **"what if" this all day long, but if he wouldn't have**

Page 87

1  recalled it, then I think we would be going down a
2  different avenue.
3  Q.  And that would be a discipline avenue for
4  Lieutenant Sealey, correct?
5  MR. ARANDA: Objection.  Calls for
6  speculation.  Facts not in evidence.
7  Hypothetical.  I'm done.
8  **A.  It could be discipline.  It could be**
9  **investigated.  It could be handled a different way.**
10  **I mean, there's probably three, four, five different**
11  **ways depending on who was involved and all sorts of**
12  **stuff.**
13  Q.  Is it fair to say that if he hadn't tried to
14  recall it there would have been negative
15  consequences for Lieutenant Sealey?
16  MR. ARANDA: Objection.  Hypothetical.  Calls
17  for speculation.
18  **A.  I don't know how you want to define "negative**
19  **consequences," but I think something would have been**
20  **done in some form or fashion.**
21  Q.  Let's take it a step further.  What if it
22  turned out that Sealey had sent this mailing
23  intentionally?
24  MR. ARANDA: Objection.  Calls for
25  speculation.  Hypothetical.

Page 88

1  **A.  Well, I think you would have done an Internal**
2  **Affairs investigation on it, and whatever facts**
3  **developed from that investigation would have**
4  **resulted in one of our findings that we have in our**
5  **IA cases.**
6  Q.  But that would be considerably more serious
7  if he had intentionally sent this e-mail to these 35
8  people, would it not?
9  MR. ARANDA: Excuse me.  Objection.  Facts
10  not in evidence.  Hypothetical.  Calls for
11  speculation.
12  **A.  If he intentionally -- say that again.  If he**
13  **intentionally?**
14  Q.  Yes.
15  **A.  Did it?**
16  Q.  Right.  If he said, "I'm going to send this
17  out to everybody with Terri's actions in it and my
18  conclusions that they were wrong, and I'm going to
19  send it to these people and that's my intention,"
20  what would have been the range of consequences for
21  him there?  Would that have been career ending, do
22  you think?
23  MR. ARANDA: Objection.  Speculation.  Facts
24  not in evidence.  Hypothetical.
25  **A.  I don't know if it would have been career**

Page 89

1  ending.  I would have to look at 3-1 code of
2  conduct.  But we have a chart of sanctions, so I
3  would imagine something in there probably would have
4  rose to that.
5     Q.  So if he decided that he was going to do this
6  intentionally but wanted to avoid those sanctions,
7  he could try to recall it, could he not?
8        MR. ARANDA:  Objection.  Calls for -- hold
9  on.  Let me put my objection on.  Calls for him to
10  testify as to someone's state of mind.  It's
11  hypothetical.  It's facts not in evidence and it
12  calls for speculation.  Go ahead.
13     A.  I think you can "what if" it all day long
14  whether it was intentional or accident.
15     Q.  Right.  And I'm not asking you whether it was
16  intentional.  I'm just saying --
17     A.  Right.
18     Q.  -- what if, what if?
19        MR. ARANDA:  Same objections.
20     A.  I could answer 100 what-ifs today.  I mean,
21  that doesn't really make sense asking that question
22  because, I mean --
23     Q.  So you can't tell me what the consequences
24  would have been if he had intentionally sent that
25  e-mail?

Page 90

1        MR. ARANDA:  Objection.  Asked and answered
2  two or three times as to the sanctions and code of
3  conduct.
4  BY MR. HELWIG:
5     Q.  Well, asked, yes.
6     A.  Yes, there would be --
7        MR. ARANDA:  Go ahead.
8     A.  Sorry.  There would be consequences.  I mean,
9  until -- if it went down that road and it was
10  investigated and whoever the chain of command was
11  that reviewed that and offered or determined that
12  there was a policy violation, then there would have
13  been -- there would have been sanctions or
14  consequences.
15     Q.  So if he, in fact, did send that e-mail
16  intentionally and then quickly tried to recall it,
17  there would be no consequences, correct, assuming
18  that nobody knew he sent it intentionally?
19        MR. ARANDA:  Objection.  Asked and answered
20  and all my other ones.  Hypothetical.
21  Speculation.  Facts not in evidence.  Go ahead.
22     A.  Yeah.  On that assumption, yes, what you're
23  saying.
24     Q.  Okay.  After this you did a performance
25  evaluation of Lieutenant Sealey that covered this

Page 91

1  period of time, correct?  I'll hand you something to
2  look at.
3     A.  Okay.
4        (Exhibit 10 was marked for identification.)
5  BY MR. HELWIG:
6     Q.  So when you're ready I'm going to ask you
7  some questions about Exhibit 10.
8        Okay.  You're ready?
9     A.  Yes.
10     Q.  This covers the period when he sent out this
11  e-mail about -- to 35 people, correct?
12     A.  Yes, sir.
13     Q.  And your evaluation of him, your overall
14  evaluation of him was, as you see on page 3 at the
15  bottom, outstanding performance.
16     A.  Yes.
17     Q.  Does this evaluation even reference his
18  sending of that e-mail on July 28th?
19     A.  I don't believe it does.
20     Q.  Why not?
21     A.  An evaluation is a yearlong process, not just
22  one thing.
23     Q.  So it wasn't something that stood out in your
24  mind?
25     A.  No.  I mean, he sent it out.  It was

Page 92

1  immediately rectified.  He recalled it.  He said it
2  was an accident.  He explained it that way.
3     Q.  And this is a memo that basically ended the
4  career of a long service and highly regarded
5  sergeant in the department.  Do you understand that?
6        MR. ARANDA:  Objection.  Predicate.  Calls
7  for a conclusion.  Go ahead.
8     A.  It was notes.  I don't know if it ended her
9  career.
10     Q.  If somebody sent out a memo like that about
11  you listing your daily activities for a period of
12  two months when you came, when you left, what you
13  did that was allegedly wrong, and sent it to 35
14  people, would you feel like you could continue in
15  your position?
16     A.  Uh-huh.  Yes.
17     Q.  How would you go about that after being
18  damaged in that way?
19        MR. ARANDA:  Objection.  Predicate.  Go
20  ahead.
21     A.  I put my head down and keep marching forward.
22     Q.  Would you attempt to correct the impression
23  created by the e-mail?
24        MR. ARANDA:  Objection.  Predicate.
25     A.  In what way?

Page 93

1  Q.  That's my question.  What could you do to
2  correct the impression?
3      MR. ARANDA:  Objection.  Predicate.
4  A.  Improve my performance, work with people,
5  talk to people.
6      Q.  But is it fair to say that once that e-mail
7  was sent out, you could not unring the bell?  It was
8  out there and it was -- people had seen it; is that
9  right?
10     MR. ARANDA:  Objection to form.  Predicate.
11 Calls for speculation, other people's impressions.
12 A.  Yes.  I mean, once it was sent, people --
13 some people read it.
14     Q.  Did you ever tell Sealey not to talk to
15 Sergeant Smith?
16     MR. ARANDA:  Objection.  Asked and answered.
17 A.  I believe we were under orders from Internal
18 Affairs or Chief Giddens at some point during that
19 time frame.
20     Q.  Did that occur in the time frame of Sealey's
21 e-mail?
22 A.  I don't know.  I'd have to build a time line
23 and look at it and see.
24     Q.  Please turn to the last page of Exhibit 10
25 where there's signatures, and the first one is

Page 94

1  Lieutenant Sealey as the employee, right?
2  A.  Yes.
3      Q.  What are the other signatures?  Whose are
4  they?
5  A.  The next two are mine as reviewer and
6  division head, and then the next one down is
7  department head or chief.
8      Q.  And who is that?  Can you tell?
9  A.  Larry Giddens.
10     Q.  During your tenure with the Lakeland Police
11 Department, have any other women under your chain of
12 command complained about sex discrimination or
13 harassment?
14 A.  No.
15     Q.  Did Billie Taylor complain about sex
16 harassment?
17 A.  No.
18     Q.  Was she under your chain of command?
19 A.  At one point, yes.
20     Q.  And she started as a patrol officer like you,
21 correct?
22 A.  Correct.
23     Q.  And became -- she became head of the general
24 services department?
25 A.  She was an officer in charge of it, yes.

Page 95

1  Q.  And you were her supervisor in that role?
2  A.  Yes.
3      Q.  How was her performance in that job?
4  A.  It was good.
5      Q.  Did she have any complaints?
6  A.  The environment there, she asked for a
7  transfer at some point.
8      Q.  What did she say about the environment, to
9  your knowledge?
10 A.  There was background investigators and a
11 couple other folks in there, and they didn't get
12 along.
13     Q.  Were the other people male?
14 A.  I believe there was a couple females too.
15     Q.  Do you recall her objecting to being asked to
16 leave a meeting that was in your unit that was --
17 where she was the only woman?
18 A.  Say that again now.
19     Q.  Do you recall her objecting to being asked to
20 leave a meeting which was within your unit and
21 consisted of only men and then she was asked to
22 leave?
23 A.  No.
24     Q.  Do you remember asking her to leave a meeting
25 because you wanted to have a heart to heart with the

Page 96

1  men?
2  A.  No.  I don't recall that.
3      Q.  Are you saying that definitely did not occur?
4  A.  I never recall dismissing her from a meeting.
5      Q.  Eventually she was moved out of your
6  department; is that right?
7  A.  Correct.
8      Q.  And she was put on the third floor in an
9  office by herself?
10 A.  Yes, up in media relations.
11     Q.  During that time did you have an employee
12 named Nick Ivancevich in your department?
13 A.  Ivancevich was a background investigator.
14     Q.  It's Ivancevich?
15 A.  Ivancevich.
16     Q.  Okay.  Thank you.  Was he a good employee?
17 A.  Yes.
18     Q.  Did you take him under your wing in the way
19 you did with Patterson?
20     MR. ARANDA:  Objection.  Predicate.  Go
21 ahead.  Answer.
22 A.  No.  He was in general services just like
23 everybody else, so...
24     Q.  Did you give him encouragement personally?
25 A.  I would give all my members encouragement.

Page 97

1  Q. Did you give him encouragement then?
2  A. I'm sure I did.
3  Q. Did you refer to him in decision-making --
4  did you defer to him in decisions about the unit?
5  A. To Nick as a background investigator?
6  Q. Right.
7  A. No.
8  Q. Do you know who Emma Melina Henderson is?
9  A. Yes.
10 Q. Was she under your chain of command or is she
11 now?
12 A. No, she's not in my chain.  She may have been
13 in my -- I'm trying to remember with Polk State
14 College.  She was at one point assigned to Polk
15 State College as the coordinator, and I don't
16 remember time line-wise -- I can't remember if
17 that's when I was in GSS or not.
18 Q. Okay.  And she filed an EEOC against the
19 department at one time, correct?
20 A. I don't know.
21 Q. Did you know that a copy of that charge was
22 circulated around the department against her will?
23 A. No, I did not.
24 Q. Did you know she was ridiculed about it?
25 A. No, I did not.

Page 98

1  Q. Do you know who Debbie Henson is?
2  A. Yes.  She's retired assistant chief.
3  Q. Did she work under your supervision?
4  A. Oh, no.  She was -- I would have worked under
5  her.  She was -- she was an assistant chief long
6  before me.
7  Q. Okay.  Did she complain that a male employee
8  called her a cunt?
9  A. Who?
10 Q. Debbie Henson.
11 A. Oh, I have no idea.
12 Q. So you weren't aware of that?
13 A. No, sir.
14    MR. ARANDA: Objection.  Predicate.
15 Q. Were there any -- other than the ones I
16 mentioned that involved you, were there any other
17 complaints by women that you supervised of sex
18 discrimination that you know of?
19    MR. ARANDA: Objection.  Predicate.  Go
20 ahead.
21 A. I have never been complained on on those.
22 Q. What about Patty Allison?
23 A. She is a 911 communication manager.
24 Q. And she was in the office with the HR
25 Director Farrington and with Chief Garcia over her

Page 99

1  complaint recently, was she not?
2  A. I believe so, yes.
3  Q. Were you advised of what happened there?
4  A. Not specifically other than she had some
5  concerns.
6  Q. Do you know what her concerns were?
7  A. No, not without looking at anything to
8  refresh my memory.
9  Q. When Chief Giddens resigned, you applied for
10 the chief position; is that right?  Or was it after
11 Garcia resigned?
12 A. Chief Garcia retired.
13 Q. And you applied for the position?
14 A. Yes.
15 Q. And were you interviewed?
16 A. Yes.
17 Q. How many interviews?
18 A. Community panel and interview with
19 Mr. Sherrouse, the city manager.
20 Q. Did your -- did Sergeant Smith's complaint of
21 discrimination come up in the interviews?
22 A. Not that I recall.
23 Q. Did your treatment of Sean Patterson come up
24 in the interviews?
25 A. Not that I recall.

Page 100

1  Q. Do you think Sergeant Smith's complaint was a
2  factor in your being unsuccessful in your attempt to
3  be chief?
4  A. I don't believe so.
5  Q. Was there any discussion in your interviews
6  about your treatment of women generally?
7  A. No, sir.
8  Q. Who is Jasper Yzaguirre?
9     THE COURT REPORTER:  One more time.
10    MR. HELWIG:  Jasper Yzaguirre,
11 Y-z-a-g-u-i-r-r-e.
12    MR. ARANDA:  Can you spell it again?
13    MR. HELWIG:  Y-z-a-g-u-i-r-r-e.
14 BY MR. HELWIG:
15 Q. And, Chief, if you can correct me --
16 A. It's Yzaguirre, but yes.
17 Q. That's how you pronounce it, Yzaguirre?
18 A. Yes.
19 Q. Who is he?
20 A. He's a patrol sergeant.
21 Q. Is he an experienced sergeant?
22 A. I believe so.
23 Q. Have you worked with him or supervised him?
24 A. I don't think so.
25 Q. What's your overall impression of him as a

Page 101

1  sergeant?
2  **A.  I think he's a good sergeant.**
3  Q.  Do you have any negative impressions about
4  him?
5  **A.  No, sir.**
6  Q.  And after Sergeant Smith left, he became
7  manager over the crime analysis unit, did he not?
8  **A.  Correct.**
9  (Exhibit 11 was marked for identification.)
10  BY MR. HELWIG:
11  Q.  Let me hand you what's been marked as
12  Exhibit 11.  It's an evaluation of Sean Patterson by
13  Jasper Yzaguirre, correct?
14  **A.  Yes.**
15  Q.  And if you turn to page 2 at the bottom, do
16  you see he writes, Yzaguirre, as a 3 just as
17  Sergeant Smith had?  Do you see that?
18  **A.  Yes, sir.**
19  Q.  Did you have any problem with that?
20  MR. ARANDA:  Well, objection.  I believe
21  predicate, but I'll wait until he tells me if any
22  of those are his signatures.
23  BY MR. HELWIG:
24  Q.  Well, let's go to that.  Are any of those
25  signatures on page 4 yours?

Page 102

1  **A.  No, sir, they're not.**
2  Q.  But seeing that now, do you have any problem
3  with Patterson being rated as a 3 on teamwork?
4  MR. ARANDA:  Objection.  Calls for
5  speculation.
6  **A.  So, I'm sorry, what was your question on**
7  **that?**
8  Q.  Did you have any problems or concerns about
9  Patterson being rated as a 3 on teamwork by Sergeant
10  Yzaguirre?
11  **A.  No.**
12  Q.  Do you see on page 2 where there is a text
13  underneath?  He says, "The issues and incident have
14  resulted in a strained working relationship between
15  Sean and Crime Analyst Brenda Wallace"?
16  Do you see that?
17  **A.  Yes, sir.**
18  Q.  Do you think that's true?
19  **A.  Yes.**
20  Q.  Okay.
21  (Exhibit 12 was marked for identification.)
22  BY MR. HELWIG:
23  Q.  I'm going to hand you Exhibit 12.  Do you see
24  it's an incident report, correct?
25  **A.  Yes, sir.**

Page 103

1  Q.  Before we move on, with respect to 11, did
2  you ever try to get Yzaguirre to change the
3  evaluation of Patterson as a 3 in teamwork?
4  **A.  No.**
5  Q.  Okay.  Now we're on to Exhibit 12.  You see
6  this is an incident report by Sergeant Yzaguirre
7  involving Sean Patterson, correct?
8  **A.  Yes.**
9  Q.  And you see on the second page there's a
10  narrative?
11  **A.  Yes, sir.**
12  Q.  And the second sentence it says, "During our
13  conversation, Sean revealed to me he has been
14  working through his lunch."
15  Do you see that?
16  **A.  Yes.**
17  Q.  And he goes on to say, "I was not aware Sean
18  had been working through his lunch.  I asked Sean
19  when and how many times he had worked through his
20  lunch.  Sean told me he did not know.  I informed
21  Sean that he could not work through his lunch
22  without proper supervisor approval."
23  Now, this had come up when Sergeant Smith was
24  in charge of the unit, did it not?
25  **A.  That or Sergeant Doty, one of the two.  I**

Page 104

1  **remember that coming up.**
2  Q.  And he had been admonished not to work
3  through lunch and expect to get time off, right?
4  **A.  I believe so, yes.**
5  Q.  It goes on to say, "Sean was not aware and
6  had never been told he could not work through his
7  lunch."
8  Do you see that?
9  **A.  Yes.**
10  Q.  And that's not true, correct?
11  **A.  Yeah.**
12  Q.  And then it says, "I gave Sean a direct order
13  not to work through his lunch anymore without my
14  knowledge or approval."
15  (Exhibit 13 was marked for identification.)
16  BY MR. HELWIG:
17  Q.  I'm handing you Exhibit 13.  It's an incident
18  report dated April 23, 2019, from Jasper Yzaguirre
19  to Sean Patterson.  Sergeant Yzaguirre states
20  Patterson requested sick leave on April 23, 2019,
21  but when the sergeant checked it out, he was
22  informed he had insufficient leave for that request.
23  Do you see that?
24  **A.  Yes.**
25  Q.  And he concludes, "Sean Patterson is expected

Page 105

1  to manage and keep track of leave.  He is expected
2  to be aware of and notify supervisor when there is a
3  conflict with his leave and get approval prior to
4  taking his leave."
5       Do you see that?
6  **A.  Yes.**
7  Q.  And that was a problem when Sergeant Smith
8  was his supervisor as well, was it not?
9       MR. ARANDA:  Objection.  Predicate.
10 **A.  I believe there is an incident or two on**
11 **that.  Both these last two exhibits I had already**
12 **been transferred out of the division.**
13      (Exhibit 14 was marked for identification.)
14 BY MR. HELWIG:
15 Q.  I'll hand you Exhibit 14.  Again, it's an
16 incident report from Jasper Yzaguirre to Sean
17 Patterson.  This one is dated May 2, 2019.  I ask
18 you to look at the second page.  Do you see that?
19 **A.  Yes.**
20 Q.  Would you read into the record the incident
21 notes, please?
22 **A.  You want me to read the whole paragraph?**
23 Q.  Please, yeah.
24 **A.  "On May 2, 2019, I notified" -- "I" is --**
25 **that's Jasper Yzaguirre.**

Page 106

1  Q.  The "I" is Jasper Yzaguirre.  I understand.
2  **A.  "I notified Sean of a request from Detective**
3  **Duhaney to update a bulletin regarding a robbery**
4  **after having an informal discussion with him about**
5  **being mindful of sending e-mails containing personal**
6  **identifying information.  Sean displayed signs of**
7  **disagreement and developed a negative attitude.  He**
8  **questioned the request and expressed his**
9  **disagreement.  I attempted to provide explanation to**
10 **Sean about the necessity of the request.  Sean was**
11 **not satisfied with my explanation.  He stood up,**
12 **turned his back toward me and started walking out of**
13 **my office and made a statement of -- made a**
14 **statement about being tired of being a secretary.**
15 **Sean's attitude and remarks are unprofessional and**
16 **provides for a negative and unproductive work**
17 **environment.  Sean has expressed disagreement with**
18 **tasks of generating bulletins and photo packs to me**
19 **directly and indirectly multiple times since he's**
20 **been assigned to the CAIC.  I have had multiple**
21 **informal conversations with Sean about that matter.**
22 **Sean's actions today indicate he is allowing his**
23 **frustrations to impact his attitude towards some of**
24 **his expected job duties, YJ93," which is Jasper**
25 **Yzaguirre and his badge number.**

Page 107

1  Q.  Now, is that what you just read consistent
2  with your experience with Sean Patterson?
3  **A.  I've never had him stand up and turn his back**
4  **to me or anything like that.**
5  Q.  Did you experience that he was balky about
6  doing things that he did not think were valuable?
7  **A.  He wasn't balky to me.**
8  Q.  But he was balky to Sergeant Smith, was he
9  not?
10      MR. ARANDA:  Objection.  Predicate.
11 **A.  I know that -- yes, I know that they had**
12 **issues.**
13      (Exhibit 15 was marked for identification.)
14 BY MR. HELWIG:
15 Q.  I'm handing you Exhibit 15.  It's a manager
16 evaluation of Brenda Wallace by Jasper Yzaguirre
17 completed on June 10, 2020.  Were you still in
18 charge of the crime analysis unit at that time?
19 **A.  No.**
20 Q.  And as you see, he gives her an overall
21 rating of 7.00, which is the highest possible
22 rating, correct?
23 **A.  Correct.**
24 Q.  Looking at the fourth page, do you recognize
25 the signatures?

Page 108

1  **A.  Yes.**
2  Q.  What are they?
3  **A.  Top one is Ms. Wallace.  Next one under**
4  **reviewer is Jasper Yzaguirre's.  Then looks like**
5  **Edward Cain, Captain Cain, division head.**
6  **Department head line, you have Sammy Taylor.  And**
7  **then Ruben Garcia.**
8  Q.  Ruben Garcia is over in the margin there?
9  **A.  He's -- yeah.  RG Number 1, 6/18/25.**
10 Q.  Thank you.
11 **A.  I'm sorry, 6/18/2020.  It looked like 2025.**
12 Q.  It did, didn't it?  We know it wasn't 25.
13      Do you have any reason to doubt that this
14 evaluation is accurate?
15 **A.  No.**
16 Q.  I believe Sean Patterson's EEOC charges are
17 already an exhibit, correct?
18      MR. ARANDA:  Yes.  7.
19      MR. HELWIG:  Thank you.
20      (Exhibit 16 was marked for identification.)
21 BY MR. HELWIG:
22 Q.  Look at Exhibit 16.  As we discussed before,
23 Sean Patterson filed a complaint with the Equal
24 Employment Opportunity Commission government agency
25 against the LPD during the time when you were his --

**Page 109**

1  he was in your chain of command, correct, when he
2  filed?
3      A.  What was the date on that?
4      Q.  It's Exhibit 7.  Do you have it over there?
5  There it is.  Down at the bottom the date should be
6  on the right maybe.  No?
7      A.  5/07 -- he digitally signed it on 5/07/2018,
8  so yes.
9      Q.  So he was in your chain at that time?
10     A.  Yes.
11     Q.  And did you -- do you know who Geli Eldemire
12  is?
13     A.  She's the attorney in HR.
14     Q.  And you see looking at Exhibit 16 the last
15  page she has signed this letter?
16     A.  Yes.
17     Q.  Did she speak to you about Patterson's
18  complaint to EEOC?
19     A.  I don't remember her asking me about this.
20     Q.  So did you have any -- you didn't go over the
21  complaint with Geli Eldemire.
22     A.  Eldemire.
23     Q.  Geli Eldemire?
24        MR. ARANDA:  Geli.
25     Q.  Geli.  Okay.

**Page 110**

1      A.  I'm sorry, ask again?  I was reading.
2      Q.  You don't recall talking to Eldemire at all
3  about Patterson's complaint?
4      A.  No.  I don't recall talking to her.
5      Q.  And on the first page in writing her defense
6  of the department to the EEOC, she says in the third
7  paragraph that "Charging party," which is Patterson,
8  "failed to acknowledge that working through lunch to
9  leave early or taking lunch at the end of the
10  workday was an ongoing issue with him two times
11  before."
12        That's correct, isn't it?
13     A.  I believe so.
14     Q.  On the second page, the third paragraph where
15  it says, "Charging party's performance evaluations,"
16  do you see that?
17     A.  Yes.
18     Q.  It says, "They documented some of the
19  challenges that the supervisor and the CA trainer
20  faced in getting him to focus on learning the
21  specific job duties, learning the unit work roles
22  and procedures, and curb his impromptu
23  disappearances from the unit to seek out males in
24  his supervisor's chain of command."
25        Do you agree with that statement by the city

**Page 111**

1  attorney?
2      A.  Yeah.  I mean, what she is saying is
3  accurate.  I would say that the last part, though,
4  where it says you didn't seek out males in his
5  supervisors, he sought out -- I have seen him talk
6  to other female detectives, so --
7      Q.  Well, he certainly sought out you, did he
8  not?
9      A.  He sought out a lot of people in that
10  division trying to learn and asking questions.
11     Q.  But my question was he sought out you, did he
12  not?
13        MR. ARANDA:  Objection to form.  Predicate.
14     A.  I don't think he specifically sought me out.
15  I have an open-door policy, like I said earlier,
16  where anybody can come in and talk to me.
17     Q.  At the end of that paragraph you see the
18  attorney for the city says that, "Patterson had a
19  general disregard for the female supervisor and his
20  assigned volunteer trainer."
21        Do you agree with that?
22     A.  I think it was a personality conflict between
23  all three.
24     Q.  So do you agree with that statement?
25        MR. ARANDA:  Objection.  Asked and answered.

**Page 112**

1      A.  That's Geli's opinion, so I don't see it as a
2  disregard.  I saw it as a personality conflict among
3  all three.
4      Q.  Thank you.  And then looking two paragraphs
5  down, you see where it begins "It is not"?
6      A.  Yes.
7      Q.  The city's attorney says, "It is not bullying
8  tactics to notify a supervisor the employee or
9  trainee left work early in violation of work rules.
10  Neither is it creating a hostile work environment or
11  prohibited discrimination for the supervisor to
12  provide feedback to the employee who continues to
13  violate the work rules in your absence, fails to
14  meet expectation or complete routine assignments and
15  asks disrespectfully to female staff."
16        Do you agree with that?
17     A.  There's a lot there.  I'm assuming that he's
18  saying it was bullying tactics.  Is that what you're
19  asking?
20     Q.  I believe, yes.
21     A.  Okay.
22     Q.  I think the question is do you agree with the
23  city attorney's statement that it was not?
24     A.  Correct.  Yeah.
25     Q.  You agree?

Page 113

1   A.  I agree.

2   Q.  Okay.  Then it goes on in the next

3   paragraph to say, "As stated by Captain Sam

4   Taylor" -- skipping -- "I do not believe any of the

5   actions as identified as occurring by CA Brenda

6   Wallace and Sergeant Terri Smith constitute

7   harassment whatsoever.  I believe they were

8   exercising their training and supervisory rights to

9   correct and ameliorate performance issues."

10      Do you agree with that?

11  A.  Yes.

12  Q.  On the next page you see where it says

13  "Background and History" as a heading?

14  A.  Yes.

15  Q.  The second line -- or first line says, "For a

16  crime analyst, it is a trainee position that takes

17  two years to become completely trained to work

18  independently."

19      Do you agree with that?

20  A.  No.

21  Q.  What do you think is a better time factor?

22  A.  I think it all depends on the person, and I

23  think it should be objective-based training.  And

24  just two years sounds like "seat time" to me.  So if

25  somebody can accomplish something faster and sooner,

Page 114

1   then I don't think it needs to be two years.

2   Q.  Okay.  Going down four paragraphs to the

3   paragraph just above where it says, "Performance

4   Evaluations."

5   A.  Okay.

6   Q.  It says, "A supervisor documented the

7   charging party was found wandering around on the

8   third floor administration probably trying to get

9   some face time with some of the staff.  Captain

10  Taylor was concerned about this.  He directed me to

11  have a talk with Sean and impress upon him again the

12  chain of command and importance of letting his

13  trainer know where he was and that he should get

14  things approved before requesting information from

15  other areas."

16      Do you agree that was an issue for Patterson?

17  A.  I don't -- I mean, my idea of supervision --

18  I mean, you can say something is an issue or not.  I

19  believe this is Captain Rick Taylor, not Captain

20  Sammy Taylor.  I believe this is before my transfer

21  into that unit.  So I manage different than others,

22  so as long as people are getting stuff done, I'm not

23  so concerned about them being at their desk, where

24  others may be like that.  So that's a management

25  style and philosophy that, you know, we can both

Page 115

1   opine on here all day.

2   Q.  Okay.  Turning to the last bullet on that

3   page on page 5 -- is it 5?  No.  It's 3, page 3.

4   "Supervisor documented about friction between

5   charging party and his assigned --"

6   A.  Hold on.  Where are you at?

7   Q.  Sure.  I'm at the bottom of page 3.  Just

8   where Robert pointed you.

9   A.  Okay.

10  Q.  "Supervisor documented about the friction

11  between charging party," which is Patterson, "and

12  his assigned trainer and that he seems to have his

13  own idea of what his job description should be and

14  is overconfident in his ability to do his job."

15      Do you agree with the city attorney's

16  statement there?

17  A.  Well, that's a quote from the attorney.

18  Q.  Yeah.  She's quoting somebody, correct.

19  A.  That's -- yeah.  Six-month evaluation.

20  Q.  Is that what it's from?

21  A.  That's what it appears, the sub bullet from

22  the bullet above that.

23  Q.  I see.  Okay.  And do you agree with that?

24  A.  To an extent, yes.

25  Q.  Okay.  Turning to page 4, the first bullet

Page 116

1   says, "On accountability the supervisor documented

2   that the charging party was 'often away from his

3   desk for long periods of time with his whereabouts

4   unknown' and failed to notify of his whereabouts

5   despite being instructed to do so.  He had been

6   counseled on this more than once."

7       Do you agree with that statement by the

8   city's attorney?

9   A.  Yeah.  He was counseled.  I also saw him and

10  others sitting at their desk for long periods of

11  time, so -- but, accordingly, he had been counseled.

12  Q.  Looking at the last bullet on that page, the

13  second sentence it says, "He improved in teamwork

14  and accountability, but overall he tends to

15  circumvent his supervisor and when he does not

16  receive a response he wants, he will seek out

17  leaders higher in the chain of command (to get the

18  response he wants) his 'attitude' along with his

19  persistence is not working well with the team and

20  tends to cause a lot of disruption in the work

21  environment."

22      Do you agree with the attorney's statement

23  there?

24  A.  That's not the attorney's statement.  That's

25  a quote from a performance evaluation.

Page 117

1  Q.  Well, it's a mixture, I think.  But this is
2  the attorney quoting that in her findings.  But at
3  any rate, do you agree with that statement?
4      **A.  I don't think he necessarily was**
5  **circumventing supervision to get what he wants as it**
6  **says here in a quote.  And him not working well with**
7  **the team, that wasn't just him.  There was tension**
8  **and disruption in the workplace environment.**
9  Q.  Okay.  Let's skip a page and turn to page 6.
10 The second paragraph the attorney says, "However,
11 with the supervisors away, the break in consistency
12 of supervision created fertile ground for charging
13 party to bend the rules, wander off neglecting his
14 assigned duties, rearrange his work schedule to come
15 in early, work through meals without prior approval
16 in an attempt to leave early and get approved for
17 work overtime, which was not permitted during
18 training."
19     Do you agree with the attorney's statement
20 there?
21     **A.  That's -- I mean, that's what she wrote.  I**
22 **don't necessarily agree with everything in here,**
23 **but, again, my idea of supervision is different than**
24 **others, and there's -- every supervisor supervises**
25 **differently.**

Page 118

1  Q.  What is there in that paragraph that you do
2  not agree with?
3      **A.  I don't agree with the part where it says you**
4  **can't get overtime while you're in training.  I**
5  **mean, that's just part of it.  If you get a late**
6  **call or something, then you're going to get**
7  **overtime.**
8  Q.  Okay.  Anything else?
9      **A.  Yeah.  The supervisor away part, that's when**
10 **we brought Sergeant Doty in to help with that**
11 **supervision.**
12 Q.  Looking at the next paragraph, it says, "It
13 was documented the charging party was often away
14 from his desk for long periods and failed to notify
15 the trainer and his co-workers about his
16 whereabouts.  This was frustrating for the unit
17 because in his absence the other two senior crime
18 analysts had to fill in for him.  Then when he
19 returned to his desk, he was secretive about his
20 projects and conversations with the senior
21 leadership staff.  He had been counseled for
22 allegedly working through lunch breaks and
23 requesting leave early in violation of the work
24 rules."
25     Do you agree with that paragraph that the

Page 119

1  attorney wrote?
2      **A.  Yeah.  He -- I mean, you have already shown**
3  **that he had been counseled for working through lunch**
4  **breaks.  Several times it says he's been away from**
5  **his desk for long periods and failing to notify**
6  **people, and, again, that to me goes back to**
7  **supervision philosophy.  And so if somebody wants**
8  **somebody at their desk every minute of the day,**
9  **that's one way to supervise.  If somebody wants**
10 **somebody to have a little bit more independence and**
11 **creative thinking or whatever or collaboration, then**
12 **that's another way to supervise.  So could it have**
13 **been frustrating to other people?  Maybe, because that's**
14 **the way that unit's always done it, and then**
15 **somebody comes in and has different ideas and has a**
16 **different way they operate.  Then, yeah, that can be**
17 **frustrating.**
18 Q.  Did Patterson have the authority to change
19 the way they operate in that unit on his own?
20     **A.  No.**
21 Q.  Okay.  Moving along, the next to the last
22 paragraph states, "The record shows the charging
23 party left work at 2:00 p.m. on March 3, 2018, three
24 hours early and had notified his co-worker Lindsey
25 just prior to leaving.  Charging party stated during

Page 120

1  the investigation of his April 23rd complaint that
2  he had received prior approval to leave early at the
3  end of the day by the supervisor filling in for his
4  supervisor.  However, that was not the recall of the
5  acting supervisor, Sergeant Doty, regarding his
6  departure."
7      Do you have any reason to dispute that?
8      **A.  No.**
9  Q.  And then the last paragraph on that page, "In
10 his clarification interview Sergeant Doty recalled
11 that charging party did not tell him before his
12 scheduled meal break that he was going to work
13 through his meal break to leave early at the end of
14 the day.  This was relevant because twice (2X)
15 before charging party was counseled regarding
16 working through lunch to leave early without prior
17 approval or working overtime and then coming to the
18 supervisor afterward to request overtime comp."
19     Do you agree with that statement by the
20 attorney?
21     **A.  I believe that was proven in one of the**
22 **investigations.**
23 Q.  Okay.  I'm going to skip to page 8.  She
24 attaches a transcript in between there.  Then we get
25 to page 8.  Are you with me?

Page 121

1   A.  Yes.
2   Q.  Okay.  Thanks.  At the very top she says,
3   "Not to be deterred, charging party again requested
4   to leave early on April 18th, claiming he had worked
5   through lunch.  Once again he had failed to get
6   preapproval before working through the lunch period.
7   This time the acting supervisor denied his request."
8      Do you disagree with that?
9   A.  No.  I believe that was addressed.
10  Q.  Okay.  Turning to page 9, there's an excerpt
11  from Ms. Bercham's interview who does interviews for
12  IA, correct?
13  A.  Yes, sir.
14  Q.  With Ms. Thompson.  And in answer to a
15  question Ms. Thompson begins by saying -- well,
16  let's read the question first.
17     Bercham says: "Okay.  In his complaint he
18  says he feels harassed by Brenda Wallace."
19     And then Thompson answers: "This is
20  absolutely not true, and, yes, he does not pull his
21  weight.  He is constantly trying to get out of doing
22  the job he was hired for."
23     Do you disagree with that?
24  A.  That's Detective Thompson's opinion.  She was
25  an intel detective at the time.  She was not a crime

Page 122

1   analyst, and many times her door was closed.  So I
2   don't know what she observed and what she didn't,
3   so...
4   Q.  Okay.  Let's move on.  Again, there are a
5   couple pages of transcript and then we wind up on
6   page 12.
7   A.  Okay.
8   Q.  The next to last paragraph the attorney says,
9   "Charging party has not suffered an adverse
10  employment action.  He continues to be employed as a
11  crime analyst in training.  The supervisor had a
12  legitimate nondiscriminatory reason for counseling
13  him for his repeated violations of the work rules
14  and neglect of duty."
15     Do you disagree with that?
16  A.  No.
17  Q.  And, lastly, let's flip to the last page, and
18  nothing there, so that completes Exhibit 16.
19     MR. HELWIG:  Off the record.
20     (Discussion off the.)
21  BY MR. HELWIG:
22  Q.  Mr. Patterson is no longer employed by the
23  Lakeland Police Department, correct?
24  A.  Correct.
25  Q.  Do you know the circumstances of his leaving?

Page 123

1   A.  No.  I believe his fiancée or girlfriend took
2   a job out of town.
3      MR. HELWIG:  Let's take a short break.
4      (A recess was taken from 1:07 p.m. until
5   1:13 p.m.)
6   BY MR. HELWIG:
7   Q.  Were you employed by the police department
8   when the whole -- when Chief Womack was in charge
9   and there was the scandal that involved a member of
10  Sergeant Smith's unit, Sue Eberle?
11  A.  Yes.
12  Q.  And that involved allegations that there
13  was -- she was having sex with various employees on
14  work time, correct?
15  A.  Correct.
16  Q.  Did that affect your -- did that lead to any
17  reconsideration of what you described as your
18  management style, which is letting people go about
19  their business and not keeping tabs on them?
20     MR. ARANDA:  Objection to form.
21  A.  I'm not sure what you're asking.
22  Q.  Okay.  Let me withdraw the question.  I'll
23  ask a different question and see if it makes more
24  sense to you.
25     After that scandal broke in the press and the

Page 124

1   department dealt with the disciplinary matters and
2   everything, was there any change in philosophy in
3   terms of being accountable to where people were
4   during the workday?
5      MR. ARANDA:  By him?
6      MR. HELWIG:  By the department.
7      MR. ARANDA:  Objection.  Predicate.  Calls
8   for speculation.
9   BY MR. HELWIG:
10  Q.  If you know.
11  A.  Yeah.  I don't know how to answer that really
12  other than back then from what I recall Chief -- you
13  know, Chief Womack -- once that case was being
14  investigated and was done, there was -- we had
15  supervisor meetings, and we talked about
16  accountability and things like that, yeah.
17  Q.  So that would include the accountability of
18  each employee for being where they were supposed to
19  be and not being off somewhere doing something that
20  was unaccountable; is that a fair statement?
21     MR. ARANDA:  Objection to form.
22  A.  Well, that particular incident was off campus
23  outside of the station.  I think you're trying to
24  compare two completely different things.  Sean
25  Patterson was in the building, so that was -- that

Page 125

1  was off-site.  That was a patrol officer and, in
2  fact, the analyst leaving the building.  So, yeah, I
3  think you have got to keep an eye on your people,
4  but you also have got to allow them some freedom.
5      Q.  And so you didn't get any message from
6  management that there would be less flexibility
7  after the Sue Eberle matter in terms of allowing
8  people to come and go as they pleased?
9          MR. ARANDA:  Objection to form.  Predicate.
10     A.  Yeah.  Coming and going as they please,
11  again, that goes back to different supervision
12  styles.  And, you know, do you want -- are you a
13  micro manager?  Are you not a micro manager?  Do you
14  allow your people to move about and get work done?
15  Do they get their work done?  Do you need to hold
16  someone more accountable than another because
17  they're not getting their work done or are they
18  getting it done in a different way?  I mean, there's
19  so many avenues on that one that you could go down.
20     Q.  So after the Eberle incident, did you modify
21  your supervisory approach in any way?
22     A.  That was ten years ago.  I don't think I have
23  really changed the way I supervise my entire career.
24  I feel like I have had pretty good success at it.
25          MR. HELWIG:  That's all I have.  Thank you.

Page 126

1          MR. ARANDA:  I have a few follow-up.  I'll
2  try to be brief.
3              CROSS-EXAMINATION
4  BY MR. ARANDA:
5      Q.  You never believed that the issues between
6  Ms. Smith, Ms. Wallace and Mr. Patterson rose to the
7  level of hostile work environment while you were
8  dealing with it, did you?
9          MR. HELWIG:  Objection.  Leading.
10         MR. ARANDA:  Well, I'm on cross.
11     A.  I don't believe it did, no.
12     Q.  Okay.  You did, however, believe that while
13  you were dealing with it that there were personality
14  conflicts within that unit, correct?
15         MR. HELWIG:  Same objection.
16     A.  Absolutely.
17     Q.  That personality conflict included
18  Mr. Patterson as it related to his then supervisor
19  Ms. Smith, correct?
20         MR. HELWIG:  Same objection.
21     A.  Correct.
22     Q.  And did that personality conflict include the
23  manner in which Ms. Smith was supervising
24  Mr. Patterson?
25     A.  Yes.

Page 127

1      Q.  Your attempts, while you were captain of that
2  division, was to try to rectify that personality
3  conflict so that the unit could run appropriately?
4          MR. HELWIG:  Objection.  Leading.
5      A.  Correct.
6      Q.  In that capacity did you instruct
7  Mr. Patterson of his need to follow the chain of
8  command?
9      A.  Yes.
10     Q.  Did you instruct Mr. Patterson of his need to
11  respect the chain of command?
12     A.  Yes.
13     Q.  Did you instruct Mr. Patterson on the need to
14  respect Sergeant Smith as his supervising sergeant?
15     A.  Yes.
16     Q.  Did you instruct Sergeant Smith of the need
17  to be flexible to how she supervised different
18  people?
19     A.  Yes.
20     Q.  Is that what's reflected in your memorandum
21  regarding the different evaluations and the
22  different books you bought for both of them?
23         MR. HELWIG:  Objection.  Leading.
24     A.  Correct.  That's exactly why I bought those
25  books.

Page 128

1      Q.  The evaluation, the memo that you did
2  regarding Mr. Patterson and Ms. Wallace, did that --
3  was that disciplinary action against Ms. Smith?
4      A.  No.
5      Q.  As a result of that evaluation memo that you
6  did, did it have any effect on Ms. Smith's pay?
7      A.  No.
8      Q.  Did it have an effect on her promotability?
9      A.  No.
10     Q.  Did it have any effect on the ability to get
11  merit increases?
12     A.  No.
13     Q.  Okay.  And then there was some discussion
14  regarding Sergeant Sealey's evaluation -- no,
15  Lieutenant Sealey's evaluation of Sergeant Smith.
16  Do you recall that?
17     A.  Yes.
18     Q.  And then I think there was a comparison done
19  by Mr. Helwig regarding the evaluation of Ms. Smith
20  by another Sergeant -- by another lieutenant.  Do
21  you recall that?  And then the evaluation done by
22  Lieutenant Smith?
23     A.  I believe it was Brenda Wallace's evaluation.
24     Q.  Let me do it differently.  The evaluation by
25  Lieutenant Sealey of Sergeant Smith, did it result

Page 129

1  in a decrease in pay for Sergeant Smith?
2  A. No.
3  Q. Did it result in an inability to get a merit
4  increase by Sergeant Smith?
5  A. No.
6  Q. Did it result in a lack of promotability to
7  Sergeant Smith?
8  A. No.
9  Q. During the time in which Mr. Patterson came
10  to you with ideas that he may have, did you as part
11  of those conversations direct him to run those ideas
12  through his chain of command?
13  A. Yes.
14      MR. HELWIG: Objection. Leading.
15  Q. I forget how to pronounce the name. Jasper?
16  A. Yzaguirre.
17  Q. Jasper Yzaguirre, he's a male?
18  A. Yes.
19  Q. You were shown various written incident
20  reports by Mr. -- say the name again.
21  A. Yzaguirre.
22  Q. Yzaguirre towards Mr. Patterson. Do you
23  remember those?
24  A. Yes.
25  Q. Do you recall Sergeant Smith ever writing

Page 130

1  written incident reports about Sergeant Smith during
2  the time in which Sergeant Smith was Mr. Patterson's
3  direct supervisor [sic]?
4  A. In the AIM section, I don't believe so.
5  Q. And what is the AIM section?
6  A. Administrative Investigations Management.
7  It's -- those are supervisor notes or what's housed
8  in our electronic forms in Internal Affairs.
9  Q. What about incident reports similar to
10  Mr. Yzaguirre's, do you recall seeing those from
11  Sergeant Smith to Mr. Patterson?
12  A. No.
13  Q. Lastly, you were walked through -- where's
14  the last exhibit, the EEOC response by the City.
15      MR. HELWIG: It's 16, I believe.
16  Q. Wait. Sorry. It's right here. Exhibit 16,
17  page 2, second full paragraph. The last two
18  sentences relate to Mr. Patterson, and then it says
19  and a general disregard for female supervisors. Do
20  you see that?
21  A. Yes.
22  Q. It appears that the issues that Mr. Patterson
23  had with Sergeant Smith that has been talked to you,
24  about leaving the desk and not working through lunch
25  and not following the orders, that Mr. Patterson had

Page 131

1  those same issues when a male -- Mr. Yzaguirre, a
2  male, was his supervisor; is that correct?
3      MR. HELWIG: Objection. Before you answer,
4  you read it incorrectly.
5  Q. Okay. I was trying not to. I was trying not
6  to quote it. Do you see in page 2 the second full
7  paragraph references to Mr. Patterson having issues
8  with female supervisors?
9      MR. HELWIG: No. Wait. I'm sorry.
10      MR. ARANDA: You can -- go ahead.
11      MR. HELWIG: It doesn't say plural female
12  supervisors if that's what you're referring to.
13      MR. ARANDA: I didn't -- I didn't mean I was
14  putting an "s" behind it. Sorry.
15      MR. HELWIG: Okay.
16  BY MR. ARANDA:
17  Q. Do you see the reference in page 2 a
18  reference to Mr. Patterson having an issue with a
19  female supervisor? Do you see that?
20  A. Yes.
21  Q. When you look at the incident reports by
22  Mr. Yzaguirre that's a male, it looks like he was
23  having the same issues with his male supervisor as
24  he was having with Sergeant Smith?
25  A. Yes.

Page 132

1  Q. Okay. Lastly, the page 6 first full -- maybe
2  second full paragraph, starts with the word
3  "However." Right there.
4  A. Okay.
5  Q. There's a reference to a break in the
6  consistency of the supervision that -- to quote,
7  "created a fertile ground for charging party,"
8  meaning Mr. Patterson, "to bend the rules and wander
9  off neglecting his assigned duties, rearrange his
10  work schedule to come in early."
11      Do you see that?
12  A. Yes.
13  Q. That paragraph references a time frame in
14  which "the supervisor away."
15      Do you see that?
16  A. Yes.
17  Q. The supervisor during this time period was
18  Sergeant Smith?
19  A. Yes, during her work hours.
20  Q. And that was a time period in which Sergeant
21  Smith was off on workers' compensation leave because
22  of an injury she sustained; is that correct?
23      MR. HELWIG: Object to form.
24  A. Yes. During some of that time, yes.
25      MR. ARANDA: That's all I have. Thank you.

Page 133

1     MR. HELWIG:  Nothing further.

2     MR. ARANDA:  We'll read.  You can pass it

3  through me.

4     THE COURT REPORTER:  Do you need it typed up

5  at this time?

6     MR. HELWIG:  Yeah, let's do it.

7     THEREUPON, the deposition of ASSISTANT CHIEF

8  HANS LEHMAN, taken at the instance of the

9  Plaintiff, was concluded at 1:27 p.m.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 134

CERTIFICATE OF OATH

1

2

3  STATE OF FLORIDA

4  COUNTY OF POLK

5     I, Tami Cline, Registered Merit Reporter,

6  Certified Realtime Reporter, Florida Professional

7  Reporter, and Notary Public in and for the State of

8  Florida at large, hereby certify that the witness

9  named herein appeared before me on January 12, 2023,

10  was duly sworn, and was personally known to me.

11     WITNESS my hand and official seal this

12  January 24, 2023.

13

14

15     *Tami Cline*

16

17  Tami Cline, RMR, CRR, FPR

18  NOTARY PUBLIC - STATE OF FLORIDA

19  MY COMMISSION NO.:  HH285917

20  EXPIRES:  5/19/2026

21

22

23

24

25

Page 135

CERTIFICATE OF REPORTER

1

2  STATE OF FLORIDA

3  COUNTY OF POLK

4     I, Tami Cline, Registered Merit Reporter,

5  Certified Realtime Reporter, and Florida

6  Professional Reporter, do hereby certify that I was

7  authorized to and did stenographically report the

8  examination of the witness named herein; that a

9  review of the transcript was requested; and that the

10  foregoing transcript is a true record of my

11  stenographic notes.

12     I FURTHER CERTIFY that I am not a relative,

13  employee, or attorney, or counsel for any of the

14  parties, nor am I a relative or employee of any of

15  the parties' attorney or counsel connected with the

16  action, nor am I financially interested in the

17  outcome of this action.

18     DATED THIS January 24, 2023, at Lakeland,

19  Polk County, Florida.

20

21     *Tami Cline*
   _____

22  Tami Cline, RMR, CRR, FPR

23

24

25

Page 136

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No. 8:20-cv-41-MSS-JSS

TERRI SMITH,

    Plaintiff,

vs.

CITY OF LAKELAND, FLORIDA,

    Defendant.

IN RE:DEPOSITION OF ASSISTANT CHIEF HANS LEHMAN
      TAKEN JANUARY 12, 2023

TO:  ROBERT ARANDA, ESQ.
     Campbell, Trohn, Tamayo & Aranda, P.A.
     Attorneys at Law
     1701 South Florida Avenue
     Lakeland, Florida 33803

     The referenced transcript has been completed and
awaits review and signing of the errata sheet.

     Thank you for agreeing to handle the reading and
signing process.  Today's date is _____.  Please
complete the reading and signing by _____.

     The original transcript of this deposition has
been delivered to Peter Helwig, Esq., and the errata
sheet, once completed, should be forwarded to all
ordering parties as listed below.

     Thank you.

     _____
     Emma Voithofer, Production Department

cc:  Peter Helwig, Esq.

```
                                          Page 137
 1          ERRATA SHEET

 2       DO NOT WRITE ON TRANSCRIPT -
         ENTER CHANGES ON THIS PAGE
 3
    IN RE:  TERRI SMITH vs CITY OF LAKELAND, FLORIDA
 4  CASE NO.:  8:20-cv-41-MSS-JSS
    DEPOSITION OF ASSISTANT CHIEF HANS LEHMAN
 5  TAKEN JANUARY 12, 2023

 6  PAGE #/LINE #   CHANGE              REASON

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20  Under penalties of perjury, I declare that I have
    read the foregoing document and that the facts
21  stated in it are true.

22                                  _____
23  ASSISTANT CHIEF HANS LEHMAN      DATE

24

25
```