# Lakeland Police Department
# Internal Affairs Investigation

*ACOP Mike Link*

*Capt. Hans Lehman*

*Lt. Steven Sealey*

*Sgt. James Roberts*

*Sgt. Jason Perez*

*C.A. Sean Patterson*

## EIR-18-006

## Book # 1

**EXHIBIT 14**

# LAKELAND POLICE DEPARTMENT
## EMPLOYEE INCIDENT REPORT FORM
Please complete the **shaded** portion & forward form to the Office of Professional Standards

| MEMBER INITIATING INTERNAL INCIDENT | | | |
|---|---|---|---|
| Name:  Chief Larry Giddens | | Race/Sex: | DOB: |
| Address: 219 N. Massachusetts Ave. | | City/ST/Zip: Lakeland, FL. 33801 | |
| Telephone Number | ☎(Home): 863-834-6900<br>☎(Work): | ⊙<br>Best Time to Call: | |

| WITNESS INFORMATION | | | |
|---|---|---|---|
| Name: | | Race/Sex: | DOB: |
| Address: | | City/ST/Zip: | |
| Telephone Number | ☎(Home):<br>☎(Work): | ⊙<br>Best Time to Call: | |

| WITNESS INFORMATION | | | |
|---|---|---|---|
| Name: | | Race/Sex: | DOB: |
| Address: | | City/ST/Zip: | |
| Telephone Number | ☎(Home):<br>☎(Work): | ⊙<br>Best Time to Call: | |

## MEMBER INFORMATION

| Name/ID#:  Capt. Hans Lehman | Supv. Name/ID#:  ACOP Mike Link #2 | Div: ISD |
|---|---|---|
| Name/ID#: CRA Sean Patterson | Supv. Name/ID#: Sgt. Terri Smith #55 | Div: ISD |
| Name/ID#: | Supv. Name/ID#: | Div: |
| Name/ID#: | Supv. Name/ID#: | Div: |

## INCIDENT INFORMATION

| Event No. | Date: | Time: | Zone: |
|---|---|---|---|
| District: | Rotation: | Location: | |

## SYNOPSIS OF INTERNAL INCIDENT

On January 17, 2018 CRA Wallace met with Carol LoBello with the City of Lakeland Human Resource Department. During the meeting, CRA Wallace lodged a formal complaint, stating the conduct of Capt. Lehman and CRA Patterson is violating Lakeland Police Department General Orders and/or City of Lakeland policies.

It is alleged both Capt. Lehman and CRA Patterson have created a hostile work environment, based primarily upon age and gender discrimination, and has been occurring over the past ten (10) months and is affecting CRA Wallace.

1

"**837.06  False official statements.**--*Whoever knowingly makes a false statement in writing with the intent to mislead a public servant in the performance of his or her official duty shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.*"

I, _____, do hereby swear or affirm, under penalty of perjury, that the allegation(s) made by me in this Employee Incident Form is, to the best of my knowledge and belief, true and correct.

_____
Member Name & Badge/ID Number

## AUTHORIZATION FOR ADMINSTRATIVE INVESTIGATION
*(Office of Professional Standards Use Only)*

Authorizing Member: _____     Date Received: 2-9-18
*(Chief of Police or Designee)*

☐ Assign to Supervisor     ☑ Assign to Office of Professional Standards     ☐ Other/See Attached Information

OPS Tracking Number: FIR 18-006

OPS Receiving Member: V. Riley     Date Received: 2-9-18

Assigned to: Lt. PACHECO     Date Assigned: 2-14-18

2

OPS 005



RECEIVED HR

JAN 16 2018

**RECEIVED**

JAN 3 0 2018

BY: OK/SW733



CITY OF
**Lakeland**

# Investigation: Incident/Complaint Form

The City of Lakeland encourages you to resolve any problem or issue informally and directly with the individual(s) involved. However, if you believe you have tried to resolve directly or you are more comfortable getting assistance in resolving your issues or concerns, the Human Resources department investigative process can assist.

Please be assured that the City is committed to careful and thorough investigation of any such complaints. Please complete this form describing the situation or incident so we can determine how best to proceed to effectively address your concerns.

**Employee Information**

Name of Employee claiming incident (s): Brenda Wallace

Employee's Job Title: Crime Analyst

Employee's Department and Direct Supervisor:  Lakeland Police Department - Criminal Investigations.  Sgt. Terri Smith

**Incident Information**

Please explain the events that occurred (include date(s), time(s) and location(s):

I have worked for the City of Lakeland for over 14 years.  During that time, I have spent most of my time working at the Police Department.  I attended training at FDLE and received the certification of FDLE Certified Crime Analyst.  This certification requires an analyst to be on the job for two years and to complete/pass their 6-month training program, tests and presentation.  I also attended the Alpha Group Trainings and completed my certification from California State University as a Certified Crime & Intelligence Analyst.  I have been trained on the job and have passed my knowledge and training on to others.  I have never had any issue nor the disrespect that I have been suffering until

shortly after starting to train Sean this past January. I was tasked with training Sean on how we do things today, our policies and procedures, tools, applications, etc. Soon after the training began, it became apparent Sean wasn't aware of what our job really entails. Perhaps he thought it was police work, crime scene analysis work, or some other type of work as seen in TV shows but he didn't want to embrace the job that he was hired to do and as I was directed to train him. Many times, as documented in my notes below, Sean would not be doing the job for which he was hired, and we would find him out walking around talking to others. I brought this to the attention of my supervisor, Sgt. Smith. She tried to take action against Sean, but her authority seemed to be undermined by Capt. Lehman and continues to be right through the date of this complaint. It is difficult for our group to work together as a team when the team is being undermined by outside forces such as management above our level, other Supervisors and Detectives. If Capt. Lehman took the time to review my past performances during my tenure, he would see how my work ethic has evolved. I have always been a team player; my values have supported the organization; I have always strived to find ways to expand my job knowledge; and I have met my professional goals. Our team has always taken our direction on future application or technology from our Supervisor. And, I have always embraced this.

I was dumbfounded when I was just handed my performance review be the Department Secretary and there was an eight-page memo attached to it written by Capt. Lehman. I wasn't deserving of any kind of explanation or presentation from him. I would have expected a supervisor at his level to handle it better. I feel like I am being punished for getting a good evaluation.

**This complaint is in reference to a hostile work environment based primarily upon age and gender discrimination that has been happening over the past 10 months and involves both Sean Patterson and Captain Lehman. It started when I was training Sean Patterson, and culminated with Captain Lehman's memo to Chief Giddens and ACOP Link. Sean is an employee that has only been with the COL for the past year. I was deemed his trainer. Sgt. Smith is our supervisor, Lt. Sealy is her supervisor and Capt. Lehman is Lt. Sealy's supervisor and ACOP Link is Capt. Lehman's supervisor. The following lists the pattern of Sean's behavior over the past 10 months with dates and incidents. The bold print identifies the issues followed by dates and descriptions of what occurred.**

**Sean has a problem with data entry (believes it is below him) and with communication to team members/direct supervisors.**

4/27/17 - I advised Sean since his morning work was done he needed to spend some time working on the gang entry project. He responded by saying that he needed to work on "his" project. I explained that he had not worked on gang entry at all this week and if he wasn't working on it today, he wouldn't be doing any this week because he was taking Friday off. When I returned from lunch,

Sean apologized. I asked him to go in the conference room so we could talk. I explained that when he finished his morning work, he is to communicate that to me so we can prioritize his work. I explained that gang entry was his project. He asked, "why, why hasn't it been finished by now? It is a menial task." I explained that we were only recently given access to enter the gangs. Our group thought it would be good for him to enter data so he can get to know the players in the Gangs. His response was "then I shouldn't just be hurrying and typing the names." I explained that it would be beneficial for him to read and understand the players who live in the area for which he is responsible. I also explained that we are a team. It is not fair to the team if he is permitted to work one hour, three hours or eight hours on a project that has nothing to do with his job as a Crime Analyst. The conversation went back again to his project. He said that he needed to tell Capt. Taylor that he would not be able to finish his project on time. I explained again that he didn't have to tell the Capt. yet. I explained that if he works an hour a day on gang entry and then the rest of the time he could spend on his other project. We can then see where he is at the end of the day. He then admitted that his deadline was 5/1 or 5/2, not today like he previously advised. Sean had been on the job for about 4 months at this point, but clearly had not learned his job. This is impossible if he is given projects that are not related to Crime Analysis as it prevents him from having the time to dedicate to learning his actual responsibilities.

**Sean has a problem communicating with the team. When we get up from our desks and we know that we are going to be gone for some time, we let each other know where we are going.**

5/16/17 - I didn't take a full hour for lunch. I returned to the office at 12:45. Sean had already gone to lunch. At 2pm, Sean still wasn't back from lunch. At 2:09, I received a call from Bill LePere that if I was looking for Sean, he was AWOL with him. He wanted to talk to Sean about Crime Analysis. Sean returned to his desk at 2:45 with no explanation.

5/26/17 - Sean was not at his desk around 3:10. I texted Sgt. Smith to advise that he was missing and he hadn't reported where he was. At 3:48, Chief Giddens called me and advised that Sean was with him and had been since 2pm. I explained that Sean didn't let anyone know where he was. Chief said he was talking to him about data mining. Sean returned at 3:55.

Sean advised that he placed a clip board outside of his cube if anyone is looking for him. I explained that the only time it is an issue is when he is gone for a long period of time without letting us know. He now has gone from one extreme to another.

6/2/17 - Sean did not advise of any movement until he was dropping off photo packs to Det. Mingus. The day before, he advised of his every move – again an extreme. When I returned from lunch at 2:15, Sean was not at his desk. The clipboard was no where to be found. When he came back, he said that the Capt. wanted to speak to him.

7/25/17 - Sean was not at his desk from after lunch until 5 pm.  Several detectives came by looking for him.  When he came back at 5pm, he said that he was called into the Lt.'s office.

9/26/17 -  Det. Sealy brought over a request for a photo pack and put it in Sean's bin around 4 pm.  Both Lindsey and I asked if he needed it asap.  Det. Sealy said no, Sean can do it.  On 9/27/17, Det. Sealy brought it back to me and said that Sean brought it to him and said he was going home sick.  Sean never told Lindsey or I that he was leaving, nor did he ask us if we could do the photo pack for him.

**Callout pay.  Sean hadn't been released for this as of yet. This was not handled fairly.**

6/19/17 – I received a call from Sgt. Smith about a callout.  She said Sgt. Chip Roberts called wanting Sean to come out because he had been working with Det. Hathcock on the case.  I explained that Det. Darlene Thompson and I spent all day on Friday working on it as well.  This should have been Lindsey's callout.  When I checked the log on Monday, Sean had pulled a TLO and checked Facebook.  Det. Hathcock said that she wanted Sean to do GEO tracking.  This is not even something that we can do at LPD.  This is done with Det. Thompson through FDLE.

9/15/17 - Lt. Sealy called me in the conference room.  He asked me if I was advised about the homicide.  I replied no.  Evidently, Sgt. Roberts asked Sean to work over time.  I was on the phone when Sean was inquiring who was on the call out.  Lt. Sealy asked me if I wanted to stay and work on it.  I said no because I had other plans that evening.  However, if Sean is called out over the weekend, I will have a problem with it because I am on call-out.

**Sean has a problem with prioritization.**

6/19/17 -  Det. Anthony asked Sean for a picture.  He said I can't I am working on a Murder case.  I leaned over and asked if I could help.  We don't turn anyone away or brush them off.

6/20/17 - Sean was working on the Kenyon Covington case.  He was running back and forth from his desk to the detective's area.  I suggested that maybe it would be better to pick up the phone rather than keep running back/forth.  He didn't ask Lindsey or I to help until his computer crashed.

The cleaning lady asked Sean if he caught his guy?  I explained to Sean that this is confidential information and the cleaning lady shouldn't know what you are working on.  He said that he would be more careful in the future.

6/26/17 - Det. Weech came to Sean's desk to ask for a list of robberies.  Sean said that he couldn't help him at the moment as he was working on something.  I asked Det. Weech what he needed and provided the list.

**At this point in time, I was becoming frustrated.  It appeared to the team that Sean wasn't being required to do the job for which he was hired, but was being permitted to just get up**

**and do whatever he wanted. I met with Sgt. Smith explaining Sean's work performance. I decided it was time to go to the Chief to try and rectify the problem. I spoke with ACOP White as I wanted to get his opinion on how I needed to express what has been occurring to Chief Giddens. He explained that I need to go to the Chief with facts.**

7/27/17 - I met with Chief Giddens. I asked the Chief if Sean was an undercover plant in our office. The Chief wanted to know why I asked that. I explained that he is an employee on probation and is getting special treatment. The Chief's response was that he read an article about the Millennials. He said he would get it for me to read. He said that Millennial's never fail. I explained that Sean has been condescending, arrogant, egotistical and acts like he knows more than anyone else since he started. I explained that he was given the task to enter the gang members and he questioned why he had to do it, it was a menial task. I explained that there is a communication problem. I was asked to train Sean but he wouldn't advise when he was finished with his work so I could assign more. He just gets up and does what he wants. He was missing on several occasions. I explained that Sean came up with the clipboard idea. There were times that he didn't use it or that he went to the other extreme of stating that he was going to the rest room or to get a drink, clearly mocking our expectations.

I explained the issue on the call out on 6/16 when it should have been Lindsey's. I explained that Sean can't handle more than one task at a time as he gets overwhelmed.

I asked the Chief how is it that Sean can go to other Supervisors and not his own. He went to Sgt. Chip Roberts and asked for a laptop. This was after Sgt. Smith explained that he could not use his personal laptop for work. He wanted a laptop to work from home or take to a crime scene. Neither of which we are permitted to do.

I also explained that my job description is not a trainer. I do not get paid extra for it.

I also asked the Chief why the Sgt's and Lt's are not putting a stop to the gossip. Sean said that I was the reason that Johnnie To was no longer here. This isn't true and how would Sean know about Johnnie? Sean also stated that our team isn't going to change as long as Terri is in charge. I asked the Chief, isn't there a policy against this?

The Chief assured me that my job was not at stake. I explained to the Chief that this isn't being handled correctly and I feel like it is a volatile work environment for me too. He asked me after I spoke with Lt. Sealy if there was a plan. I stated that I was not given one.

I also asked where the policy was on how to write a shout out. Sgt. Smith was reprimanded on a shout out that she has written. This issue wasn't handled correctly either. I worked on the case too.

**Sean is inconsiderate of others on the team.**

7/28/17 - Lindsey made the comment that she is not doing Sean's work for him because he is gone from his desk too much. She has had to help pick up the slack for Sean not sitting at his desk and completing his tasks. I advised that she tell Sgt. Smith how she feels.

12/11/17 - Sean took a vacation day knowing that Lindsey and Darlene were in class all week. He went to Lt. Sealy for approval. Lt. Sealy doesn't know our vacation plans. Sean didn't ask his immediate supervisor, Sgt. Smith. When others on our team take off, we communicate to each other. We put it on our calendars so we know and can plan accordingly. Sean was planning on leaving me to handle everything. I ended up really sick that week.

**Drug Tips.**

9/25/17 - Sean has a problem with completing the drug tips each week. I was pulled into a meeting with Lt. Sealy, Capt. Lehman and Sgt. Smith in reference to the drug tips. I was asked how long it takes to complete a tip. I advised about 15-20 minutes. I was asked where the majority of the tips come from – I said that I wasn't sure without looking but I was thinking the tipline. Capt. Lehman wants to shorten the process. Capt. Lehman thinks that we can stop sending the entire work-out up front. I explained that it is easier just to do it all when we complete the tip because we have the time. If we wait until it is requested, we may be slammed with other work. I also explained that before we change the process, we need to involve SIS.

**Skipping chain of command.**

9/22/17 - Sean requested overtime to work on 9/23. Sgt. Smith denied this. Sean went to Capt. Lehman and he approved it without checking with Sgt. Smith. If he needed help, why didn't Sean ask Lindsey or me for help as this would have eliminated any need for overtime. And why is Sean permitted to go to others to request something that was denied by his immediate supervisor?

**Special Treatment.**

10/10/17 - Sean received a new computer and now has three monitors. How is it that someone on probation gets a new computer before someone with years of seniority? It has always been our practice that the person with seniority gets the new computer. Capt. Lehman has stated that Lindsey and I will get ours in January. Why is Capt. Lehman favoring Sean to the detriment of the rest of the team?

**At this point, I will address the memo Capt. Lehman attached to my performance review. Capt. Lehman is extremely biased throughout his memo; not entirely honest about factual issues; and provides the basis for my age and gender discrimination claims that has allowed this hostile work environment to continue. Throughout my entire career at LPD, I have never worked with such a terrible Capt. It is obvious he supports the "good ole boy" network and**

has a problem with women. We had a great team until all of this happened. Everyone got along and our team excelled.

Capt. Lehman expresses there appears to be a generational gap and philosophical difference between Ms. Wallace and Sgt. Smith when it comes to working with Sean Patterson. This is clearly *age and gender discrimination*. I am tired of hearing about the excuse from others that Sean is a millennial. This is NOT an excuse not to do his job, and he isn't doing what he was hired to do! Nor is it acceptable for Capt. Lehman to discriminate against us for our age ("generational" was his word) or gender ("philosophical" was his word) and play favoritism with a probationary male employee.

Capt. Lehman is also factually incorrect. He states that in July or August Mr. Patterson's training was finished by Lindsey Morris and Sgt. Smith instead of me. Lindsey flat out refused to train Mr. Patterson.

**Job knowledge/Practical Application:**

I am not sure how Capt. Lehman can hold against me the fact that there are processes in the CAIC Unit that are not efficient. Capt. Lehman has never once sat down with me to discuss or review our processes; he has only done this with Sean.

As far as his pushing for ESRI ArcGIS mapping, this is something that has been in the works for some time now. Sgt. Smith had already started working on this. This isn't a new idea by Capt. Lehman as he is leading everyone to believe. It is also somewhat ingenious how he complements me on creating SCOPE and the Monthly Narcotics Report, but then stabs me by stating that we need to expand our use of intelligence Led Policing and find meaningful targets. What does he think that SCOPE and the Narcotics report are? I took it a step further and put together meaningful targets. He is not giving me credit for what I am already doing.

Capt. Lehman commanded us all to attend the Intelligence Lead Policing weeklong training. At the end of the training, we were all asked to make a presentation on how we were going to put what we learned into practice and to present this to the Chief. Our instructor made the comment that we do not need to spend money on any new systems because it can be done with what we have! It was amazing that Lindsey, Det. Thompson and Lt. Kimball gave our presentation and we hit right on what we need to do to as an agency for the future and our team was already heading in that direction.

**Organizational Support:**

The example that Capt. Lehman uses again is that I don't support the organization. Again, as an experienced Crime Analyst, I and Sgt. Smith gave legitimate reasons why the P3Tips web-based application and the approach Capt. Lehman was using would not work. I have never expressed that I wasn't willing to change. I believe that we need to continue as we are doing while testing the new process. Capt. Lehman wants us to just stop doing our old process and do the new one. This

application, however, is located on someone else's server (outside organization).  What would happen if they closed down their server and we lost all of our data that we input into the application.  The people that were viewing the data were not CJIS certified.  This is a safety concern.  Capt. Lehman again stated a fact that is not true.  He said that I was not open minded and willing to try different processes.  I believe that throughout my career, I have been open minded and have tried many things.  We have evolved into one of the best Crime Analysis Units in the state.  Our agency has always been in the lead.  This did not happen because I was closed minded.

**Teamwork:**

Again, if Capt. Lehman would have handled Sean's lack of team work since June, I wouldn't be blamed for personality conflicts.  As far as going to lunch, this was done as a way to persuade me to stay in the unit.  At the time, I was applying for another job within the city because management truly was not going to deal with what was happening.  I was tired of all of the preferential treatment Sean was getting.  I have always been a team player.  Just because I do not like someone doesn't mean that I can't work with them.  I do not have to be their friend.  Why should my evaluation be negatively impacted because of Sean's inability to do his job; Sean's refusal to complete the tasks for which he was hired; or Capt. Lehman's inappropriate interference and his preferential treatment of Sean?

Also, Capt. Lehman is concerned about the friendship between Sgt. Smith and myself.  I am not sure where he is getting his information but again he is wrong. Sgt. Smith and I have a very good professional working relationship that has evolved over time on the job, not a social relationship.  We do not meet outside of work to socialize; we do not go to each other's houses and we do not go to dinner together.

**Employee Goal:**

Capt. Lehman is not telling the truth about the drug tips. He states that he asked Sgt. Smith and myself why we were not tracking all tips instead of just drug tips and claims he never really received a logical answer.  He did receive an answer, but it wasn't the answer he wanted.  We explained to Capt. Lehman the reasoning behind the log for drug tips.  In the past, a citizen would call in a drug tip.  When it wasn't being completed, the citizen would call again.  The issue would get escalated to City Hall – usually the City Manager or Mayor and then they would contact the Chief and inquire.  There was no log.  We created the log to track the issue from beginning to end.  If the Chief called and wanted to inquire on a specific tip, we could look at the log and advise what was being done.  This log was for all drug tips from the tipline, Heartland Crime stoppers, webtips, PCSO forwarded tips and internal tips, etc.  Capt. Lehman asked why we weren't tracking all tips such as warrants, fraud, etc.  These types of issues, however, were being handled by patrol or specific detectives.  We weren't receiving complaints about them not being handled.  In the past, we didn't see a reason to

track them.  Since Capt. Lehman brought this up, I thought it would be a good idea to add a tab to our log for these types of tips and track them as well.

I am not sure how this became a goal for just me.  This could and should have been handled differently.  Capt. Lehman could have met with the entire CAIC team and discussed the issues.  Then the SIS team could have been asked for their opinions on the process since it involves them.  We also found in our meeting that SIS didn't need the entire work up on each drug tip.  SIS also requested access to our log, which I have already set up for them.  I also sent an e-mail to (SIS) Lt.          and Sgt          about moving towards a better process.  Lt          specifically asked that we wait on changing the process until later in January when he is in charge of the SIS group.  He doesn't want any changes done until he meets with his group.

Again, Capt. Lehman is suggesting that we free up analysts to do more data mining instead of data entry.  If Capt. Lehman would simply have Mr. Patterson do the job for which he was hired without running to him when he doesn't get his way or preferentially allow Mr. Patterson to spend time away from his desk, perhaps Mr. Patterson and the entire team would have more time to do data mining.

**Sean Patterson's evaluation:**

I do not understand how Capt. Lehman can compare a seasoned analyst's evaluation to an employee that has only been on the job for less than a year.  This is like comparing apples to oranges.  Mr. Patterson has not had prior Crime Analyst experience or even police work experience.  I think it is great that Mr. Patterson has more technical skills than others on our team.  However, he wasn't hired for his technical skills alone.  Also, Capt. Lehman neglected to state that the Case Management Tool was not solely created by Sean Patterson.  Sgt. Smith outlined it and Sean met with Det. Jason Leggett to complete it.  Capt. Lehman also failed to point out that there have been issues with it not working.  Sean is the only one in CID that can fix the problems.  When a Detective has a problem with it, they must solely rely on Sean.  How is this helping with moving our technology forward when it is relying solely on one person?

I am not sure how Capt. Lehman can lose focus on the issue of Sean not sitting at his desk and completing his tasks.  Yes, we all get up and interact with the Detectives from time to time as needed but we complete our responsibilities and we work as a team – letting others know where we are throughout the day so our team's responsibilities can be covered.  If everyone in our team was permitted to be missing without explanation, or to decide we won't do our job because it is "too menial", our team would get nothing accomplished.  How can Capt. Lehman possibly justify this preferential treatment that HE is affording Sean, and which is creating the very same conflicts that Capt. Lehman attempts to blame upon Sgt. Smith and me?

I also find it disconcerting that Capt. Lehman can make the statement that he has seen more teamwork and synergy between Sean and Lindsey in the past two weeks since I have been on

vacation and Sgt. Smith was working on UCR. This is funny since Sean was out during some of that time too. The team work was actually between Det. Thompson and Lindsey. It is also appalling that Capt. Lehman can have a meeting that involves the entire CAIC team when not everyone can be at the meeting. Capt. Lehman has neglected to state that the meeting was a last-minute meeting and not well planned. Lindsey was actually on her way to lunch when he pulled her into it. Capt. Lehman had set up a meeting with a representative from PCSO to discuss how they complete their daily briefing report. In the meeting, they expected Lindsey to come in after the holidays and complete the process. Lindsey refused to do it because she was just shown the system for five minutes. She was confident that she could not do it and get all the daily work done by herself. Again, the entire team was not asked about the pros and cons. Capt. Lehman also neglected to state that he set up a follow-up meeting to discuss the Internal Led Policing concept, and the day of the meeting he wanted Lindsey to do the new process for the daily briefing. She had not been given the step by step process and was having problems with it. Still the entire team was not given this process. How can Capt. Lehman expect us to work as a team when he keeps impeding our progress? Capt. Lehman clearly shows more concern over his ability to advance to ACOP than helping us work as a team. Capt. Lehman also failed to advise that when the new daily briefing was presented at the Intelligence Led Policing meeting, it was not well liked. Capt. Lehman is trying to recreate the wheel. Neither Sgt. Smith nor I were asked why we pulled the data for the daily briefing, or what data perimeters were used. This was discussed with the Senior Staff and narrowed down to include what is currently in it today. Capt. Lehman was setting it up with too much data which made the report too cumbersome to read. I am not opposed to making changes that are good for the organization. Several PCSO employees have commented on how nice our current daily briefing is compared to what they have. They have stated that they would like to have it. Why does Capt. Lehman want us to go backwards?

Capt. Lehman is the reason that Sean has had difficulties learning the Chain of Command. Capt. Lehman and Lt. Sealy have allowed Sean to jump command by not supporting Sgt. Smith while she tried/tries to mentor Sean. They have set Sean up for failure, and have created the very problems for which they attempt to blame on Sgt. Smith and me. Why is it that Lindsey and I can communicate with Sgt. Smith when she is not in the office but Sean doesn't have too? Sgt. Smith has always had an open-door policy, and she has always encouraged us to share ideas and try new ways.

Were there any witnesses to this event(s)? Provide names. I have provided the witnesses names where needed.

What ideas do you have for remedying the situation?

I would like Capt. Lehman to allow Sgt. Smith to do her job. She has tenure on the job and has proven that she can do her job. Capt. Lehman should not be involved in a front-line supervisor's

evaluation of her/his employees. He can give recommendations, but why has he tried to bully her into altering an evaluation?  And when that failed, why does he think it is ok to write such a factually incorrect, self-serving, and overly biased memo to the Chief in an attempt to discredit both Sgt. Smith and myself?  I would like to see Capt. Lehman communicate with the entire team and not just Sean.  He is playing favorites, and his own memo identifies his favoritism toward Sean, and against both Sgt. Smith and me – establishing both age and gender discrimination issues and creating a hostile work environment.

Capt. Lehman needs to be counseled on hostile work environments, as well as age and gender discrimination.  This needs to be documented in his file.  Capt. Lehman needs to be removed and reassigned somewhere else in the department.  I no longer trust him to treat me fairly and impartially in my job.  It is sad that it has come to this for me to be able to say what is going on and finally being heard after months of frustration.  Capt. Lehman is treating Sean like his personal assistant and spending hours with him yet he has never once asked Lindsey or me to come into his office and share ideas.  After spending no time with me discussing the procedures I used in my job, Capt. Lehman attempts to evaluate me and my work.

Why is Capt. Lehman picking on the CAIC unit?  Since his time in CID, he has not evaluated any of the other processes being done in CID.  This needs to be done as well.

I would like to have Capt. Lehman's memo to the Chief removed from my file.  It is not fair, it is factually incorrect, and it clearly identifies that Capt. Lehman is the reason for the existing conflicts within our department.

I would also like to recommend that the Crime Analysis Unit report directly to an ACOP.  This would alleviate any agendas that a Capt. would have for promotion.

Is there any other information you feel is relevant to this situation? Not at this time.

Signature: _Brenda J Wallace_

Date: _1/19/18_



# LAKELAND POLICE DEPARTMENT
## EMPLOYEE INCIDENT REPORT FORM
Please complete the **shaded** portion & forward form to the Office of Professional Standards

### MEMBER INITIATING INTERNAL INCIDENT

| Name: **Chief Larry Giddens** | | Race/Sex: W/M | DOB: N/A |
|---|---|---|---|
| Address: 219 N. Massachusetts Avenue, | | City/ST/Zip: Lakeland, Florida 33801 | |
| Telephone Number | ☎(Home): N/A<br>☎(Work): 863-834-6900 | ⏰<br>Best Time to Call: | |

### WITNESS INFORMATION

| Name: | | Race/Sex: | DOB: |
|---|---|---|---|
| Address: | | City/ST/Zip: | |
| Telephone Number | ☎(Home): N/A<br>☎(Work): N/A | ⏰<br>Best Time to Call: | |

### WITNESS INFORMATION

| Name: | | Race/Sex: | DOB: |
|---|---|---|---|
| Address: | | City/ST/Zip: | |
| Telephone Number | ☎(Home):<br>☎(Work): | ⏰<br>Best Time to Call: | |

### MEMBER INFORMATION

| Name/ID#: **ACOP Mike Link** | Supv. Name/ID#: **COP L. Giddens** | Div: Admin |
|---|---|---|
| Name/ID#: **Lt. Steven Sealey** | Supv. Name/ID#: **Capt. Hans Lehman** | Div: CIS |
| Name/ID#: **Sgt. James Roberts** | Supv. Name/ID#: **Lt. Steven Sealey** | Div: CIS |
| Name/ID#: **Sgt. Jason Perez** | Supv. Name/ID#: **Lt. Steven Sealey** | Div: CIS |

### INCIDENT INFORMATION

| Event No. N/A | Date: N/A | Time: N/A | Zone: N/A |
|---|---|---|---|
| District: N/A | Rotation: N/A | Lakeland Police Department<br>Location: 219 N. Massachusetts Ave, Lkld, Fl. 33801 | |

### SYNOPSIS OF INTERNAL INCIDENT

*On January 17, 2018, Sgt. Terri Smith met with Carol Lobello with the City of Lakeland Human Resources Department. During the meeting, Sgt. Smith conveyed a verbal complaint, stating the conduct of Capt. Hans Lehman and CRA Sean Patterson is violating Lakeland Police Department General Orders and/or City of Lakeland Policies.*

*On February 13, 2018, the Office of Professional Standards received a formal complaint memorandum from Sgt. Smith alleging additional members who had violated Lakeland Police Department General Orders and/or City of Lakeland Policies. Sgt. Smith alleges a hostile and toxic work environment has been created by the named subjects, which is based on age discrimination, gender bias, and medical discrimination.*

*If this allegation is proven to be true, it would be in violation of G.O. 4-4, Harassment in the Workplace.*

RECEIVED
FEB 1 3 2018
BY: _____ #65

To:              CHIEF LARRY GIDDENS

DATE:           FEBRUARY 8, 2018

SUBJECT:       Internal Affairs Complaint on Hostile Work Environment

EMPLOYEES
NAMED:          ACOP MIKE LINK, CO/ISB
                 CAPTAIN HANS LEHMAN, CO/CIS
                 LIEUTENANT STEVE SEALEY, OIC/CIS
                 SERGEANT JAMES ROBERTS
                 SERGEANT JASON PEREZ
                 CRIME ANALYST SEAN PATTERSON

I am writing this memorandum to complain about a hostile and toxic work environment that has been created in my place of employment collectively by six white males – all but one that are supervisors – in the Lakeland Police Department. They have stripped me of my authority to supervise subordinates. They have demeaned and humiliated me and they have unjustly attacked my integrity and painted a picture of me as an old, useless woman that has reached the expiration date of her ability to perform her job. This work environment is affecting my physical health and my emotional health. This environment is so distasteful and hostile to me that I can hardly bring myself to come to work.

Sean Patterson was hired on January 9, 2017, as a crime analyst assigned to my unit, CAIC. He is a 26 year old white male. He had no prior law enforcement or crime analysis experience. During the hiring process he demonstrated some advanced computer skills that would be advantageous to this assignment. Upon his arrival, as his supervisor, I briefed him on his duties, our expectations and our organizational structure. He was provided reading material to assist in his transition and he was told to be patient in that our training process might seem slow at times but that it was imperative that he grasp the nuances of this job such as state statutes, the handling of confidential information, and resource systems in place related to our crime analysis process. In addition to this information, I explained our chain of command and how it worked. I explained to him that he would be assigned to Crime Analyst Brenda Wallace for training and that if he had other questions he should come to me.

Brenda Wallace is our Senior Analyst. She has been with LPD and the CAIC since the inception of the unit in 2004. She has proven to be an extremely dependable, productive and conscientious member of this organization. She has a "task oriented", "get it done" work ethic. She keeps to herself and does not engage in office gossip or the like. She accepted my request to train Sean even though she receives no extra compensation or special training for this added responsibility.

Within Patterson's first month on the job we began to detect a number of traits that were problematic. He was more interested in changing our systems and processes before he

had learned them and the reasons for them. I attempted to redirect his focus back to his training assignments but found that days later he made his way to Captain Rick Taylor's office (our commander at the time) to float some of his new ideas on the crime analysis process to the Captain – ideas that he had found by using google. He engaged in this activity at the expense of his training assignments, which he was not completing in a timely manner. He began this meeting with Captain Taylor by stating, "I'm probably slitting my throat by doing this, but . . . " This indicates that Sean was aware he was in violation of policy and had intentionally and with premeditation subverted the chain of command. Then Sean was observed wandering about the third floor (administration) away from his duty station on another occasion. While addressing him regarding his wandering about Sean demonstrated what I will describe as a disrespectful tone and defiant attitude toward Brenda Wallace who was also present. During the course of this discussion where I was explaining to him his duties and responsibilities and that of Mrs. Wallace as his trainer he became agitated and argumentative with me. Wallace came to me after this meeting and told me she was becoming frustrated with Sean's argumentative and defiant behavior, traits we had identified as problematic. That aside, she agreed to continue to train Sean at that time in an effort to work through these issues with him.

It wasn't long after that Brenda came to me again and said Sean was still doing the same things. Sean was disappearing and not letting people know where he was. Sean was not following direction, not completing his training assignments, and otherwise not doing what he had been instructed to do.

I then met with Sean in the presence of Lieutenant Sealey in another attempt to get Sean on track. Sean was disrespectful, argumentative, and rude in that meeting as well. I told Sean he had been directed to let Brenda know where he was and that she was his trainer. I also reiterated that Sean appeared to believe that he can do what he wants to do when he wants to do it regardless of Brenda's direction. I also reminded Sean of the chain of command and that it appeared that he if did not like the response he got from me as his immediate supervisor he would go on to another supervisor in the chain to share his ideas or concern. This is a practice that is in direct conflict with our policy and procedures regarding the chain of command. During this meeting, Sean attempted to divert attention from his performance and accused me of "running off" a previous employee that Sean had never met. Sean stated to me that "higher ups" were talking to him and telling him that "nothing would change" as long as I was the supervisor of the CAIC. When asked where Sean had heard this he replied, "I can't say". Sean challenged Brenda's ability to train him stating that "I'm a crime analyst just like she is" and "I have more education than she does". I stood up to end the meeting, opened the door, and dismissed Sean. Sean remained seated and ignored me. During this meeting Lieutenant Sealey had the opportunity to support my attempt to set Sean back on track, but he chose to enable Sean by allowing Sean to behave this way in his presence. I believe that if I was a male supervisor Lieutenant Sealey would not have permitted this insubordinate behavior toward me. This was a prime example of gender discrimination and gave Sean the idea that his behavior of speaking to me in this way and ignoring me in an insubordinate way was going to be tolerated.

Sean also began campaigning when he was away from his desk during work hours. Sean obviously was engaging in gossip with other employees about the CAIC unit. One such person that contributed to this gossip mill was Sergeant James Roberts. Roberts reported that Johnny To had made statements to him that Brenda Wallace and I had "run him off". Johnny To worked as a crime analysts for about a year. He resigned and moved back to                where he still owned a home. Johnny did not file a complaint about issues in the work place, nor did Johnny did not speak to me about any work related issues although I regularly spoke to Johnny and asked him if everything was going okay. Sergeant Roberts also attempted to give Sean Patterson preferential treatment by asking me if I could get a laptop for Sean so Sean could "work from home" and "go out on calls in the field". I found this highly irregular since Sean was a probationary employee and there were two other analysts with more experience and training that were not even considered for this opportunity.

Jason Perez also was giving Sean special treatment. On July 14, 2017, Perez wrote a "Shout Out" about Sean's good work he had done on a homicide, but neglected to give the female analyst and the female intel detective any credit when one of them had been working on the case for months. When I told Sergeant Perez that he had omitted them and I wished he would do another shout out and give them credit, he did not respond. This type of preferential treatment and recognition is not good for a unit because it gives favored treatment to a male employee because of his gender and quashes morale. The following week I wrote a Shout Out giving Brenda and Darlene credit for their part in the case. Although he had been recognized in the previous shout out, I also included Sean Patterson in my Shout Out and gave him credit for a job well done, too.

Perez and Roberts also attempted to bypass our voluntary callout list to utilize Sean for callouts when he was still on probation and not authorized for callout. This endeavor also would take money out of the pockets of the experienced female analysts that are on voluntary callout.

On July 26, 2017, I was called into Captain Hans Lehman's Office with Lieutenant Sealey and given a "CAIC Unit Issue" memorandum that was actually a counseling form for writing the Shout Out. Also, I was counseled for the performance evaluation I gave to Sean Patterson. "You evaluated him a 1 in at least two categories". They said the evaluation was negative and I was directed to write a memo to "further explain the scores" and what I would do to "help him improve". They also counseled me for the Shout Out by stating that the "play by play dates" went beyond what was needed and that it caused "consternation" in the manner it was written and that this Shout Out "appeared to be minimizing Sean Patterson's contributions." I objected to the counseling form and stated such. I was told it would not be in my personnel file, but would "only" be entered into the AIM system.

I stated there was not a policy on Shout Outs and I did not agree with their perception of the issues going on with my unit. I stated the ratings given to Sean Patterson were given in good faith because he is a problem. At this point in time I realized that my ability to supervise Patterson was compromised because Captain Hans Lehman and Lieutenant

Steve Sealey have attempted to strip me of my ability to do this. They have formally put me on notice that I am being accused of singling out Sean and that this could lead to a "Hostile Work Environment" complaint. This set me up so that any correction I gave to Sean from this point forward would look like I was "singling him out" and "picking on him". In addition to this, these two supervisors were constantly allowing this young, white, male probationary civilian employee to subvert my authority by overriding my directions to him. And finally, they seemed oblivious to the problems that Sean Patterson was creating for the CAIC and the entire second floor of the Lakeland Police Department.

Lieutenant Steve Sealey's office is about 50 yards away from mine at the far end of the second floor. We rarely see Steve unless he is passing by on the way to the copy machine or a meeting in the conference room. From his vantage point Steve is unable to observe the CAIC or see the exchanges that take place. Captain Hans Lehman came to CIS in July, 2017. Lehman has no prior experience in Crime Analysis and had not been in his position long enough to observe with any consistency or experience the inner workings of the CAIC and the exchanges going on – specifically that of Crime Analyst Brenda Wallace. Yet Lehman chose to get his information from a one year, probationary, young, white male civilian who appears to have decided that he has a personal stake in degrading the women in our unit, including his supervisor. Captain Lehman did not seek out my opinion on the CAIC or any of the "ideas" Sean Patterson came up with. In this he undermined my authority and ability to run the unit and enabled Sean Patterson's insubordination. This was similar in nature of asking a rookie to begin conducting briefings or be responsible for the operations plan on a search warrant.

I was getting complaints from the other analysts because Sean continued to wander away from his desk, was not working with the team, and was engaging in small talk with others in the office to the point that he was neglecting his job. Sean would often come back to his desk towards the end of the day and ask the other analysts to help him complete his work.

Anytime I would speak with Sealey or Lehman about these problems, I would be told that Sean is a "millennial" and that's what millennials do. Sean continued to work with Captain Lehman on projects that were not discussed with the other analysts or me. Sean was constantly in Captain Lehman's office. Captain Lehman claims he is "mentoring" Sean, but he has actually assumed my role of supervisor and is enabling Sean to subvert my authority.

Sean Patterson has contributed to a hostile work environment by his rude, flippant, and disrespectful remarks to myself and his trainer, Brenda Wallace, on many occasions. Sean has also passed my door and made remarks of malicious compliance. He has engaged in gossip and undermined my authority by failing to follow my directions and seeking out others above my rank in the chain of command when he does not get his way. Sean refuses to be a part of the team by letting team members know where he is and what he is doing. Sean is secretive and generally unhelpful to his team members.

Throughout the course of Sean's employment both Lieutenant Sealey and Captain Hans Lehman have spent hours counseling Sean and supervising him. Captain Lehman and Lieutenant Sealey have shown favoritism to Sean Patterson and given him preferential treatment based on his gender and age. They have not given the other female analysts the same considerations. They have told me to make special considerations for Sean because he is a "millennial" and excused many of his behaviors for this reason, showing that they have set different performance standards for him because of his age.  (age discrimination) They have said that I am "set in my ways" and "resistant to change", but neither Lieutenant Sealey or Captain Lehman have once sat down with me and asked me how my unit has evolved since its inception or in the recent past. Neither of them has invited the other two experienced female analysts into their offices and asked them what they think about new programs or asked them about any ideas they may have. They have instead chosen to treat a younger white male probationary employee without any experience, training, or education in crime analysis as a subject matter expert.

When Sean's one year performance evaluation came up I completed it with trepidation. I felt there was behavior that needed to be documented, but I also believed that if I didn't give him exceptional marks – marks that I felt he did not deserve - there would be controversy.  This was a one year evaluation and I gave Patterson a rating of "3". This was a very common rating for a one year employee meaning satisfactory performance. I also asked two objective supervisors to review it to make sure it was fair.

After completing the evaluation signed by Sean Patterson and me, it was delivered to Lieutenant Sealey.  The next thing I know I am called into Captain Lehman's office to "discuss" the performance evaluations.  Captain Lehman attempted to bully me into lowering the rating on Crime Analyst Brenda Wallace's performance review by one notch because "it takes two to tango".  I respectfully disagreed with Captain Lehman and did not see it this way. Captain Lehman then threatened that if I did not lower it he would be "forced to write a memo."  Captain Lehman also cited an example of a time he felt Brenda did not exercise teamwork.  This time cited by Captain Lehman had occurred after the end of her 2017 evaluation period so it would have been null and void and not applied to the current evaluation.

There is no doubt, Captain Lehman and I share very different perspectives in reference to the two evaluations noted above. Mine is founded on daily experience and contact with the subject employees, as well as our existing policies, procedures and practices of the CAIC, expectations that have been set forth by the department and this unit for its members and their respective performance to achieve these goals. The ratings and comments are supported by my personal observations of their daily activities.  One deals with a young, white, male, probationary employee with no prior experience in this particular field. A probationary employee who has repeatedly demonstrated a lack of ability or desire to follow instruction and has demonstrated behavioral concerns in being argumentative and disrespectful to his trainer and his supervisor when confronted about these concerns. This particular evaluation is supported by the 3, 6 and 9 month evaluations. The other is that of a 14 year older, white, female veteran of our CAIC, our senior analyst who has proven over the years to be an extremely dependable, trustworthy

and productive employee, an employee who has been tasked with training a problematic probationary employee.  To compare these two side by side is much like apples to oranges.

It is my opinion that Captain Lehman's perspective has been tainted. First, he does not see the daily performance and/or output of both employees although he has spent what appears to be an inordinate amount of time with the younger and newest member, Sean Patterson, in comparison to Brenda Wallace. He has not witnessed Patterson's behavior when not in his company or the company of other commanders or others that may listen to his ideas of new concepts and CAIC changes.  People just may have different "personalities" depending on who they are trying to impress.  Some may even demonstrate less than respectful behaviors toward women supervisors for example.

It should be noted that the Captain has been in this command assignment since June of 2017 (7 months) and having limited if any prior exposure or experience to the crime analysis process in the past he is not as well versed as one might want to believe. And as best I can tell, nor is Mr. Patterson for that matter. To that end, it is my belief there may very well be a "like-me" type relationship in existence between the two that may further complicate and cloud his perspective.   In addition to these observations, it appears that the captain is simply enamored with Sean Patterson because of his age and gender. This is based on Captain Lehman's comments to me regarding the time they (Lehman and Patterson) have spent together discussing what they have described as efficiencies, data mining concepts and new programs while directing me to be more considerate of Sean's age and his "millennial" needs when I have brought our concerns of Sean's behaviors and procedural violations to the captain's attention.  That's preferential treatment.

On January 16, 2018, I was called into the conference room to discuss performance evaluations.  Seated at the conference table was Lieutenant Steve Sealey, Captain Hans Lehman, and ACOP Mike Link.  I was given a very lengthy memo.  The topic of this meeting was more about Sean Patterson than Brenda Wallace.  Once again, I was told that Sean had great "ideas" and that there are two "philosophical" differences in a crime analyst's job at play.  ACOP Link stated if Sean wanted to leave his desk, take a break, and speak to other detectives and "network" he didn't have a problem with it.  I told him that I didn't have a problem with it either until it was excessive to the point he was not getting his work done and asking others to do it for him and that this was the case on a regular basis.  Lieutenant Sealey made the comment that he didn't understand how anyone could sit in front of a computer all day and work – he said, "I couldn't do that".  I responded, "Because it is his job."  This is an example of gender bias – it's okay for women to sit at a desk all day like secretaries – but men are not made the same way.

I was shocked that a meeting such as this was conducted over one notch on a performance evaluation for an analyst that was not even hardly mentioned in this meeting. The main message of this meeting was that I was to treat Sean differently than I do the others I supervise.  I was to allow him to roam around the office as he wished and if I was to correct him on something he did then I would be accused of giving Sean unfair treatment.  It should be noted that it was not too long ago when the CAIC was the

epicenter of the most egregious scandal in LPD history. Brenda Wallace and I lived through that memorable experience. Although the inappropriate conduct of that one analyst in question was not job related per se, it has left an indelible mark on us. We remain sensitive to the conduct and actions of our team members and are very concerned with the whereabouts of those we are responsible for.

This memo was then attached to the performance evaluation of both Sean Patterson and Brenda Wallace. A copy of the memo was later given to each one of them.

When I was able to review the memo after the meeting had concluded and I had been dismissed by the administrators, I was completely shocked. The memo was addressed to Chief Larry Giddens and ACOP Mike Link. ACOP Link had initialed the memo indicating he approved of it. Very disappointing. Chief Giddens had not. ACOP Link had also sat in the room when the memo was given to me and indicated he approved of it. By his actions, ACOP Link indicated he approved and supported these actions of gender bias, age discrimination, and medical discrimination. Lehman had taken the two performance evaluations of Brenda Wallace and Sean Patterson and gone through them piece by piece. He built Sean Patterson up and tore Brenda Wallace down. He also lambasted me and my work ethic as a supervisor.

The result of this memo was that it polarized our unit – if there was ever any chance of us working together as a unit it was hereby destroyed. This memo created an "Us"/"Them" situation. Captain Lehman had drawn the line and pitted the "girls against the boys". This memo was filled with gender bias, age discrimination, and medical discrimination. Captain Lehman recommends the book "Managing the Millennials" to provide "great insight and information" to assist me in supervising Sean. Captain Lehman directs me to be "more open-minded to ideas and suggestions" by Sean Patterson indicating that I am an old woman with an expired expiration date. Captain Lehman states I need to "get on the bus" and says we need a more "data driven approach" although Captain Lehman has not discussed this with me before what his idea of a "data driven approach" is.

Captain Lehman has spent little to no time with Brenda Wallace to actually be able to have enough information to assess her performance. Captain Lehman was critical of Brenda in many areas that are simply unsupported by fact and common sense. Lehman's comments are heavily laden with age discrimination as he mentions, "those around him who are not willing to change", "would rather keep doing the same thing that has been done for years", "there is a generational conflict occurring", "our young employees need members that will embrace them", and "the new generation of employee expects this". These are just a few of the many references to age discrimination contained in this memorandum.

After the memorandum was received and digested, I spoke to Human Resources about making a complaint. Brenda Wallace and I also spoke with ACOP Link and Chief Giddens about resolving the issues. I expressed theaw concerns:

1. That Captain Lehman was giving Sean Patterson, a young white civilian male, preferential treatment and he was treating Sean like he was a subject matter expert when, in fact, it is impossible for Patterson to know what he is doing at this point in time based on his education, training, and experience.

2. The memo written by Captain Lehman was heavily laden with references to age discrimination and gender bias. I took great offense to that memo and the way it was delivered to Brenda Wallace – a loyal, tenured, and trusted employee by having the mail courier plunk it down on her desk along with her performance review without explanation or discussion.

3. That Captain Lehman had gone too far in this memo and was out of line by comparing my assessment of two employees, making derogatory statements about one of them and me, and then giving them both (Sean and Brenda) this memo. This memo demeaned me in the eyes of my subordinates and was basically Captain Lehman using a backhanded way of writing a counseling form to me and completing two performance reviews on two of my subordinates and then sharing this memo with everyone.

4. This memo removed any authority I had left over Sean Patterson and undermines my ability to supervise him. If I was to correct him on anything from this point on it would look as if I was "picking on him". Captain Lehman had basically promoted Sean Patterson to a rank higher than mine. By directing me to listen to his ideas and mentor him, Captain Lehman had put Sean in charge.

5. Since Captain Lehman had come to CIS it appeared as if Sean was the supervisor of the unit. Anything that Sean comes up with is our next change. When in fact what Sean comes up with is generally ways to avoid doing things he does not like to do. Many of Sean's ideas consist of passing his work onto someone else to do or just doing away with it.

6. Captain Lehman does not have the experience or training to be driving the bus that I am supposed to "get on" in the area of Crime Analysis. Yet he continues to push forward and does not run things by me and *listen* to what I have to say. He continues to spend time with the youngest and most inexperienced member of the CAIC – Sean Patterson – and listen to his ideas and treat him like a subject matter expert and a fellow supervisor.

7. I no longer have any respect for Hans Lehman as a person or as a manager. Captain Lehman's reasons for my poor supervisory ability were gender bias based, age discrimination based, and blamed on a medical condition that I sustained in an on-the-job injury.

During this meeting, Chief Giddens stated that Lehman was "within his right to write that memo" and he "couldn't move a Captain", showing that he has made a decision before hearing all of the information. Chief Giddens stated that Hans Lehman had to stay where

he was so that he could be developed for a future as an assistant chief and maybe a chief one day. This shows that Chief Giddens was more interested in the development of Hans Lehman than he was in addressing the age discrimination, gender bias, and abuse that Brenda Wallace and I were suffering. Chief Giddens stated that to resolve things he would make Lieutenant Sealey our first line supervisor and that I would report to him. Chief Giddens said that he would try to work things out. I told him I did not agree with this and there had been irreparable damage done to this unit. That Hans Lehman had destroyed any possibility of cohesion in the unit as a result of his memo. And so actually nothing changed from that meeting. I already report directly to Lieutenant Sealey who is part of the problem.

On February 6, Lieutenant Sealey brought me into his office for my performance review that was completed by him. Lieutenant Sealey presented the performance review to me on a Microsoft word document. There were no ratings on it and it obviously had not been entered into the people soft program. Lieutenant Sealey proceeded to tell me that he had not done one this way before and that he was going to give me "5ish" ratings – low enough that Captain Lehman would not feel compelled to write a memo. By this Lieutenant Sealey implied he was doing me a favor and looking out for me. I also saw that there was a reoccurring theme throughout this performance evaluation that referenced Sean. Lieutenant Sealey also told me he was here to help me and that I could come to him if I had any questions about the internal affairs process, or anything else. But my performance evaluation says otherwise.

The performance evaluation continues to accuse me of neglecting Sean and not working with him and talks about the conflict in the unit. The performance evaluation gives excuses for Sean's behavior saying that he is "not fitting into the mold of other members" when, in fact, Sean is not satisfactorily doing his job. Also mentioned is that Sean has "pushed the envelope with new ideas and trends". This performance evaluation is retaliatory and vindictive. It is passive-aggressive in areas and attempts to put the blame for the conflict in the unit on my shoulders. It holds me responsible for things that occurred due to a work related injury. It makes excuses for Sean Patterson, a young white male employee that has caused trouble since the day he began to work. This memo also cites the memorandum that was written by Captain Lehman and given to me on January 16, 2018, for some of its examples. This memo was cited on February 6, 2018, after I had discussed how inappropriate that memorandum was and pointed out that it contained age discrimination, gender bias, and unacceptable mention of a medical condition. The performance review mentions that my unit was on "auto pilot" until Patterson emerged into the scene and challenged me to handle problems as a supervisor. This implies that I am a great supervisor as long as there are really no problems.

The tone of this entire evaluation is negative and based more on Sean Patterson than it is on my actual work. In this evaluation it is also pointed out more than once my on-the-job injury has contributed to this situation through "no fault" of my own, yet I am still held accountable for the perceived shortcomings noted by Lieutenant Sealey. It is quite obvious that a different standard is being applied to the performance of Sean Patterson

based on age and gender than it is to myself or the other members of my unit.   This performance review is retaliatory in nature based on the annual performance review I gave to Sean Patterson and the memorandum written about that performance review by Captain Hans Lehman because I refused to lower the score of a tenured, seasoned, and proven female analyst by one notch.   An analyst that has worked diligently for our department for 14 years and agreed to train Sean Patterson without any additional benefits or compensation.

In summary, Captain Hans Lehman, Lieutenant Steve Sealey, ACOP Mike Link, Sergeant James Roberts, and Sergeant Jason Perez, and Crime Analyst Sean Patterson have collectively created a toxic work environment based on age discrimination, gender bias, and medical discrimination.  The supervisors named have given preferential treatment to a young, white, male, civilian employee - Sean Patterson - and caused strife within the Crime Analysis and Intelligence Center.  They have enabled Sean to subvert my authority and more or less stripped me of the ability and authority to supervise him.

Respectfully Submitted,

Sergeant Terri Smith

COMPLAINANT: Sgt. Terri Smith

RECEIVED
MAR 0 8 2018
BY: SN #23

TIMELINE

Sean began working on 1/9/17.   He was instructed on chain of command, protocol for various things, and was placed in the competent hands of Brenda Wallace for training.

After being on the job for less than 30 days, Sean approached me with his "ideas" on how to make the job better. I told Sean that he was too new to the job to begin advocating changes and that he needed to get trained first and understand the big picture before introducing ideas. I told Sean there were many reasons why things are done a certain way and even though it may look to someone new like there is a quick and better way to do things this is most often not the case. I told Sean for right now he needed to focus on learning his job and conforming to the way things are now. I told him his ideas would be heard after he had more time on the job for and had more first -hand experience on how and why things are done. Sean's first "idea" he presented to me was that detective's should have to do their own bolos. I told Sean this would not be happening.

2/14/17 – Sean had been completing his onboarding process with the City of Lakeland. Alis from the Community Redevelopment Agency had sent out an email asking if anyone was interesting in being a liaison with the group to provide crime statistics and attend meetings. I advised Sean that he needed to learn his job before he would be able to be considered as a candidate to represent our agency. I was very surprised that someone without training, education, or experience could think he would be able to function in this capacity.

Shortly after this, Sean approached Captain Taylor to meet with him in private. When entering his office, Sean told Captain Taylor that "I'm probably slitting my own throat by doing this, but . . . " Sean began by telling Captain Taylor he had gone to Charles Marsh and asked for a report on the number of people that look at bulletins and those that do not. He presented the report to Captain Taylor and told him that obviously not a lot of people were looking at the bulletins and he wanted to create a way that detectives could do them at their desk. Sean also showed Captain Taylor the IACA (International Association of Crime Analysts). Sean told Captain Taylor that the Lakeland Crime Analysis Unit was not doing what crime analysts should do. Bear in mind that Sean had never worked as a crime analyst and had only been on the job for less than 30 days. Sean also has no prior police experience or formal training in crime analysis.

Sean had also been found wandering around on the third floor – administration – probably trying to get some face time with some of the staff. Captain Taylor was concerned about this. He directed me to have a talk with Sean and impress upon him again the chain of command and the importance of letting his trainer know where he was, and that he should get things approved before requesting information from other areas (the IT bulletin report).

I conferred with Captain Taylor on this and I pulled Sean in and talked to him. Brenda Wallace was brought in as a witness (directed by Captain Taylor). I explained to Sean we wanted to discuss some job performance issues and Sean said, "Why is she in here?" and used this thumb in a gesture toward Brenda. I found this gesture very rude and his tone of voice inappropriate and rude. I explained it was at the direction of Captain Taylor. I again explained to Sean that he needed to focus on learning his job. I told Sean that there are reasons that he would not be aware of as to why things are done as they are

today, but intentionally jumping the chain of command to go over my head after I specifically directed him to focus on his job is not acceptable. I told Sean that he has been here less than two months with no prior experience and he does not have the knowledge base about procedures, laws, and best practices to advocate changes. I told Sean that he did not tell his trainer of his plans (nor was he directed) to contact the IT staff for information. I told Sean he knew his work activities were to be overseen by his trainer at this point. I told Sean he was directed to get approval from his trainer or me to request information like that in the future. I also reiterated to Sean that Brenda Wallace is his trainer and he is to take her direction on his daily activities. Sean became argumentative. Sean stated that he was the type of person that needed to know "why" he did things. I told Sean that as an employee it is his job to do as directed and we may not always tell him why. I explained to Sean that it was unacceptable to disobey my direction that he focus on his job and go behind my back and jump the chain of command to attempt to force a change on something he had already discussed with me. Sean appeared to have an issue with taking direction and wants to do things he wants to do when he wants to do it. If he does not like the response he gets from immediate from supervision, he goes over their head. It appeared that Sean's whole attitude was one of apathy and arrogance with regard to Brenda and I. He seemed to have the attitude that neither of us had anything he wanted because he already knew more than we did.

The next day I reported back to Captain Taylor and told him that I had some real concerns about Sean and his attitude. He did not seem to respond to authority or handle criticism well. Captain Taylor told me to continue to monitor the situation.

4/4/17 Brenda sent Sean an email and told him to take the online test for FACES and provided the link. On 4/18/17 Brenda told me that Sean had not completed this yet. I asked him about it and he said he didn't know about it. I told him Brenda had sent him an email to do it. He responded and said he would do it that day.

4/5/17

I was out sick and upon returning to work on 4/7/17, Captain Taylor told me that there had been an incident reported by Sean involving Brenda. Sean had apparently been at the crimeview presentation given by PCSO and at the end asked a question and stated that Brenda "cut him off" inappropriately. Sean complained to Lt. Sealey that he thought that was inappropriate. Lt. Sealey instructed Sean to get with me on that when I got back.

Sean did come into my office when I got back and brought up the incident. He did not mention at any time that he had already spoken with Lt. Sealey.

Sean stated that PCSO invited anyone to ask questions at the end of the discussion and he asked how they used crimestat at PCSO. Sean said that Brenda interrupted and told him that it wasn't necessary for us to know this. Sean thought this was rude and Crime Analyst Jennifer Samples answered Sean's question anyway. Sean said that Jennifer sent him an email later telling him that he could email them at any time with any question and she would answer him.

Sean went on to say that "I love working here and I plan on retiring here." He also said "I have lots of friends here. I have so many friends and I get along with everyone except Brenda." Sean said that he had been talking to some of the guys and he can't name any names, but they have told him that they do

2

not go to Brenda for information anymore because they don't like her either. I told Sean when someone tells me something like that from an anonymous/invisible source it is considered to be unreliable information because it cannot be verified.

What was concerning about this is that Sean did not keep his complaint to just his personal interaction with Brenda, he made an attempt to discredit her and damage her reputation with a statement that totally lacked foundation and had obviously been engaging in gossip and speaking with several people.

I told Sean I would bring Brenda in on Monday and she, he, and I would sit down and air this out.

On Monday Sean told me that he had changed his mind and he would like to forget about it because he seemed to be getting along better with Brenda.

I spoke with Brenda later on this and she said that she was becoming frustrated with Sean because he was difficult to train. Brenda says he questions everything, does not take direction well, and at times is rude and flippant with her. He is not learning his job, and is causing her difficulty in getting her work done because his arguing, disappearing, questions, and failure to take direction are causing her to stress and taking too much time. I reminded Brenda that if she needed to correct Sean to not do so in front of people, but to take him aside and speak to him. Publicly praise, privately counsel.

It was sometime in this time frame that I asked Darlene Thompson to speak with Sean to impress the importance of chain of command and training. She did so more than once. But Sean did not listen.

4/14/17

Sean told Lindsey he was going up to see Charles at approximately 2:15 pm. Lindsey asked him why and he gave her a "vague" answer and said he would not be gone more than 30 minutes. Lindsey told him to make sure he was back by 3:00 because she was leaving (Brenda was off for the day) and there would be no one to cover. At 3:00 Lindsey called me and told me that Sean had not returned. I sent him a text and told him to return to his work station because Lindsey was leaving. He returned my text with "10-4". When I came in I asked Sean why he needed to see Charles. He said "to show him my project". I told him that Charles could come to him because he needed to be at his desk in case anyone needed an analyst. He said he was only gone 30 minutes. He was gone at least 45.

4/18/17 – Brenda told me that Sean was instructed to take the FACES online class and still had not done this. She said that Eddie Mingus was at Sean's desk and they were talking about interviews and prostitutes.

Brenda reported later that Sean had apologized, but then turned around and became rude and argumentative again. Sean did not feel it was fair that he had to do the gang project. He thought the work was "menial" and that it "should have been done". Sean had also taken the day off and not told the other analysts. This is important because when an analyst is gone another person has to do their job. Although it is not a policy, it is something that they have always done out of consideration. Brenda said she was also concerned because Sean had first told her his deadline for Captain Taylor's project was Friday, when in fact it was not until 5/2/17. Brenda felt he had been untruthful.

4/27/17  Brenda reported to me that Sean had been directed to work on the gang entry project and had not worked on it all week. He was working on a project for Captain Taylor. Brenda had wanted him to spend a little time on it each day. Sean had not done this. I talked to Sean and told him, once again, that he needed to do as Brenda directed him.

Brenda gave me a report of the following five events on Sean:

5/3/17  Brenda stated that Sean was told he would be trained on how to do CFS for citizens within the next hour and he got up from his desk and left without any explanation.

**5/9/17** - Sean left at 11 am and did not tell her. He usually took lunch at 1:00 p.m. This messed up her plans for training. He did not apologize or seem remorseful.

 **5/12/17** – Lt. Spade and had given Sean a project. Sean never mentioned it to her. Brenda is his trainer and he should keep her updated on what he is working on.

**5/12/17** – Lindsey printed out a bolo and asked Sean to hold off on from sending the one he was working on because they looked like the same suspect and he agreed. Sean went ahead and sent his out anyway. The detective asked for them not to be sent out when it was verified it was the same suspect.

**5/16/17** – Sean did not return from lunch. Bill LePere contacted Brenda and told her that Sean was in his office talking about crime analysis. I spoke with Bill and told him that we were having issues with Sean being AWOL and wandering off from his duty station.

5/26/17 Sean did not return from lunch again. At 3:48 Chief Giddens called and advised Sean was with him since 2. Apparently Sean had an appointment with him and did not say a word to Brenda so she did not know where he was.

I spoke to Sean and told him again that he needed to let Brenda know where he was. She way trying to train him and arranging her tasks to that she could get her own work and his training accomplished. I explained again the importance of letting her know and told him it is imperative that he do this. Again I told Sean he needs to learn his job. Sean was going to get a clip board and log where he went and how long he was gone. This way Brenda would know where he was. I told him that if it was a long period of time to let her know so it would not interfere with training plans and it would be better to communicate that way.

After I had this talk with Sean he became very rude and flippant. He walked by my office and say in a sarcastic way, "I'm going to get a drink", or "I'm going to the bathroom", mocking us for trying to improve communication. Then it would go from one extreme to another. Sean would advise every move, then he would stop filling it out.

Lieutenant Sealey and I called Sean in for the purpose of talking to him these previous incidents. It seemed to me like Sean was getting worse instead of better and doing what he wanted when he wanted. During this verbal counseling, Sean made the following statements:

I am equal to Brenda. She is a crime analyst just like me.

Told Sean, yes she is – but she is training you. You need to let her know where you are going if you are going to be gone and what you are doing.

4

Sean said Brenda always rolls her eyes and him and says he will be with him in a minute when he asks her how to do something.

I told Sean that he can't always expect her to drop what she is doing and help him, he must be patient.

Sean says that he has talked to other "people" and that Brenda ran off Johnny To. I asked Sean who these "other people" are and Sean said I don't want to say. I told Sean that he didn't know Johnny To, that this incident with him has nothing to do with Johnny To, and that when he refuses to reveal his sources of his gossip I do not give it any credibility. I told Sean that this is about his behavior, not Brenda's.

Sean said that Brenda and I are friends and he thinks we team up against him. I told Sean that is not true. That all he has to do is what he is told to do. I told Sean that he was directed to learn his job and that once he learns his job we will discuss some of his ideas on changing the way things are done. I told Sean that there are many reasons why we do things the way we do. There are many variables that enter in such as policy, CALEA standards, and the fact that we handle sensitive information. I told Sean that someone without crime analysis experience or education would not be in any position to push for changes after having been on the job for so little time – especially when he first began to do this after less than 30 days on the job. Sean said he does have a degree in criminal justice and has worked in finance. I said that criminal justice is not a crime analysis and finance does not have a lot to do with criminal justice. I told Sean that when he takes it upon himself to do some of the things he does without proper vetting he wastes the time of everyone involved. Sean said, "I have more education than Brenda". Sean further said that as long as you are in charge of the unit there will be no changes and nothing will change, "I have talked to the higher ups and they are even saying that." I asked Sean who these "higher ups" are he is referring to and he said, "I can't say". I stood up to end the meeting, opened the door, and dismissed Sean. Sean remained seated and ignored me, but continued to look at Sealey. I told Sean he could go. Sean still did not move but asked Sealey, "Can I talk to you?" I told Sean he could go – I would be talking to Lieutenant Sealey. Sean still did not move or acknowledge me. Finally Sealey said, "I'll talk to you later, Sean." Sean stood up and walked out arrogantly.

This was a pivotal point in this situation with Sean. Lieutenant Sealey had the opportunity to support me. He did not do this. Instead he told Sean that his job was not in any danger (I have your back, buddy), he was not going to get fired. I was feeling differently at this point. I was getting tired of Sean's blatant disregard for my direction and his acts of flagrantly doing what he wanted to do. I was on the road to recommending termination if Sean did not shape up. At this point in time I knew that my ability to supervise Sean had been compromised. Sean had received the message from Lt. Sealey that it was okay to treat me in this way – argue with me – talk back to me – and generally disregard me as a supervisor.

After this meeting when I spoke with Sealey he said I was kind of "defensive" with Sean. I was surprised. I did not believe I was defensive. I was merely trying to divert him back to the main issue. Sean was trying to send us off on an irrelevant discussion that had nothing to do with him not following the rules.

I told Sealey that the problem was not restricted to Sean alone. That if I could get support and be left alone to supervise him Sean would either learn to follow the rules or be looking for another job. Sealey summed it up by saying, "too many hands in the pot?" I said, "Yes". But it continued this way.

I had also had trouble with Sean shipping out work without checking first. This is an issue because of the confidential information we deal with. I directed Sean to check with Brenda or I before sending out information to other agencies to make sure it was accurate and approved. I told him that some things always needed to be approved, and some he would learn the difference as we go.

That afternoon, ACOP Link called and asked Sean for a copy of a report. Sean told him, "I will have to check with my sergeant first." Sean did this intentionally. He knows that when a Chief or Assistant Chief calls for information, especially a copy of a report, that he can send it. This is called *malicious compliance*. Of course, ACOP Link immediately called Lt. Sealey and somehow I was the bad guy in this situation. Sean knew very well what I was talking about when I told him to check with someone before sending something out.

**6/17/17** –Chip called wanting Sean to come out because he had been working with Tammy on a case. This was Lindsey's callout. Later I found out Sean had told them he could do GEO tracking – he cannot do this. Also I found out that Darlene and Brenda had done a lot of work on Friday when Sean called in sick – and Brenda had been working on the case since October of 2016. Sean had received over 5 hours of callout pay. This is a big issue because this money comes out of the pocket of the person that is on callout. Sean is probably the least capable person of working a callout at this point because of his training and experience. I found this was developing into blatant preferential treatment

Sean was called out and told the detectives he could put a "GEO Fence" or they wanted him to do "GEO Tracking" on a homicide suspect. Sean does not have the ability to do this. If Sean said he could do this, he is lying. We do not have the software that it takes to capture tweets and other social media. It is also now outlawed. If the violent crimes unit requested this then they should have run it by me.

Sergeant Chip Roberts sent me an email asking if I could get Sean a laptop so he could go out on calls or work from home. I found this concerning because Roberts had not discussed with me whether Sean would be permitted to do this in the first place. I had to more or less argue to stop this from happening. Here are the reasons:

1. Sean was not trained enough yet to work on his own. He did not have the expertise to work independently.
2. Sean would have confidential information on that computer. Sean does not live alone and others may have access to some information they should not.
3. How do you ensure that Sean is actually working if he puts in for time.
4. What happens if Sean is injured from home – is he covered by workman's compensation?
5. Detectives are not allowed to work from home and yet it is proposed that a probationary civilian be allowed to do this?
6. Finally, we had two other analysts with more experience and training that were not even considered to be the first ones to pilot this endeavor.

During this time Lehman was starting to spend more and more time with Sean. Sean was in his officer more than he was at his own desk. Several other members of CIS commented on this to me. Paula Parker was one of them. I was finding it difficult to supervise Sean because he was always with Lehman.

6

It seems like Lehman was throwing more and more work at me to do and was talking about doing all of these things Sean wanted to do.

6/17/17

Sean was called out and told the detectives he could put a "GEO Fence" or they wanted him to do "GEO Tracking" on a homicide suspect. Sean does not have the ability to do this. If Sean said he could do this, he is lying. We do not have the software that it takes to capture tweets and other social media. It is also now outlawed. If the violent crimes unit requested this then they should have run it by me. Brenda also told me that it appeared Sean was taking work home with him. I spoke with Sean and told him that he should not discuss cases with anyone that he was working on – especially support personnel. I also told Sean that he should not take confidential work home. During the next week or so Brenda stated that Sean had been continuing to leave his desk and not logging or advising anyone where he was. He had been telling detectives he did not have time to help them with their requests, and he had completed a bolo and not run a tag. The tag led to the identification of the suspect (probably something the detective should have done in the first place)Sean had also been missing for about 40 minutes and was found in Jason Perez's office

**6/19/17** – Brenda reported to me that Sean is continuing to be missing and not using his log. Brenda said that Sean was missing again for most of the afternoon.

Brenda said a detective had asked Sean for something and Sean told him he was too busy. This is something we do not do – we always help them some way.

6/21/17 Lt. Sealey mentioned that Sean appeared to be using his personal computer for work. I instructed Sean to not use his personal computer for work. I explained that we need to have his work on his desktop computer for a variety of reasons. He asked if he could use it for personal stuff and I said yes, of course.

6/22/17 I told Sean that I would be giving a crimeview demo to the staff and that if he was there he was to hold off and not do it because I would be doing it in the morning.

7/5/17 Sergeant Chip Roberts sent me an email asking if I could get Sean a laptop so he could go out on calls or work from home. I found this concerning because Roberts had not discussed with me whether Sean would be permitted to do this in the first place. I had to more or less argue to stop this from happening. Here are the reasons:

7.   Sean was not trained enough yet to work on his own. He did not have the expertise to work independently.

8.   Sean would have confidential information on that computer. Sean does not live alone and others may have access to some information they should not.

9.   How do you ensure that Sean is actually working if he puts in for time.

10.  What happens if Sean is injured from home – is he covered by workman's compensation?

11.  Detectives are not allowed to work from home and yet it is proposed that a probationary civilian be allowed to do this?

12. Finally, we had two other analysts with more experience and training that were not even considered to be the first ones to pilot this endeavor.

7/9/17 – I completed Sean's 6 month evaluation. I noted in there the issues I have observed with Sean over the past six months – that he doesn't work well with his team. Brenda's frustration because Sean was not complying with her directions for training, away from his desk without letting anyone know, that he is more interesting in changing things than learning his job, that he has demonstrated problems with chain of command, that he was engaging in gossip with others in the office, and that he tends to not do work he find tedious. I went over the performance review with Sean. He did not seem too upset with it – I believe because it was fair. I told him that I thought I needed to document these things but that this review did not affect his pay increase and he had time to turn things around if he wanted to.

It wasn't long after this that I received the performance review back with notes all over it from Lehman wanting me to explain things and change things. I was also directed by ACOP Link to write a memo explaining what I was going to do to help Sean succeed. It was very irritating because I felt the performance review explained what Sean needed to do to succeed. Follow the rules. Very simple. But I did write one saying I would do a bunch of stuff – but still Sean was given the idea that he was being picked on. In the memo it said that I would meet with Sean to go over his progress.

7/14/17 Jason Perez did a shout out for Sean on the Kenyon Covington case but did not include Brenda and Darlene. Brenda had worked on the case since October of 2016 and Darlene helped Brenda all day Friday track down the suspect on facebook. Neither was mentioned. I sent Jason an email telling him that Brenda had done a lot of work on the case. I later stopped by his office and explained that she had done a lot and so had Darlene. Jason just shrugged his shoulders.

7/21/17 I sent out a shout out for the Kenyon Covington case giving Brenda and Darlene credit for their contribution. I also included Sean.

7/22/17. As Sean was learning more and being released on his own to do more, he began to have trouble multi-tasking. He would become panicky if given two or more things to do at a time. Brenda and I both began to work with him on how to prioritize his work. He had a lot of trouble with this. Sean was also having trouble getting the drug tips done. He was the first analyst ever that had issues with this. Brenda pulled the tips for several months back and I saw he also had the least number of drug tips to do. I talked to Sean about this and told him to do a few each week. They were important and he should get them done.

Sean was making more mistakes. He was not taking time to check his work.

Sean also was doing things and making changes without asking. He created a auto date for our bulletins. This did not work because when you pulled it back up it changed the date on the bulletin so there was not a historical date. I h told Sean again not to make changes without asking.

7/25/17 Brenda stated that Sean was missing again after lunch and no one knew where he was. He did not show up again until 5 and he told them he had been in Sealey's office. No communication and this was also a problem. Sealey would take Sean into his office on several occasions and talk to him for hours. I do not recall a supervisor doing this with a civilian probationary employee in the past. I was not ever apprised of what the conversation was about except that Sealey told me that talking to Sean he felt like a father talking to his son. I felt that this was excessive and gave the appearance that Sean was

getting preferential treatment. While Sealey is in there "mentoring" Sean there is no one at his desk doing his work. So he comes bouncing out of there at 5 and has not done his work for the day. There were several of these counseling sessions with Sean.

7/26/17. I was called into a meeting with Sealey and Lehman and given a counseling form about the shout out. The counseling form said that there was "consternation among several detectives in CIS" (most likely Roberts, Perez, Hathcock) because the shout out tried to "diminish" Sean's involvement in the case. They also said that this was leading to a "hostile" work environment. I told them I did not agree with this – that there is no policy on shout outs and this one had been approved by the Chief of Police. I also informed them the intention in the shoutout was not to diminish Sean's involvement, but to give Darlene and Brenda credit for what they did. I also included Sean in my shoutout and again said he did a great job. I also said that I did not have anything on my record in the past and I objected to this. They told me I had to sign it and it would be in the AIM system, but not to worry – it wouldn't be in my personnel file. I could see exactly what they were doing. They were hanging paper on me in order to try to create the illusion that I was the problem here.

Lehman also took the opportunity to tell me that Sean was given 1's on his six month evaluation and he didn't feel that was appropriate. He went into a speech about how Sean is a millennial and told me again about this book to read on millennials. I found this somewhat amusing actually because it was so ridiculous. Sealey told me if I would work with Sean that Sean would make me a "super star". I just thought to myself that I can't work with Sean because he just ignores what I tell him to do and does not follow the rules. They also told me I needed to come up with a plan to help Sean succeed. I thought that they were trying to create the illusion that I was the problem and Sean was some sort of savant that would be a crime analysis super hero. They just did not seem to grasp what I was telling them. It was also very demeaning to see that these men were taking the work of a young, white, male, probationary civilian employee over two women that had a combined total of 37 years on the job.

I was appalled and disgusted. It was about this time that Lehman began spending a lot of time with Sean. Sean was constantly in Lehman's office. During this time I was also trying to do the 6 month UCR. Lehman did not seem to appreciate this and how much time this takes and continued to act like I had all the time in the world.

Lindsey had also started being more vocal in complaining about Sean. She said he disappears and no one knows where he is. She can hear him laughing and talking all over the office and then he comes back and want her to help him with his work. I also shared this with Sealey. His statement was, "good". Meaning good she was refusing to help him – but the point is she should not have to be put in that position. Sean needs to be accountable. He continues not to be. He also continues to lag behind in doing the drug tips. This is because now Sean is fully aware that he is untouchable.

Sean approached me in the morning and stated he "needed" to work overtime because he didn't have time to get the drug tips caught up and he was helping with a homicide. He produced a file that had several "TLO's" in it and said he had done all that work and didn't have time to get his other work done. He waved around the TLO's like they equaled to a lot of time spent to achieve them. I happen to know it takes about 5 minutes to do one.

I told Sean that if he was having trouble getting his work caught up he needed to talk to me before it turned into a crisis. That I couldn't approve overtime for him for a weekend to come in and get caught

up on his job. The homicide case is important, but he should remember that it isn't his case, he is not the case agent – he is support. Any of the analysts can pitch in and run things for him and assist him with it. That is how it works. You get more done quickly when more people help. I asked Sean if he had asked anyone for help and he said no. He mentioned that he would like to hand off the drug tips to someone else to do. I told him no, those are his to do. He can get help with the homicide stuff. Sean gave me a "We'll see about that" look and left my office. I predicted he would try to go around me for that. This is what he wants to do – the work he thinks is fun and challenging to him and leave the drudgery work to someone else.

7/28/17 I checked and could see Sean still had not completed the drug tips. It is so easy to do and takes such little time I believed this was Sean's way of letting me know I did not have any authority over him. He was blatantly not doing them.

8/22/17 Brenda said she overheard Sean talking to Keith Bennett about reconfiguring his work area for he could have a dry erase board. I told Brenda I had not approved this but maybe someone else had.

8/23/17 – Sean got 2.25 hours for vehicle burglary intelligence gathering and analysis approved by 72?

It was about this time that Lehman began running full throttle with Sean's ideas. Sean's motivations for his great "ideas" were obvious. He wanted to pass off the work he did not like doing. Here are some of Sean's "ideas"

1. Let's have the detectives do their own bulletins. Within 30 days of being hired. Again brought this up in July. He brought this up to Captain Taylor first.
2. Let's have the detectives do their own photopacks. Within 30 days of being hired. Again brought this up in July. I believe Sean also brought this up to Captain Taylor.
3. Let's do away with the daily briefing – the 12 Hour Calls for Service Report is good enough. Sean wanted to do away with this because he did not like have to read all the reports in his area in the morning when he came into work and do a summary for the crime for the daily briefing report. I explained to him once that we do not be doing away with this – the administrators like this report and we do what is easiest for them, not us. Sean went on to ask Lehman to do away with this report twice. Lehman said he talked to him once and explained why we couldn't do it and Sean had actually asked him again so he explained to him again. Lehman said he thinks that Sean finally got it the second time (would actually be the third time) Well, Sean's idea backfired on him because Lehman did have him do the daily briefing report from the Tiburon system, but there is no way to get around reading the reports. Now it takes longer and Sean still has to read all the reports. Sean brought this up early, too. And again when Lehman was there.
4. Sean did not like having to use the excel spread sheet to do the tips or do workups on them so he wanted to do away with it. He wanted to put our drug line tips into the crime stoppers server. I had complained several times to Lehman and Sealey that Sean was not keeping up with these – that he had fewer to keep up with than any analyst has ever had – and that there had not been one analyst that has a problem keeping up with them. Hans said he was going to remind Sean at the beginning of each week to do them so he didn't wait until the last minute and get behind. I thought this was ridiculous, but it apparently didn't work because he still did not keep up with them.

5. Sean does not like to do anything he perceives to be "data entry". He sees this as beneath him. This is why he wanted to do away with the ASA spreadsheet. I still think that was a bad idea – it was the only searchable way to find this information.

Lehman began running with Sean's ideas. It was like Sean was supervising the unit. Lehman did not ask me, Brenda, or Lindsey about any input. I tried to discuss some of these things with Lehman, but he was not interested in listening to what I had to say. He was truly treating Sean like he was the supervisor of the unit. He did not come to me and ask my opinion on anything. He was just intent on doing it. I actually had to argue to stop some foolish things from happening. Like the detectives doing their own bulletins and photo packs.

I cannot believe that he would think that someone with so little experience, education, or training in the job would be qualified to make these changes. Lehman himself did not have experience in crime analysis. He had three subject matter experts that were not even consulted.

Not once did Lehman invite Brenda, Lindsey, or I into his office to ask us about these things – only Sean

Sean wanted to work with the violent crime unit and wanted to try to change the job into what he wanted to do.

I have worked hard to keep the workload balanced and fair. I divide things up into geographical areas so that detectives don't play favorites with analysts. They may like one better than the other, but when it is time to get work done, they will use the one that is designated for the work. Above that the fall back is seniority. Workers general understand seniority. It also gives them something to work toward and a lot of police work is based on seniority.

Roberts, Perez, and the violent crimes unit, and Sean tried to bypass the system creating a lot of tension in the unit. They wanted Sean to work with them on all of their cases, always having him come back to their office. Sean was like a rookie police officer that thinks all police work is car chases and fighting bad guys. Sean thought that crime analysis was going to be like a detective without a badge that goes out on calls and works his own cases. He only wanted to do what he thought was the fun stuff and not the work he found tedious. Don't we all. For some reason, these three think that a probationary employee with no prior experience in crime analysis who is just learning his job is the best analyst to use to work on a homicide investigation. I also wonder why this choice was not approved by me. They continue to cultivate this relationship with Sean and usually go only to him. This is not acceptable.

9/25/17

I arrived at work and had an email to see Lt. Sealey. Sure enough, just as predicted, Sean had tried to go around me. I learned that on Friday Tim McDonald had approached him and asked him for some help and Sean had told him no (not sure what the excuse was, but I am sure it was that he had to do the drug tips probably). Sean went to Captain Lehman and told him he needed to work overtime for the homicide and Captain Lehman had approved it.

Captain Lehman and Lt. Sealey both were in this discussion. I told them that this is what Sean does – we get along fine until I tell him no and then he goes around me. The issue is that he does not like to do the drug tips and either blows them off or tries to get out of doing them. The discussion was whether or not the drug tips are necessary, can be done differently, etc. In my opinion the issue was Sean not doing his

11

work as directed. I explained to them that I have counseled Sean on this every week because he has not been doing them as directed. That no one in the past had EVER had a problem keeping up with them before. That they are critical and were developed and approved by the Chief. That there is an average of 4 or 5 of them a week – that they take about 15 to 20 minutes a week to do (at the most) and that they have all week to do them. That there is simply NO excuse not to have them done. I proposed that if Sean does not keep up with them he should be assigned to do them for the next cycle until he learns how to do them. Lt. Sealey intervened and said that he would not be for that – "let's just get him to the end of this cycle and we can move on." I said, "then he will do the same thing with something else he doesn't like to do". I guess nothing in regard to Sean is my decision to make. Every decision I make has to be run by my supervisor. I told them that Sean spends a lot of time running around talking to other people and not enough time at his desk. Captain Lehman said, "Let's be fair with Sean – I see him at his desk a lot." So now I am out to get him and I am not being fair. It would be fair to say that after I received the shout out counseling Sean was more flagrant about ignoring my directions and walking around like he owned the place.

If Sean had been an officer in the FTO program he would have been bounced out of there in the first two months if he had talked to a FTO or a supervisor like he talked to me. Of course, I am a woman and Sean is a man. That is the difference.

I told them that when we start giving analysts overtime on a weekend in advance (that is not a callout) we are affecting the other analysts who are not getting overtime to do their job. That we have worked many homicides and have not had analysts that have to come in and get overtime to support a detective. I don't know why Sean can't seem to get his job done when the others have for years with less analysts working. Sean should ask for help with TLO's, Bolo's, etc., when he can't keep up, but he doesn't because he would rather work on that stuff and push off the work he doesn't like to do on the others.

I offered a solution that if Sean cannot get his work done with a homicide, he should hand it over to Brenda and concentrate on his other work until he learns better time management. Brenda seems to manage to get it done without any problem.

They said that Sean had developed more leads for them to look at – as if he was the only one that could do that. This isn't true – any of the analysts can do this.

I spoke with Lt. Sealey about Sean continuing to be behind on the TIPS line calls. I told him that I had not had an analyst that was unable to keep up with them before. Sean does not like to do them so he shrugs them off. This is a pattern with him – if he doesn't like to do something he wants to do away with it, or he just does a sloppy job of it, or he doesn't do it at all. Lehman stopped by and before I know it, the topic of conversation had changed from the real issue – Sean not following the rules and doing what he is told – to "how long does it take to do the tips and do we really need them". This was Sean again getting his way and Lehman listening to Sean instead of to me. Brenda was called in and grilled on how we do the tips. We both feel this information is important because with our system we have all complaints accounted for.

Later I found out that Seans new idea was to use the crime stoppers web site to track LPD anonymous tips from things that had nothing to do with crime stoppers. This idea was ridiculous and insane.

However, I was not consulted about it. Instead, Lehman listened to Sean and actually had a meeting with several people present and spent a lot of wasted time on it.

This tips line idea of Sean's was a terrible idea, riddled with disastrous consequences. From my experience in this area, I could see at the very beginning that it would not work for many reasons. This idea was to utilize the crime stoppers web site to house our tips so we could get out of using an excel log and entering the data on the log. I will outline the reasons I found this to be a BAD IDEA.

1.  This web site is controlled by an outside agency – crime stoppers. This means that our data would go to a foreign place and we would lose control of it.
2.  We do not know who would be able to see this data. Some of it is intelligence information and should not be viewed or shared.
3.  If those in control of this web site decide to shut it down, we lose all the data. It is only a searchable data base as long as their site is up and running and stays the way it is. Any changes to the programming might mean it would lose its viability.
4.  This website is not designed for what Lehman was intending to use it for. It was designed for detectives to be able to enter in information if an arrest is made from a crime stoppers giving the information crime stoppers needs so the tipster could be paid. Use of this web site in this way is like trying to fit a square peg in a round hole.
5.  There are security issues using this web site – is it hackable? How secure is the information.
6.  The website is not user friendly. In the demo given by Lehman where he is presenting how easy it is to use it, he had to ask Sean for help. Yet he thinks other officers will use this. They won't.
7.  This is a wonderful tool for searching for tips in their server, but not for managing tips. Too risky.

While I am open to changes, I do stand my ground when I believe from my experience that something could cause harm to our agency. I could see this thing was risky and could cause terrible consequences. Compromise of confidential information was a possibility and for all of these reasons, I did not believe this system was a good idea. During this meeting Sgt.                also looked horrified. He and Brenda did communicate with each other and began working to improve the internal system we have in place and expand to make it more streamlined. Lehman refused to listen to Brenda,              . and I and clung to his ridiculous idea of using the crime stoppers web site. Lehman tends to accuse me of being closed to change and stuck in rut and tells me to get on the bus when I disagree with one of his ideas. So Lehman's idea of being open to change is to agree with everything he and Sean come up with even if I have serious reservations about the consequences of it. In the case of this idea, I would think that one conversation with me would point out enough obstacles and legitimate reasons for passing on this and spending time to pursue other ways to change this. But Lehman didn't. He followed it through and wasted time and it did not work for the reasons I listed above. Lehman still will not admit this. Today he is working on using the TIPS system in Tiburon. He is implying this was the original idea and that is not true. He finally realized that initial idea would not work and dropped it. I don't know that this one is better. I like having stand alone systems for tracking what we can so that all our eggs are not in one basket. When we get a new report writer system or the one we have goes bad, all our information is linked to it. Not a good way to do business in my opinion.

Further, in the evaluation, Sgt. Smith cites that Mr. Patterson needs to let his co-workers know when he will be gone for periods of more than 15 minutes. While this may be considered a courtesy, this is not a

requirement in policy and is a personal preference by Sgt. Smith. I have heard numerous times from Sgt. Smith that he is never at his desk, however, there are numerous times where I have seen him at his desk working or down the hallway working with a detective on a request. I believe he does provide service to his "customers" in a timely manner and many have his cell number so that they can reach out to him if . . . . .he is not at his desk. To expound on this further, a couple months back Mr. Patterson was assisting a detective trying to find information on homicide when he received a call from Sgt. Smith asking why he was not at his desk. Sgt. Smith was not in the office and the only way she would have known this is to receive a call advising such. My understanding is this call was from Ms. Wallace. This is an instance of what he has had to deal with on occasion.

9/26/17 – Brenda told me Sean was working on an electronic evidence submission form. I did not know anything about it.

10/3/17 – Lehman was sent an email showing how far behind Sean is in the drug tips. Instead of addressing the issues Lehman is questioning whether the number is correct. Even if it isn't, there is no excuse for it. No one else has had trouble keeping this up but Sean – who just doesn't do it.

10/3/17 – I completed Sean's 9 month evaluation. In this again I included my observations of Sean. I said that he still needed to improve on working with co-workers. He does not share what he is working on and still puts off work he feels is tedious. He is still not keeping up with the tips line. I said he was doing satisfactory but still needed to work on these things.

10/15/17 – Brenda states that Sean is still not completing the tips line on time. He is also continuing to be away from his desk MIA. He seems to be spending a lot of time in Jason's office now as well as Lehman's.

11/13/17 – Sean got 3 hours overtime for bolo cancelation/creation and callout. This was approved by Perez and Brenda was the person on callout. I was not informed that this even occurred.

11/17/17 – Brenda stated that Sean was was late back from lunch again. No word to anyone. I told her to document it.

11/21/17 – Brenda stated that she came back from lunch and Lehman was at Sean's desk talking about using the crime stoppers tips line to track our complaints. She said she could overhear them talking about it and it was a ridiculous idea that she knew would not work. She mentioned a few times that it wouldn't work but they just ignored her. She couldn't believe they didn't ask for her input.

11/22/17 – Sean 30 minutes late again. He thinks he is untouchable and can do whatever he wants because he spends so much time with Lehman.

12/11/17 – Sean took a vacation day on a Monday knowing that Lindsey would be gone on vacation as well. He got this approved by Sealey and did not let anyone know. This was basically dumping on the person working on Monday because she has to do all of his work.

1/9/18 I completed Sean's one year evaluation. I noted my observations of his work – that he still has trouble prioritizing his work. That he still does not complete the drug tips. Still needs to work on teamwork with this co-workers and being missing in action. That Sean continues to circumvent his supervisor when he doesn't get what he wants and gave an example. I also noted that Sean want

change but does not have the experience or training to know the long term affects and that this attitude is causing tension. That he needs to work on multi-tasking.

A few days Lehman called me into his office to talk to me about Sean's evaluation. He said that he felt I should also take down Brenda's rating in teamwork because it takes "two to tango". I disagreed with him and said that the conflict was because Brenda was Sean's trainer and did not do as directed.

Lehman threatened that he would have to write a memo if I did not change it. I told him if that is what he thought he would have to do then do it.

1/10/18 – Sean got overtime for .75 hours for creating notes for Lehman. Approved by Lehman.

1/16/18 – I was called into a meeting with Link, Lehman, and Sealey on performance reviews. The topic was, of course, Sean and not lowering Brenda's team work score. I was shocked that this was happening. They shoved a pile of papers at me and I saw it was a memo, but did not have time to read it. They proceed to tell me that they thought Sean had a different philosophy on crime analysis. Link said he didn't have trouble with Sean "networking" with the other detectives. I said I didn't either as long as it wasn't causing him to not get his work done and work overtime. But it was. They said they couldn't understand how Brenda and Lindsey can sit at their desk all day. I was getting the impression I was being given an ultimatum – get on the Sean bus or else. During this time I confronted Lehman in the presence of Link and Sealey about him telling me he would wait until UCR was done to begin scheduling meetings on all these changes that Sean wanted. He had not kept his word. He said, well, he hadn't "changed" anything yet – they had just met on ideas. I said that was the point. I was left out of it all. I felt like that gave a visible indication to everyone that I was being left out and my authority taken away and Sean was running things.

While in there I again told of some of the things Sean had done such as going by me and stating maliciously, "I'm going to the bathroom." "I'm going to get a drink". And asked what he would do. He said he would snatch him up and take him in his office and have a work with him. Unfortunately, the last time I did that I was accused of being "defensive". I have notice if a woman is assertive and holds her ground she is hard headed or a bitch. If a man does this, he is a strong leader.

When I read the memo I was furious. I found they had talked again about Sean being a millennial and what the "youth" need. They made reference to my age by talking about how I was "stuck in my ways". They also reference by workmans comp injury and how that contributed to things. I told them that nobody else had a problem with it but Sean. I still approved all work and was available to answer calls. Only Sean used the opportunity to run to other supervisors when I was away. He should have been directed to call me or wait until the next day.

They told me a copy of the memo would be attached and placed in Brenda's and Sean's performance reviews. So now any ability I had to supervise Sean was now removed. Sean was getting this memo and he would be totally untouchable. When Lehman talks about "mentoring" Sean he is actually "supervising" him. I have never seen a commanding officer spend so much time with probationary civilian employee.

1/17/18 Brenda and I met with Carole LeBele from HR to discuss a hostile work environment case

1/18/17 – Brenda filed her paperwork – I spoke with Nick Marolda about my case.

1/25/18  Brenda reported that Sean has missed a shooting incident on the briefing report.  I did not say anything to him.

1/29/18 – Hans, Sealey, Lindsey, Sean, and Brenda had a meeting about the new briefing report I believe.  After the meeting Lehman told Brenda she needed to stay behind.  She came into my office and asked me if she had to.  I told her yes, but take a witness.  She took Paula Parker in there.  Lehman told her he wanted to talk to her about the memo attached to her performance review.  He said he didn't agree with what I had said in her review.  Brenda told him she felt uncomfortable talking about it because she had filed a hostile work place complaint against him in HR.  Sealey said he wasn't sure what we were up to but we needed to move forward.

Hans then called me in.  He told me when he arranged a meeting he expected me to be there.

1/30/18

I went to work in the morning and was working in my office.  Hans came in and asked me if I was going to the meeting.  I told him no, I had some VOCA numbers to work on.  He left.

After the meeting on new crime analysis tools, Brenda came into my office.  She told me that Hans and Sealey had asked her to "hang back" after the meeting.  She told them she would be right back and ran into my office.  She asked me if she had to talk to them and said she didn't want to.  I said yes, but take a witness.  She took Paula Parker.  After the meeting Brenda came back into my office and said Hans tried to talk to her about the memo.  He tried to explain why he didn't talk to her about it and why he wrote it.  She told him that she did not feel comfortable talking about it because she had filed a hostile work environment over it.  Sealey said, "I don't know what you are up to but we need to move forward."  Brenda said she was excused.

Brenda asked me what I thought she should do.  She was very shaken up and tearing up.  I told her to write an email to Larry and cc Steve Pachecho and Carol LaBello.  Tell him what happened and that you don't understand why Hans was discussing this when you had filed the initial complaint on 1/18/18.  Brenda did this.

Hans then told me to come in and told me that when he calls a meeting he expects me to be there because I am the subject matter expert and he needs me to be there.  (Funny how he didn't think it was necessary before the hostile work place complaint was filed).  He basically put me on notice that he expected me to be there.

Later that evening Larry Giddens called me.  He asked me what I needed to be happy with this situation.  I told him I was at the end of my rope.  I told him that I didn't feel I could work for Hans anymore after what he had written.  I felt like he had demoted me and elevated Sean to the level of a lieutenant.  I felt like Hans had demeaned and ridiculed me because this document was public and Sean had been given a copy of it as well as Brenda.  I felt it was unfair and Hans was giving Sean preferential treatment.  I told Larry that I could not supervise Sean because Hans had taken away any authority I might have over him with that memo and more or less given the impression in the memo that I was "picking on Sean".  So now any time I might try to correct his behavior I would be accused of harassing him.  Larry said to give him a day or two.  He was going to come up with something.

16

I also noticed that after Sean and everyone was notified that Brenda and I had filed a hostile work environment case suddenly Sean seemed to be able to sit at his desk and do his work. Amazing. But too late.

1/31/18

Larry called and asked if Brenda and I would meet with Larry and ACOP Mike Link in the conference room to discuss this matter with Hans and Sean. We went up there and did this. Larry said that Hans was absolutely in the right to write that memo. He said that as a supervisor if he sees what he believes to be an issue he can then address it. He said that Hans needs to stay in CIS for two years to be developed and groomed so that he can advance to the rank of ACOP and maybe someday Chief. Larry said that we would not lose our jobs or be fired. Our jobs are safe. If we wanted to file a complaint it was our right. What would happen is that they would make an adjustment so that I would report only to Steve and Hans would have as little contact with me as possible. If I or Steve was not there then they would report to Jason Perez. I said, please not Jason. He is part of the problem. Brenda agreed. I said what about Doty, Brown, or Guity. And of those would be fine. I felt they were more objective especially towards the analysts. Perez and Roberts had already been involved in some of the matters that were complained about. Larry said he would see if he could work that out. Larry also said that if we filed the complaint that everyone would be called in and interviewed and they would also bring in Johnny To. It would be a he said/she said situation and nothing would really come of it. He said it would make matters worse in the long run. If we allow Larry to work through this – and he and Mike Link are committed to doing this – he would make sure things change. He said he would bring everyone in and we would sit around the table and discuss the problems and work things out. I told him I did not think that would work – that things had already gone too far.

Mike said that he also was committed to changing and fixing this. He said that he initially told Hans he wanted the unit to change because of all the information that they were receiving – they were bombarded with it. He said he wanted a great unit to become even better. I told him that Hans had not asked the opinion of myself, Brenda, or Lindsey about what to change or not change. He had only asked Sean and that Sean was in Han's office more than he was at his own desk. I told him that all I wanted from day one was for Sean to follow rules and learn his job, but Sean subverted my authority and other supervisors allowed it. When I tried to rein him in, I was told he is a millennial and I needed to "mentor" him.

Larry asked me to let him know pretty quick if I was going to file a hostile work place complaint because he would need to know. I told him I would but I wanted to talk to an attorney.


2/12/18 – I came to work and they were moving Sean from his cubicle over to the other side to a desk that is designed for a detective. So now Sean is out of our sight and closer to Lehman. I was not told this was happening. Neither of the other analysts were asked if they would like to remain where they are or if they would want the bigger, quieter work station.

2/17/18  Sean got 4.5 hours overtime for analyzing vehicle burglaries and thefts around Joker Marchant stadium. This was approved by Lehman – I was not informed.

17

2/22/18 – Brenda called me and said that it looked like they skipped over her for callout and called out Sean. She said had worked late and she passed Roberts as she was leaving and he was standing outside the door and he saw her.  AS she was pulling away she saw Sean pull into the station.

I sent Roberts an email asking him if there was some reason he did not utilize the callout list for the callout. He responded that he would be happy to discuss it with me if I would stop by his office. I found out from Checo that Roberts had said that Sean was already there working. That was not true.  Brenda had seen him pull in. There is no excuse for this – this is taking money out of the pocket of the analyst.

2/6/18

I had a very important deadline assigned to me by Chief Giddens. He wanted information by close of business tomorrow. I divided the assignment into three sections – one for each of the three analysts. I emailed it to them with instructions on what I needed. I did not hear back from Sean so I called him at 1:45 p.m. He answered the phone and said he was just finishing up lunch. I told him what I needed and how important it was. He said as soon as he finished lunch he would "get right on it and start bangin' it out". That would have been at 2:00 pm. At 3:30 pm, I called Brenda to see how it was going. She said she and Lindsey were working on it and it was moving along. I asked if she knew if Sean was working on his. She said, "Sean's not back from lunch yet." Here goes Sean again. I feel unable to confront him on this because he will surely go running to a supervisor.

2/7/18

I was assigned a very high priority project to be completed by the Chief. This involved working with several different units to address problems with the Tiburon computer system.  A meeting was scheduled for 9:00 am with Sean Collins, Steve Sealey, Ed Cain, Charles Marsh, Robert Steele on how to get this done. This was a short burn project and I was to begin working with records immediately. After the meeting at approximately 10:00 I was on my way to records when Steve Sealey told me he needed 30 minutes of my time to discuss my performance evaluation that was due. We went into his office. I was in there until 11:30.

During this time he gave me a rough copy of my performance evaluation.  Normally a performance evaluation is completed in the City of Lakeland People Soft Program on the computer.  The scores are given and the report is saved and printed out.  A supervisor then gives the completed performance review to the employee, discusses it, and both sign it. I have NEVER had a supervisor hand me a performance review written in this manner.  This one was written in Microsoft word without any ratings. He said this was a first for him – he had never done one this way before.  The categories of evaluation were set forth on this evaluation, but there were no "grades" attached. This evaluation is run on what is known as the likert scale with a possible rating of 1, 3, 5, or 7, with 7 being the highest.  He said that this time he is doing it differently.  He didn't explain why he was doing it differently. He told me that his goal was to give me about a "5" average.  He said he told them "Hans and Link" that he wasn't going to "annihilate" me. The community service category was just copied and pasted from my evaluation from last year, so he would be giving me a 7 for that one since he did last year. He wasn't sure how he was going to rate the others.  I asked him if he had ever given anyone straight 7's. He said he has. He went on to say that he felt that this year was what he would call a "perfect storm" that caused all this to happen. Me being injured, a new employee, a new captain, and he felt that if Brenda's evaluation and Sean's evaluation had not landed on Hans' desk at the same time so he saw them side by side we would

not be having this issue at all. I told Steve I believed Hans was way out of line writing that evaluation as he did. Steve said he was within his right to do so. I told him that the memo would not do anything to promote unity as a team, rather it did irreparable damage and struck up an "us" –"them" polarization. Steve also told me that he works with people he does not like and will never like at the department – Implying that I needed to do that with Hans. Steve told me he believes once I get healed up and over my surgeries I will be able to get this unit back on it's feet. He told me he would now enter it into people soft, apply the ratings, and slide it under my door for me to sign. Steve said with him giving me a "5ish" average that perhaps Hans would not feel compelled to write a memo on my performance evaluation. Steve implied that he was actually doing me a favor when I suspect he was just complying with the directions of Hans.

Steve kept talking about how he didn't want me to go anywhere – he actually said, "I don't want you to go back to patrol". He said that he believes in me and that I can do this. Steve talks about how he is there to help me – I was thinking, like he did last time?

As soon as he let me go, I rushed to records to meet with the people I needed to meet with on the project. They had already gone to lunch. My thinking also was, here we go again! More continuing, never ending, Sean drama that has eaten up the clock taking away valuable time I needed to do work. Now it will once again look like I am not getting things done because I spent a good part of the time I had listening to Steve justify my performance evaluation. I also noted that the entire thing was negative and vague. It talks a lot about the past, and indicates I am sliding down into an abyss – the Sean abyss. It holds me accountable for Sean's behavior, the behavior of the entire unit, and Han's behavior – mostly things that I have little to no control over.

Also during this meeting Steve told me that yesterday when I called Sean at 1:45, Sean was actually in his office talking to him. He said he had a long talk with him and told Sean that he understands why I want him to learn his job and that he supports me on that. Steve said that he spent about an hour talking to Sean. I thought, good grief! He spent an hour explaining to Sean once again why he had to do his job. Meanwhile, Sean knows there is a big project due and instead of being out there working on it with the other analysts, Sean is sitting in Sealey's office. Sean knew how important it was. So he shows up at 3:30 and puts in an hour and a half on it.

February 12, 2018.

Today I was working on UCR all day. I began my day by coming to the office and seeing they were moving Sean Patterson's work station to the other side of the soft wall. I was not told this was happening. This will locate Patterson right outside of Captain Lehman's door. I was also asked to participate in a meeting with Jason Perez and Steve Sealey to go over what my job is so that Jason can take care of my unit while I am out on                        I specifically asked that Jason not be the one in charge of my unit. Nothing has changed.

Sealey also came in and told me that Link wanted to have Darlene stop sending out bulletins one at a time and to make sure that everyone (Hans of course) in the chain of command is included in the emails.

Then I got an email asking about the monthly report that was due the 10th – I have been working non-stop on UCR. Then another email asking me to come up with some type of performance measures for the CAIC Unit. Still working incessantly on UCR.

February 13, 2018

Still working on UCR. This is taking the majority of my time. Instead of acknowledging there is a problem with it and standing down on other assignments, they are continuing to throw things at me. There was an email sent about the monthly report and apologizing to Chief Link that it was late. Of course it is late. I am spending an inordinate amount of time on UCR. They are picking things apart and looking at arrests. I am spending a lot of my own time on it without pay.

February 14, 2018.

I have a project due from Jo Ann Rowe for VOCA grant numbers. I am trying to get this done, but I keep getting pulled away to work on other things.

Thursday, February 22

A morning meeting on UCR. They are now vetting the rapes and have found 6 that are unfounded. Chief Link wants this submitted by Friday, but I am on vacation Friday and Monday (Feb 23 and Feb 26). I later told Hans that I am off till Tuesday and it will be submitted then. They sent me an email telling me the final numbers needed to be submitted by noon on Tuesday, Feb 27th.

Tuesday, Feb 27th

Getting emails on UCR again. I re-submitted the report. I sent them notice that it had been done and we will now have to wait for them to send us the final numbers for signature by the Chief. Got another email asking if we are in compliance with UCR. I responded yes. Then they asked me to send them the new numbers so the Chief could have them handy. I sent an email telling them the only difference is that rapes were now 73 instead of 79.

Also, we are suspecting that Sean may have been issued a "token" to work from home. I am going to find out. This is another thing that is egregious because to my knowledge only some supervisors, PIO's, and IT personnel are issued tokens. The other analysts do not have them and they were not offered to them. I am working with Dave Doty to test the report writer with regard to UCR.

Feb 28

Sean was not here today. There was a slip in my box that he was taking the day off to "move". Using comp time. Also an email saying he is off Thur and Fri, too. Don't know if he used comp or vacation time. Brenda is requesting the slips.

Worked on Voca numbers all morning for Jo Ann Rowe. It was very time consuming because she wanted them by quarters for fiscal year. So I had to break down all of 2016 and 2017 and separate by quarters to get the 2017 fiscal year. It took me all morning working straight through without a break.

Saw in the Ledger that Lt. Addison was on paid administrative leave for a domestic battery allegation. This investigation is being done by PCSO. Seems all three of the domestic violence claims investigated by internal affairs were unfounded. Good old boy system.

There was a deadline for "bolo" formation that was due today Wed. I didn't have time to do it because of the VOCA numbers. Tomorrow we have a meeting on UCR update – wasted time. So I will try to get the bolo meeting taken care of on Friday.

A few other emails asking the same questions about UCR. I answered them.

Brenda has the slip for 2/22/18 when Sean took her callout and it was signed by Chip Roberts and says, "CALLOUT".

3/1/18

I began the day by looking at email and taking care of business. I did the time sheets. I also had some wrap up UCR to do.

I then began working with Dave Doty on troubleshooting UCR. We worked back and forth testing clearances in Case Management/RMS.

Yahbreilla Riley came to my office and need demographic information for CALEA on arrests. I stopped what I was doing to help her. This took about 45 minutes.

I then worked on the monthly report until it was time to leave.

3/2/18

Met Brenda, Lindsey, and Darlene to work on Bolo formatting and developed a plan. Brenda will put it together. This took an hour and ½.

Did daily housekeeping – answering emails. I spoke with Mike Spade about LEOKA numbers.

Worked on the monthly report until it was time to go.

3/5/18 – worked on the monthly report. There is more information that goes into it every week now so it is more time consuming. I got an email from Hans stating that my project of designing a performance measures document was due 3/23/18 and it is now 10 days late. He asked that I have a reason in writing. I told them due to the unexpected issues of UCR and the time extended to correct it I was unable to get it done. Also, Sean was out four days last week and I couldn't gather his information. There were several other things I needed to do that were a higher priority.

I also worked on getting LEOKA numbers for Mike Spade, read a letter Buddy had that was sent to his wife, a judge and told him to get with Darlene.

3/5/18  Today nothing has changed. There is a tension hanging in the air and it is still hostility. I don't see Sean much since he moved to the other side of the cubicle. I do not have much contact with him at all because I know I will be accused of picking on him. My authority over Sean has been removed.

They are dumping a lot of new work on me with "due dates" and trying to make it impossible to get things done. It is a terrible, toxic place to work.

no effect on her pay. Brenda, Sgt Smith and Lt Sealey signed the evaluation on December 13th and placed it on Captain Lehman's desk for his approval and signature. Captain Lehman signed the document on January 10, 2018 and completed the "Clarification on Employee Evaluations" memo on January 11, 2018. Sgt Smith completed CA Patterson's 1-year evaluation on January 5, 2018 and rated him a 3 (Standard Performance), in every category. Both Patterson and Sgt Smith signed it the same day. Lt Sealey signed the evaluation on the 6th and placed on Captain Lehman's desk for approval. Captain Lehman approved the evaluation on January 10, 2018 with the "Clarification on Employee Evaluations" memo attached. The "Clarification on Employee Evaluations" memo is reviewed with Sgt Smith on January 16, 2018, attending the meeting was ACOP Link, Captain Lehman and Lt Sealey and Sgt Smith is provided a copy of the memo.

On January 17, 2018 Sgt Smith and CA Brenda Wallace meet with the City of Lakeland's HR Department to discuss a possible Hostile Work Environment and on January 19, 2018 CA Wallace filed a formal complaint. Several more meetings take place in the next several weeks between Sgt Smith, CA Wallace, Lt Sealey and Captain Lehman to discuss new briefing report and the "Clarification on Employee Evaluations" memo and Brenda Wallace is provided a copy (Left on her desk), of the memo. On January 31, 2018 CA Wallace and Sgt Smith meet with the Chief and ACOP Link to discuss the ongoing issues in the CAIC unit and, no resolution is reached. On February 7, 2018 Lt Sealey completed Sgt Smith's evaluation giving her an overall rating of 4.76 which was down from the previous year's rating of 6.72. Sgt Smith attaches a "Response to Employee Evaluation" memo dated February 12, 2018, alleging that her reduced rating was the result of retaliation for her refusal to lower CA Wallace's evaluation rating from a perfect score. On February 9th, the Chief orders an internal investigation into CA Wallace's allegations and on February 13, 2018 he orders an internal investigation into Sgt Smith's allegations.

Fifty-five (55) witnesses were interviewed by OPS for this investigation. Those interviewed were Caucasian, African American, Hispanic, Male, Female, Detectives, Sergeants, a Lieutenant, a Captain and numerous non-sworn Civilians to include 2 former Crime Analysts who no longer work for the city. Each one was asked in their interviews the following questions:

1. With regards to the complainant **Sgt. Terri Smith,** between the dates of January 9, 2017 until February 13, 2018:

   a. Do you have any knowledge that ***CA Sean Patterson's*** conduct created an intimidating, hostile, or offensive working environment for Sgt. Smith?

   a. Do you have any knowledge that ***Sgt. Robert's*** conduct created an intimidating, hostile, or offensive working environment for Sgt. Smith?

a. Do you have any knowledge that ***Sgt. Perez's*** conduct created an intimidating, hostile, or offensive working environment for Sgt. Smith?

a. Do you have any knowledge that ***Lt. Sealey's*** conduct created an intimidating, hostile, or offensive working environment for Sgt. Smith?

a. Do you have any knowledge that ***Capt. Lehman's*** conduct created an intimidating, hostile, or offensive working environment for Sgt. Smith?

a. Do you have any knowledge that ***ACOP Link's*** conduct created an intimidating, hostile, or offensive working environment for Sgt. Smith?

2. With regards to the complainant **Sgt. Terri Smith,** between the dates of January 9, 2017 until February 13, 2018:

b. Do you have any knowledge Sgt. Smith was discriminated against due to her Gender, Age or Medical condition because of ***CA Sean Patterson's*** conduct?

b. Do you have any knowledge Sgt. Smith was discriminated against due to her Gender, Age or Medical condition because of ***Sgt. Robert's*** conduct?

b. Do you have any knowledge Sgt. Smith was discriminated against due to her Gender, Age or Medical condition because of ***Sgt. Perez's*** conduct?

b. Do you have any knowledge Sgt. Smith was discriminated against due to her Gender, Age or Medical condition because of ***Lt. Sealey's*** conduct?

b. Do you have any knowledge Sgt. Smith was discriminated against due to her Gender, Age or Medical condition because of ***Capt. Lehman's*** conduct?

b. Do you have any knowledge Sgt. Smith was discriminated against due to her Gender, Age or Medical condition because of ***ACOP Link's*** conduct?

3. With regards to the complainant **Brenda Wallace**, between the dates of January 9, 2017 until February 22, 2018:

a.  Do you have any knowledge that **_CA Sean Patterson's_** conduct created an intimidating, hostile, or offensive working environment for Brenda Wallace?

a.  Do you have any knowledge that **_Sgt. Robert's_** conduct created an intimidating, hostile, or offensive working environment for Brenda Wallace?

a.  Do you have any knowledge that **_Sgt. Perez's_** conduct created an intimidating, hostile, or offensive working environment for Brenda Wallace?

a.  Do you have any knowledge that **_Lt. Sealey's_** conduct created an intimidating, hostile, or offensive working environment for Brenda Wallace?

a.  Do you have any knowledge that **_Capt. Lehman's_** conduct created an intimidating, hostile, or offensive working environment for Brenda Wallace?

a.  Do you have any knowledge that **_ACOP Link's_** conduct created an intimidating, hostile, or offensive working environment for Brenda Wallace?

4. With regards to the complainant **Brenda Wallace**, between the dates of January 9, 2017 until February 22, 2018:

b. Do you have any knowledge Brenda Wallace was discriminated against due to her Gender or Age because of **_CA Sean Patterson's_** conduct?

b. Do you have any knowledge Brenda Wallace was discriminated against due to her Gender or Age because of **_Sgt. Robert's_** conduct?

b. Do you have any knowledge Brenda Wallace was discriminated against due to her Gender or Age because of **_Sgt. Perez's_** conduct?

b. Do you have any knowledge Brenda Wallace was discriminated against due to her Gender or Age because of **_Lt. Sealey's_** conduct?

b. Do you have any knowledge Brenda Wallace was discriminated against due to her Gender or Age because of **_Capt. Lehman's_** conduct?

b. Do you have any knowledge Brenda Wallace was discriminated against due to her Gender or Age because of **_ACOP Link's_** conduct?

Fifty-Three (53) of the witnesses questioned answered "No" to each of the relevant questions listed above. Two (2) answered "Yes" to some questions and "No" to others as it pertained to the different subject officers. However, their "Yes" answers referred to various events such as calling CA Patterson out or asking him to stay late when he was not on call, not following CA Wallace's directions when she was Patterson's trainer, and being issued a new computer by Captain Lehman before CA Wallace and CA Morris. Additionally, the two witnesses alleged Patterson consistently ignored the chain of command by having discussions with other Sgts, Captain Lehman and Lt Sealey, and failed to complete his assigned work in a timely fashion. Several of the 53 "No" witnesses emphasized that not only was CA Patterson a hard worker, but in their opinion, he was the victim of verbal and mental abuse from CA Wallace and Sgt Smith.

Lakeland Police General Order 4-4 defines General Harassment as: "Unreasonable Conduct by one member which interferes with another member's status or performance by creating an intimidating, hostile or offensive working environment. Harassment usually involves a course of conduct; however, a single act may constitute harassment if it is sufficiently serious. Harassment includes, but is not limited to, ridiculing, mocking or belittling another member. **_Harassment does not include an assessment of a member's skills, abilities, or performance by a training officer, supervisor or member of the chain of command"._** (Emphasis Added) I do not believe that any of the actions identified as occurring by the 5 sworn subject officers (ACOP Link, Captain Lehman, Lt Sealey, Sgt Roberts and Sgt Perez) constitute harassment whatsoever. I believe they were exercising their supervisory right(s) to correct and ameliorate a personality conflict between CA Patterson, CA Wallace and Sgt Smith. It appears to be that they were making every effort to work through the problem(s) and at no time do I see any overt or covert attempts by any of the sworn officers to harass and belittle CA Wallace or Sgt Smith. I did not identify any effort to de minimus any of Sgt Smith's authority as she alleged. Likewise, I could find no evidence of CA Patterson harassing,

discriminating or creating a toxic work environment for CA Wallace and Sgt Smith. I do agree that he was difficult to supervise and train and it appeared he required a lot of explanations as to why he was tasked with doing certain things during his training. Being difficult to supervise and asking "why" is not harassment. It was CA Wallace's and Sgt Smith responsibility to tailor their training methods to reach Patterson and make him successful. If they were having issues training CA Patterson, it was their responsibility to notify their chain of command before Sgt Smith told Lt Sealey "I hate this kid. He needs to go" (Sealey Page 10 Lines 389-390) five months into his training. Likewise, it was Patterson's responsibility to listen to CA Wallace and Sgt Smith and do what was asked of him to complete his training in a timely fashion. Further, it was Patterson's responsibility to show the requisite respect that CA Wallace and Sgt Smith have earned in this organization, which at times he clearly did not do.

Therefore, I recommend any allegations relating to harassment in the workplace, hostile work environment, age and gender discrimination or bias, discrimination relating to medical conditions, or creating a toxic work environment be EXONERATED for all the subject officers and CA Patterson. Additionally, I recommend that the Conduct Unbecoming allegations against Sgt Roberts, Sgt Perez, and Lt Sealey be SUSTAINED. I recommend the allegation relating to Supervisor Responsibilities/Command and Coordination be sustained for Captain Lehman and a classification of OTHER for Lt Sealey for the reasons noted below. Lastly, I recommend that the Neglect of Duty, Interaction and Cooperation between Department Personnel and the Conduct Unbecoming allegations against CA Patterson be SUSTAINED for the reasons noted below.

Listed below is a summary of the alleged policy violations and my recommendations for each:

### CRA Sean Patterson
Allegation:
- General Order 3-1.2 Code of Conduct/Neglect of Duty-**SUSTAINED**

    CA Patterson was asked if he violated this policy by engaging in personal business where he completed unauthorized work, the changing of the forms for Sergeant Roberts, that caused him to neglect or be inattentive to his assigned responsibilities as a crime analyst trainee and he replied, **"Yes."**

- General Order 3-1.7 and 4-4.1 Code of Conduct/Harassment in the Workplace-**EXONERATED**

    CA Patterson was asked if his conduct created an intimidating, hostile, or offensive working environment for *Sergeant Smith* and he replied, **"No."**

CA Patterson was asked if his conduct discriminated against *Sergeant Smith* due to her gender, age, or her medical condition and he replied, **"No."**

CA Patterson was asked if his conduct caused *Sergeant Smith* to be harmed in any way and he replied, **"No."**

CA Patterson was asked if his conduct created an intimidating, hostile, or offensive working environment for *Brenda Wallace* and he replied, **"No."**
CA Patterson was asked if his conduct discriminated against *Brenda Wallace* due to her gender, age, or her medical condition and he replied, **"No."**

CA Patterson was asked if his conduct caused *Brenda Wallace* to be harmed in any way and he replied, "**No."**

- General Order 3-1.11 Code of Conduct/Interaction and Cooperation-**SUSTAINED**

  Patterson's responsibility to listen to CA Wallace and Sgt Smith and do what was asked of him to complete his training in a timely fashion and to cooperate with his chain of command. Further, it was Patterson's responsibility to show the requisite respect that his trainer CA Wallace and Sgt Smith have earned in this organization, which at times he clearly did not do.

- General Order 3-1.14 Code of Conduct/Conduct Unbecoming-**SUSTAINED**

  CA Patterson was asked if he engaged in any conduct that reflected unfavorably upon him during his training as a crime analyst since his hiring in January of 2017 and he replied, **"No."** Patterson's course of conduct and the totality of circumstances surrounding this investigation certainly reflects unfavorably upon Sean and impaired the operational efficiency of this department.

### Sergeant Jason Perez
Allegation:
- General Order 3-1.7 and 4-4.1 Code of Conduct/Harassment in the Workplace-**EXONERATED**

  Sgt. Perez was asked, if his supervisory conduct, treatment, or alleged preferential treatment of Crime Analyst Sean Patterson create an intimidating, hostile, or offensive working environment for Sergeant Smith and he replied, **"No, absolutely not."**

  Sgt. Perez was asked, if his supervisory conduct, treatment, or alleged preferential treatment of Crime Analyst Sean Patterson discriminate against Sergeant Smith due to her gender, age, or her medical condition and he replied, **"Absolutely not."**

Sgt. Perez was asked, if his supervisory conduct, treatment, or alleged preferential treatment of Sean Patterson cause any harm to Sergeant Smith and he replied, **"No Sir."**

- General Order 3-1.14 Code of Conduct/Conduct Unbecoming-**SUSTAINED**

    Sgt. Perez was asked, by displaying his OPS notice of investigation in his office in plain view where as anyone who entered could view them, if he violated this policy by engaging in conduct which reflected unfavorably upon him as a member of the department, damaged or affected his reputation as an employee, or impaired the operation or the efficiency of the department or any of its personnel and he replied, **" Sir, I -- I will take full accountability for my actions, but to be honest -- not honest, but my opinion is no.  I -- I -- I think there has to be an intent, and my intent was never to bring, uh, the department into a negative light.  It was more -- yes, I -- I readily admit it was an ignorance of the law, which I know is not a defense.  I readily admit that and I take responsibility for my actions, but, uh, I do not believe that I intentionally did any of these things; and that would be a matter of interpretation at a later date."**

    While the location and placement of the IA documents was certainly less egregious than the location Sgt Roberts chose, I can find no logical reason for their "posting" at all.

### Sergeant James Roberts
Allegation:
- General Order 3-1.7, 4-4.1 and 4-4.2(B) Code of Conduct/Harassment in the Workplace/Supervisor Responsibilities-**EXONERATED**

    Sgt. Roberts acknowledged, on February 19, 2018, he was provided with a copy of the City of Lakeland's Hostile Work Environment, which he stated he read and understood the document. He also acknowledged, as an LPD Supervisor, it was his responsibility to provide a work environment free from intimidation, fear and threats. Sgt. Roberts was then asked, after displaying his O.P.S. Notice of Investigation with Sergeant Smith's name highlighted, along with the memorandum on Hostile Work Environment on the front of his desk, if his conduct created an intimidating, hostile or offensive working environment for Sergeant Smith and he replied, **"Not to my knowledge. And it certainly was not my intent to create an intimidating, hostile or offensive work environment for Sergeant Terri Smith."**

    Sgt. Roberts was asked, if his supervisory conduct, treatment or alleged preferentially treatment of Sean Patterson discriminated against Sergeant Smith due to her gender, age or her medical condition and he replied, **"No. The question presupposes that I gave Crime Analyst Sean Patterson**

**preferential treatment which I did not. Furthermore, I did not discriminate against Sergeant Terri Smith."**

Sgt. Roberts was asked, if his supervisory conduct, treatment or alleged preferential treatment of Crime Analyst Sean Patterson caused any harm to Sergeant Smith and he replied, **"Again, the question presumes well, presupposes that I gave Crime Analyst Sean Patterson preferential treatment which I did not. My interactions with Crime Sean Patterson, although professional, was not intended to cause harm to Sergeant Terri Smith."**

- General Order 3-1.14 Code of Conduct/Conduct Unbecoming-**SUSTAINED**

Sgt. Roberts was asked, if his conduct, by displaying his O.P.S. notice of investigation with Sergeant Smith's name highlighted along with the memorandum on hostile work environment on the front of his desk, if he engaged in conduct which reflected unfavorably upon him as a member of the Department, damaged or affected his reputation as an employee, or impaired of the operation or the efficiency of the Department or any of its personnel and he replied, "Well – well, first of all, in hindsight, I certainly wouldn't do it again. However, I did not know it was wrong. In fact, I went to my Lieutenant and discussed this with him. Um, I was not given any indication that my actions would, uh, be in violation of General Order or Florida State Statue. In addition to that, uh, Captain Hans Lehman observed this document taped to my desk and he did not provide me with any direction as to me being in violation of General Order or Florida State Statue, and to me I felt that was a – a – relevant, uh, based on their, uh, positions within the Department as well as the fact that they were once supervisors of O.P.S."

I can find no reason for the posting of these documents.

***Lieutenant Steve Sealey***
Allegation:
- General Order 1-4.1(C), 1-4.3(C), 1-4.4 (G), 1-4.6(B1) Supervisor Duties/Responsibilities/Command and Coordination/Disciplinary Action-**OTHER**

Lt. Sealey was asked, with regards to Sergeant Roberts, by not directing Sergeant Roberts to remove his official Internal Affairs documents from his desk that were hanging in plain view, if he violated any of these policies as his supervisor by failing to initiate disciplinary action and/or report the violation of Department policy to his immediate supervisor and he replied, **"Prior to March 5th it was my belief that he did not violate anything. Um, so no, I did not."** There is some ambiguity between the statements of Lt Sealey and Sgt Roberts regarding the content of a conversation that they had concerning the display of the IA documents. Such as, if Lt Sealey knew, and obliquely approved of Sgt Roberts taping the IA documents to his desk. Sgt Roberts indicated in his

statement that Lt Sealey seemed to approve of his placement of the documents and Lt Sealey stated that he at no time gave permission to Sgt Roberts to tape the documents to his desk. Therefore, I recommend a finding of OTHER.

- General Order 3-1.7,4-4.1, and 4-4.2(B) Code of Conduct/Harassment in the Workplace/Supervisor Responsibilities-**EXONERATED**

Lt. Sealey was asked, if his supervisory conduct treatment or alleged preferential treatment of Crime Analyst Sean Patterson create an intimidating, hostile, or offensive working environment for Sergeant Smith and he replied, **"No, sir."**

Lt. Sealey was asked, if his supervisory conduct, treatment, or alleged preferential treatment of Crime Analyst Sean Patterson discriminated against Sergeant Smith due to her gender, age, or her medical condition and he replied, **"No, sir."**

Lt. Sealey was asked, if his supervisory conduct, treatment or alleged preferential treatment of Sean Patterson caused Sergeant Smith to be harmed in any way whereas her authority to supervise Patterson was taken away from her as Patterson's immediate supervisor and he replied, **"No, sir."**

Lt. Sealey was asked, regarding his supervisor duties in 4-4.2(B), regarding Sean Patterson's statements to him about a hostile work environment, if he believed he followed policy with regards CA Patterson's statements that he could possibly be a victim of hostile work environment and he replied, **"Sean told – mentioned it. I asked him specifically, flat out "Do you feel it?" And he said, "No." So--do I have a complaint? Not if he doesn't feel it. If he said, yes, as I said earlier, I would have drove him to HR."**

- General Order 3-1.14 Code of Conduct/Conduct Unbecoming-**SUSTAINED**

Lt. Sealey was asked, by displaying his OPS Notice of Investigation in his office in plain view, whereas anyone who could enter could view them, if he violated this policy by engaging in conduct which reflected unfavorably upon him as a member of the Department, damaged or affected his reputation as an employee or impaired the operation or efficiency of the Department or any of its personnel and he replied, **"I would say, no. In my – based on my belief at that time."**

I can find no logical reason for the posting of these documents

**Captain Hans Lehman**
Allegation:
- General Order 1-4.1(C), 1-4.3(C), 1-4.4(G), and 1-4.6(B1) Supervisor Duties/Responsibilities/Command and Coordination/Disciplinary Action-**SUSTAINED**

**LAKELAND POLICE DEPARTMENT**
**FINDINGS AND RECOMMENDED ACTION FORM**

**Employee: CRA Sean Patterson #644**                    **OPS File#: EIR 18-006**

*Supervisor's Recommendations*

I have reviewed the complaint and/or investigative report and have determined the incident/complaint to be:

**It is alleged that over the past ten (10) months, Sean Patterson has engaged in conduct which has created a hostile work environment that is based primarily upon age and gender discrimination. This conduct has affected and interfered with another member's performance.**

Lakeland Police Department Policy References:

1. **GENERAL ORDER 3-1.2 Code of Conduct: Neglect of Duty**

☒ Sustained                    ☐ Not Sustained
☐ Exonerated                  ☐ Unfounded
☐ Policy Failure              ☐ Other

2. **GENERAL ORDER 3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions)**

☐ Sustained                    ☐ Not Sustained
☒ Exonerated                  ☐ Unfounded
☐ Policy Failure              ☐ Other

3. **GENERAL ORDER 3-1.11 Code of Conduct: Interaction and Cooperation Between Department Personnel**

☒ Sustained                    ☐ Not Sustained
☐ Exonerated                  ☐ Unfounded
☐ Policy Failure              ☐ Other

4. **GENERAL ORDER 3-1.14 Code of Conduct: Conduct Unbecoming**

☒ Sustained                    ☐ Not Sustained
☐ Exonerated                  ☐ Unfounded
☐ Policy Failure              ☐ Other

## RECOMMENDED ACTION

☒ Written Reprimand
☐ Suspension of _____ Hrs.
☐ Demotion
☐ Termination
☐ None

☐ Counseling
☐ Written Reminder (Repeated Offense)
☐ Retraining

7/2/18

☒ **RECOMMENDED DIVERSION (IF ANY)**

☒ Education Based (EBD)                    ☐ Other: _____

A. Toy                                          6/28/18

Supervisor                                     Date

## ADMINISTRATIVE REVIEW

### Officer in Charge

| Lieutenant | Date Received | Date Forwarded | ☐ Concur | ☐ Do Not Concur |
|---|---|---|---|---|

N/A

### Division Commander

| Captain | Date Received | Date Forwarded | ☐ Concur | ☐ Do Not Concur |
|---|---|---|---|---|
| S. L. Taylor #7 | 4/22/18 | 4/28/18 | | |

See Attached Memo

### Bureau Commander

| Assistant Chief | Date Received | Date Forwarded | ☒ Concur | ☐ Do Not Concur |
|---|---|---|---|---|
| | 6/28/18 | 6/28/18 | | |

OPS 013

**\*\*\* FORWARD TO OFFICE OF PROFESSIONAL STANDARDS \*\*\***

## Office of Professional Standards

Citizen Complaint: ☐Yes ☑No          Complaint Review Board: ☐Yes ☑No ☐Waived

_____ #33                                    6/28/18

OPS Supervisor                              Date

**NOTE: Subject member has 3 days to elect CRB pursuant to member being served with Notice of Final Agency Action memorandum**

## Chief of Police

| | | ☑ Concur ☐ Do Not Concur |
|---|---|---|
| Chief of Police | 7/2/2018  EDB – | |
| | Date | |

### 1. GENERAL ORDER 3-1.2 Code of Conduct: Neglect of Duty

☑ Sustained          ☐ Not Sustained
☐ Exonerated          ☐ Unfounded
☐ Policy Failure       ☐ Other

### 2. GENERAL ORDER 3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions)

☐ Sustained          ☐ Not Sustained
☑ Exonerated          ☐ Unfounded
☐ Policy Failure       ☐ Other

### 3. GENERAL ORDER 3-1.11 Interaction and Cooperation Between Department Personnel

☑ Sustained          ☐ Not Sustained
☐ Exonerated          ☐ Unfounded
☐ Policy Failure       ☐ Other

### 4. GENERAL ORDER 3-1.14 Conduct Unbecoming

☑ Sustained          ☐ Not Sustained
☐ Exonerated          ☐ Unfounded
☐ Policy Failure       ☐ Other

OPS 013

Comments: EDUCATIONAL BASED (EBD) IN LIEU OF A WRITTEN Reprimand - OPS WILL ADMINISTER 1500 WORD PAPER on ORGANIZATIONAL LEADERSHIP - TEAMWORK Completed By August 31, 2018.

## EXPLANATION OF CONCLUSIONS

**SUSTAINED:**         Allegation supported by sufficient evidence.

**NOT SUSTAINED:**     Insufficient evidence to prove or disprove the allegation.

**UNFOUNDED:**         Allegation is false or not based on valid facts.

**EXONERATED:**        The incident that occurred/complained of was lawful and proper.

**POLICY FAILURE:**    The allegation is true, but the investigation reveals policy or procedural changes
                       are necessary.

**OTHER:**             The evidence supports a sustained violation for some other matter discovered
                       during the investigation or other exigent circumstances exist. *(Explain in
                       attached memorandum)*

**LAKELAND POLICE DEPARTMENT**
**FINDINGS AND RECOMMENDED ACTION FORM**

**Employee: Sgt. Jason Perez  #77**                          **OPS File#: EIR 18-006**

*Supervisor's Recommendations*

I have reviewed the complaint and/or investigative report and have determined the incident/complaint to be:

**It is alleged that over the past ten (10) months, Sgt. Perez has engaged in conduct which has created a hostile work environment that is based primarily upon age, gender, and medical discrimination. This conduct has affected and interfered with another member's performance.**

Lakeland Police Department Policy References:

1. **GENERAL ORDER  3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions)**

☐ Sustained                              ☐ Not Sustained
☒ Exonerated                           ☐ Unfounded
☐ Policy Failure                        ☐ Other

2. **GENERAL ORDER  3-1.14 Code of Conduct: Conduct Unbecoming**

☒ Sustained                              ☐ Not Sustained
☐ Exonerated                           ☐ Unfounded
☐ Policy Failure                        ☐ Other

**RECOMMENDED ACTION**

☐ Written Reprimand                  ☒ Counseling
☐ Suspension of _____ Hrs.        ☐ Written Reminder (Repeated Offense)
☐ Demotion                               ☐ Retraining
☐ Termination
☐ None

**RECOMMENDED DIVERSION (IF ANY)**

☐ Education Based (EBD)            ☐ Other: _____

_____           ___6/28/18_____
Supervisor                                    Date

OPS 013

## ADMINISTRATIVE REVIEW

### Officer in Charge

| Lieutenant | Date Received | Date Forwarded | ☐ Concur | ☐ Do Not Concur |
|------------|---------------|----------------|----------|------------------|

*N/A*

### Division Commander

| Captain | Date Received | Date Forwarded | ☐ Concur | ☐ Do Not Concur |
|---------|---------------|----------------|----------|------------------|
| S.L. Taylor #7 | 6/22/18 | 6/28/18 | | |

See Attached Memo

### Bureau Commander

| Assistant Chief | Date Received | Date Forwarded | ☑ Concur | ☐ Do Not Concur |
|-----------------|---------------|----------------|----------|------------------|
| | 6/28/18 | 6/28/18 | | |

### *** FORWARD TO OFFICE OF PROFESSIONAL STANDARDS ***

### Office of Professional Standards

Citizen Complaint: ☐Yes ☑No          Complaint Review Board: ☐Yes ☑No ☐Waived

OPS Supervisor #37          6/28/18

OPS Supervisor          Date

NOTE: Subject member has 3 days to elect CRB pursuant to member being served with Notice of Final
Agency Action memorandum

OPS 013

## Chief of Police

| | | | ☑ Concur | ☐ Do Not Concur |
|---|---|---|---|---|
| Chief of Police | 6/29/13 Date | | | |

1. **GENERAL ORDER 3-1.7 Code of Conduct: Harassment in the Workplace**
   **(G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions)**

☐ Sustained          ☐ Not Sustained
☑ Exonerated         ☐ Unfounded
☐ Policy Failure     ☐ Other

2. **GENERAL ORDER 3-1.14 Code of Conduct: Conduct Unbecoming**

☑ Sustained          ☐ Not Sustained
☐ Exonerated         ☐ Unfounded
☐ Policy Failure     ☐ Other

Comments:  ˮCounseled ˮ

## EXPLANATION OF CONCLUSIONS

**SUSTAINED:**       Allegation supported by sufficient evidence.

**NOT SUSTAINED:**   Insufficient evidence to prove or disprove the allegation.

**UNFOUNDED:**       Allegation is false or not based on valid facts.

**EXONERATED:**      The incident that occurred/complained of was lawful and proper.

**POLICY FAILURE:**  The allegation is true, but the investigation reveals policy or procedural changes
                     are necessary.

**OTHER:**           The evidence supports a sustained violation for some other matter discovered
                     during the investigation or other exigent circumstances exist. *(Explain in
                     attached memorandum)*

**LAKELAND POLICE DEPARTMENT**
**FINDINGS AND RECOMMENDED ACTION FORM**

**Employee: Sgt. James "Chip" Roberts #54**          **OPS File#: EIR 18-006**

*Supervisor's Recommendations*

I have reviewed the complaint and/or investigative report and have determined the incident/complaint to be:

**It is alleged that over the past ten (10) months, Sgt. Roberts has engaged in conduct which has created a hostile work environment that is based primarily upon age and gender discrimination. This conduct has affected and interfered with another member's performance.**

Lakeland Police Department Policy References:

1. **GENERAL ORDER 3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions; G.O. 4-4.2 Supervisor's Responsibilities)**

☐ Sustained                    ☐ Not Sustained
☒ Exonerated                   ☐ Unfounded
☐ Policy Failure               ☐ Other

2. **GENERAL ORDER 3-1.14 Code of Conduct: Conduct Unbecoming**

☒ Sustained                    ☐ Not Sustained
☐ Exonerated                   ☐ Unfounded
☐ Policy Failure               ☐ Other

**RECOMMENDED ACTION**

☐ Written Reprimand            ☒ Counseling
☐ Suspension of _____ Hrs.     ☐ Written Reminder (Repeated Offense)
☐ Demotion                     ☐ Retraining
☐ Termination
☐ None

**RECOMMENDED DIVERSION (IF ANY)**

☐ Education Based (EBD)        ☐ Other: _____

_S Taylor_                     _0/28/18_
Supervisor                     Date

OPS 013

# ADMINISTRATIVE REVIEW

## Officer in Charge

| | | | ☐ Concur | ☐ Do Not Concur |
|---|---|---|---|---|
| Lieutenant | Date Received | Date Forwarded | | |

*N/A*

## Division Commander

| S.L. Taylor #7 | 4/22/18 | 4/28/18 | ☐ Concur | ☐ Do Not Concur |
|---|---|---|---|---|
| Captain | Date Received | Date Forwarded | | |

*See Attached*

## Bureau Commander

| | 6/28/18 | 6/28/18 | ☑ Concur | ☐ Do Not Concur |
|---|---|---|---|---|
| Assistant Chief | Date Received | Date Forwarded | | |

**\*\*\* FORWARD TO OFFICE OF PROFESSIONAL STANDARDS \*\*\***

## Office of Professional Standards

Citizen Complaint: ☐Yes ☑No          Complaint Review Board: ☐Yes ☑No ☐Waived

_____ #57                    6/28/18

OPS Supervisor                        Date

**NOTE: Subject member has 3 days to elect CRB pursuant to member being served with Notice of Final Agency Action memorandum**

## Chief of Police

|  |  | ☑ Concur | ☐ Do Not Concur |
|---|---|---|---|
| Chief of Police | 6/29/18 Date | | |

1. **GENERAL ORDER 3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions; G.O. 4-4.2 Supervisor's Responsibilities)**

☐ Sustained        ☐ Not Sustained
☑ Exonerated       ☐ Unfounded
☐ Policy Failure   ☐ Other

2. **GENERAL ORDER 3-1.14 Code of Conduct: Conduct Unbecoming**

☑ Sustained        ☐ Not Sustained
☐ Exonerated       ☐ Unfounded
☐ Policy Failure   ☐ Other

Comments:

_____ ' COUNSELING " _____

_____

_____

## EXPLANATION OF CONCLUSIONS

**SUSTAINED:**      Allegation supported by sufficient evidence.

**NOT SUSTAINED:**  Insufficient evidence to prove or disprove the allegation.

**UNFOUNDED:**      Allegation is false or not based on valid facts.

**EXONERATED:**     The incident that occurred/complained of was lawful and proper.

**POLICY FAILURE:** The allegation is true, but the investigation reveals policy or procedural changes are necessary.

**OTHER:**          The evidence supports a sustained violation for some other matter discovered during the investigation or other exigent circumstances exist. ***(Explain in attached memorandum)***

**LAKELAND POLICE DEPARTMENT**
**FINDINGS AND RECOMMENDED ACTION FORM**

**Employee: Lt. Steven Sealey #27**                    **OPS File#: EIR 18-006**

*Supervisor's Recommendations*

I have reviewed the complaint and/or investigative report and have determined the incident/complaint to be:

**It is alleged that over the past ten (10) months, Lieutenant Sealey engaged in conduct which had created a hostile work environment that is based primarily upon age, gender, and medical discrimination. This conduct had affected and interfered with another member's performance.**

Lakeland Police Department Policy References:

1. **GENERAL ORDER 1-4.1 Supervisor Duties: Supervisor's Responsibilities, G.O. 1-4.3 (C) Supervisor's Duties, G.O. 1-4.4 (G) Supervisory Command and Coordination, G.O. 1-4.6 (B,1) Disciplinary Action**

☐ Sustained                              ☐ Not Sustained
☒ ~~Exonerated~~ (ST) 6/29/18            ☐ Unfounded
☐ Policy Failure                         ☒ Other

2. **GENERAL ORDER 3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions, G.O. 4-4.2 Supervisor's Responsibilities)**

☐ Sustained                              ☐ Not Sustained
☒ Exonerated                             ☐ Unfounded
☐ Policy Failure                         ☐ Other

3. **GENERAL ORDER 3-1.14 Code of Conduct: Conduct Unbecoming**

☒ Sustained                              ☐ Not Sustained
☐ Exonerated                             ☐ Unfounded
☐ Policy Failure                         ☐ Other

**RECOMMENDED ACTION**

☐ Written Reprimand                      ☒ Counseling
☐ Suspension of ____ Hrs.                ☐ Written Reminder (Repeated Offense)
☐ Demotion                               ☐ Retraining
☐ Termination
☐ None

OPS 013

## RECOMMENDED DIVERSION (IF ANY)

☐ Education Based (EBD)                    ☐ Other: _____

_S.Tayl.rT_                                 _4/28/18_
Supervisor                                  Date

## ADMINISTRATIVE REVIEW

### Officer in Charge

| | | | ☐ Concur | ☐ Do Not Concur |
|---|---|---|---|---|
| Lieutenant | Date Received | Date Forwarded | | |

_N/A_

### Division Commander

| | | | ☐ Concur | ☐ Do Not Concur |
|---|---|---|---|---|
| _S.L.Taylor T_ | _6/22/18_ | _6/28/18_ | | |
| Captain | Date Received | Date Forwarded | | |

_See Attached Memo_

### Bureau Commander

| | | | ☐ Concur | ☐ Do Not Concur |
|---|---|---|---|---|
| _WB_ | _6/28/18_ | _6/28/18_ | ☑ Concur | |
| Assistant Chief | Date Received | Date Forwarded | | |

*** FORWARD TO OFFICE OF PROFESSIONAL STANDARDS ***

### Office of Professional Standards

Citizen Complaint: ☐Yes ☑No

_#33_

OPS Supervisor

Complaint Review Board: ☐Yes ☑No ☐Waived

_6/28/18_

Date

OPS 013

NOTE: Subject member has 3 days to elect CRB pursuant to member being served with Notice of Final Agency Action memorandum

## Chief of Police

| | | ☑ Concur  ☐ Do Not Concur |
|---|---|---|
| Chief of Police | 6/29/18 | |
| | Date | |

1. **GENERAL ORDER 1-4.1 Supervisor Duties: Supervisor's Responsibilities, G.O. 1-4.3 (C) Supervisor's Duties, G.O. 1-4.4 (G) Supervisory Command and Coordination, G.O. 1-4.6 (B,1) Disciplinary Action**

☐ Sustained        ☐ Not Sustained
☐ Exonerated      ☐ Unfounded
☐ Policy Failure     ☑ Other

2. **GENERAL ORDER 3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions, G.O. 4-4.2 Supervisor's Responsibilities)**

☐ Sustained        ☐ Not Sustained
☑ Exonerated      ☐ Unfounded
☐ Policy Failure     ☐ Other

3. **GENERAL ORDER 3-1.14 Code of Conduct: Conduct Unbecoming**

☑ Sustained        ☐ Not Sustained
☐ Exonerated      ☐ Unfounded
☐ Policy Failure     ☐ Other

Comments:

"Counseling"

## EXPLANATION OF CONCLUSIONS

**SUSTAINED:**      Allegation supported by sufficient evidence.

**NOT SUSTAINED:**      Insufficient evidence to prove or disprove the allegation.

**UNFOUNDED:**      Allegation is false or not based on valid facts.

**EXONERATED:**   The incident that occurred/complained of was lawful and proper.

**POLICY FAILURE:**   The allegation is true, but the investigation reveals policy or procedural changes are necessary.

**OTHER:**   The evidence supports a sustained violation for some other matter discovered during the investigation or other exigent circumstances exist. *(Explain in attached memorandum)*

## LAKELAND POLICE DEPARTMENT
## FINDINGS AND RECOMMENDED ACTION FORM

**Employee: Capt. Harold "Hans" Lehman #08**          **OPS File#: EIR 18-006**

### *Supervisor's Recommendations*

I have reviewed the complaint and/or investigative report and have determined the incident/complaint to be:

**It is alleged that over the past ten (10) months, Captain Lehman engaged in conduct which has created a hostile work environment that is based primarily upon age, gender, and medical discrimination. This conduct has affected and interfered with another member's performance.**

Lakeland Police Department Policy References:

**1. GENERAL ORDER 1-4.1 Supervisor Duties: Supervisor's Responsibilities, G.O. 1-4.3 (C) Supervisor's Duties, G.O. 1-4.4 (G) Supervisory Command and Coordination, G.O. 1-4.6 (B,1) Disciplinary Action**

☒ Sustained                    ☐ Not Sustained
☐ Exonerated                  ☐ Unfounded
☐ Policy Failure              ☐ Other

**2. GENERAL ORDER 3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions, G.O. 4-4.2 Supervisor's Responsibilities)**

☐ Sustained                    ☐ Not Sustained
☒ Exonerated                  ☐ Unfounded
☐ Policy Failure              ☐ Other

### RECOMMENDED ACTION

☐ Written Reprimand              ☒ Counseling
☐ Suspension of _____ Hrs.      ☐ Written Reminder (Repeated Offense)
☐ Demotion                       ☐ Retraining
☐ Termination
☐ None

### RECOMMENDED DIVERSION (IF ANY)

☐ Education Based (EBD)          ☐ Other: _____

_S. Tyler_____          _6/28/18_____
Supervisor                           Date

OPS 013

## ADMINISTRATIVE REVIEW

### Officer in Charge

| Lieutenant | Date Received | Date Forwarded | ☐ Concur | ☐ Do Not Concur |

*N/A*

### Division Commander

| Captain | Date Received | Date Forwarded | ☐ Concur | ☐ Do Not Concur |

S. L. Taylor #7    4|22|18    6|28|18

*See Attached Memo*

### Bureau Commander

| Assistant Chief | Date Received | Date Forwarded | ☑ Concur | ☐ Do Not Concur |

AW3    6/28/18   6/28/18

### *** FORWARD TO OFFICE OF PROFESSIONAL STANDARDS ***

### Office of Professional Standards

Citizen Complaint: ☐ Yes ☑ No

Complaint Review Board: ☐ Yes ☑ No ☐ Waived

_____
OPS Supervisor

6/28/18
Date

NOTE: Subject member has 3 days to elect CRB pursuant to member being served with Notice of Final Agency Action memorandum

OPS 013

## Chief of Police

| | | ☑ **Concur** | ☐ **Do Not Concur** |
|---|---|---|---|
| Chief of Police | 6/29/18 | | |
| | Date | | |

1. **GENERAL ORDER 1-4.1 Supervisor Duties: Supervisor's Responsibilities, G.O. 1-4.3 (C) Supervisor's Duties, G.O. 1-4.4 (G) Supervisory Command and Coordination, G.O. 1-4.6 (B,1) Disciplinary Action**

☑ Sustained          ☐ Not Sustained
☐ Exonerated        ☐ Unfounded
☐ Policy Failure      ☐ Other

2. **GENERAL ORDER 3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions, G.O. 4-4.2 Supervisor's Responsibilities)**

☐ Sustained          ☐ Not Sustained
☑ Exonerated        ☐ Unfounded
☐ Policy Failure      ☐ Other

Comments:

"Counseling"

## EXPLANATION OF CONCLUSIONS

**SUSTAINED:**        Allegation supported by sufficient evidence.

**NOT SUSTAINED:**    Insufficient evidence to prove or disprove the allegation.

**UNFOUNDED:**        Allegation is false or not based on valid facts.

**EXONERATED:**       The incident that occurred/complained of was lawful and proper.

**POLICY FAILURE:**   The allegation is true, but the investigation reveals policy or procedural changes
                      are necessary.

**OTHER:**            The evidence supports a sustained violation for some other matter discovered
                      during the investigation or other exigent circumstances exist. *(Explain in
                      attached memorandum)*

OPS 013

**LAKELAND POLICE DEPARTMENT**
**FINDINGS AND RECOMMENDED ACTION FORM**

**Employee: ACOP Michael Link #02**                    **OPS File#: EIR 18-006**

*Supervisor's Recommendations*

I have reviewed the complaint and/or investigative report and have determined the incident/complaint to be:

**It is alleged that over the past ten (10) months, ACOP Link engaged in conduct which has created a hostile work environment that is based primarily upon age, gender, and medical discrimination. This conduct has affected and interfered with another member's performance.**

Lakeland Police Department Policy References:

1. **GENERAL ORDER 3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions)**

☐ Sustained                    ☐ Not Sustained
☒ Exonerated                   ☐ Unfounded
☐ Policy Failure               ☐ Other

## RECOMMENDED ACTION

☐ Written Reprimand            ☐ Counseling
☐ Suspension of _____ Hrs.     ☐ Written Reminder (Repeated Offense)
☐ Demotion                     ☐ Retraining
☐ Termination
☒ None

## RECOMMENDED DIVERSION (IF ANY)

☐ Education Based (EBD)            ☐ Other: _____

_S.Taylor #7_                        _4/28/18_
Supervisor                           Date

OPS 013

# ADMINISTRATIVE REVIEW

## Officer in Charge

| | | | ☐ Concur | ☐ Do Not Concur |
|---|---|---|---|---|
| Lieutenant | Date Received | Date Forwarded | | |

*N/A*

## Division Commander

| S.L. Taylor #7 | 4/22/18 | 4/28/18 | ☐ Concur | ☐ Do Not Concur |
|---|---|---|---|---|
| Captain | Date Received | Date Forwarded | | |

*See Attached Memo*

## Bureau Commander

| #W3 | 6/28/18 | 6/28/18 | ☑ Concur | ☐ Do Not Concur |
|---|---|---|---|---|
| Assistant Chief | Date Received | Date Forwarded | | |

### *** FORWARD TO OFFICE OF PROFESSIONAL STANDARDS ***

## Office of Professional Standards

Citizen Complaint: ☐Yes ☑No          Complaint Review Board: ☐Yes ☑No ☐Waived

_____ #39          6/28/18

OPS Supervisor          Date

**NOTE: Subject member has 3 days to elect CRB pursuant to member being served with Notice of Final Agency Action memorandum**

OPS 013

## Chief of Police

| | | ☑ Concur | ☐ Do Not Concur |
|---|---|---|---|
| _Chief of Police_ | _Date_ | | |

1. **GENERAL ORDER  3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions)**

☐ Sustained          ☐ Not Sustained
☑ Exonerated          ☐ Unfounded
☐ Policy Failure          ☐ Other


Comments:

_____

_____ N/A _____

_____


## EXPLANATION OF CONCLUSIONS

**SUSTAINED:**          Allegation supported by sufficient evidence.

**NOT SUSTAINED:**          Insufficient evidence to prove or disprove the allegation.

**UNFOUNDED:**          Allegation is false or not based on valid facts.

**EXONERATED:**          The incident that occurred/complained of was lawful and proper.

**POLICY FAILURE:**          The allegation is true, but the investigation reveals policy or procedural changes are necessary.

**OTHER:**          The evidence supports a sustained violation for some other matter discovered during the investigation or other exigent circumstances exist. *(Explain in attached memorandum)*

# LAKELAND POLICE DEPARTMENT
Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:        **Crime Analysist Sean Patterson**

FROM:    Sgt. LeRon Strong #69 SUPV/IAU/OPS

DATE:    February 9, 2018

SUBJ:    Notice of Administrative Investigation –
         File# **EIR 18-006**

You are hereby notified of an Administrative Investigation being conducted in which your actions are under investigation for possible violation of Lakeland Police Department (LPD) and/or City of Lakeland polic(y)(ies) and/or procedures. Chief of Police Larry Giddens has ordered this Administrative Investigation.

The nature of the investigation is the search for, and marshalling of evidence of your actions and inactions, if any, that would support a finding of, or constitute (a) violation(s) of LPD or City polic(y)(ies). The scope of the investigation is defined by, but is not necessarily limited to, the specifics of the complaint against you. The complaint against you is summarized as follows:

**It is alleged that over the past ten (10) months, you have engaged in conduct which has created a hostile work environment that is based primarily upon age and gender discrimination.  This conduct has affected and interfered with another member's performance.**

**If this allegation is proven to be true, it would be in violation of Lakeland Police Department G.O. 4-4 Harassment in the Workplace.**

The complainant in this investigation is Chief Larry Giddens.

The investigation is being conducted by Lt. Steven Pacheco.

In the event a formal interview is necessary to obtain a statement from you, sufficient advance notice will be provided as to the date and time of your interview.  It is your right to have a representative of your choice present with you during your interview. It is your responsibility to arrange to have your chosen representative in attendance at the scheduled time.

You are ordered not to discuss, except with your legal counsel and/or representative, this administrative investigation, your testimony in this investigation, or any other testimony or evidence relevant to the administrative investigation of which you have knowledge until such time as this investigation is concluded.

### ACKNOWLEDGEMENT OF RECEIPT

I, **Sean Patterson** do hereby acknowledge receipt of this notice on the 9 **day of February, 2018.**

_____          _____
**Signature**                                    **(Witness) Signature**

_____          _____
**Printed Name**                             **Printed Name**

2

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:        CA Sean Patterson

FROM:    Lt. Steven Pacheco, OIC/OPS

DATE:     February 19, 2018

SUBJ:     EIR-18-006

During the month of January 2018, a complaint was submitted to the City of Lakeland Human Resources Department (HR) and the Office of Professional Standards regarding harassment in the workplace (hostile work environment).  As such, and following consultation with City of Lakeland HR, Chief of Police Larry Giddens authorized an Internal Affairs Administrative Investigation into these allegations. Pursuant to the Police Officer Bill of Rights (F.S.S. 112), OPS notified you in writing that you were a named subject member of this Internal Affairs Investigation.

As such, you are hereby noticed that any form of retaliation against the two department members who filed a bona fide complaint under the Cities Hostile Work Environment Policy is strictly prohibited.

Additionally, in accordance with LPD Policies regarding open internal affairs investigations, you are hereby reminded not to speak about this investigation with anyone other than your PBA Representative or chosen legal counsel.

By signing below, you are stating you understand this "official" notice I am issuing and that you have received a copy of the City of Lakeland's Hostile Work Environment policy.


_____
CA Sean Patterson

*February 19, 2018*
Date


_____
Lt. Steven Pacheco, OIC/OPS

*February 19, 2018*
Date

## HOSTILE WORK ENVIRONMENT

Employees of the City of Lakeland are prohibited from acting in a hostile manner against any other employees, direct reports, or supervisors. Such conduct may result in disciplinary action, up to and including termination.

Managers are responsible for providing a work environment free from intimidation, fear, and threats, whether physical or career related. Employees who judge that they are subject to a hostile work environment are encouraged to first speak to their supervisors and are free to report the complaint to the Employee Relations Director or his/her designee. Disciplinary actions which are founded and positively administered are not considered hostile actions.

Any form of retaliation against any employee for filing a bona fide complaint under this policy or assisting in a complaint investigation is prohibited. However, if, after investigating any complaint of harassment or unlawful discrimination, it is determined that the complaint is not bona fide or that an employee has provided false information regarding the complaint, disciplinary action may be taken against the individual who filed the complaint or who gave false information, up to and including termination.

Questions pertaining to this policy should be directed to the Employee Relations Office.

**REFERENCE:** Administrative Directive
**ORIGINAL EFFECTIVE DATE:** January 1, 1989

**REVISED EFFECTIVE DATE:** February 1, 1994,

April 6, 2005

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:        CA Sean Patterson

FROM:    Lt. Steven A. Pacheco #33

DATE:     February 2~~0~~ 21st, 2018

SUBJ:     **AMENDED** NOTICE OF ADMINISTRATIVE INVESTIGATION –
          **FILE# EIR-18-006**

---

Pursuant to Section 112.532 of the Florida Statutes, you are hereby notified of an Administrative Investigation being conducted in which your actions are under investigation for possible violation of Lakeland Police Department (LPD) and/or City of Lakeland polic(y)(ies) and/or procedures.   Chief Larry Giddens has ordered this Administrative Investigation.

The nature of the investigation is the search for, and marshalling of evidence of your actions and inactions, if any, that would support a finding of, or constitute (a) violation(s) of LPD or City polic(y)(ies). The scope of the investigation is defined by, but is not necessarily limited to, the specifics of the complaint against you. The complaint against you is summarized as follows:

**It is alleged that over the past ten months, you have engaged in conduct which has created a hostile work environment which is based primarily upon age, gender and medical discrimination. This conduct has affected and interfered with another member's performance.**

**If this allegation is proven to be true, it would be in violation of Lakeland Police Department G.O. 4-4, Harassment in the Workplace.**

The complainant in this investigation is **Sgt. Terri Smith**.

The investigation is being conducted by **Lt. Steven Pacheco**.

1

OPS 011

In the event a formal interview is necessary to obtain a statement from you, sufficient advance notice will be provided as to the date and time of your interview.  It is your right to have a representative of your choice present with you during your interview.  It is your responsibility to arrange to have your chosen representative in attendance at the scheduled time.

You are ordered not to discuss, except with your legal counsel and/or representative, this administrative investigation, your testimony in this investigation, or any other testimony or evidence relevant to the administrative investigation of which you have knowledge until such time as this investigation is concluded.

(I have been provided a copy of Sections 112.532, 112.533 and 112.534 of the

Florida Statutes (includes "Police Officer's Bill of Rights").   ___N/A____

Initials

## ACKNOWLEDGEMENT OF RECEIPT

I, **CA Sean Patterson** do hereby acknowledge receipt of this notice on the ~~**20th**~~ **21ST** day of

**February**, 2018.


_____
Signature

**CA Sean Patterson**___
Printed Name


_____
**Signature (Witness)**

**Lt. Steven A. Pacheco**
Printed Name (Witness)

2

OPS 011

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:      CA Sean Patterson

FROM:   Lt. Steven A. Pacheco

DATE:   June 14 , 2018

SUBJ:   NOTICE OF INVESTIGATIVE INTERVIEW – SUBJECT MEMBER

Your investigative interview for FILE # **EIR-18-006,** has been scheduled for **June 19 , 2018** at _0900_ hrs. This interview will be conducted at the Office of Professional Standards.

You will be permitted to review the complaint, witness statements, and all existing evidence in relation to this administrative investigation immediately prior to your investigative interview.

If you intend to have a representative present, please advise the assigned investigator prior to the date of your investigative interview. It is your responsibility to have your representative with you at the time of this scheduled interview.

Your chosen representative is permitted to review the complaint, witness statements and all existing evidence related to this administrative investigation, immediately prior to your investigative interview.

Under certain circumstances, arrangements can be made to reschedule the investigative interview. However, unless we hear from you otherwise, we will be prepared to conduct this interview at the designated time.

Please report to the location listed in this notice on the designated date and time. Your promptness is expected and appreciated. Failure to comply with any portion of this notice may result in disciplinary action.

OPS 017

## ACKNOWLEDGEMENT OF RECEIPT

I, **CA Sean Patterson** do hereby acknowledge receipt of this notice on the ___14 TH___ day

of __June, 2018.__

_____          _____
**Signature**                                                        **Signature (Witness)**


___CA Sean Patterson_____          **Lt. Steven A. Pacheco**
**Printed Name**                                              **Printed Name (Witness)**

2



# LAKELAND POLICE DEPARTMENT
Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

**Lakeland Police Department**
**Garrity Warning**

You are hereby advised that I intend to question you as part of an official administrative investigation of the Lakeland Police Department. You will be asked questions specifically directed and narrowly related to the performance of your official duties or fitness for office. You are entitled to all the rights and privileges guaranteed by the laws and the Constitution of the State of Florida and the Constitution of the United States, including the right not to be compelled to incriminate yourself.

Pursuant to the Lakeland Police Department's General Orders, you are required to answer my questions fully and truthfully. If you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you may be subject to disciplinary action, to include termination. Your statements, if truthful, however, or any information or evidence gained by reason of your statements cannot be used against you in a criminal proceedings. However, your statements may be used against you in other administrative and/or disciplinary action(s) taken against you. As such, you are ordered to answer all questions truthfully.

## ACKNOWLEDGEMENT OF RECEIPT

I, __**CA Sean Patterson**__ do hereby acknowledge receipt of this notice on the

_____ *19TH* _____ day of __**June**__ , 2018.

_____
Signature

_____
Signature (Witness)

**CA Sean Patterson**
Printed Name

**Lt. Steven A. Pacheco**
Printed Name (Witness)

OPS FILE # __**EIR-18-006**__

OPS 021



## LAKELAND POLICE DEPARTMENT
### Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

### <u>NOTICE OF FINAL AGENCY ACTION</u>

### SGT. JAMES "CHIP" ROBERTS

### EIR 18-006

After careful consideration of the totality of relevant facts, policies, law, and information I learned in this matter, and after consideration of the recommendations of the chain of command, I have made the following determination:

1. G.O. 3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions; G.O. 4-4.2 Supervisor's Responsibilities); **Exonerated**

2. G.O. 3-1.14 Code of Conduct: Conduct Unbecoming; **Sustained**

You will receive a Member Counseling for having violated the stated policy.

The case file will be retained by the Office of Professional Standards for a time period consistent with state and local Record Retention laws.

**Final agency action in this matter is the memorialization of my above-stated, final determination and the fact of your receipt of this Notice as evidenced below.**

ISSUED THIS 29th of June 2018.

By Order of:

LARRY GIDDENS
CHIEF OF POLICE

1

OPS 038

## **ACKNOWLEDGEMENT OF RECEIPT**

I, Sgt. James "Chip" Roberts, hereby acknowledge receipt of this Notice on 29th day of June 2018.

_____
Sgt. James "Chip" Roberts #54

Witness:

_____
Signature

_____
Print name of witness here

2

OPS 038

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:        Sgt. James Roberts

FROM:      Lt. Steven A. Pacheco #33

DATE:      February 15, 2018

SUBJ:      NOTICE OF ADMINISTRATIVE INVESTIGATION – **FILE# EIR-18-006**

Pursuant to Section 112.532 of the Florida Statutes, you are hereby notified of an Administrative Investigation being conducted in which your actions are under investigation for possible violation of Lakeland Police Department (LPD) and/or City of Lakeland polic(y)(ies) and/or procedures.   Chief Larry Giddens has ordered this Administrative Investigation.

The nature of the investigation is the search for, and marshalling of evidence of your actions and inactions, if any, that would support a finding of, or constitute (a) violation(s) of LPD or City polic(y)(ies). The scope of the investigation is defined by, but is not necessarily limited to, the specifics of the complaint against you. The complaint against you is summarized as follows:

**It is alleged that over the past ten months, you have engaged in conduct which has created a hostile work environment which is based primarily upon age, gender and medical discrimination. This conduct has affected and interfered with another member's performance.**

**If this allegation is proven to be true, it would be in violation of Lakeland Police Department G.O. 4-4, Harassment in the Workplace.**

The complainant in this investigation is **Sgt. Terri Smith**.

The investigation is being conducted by **Lt. Steven Pacheco**.

In the event a formal interview is necessary to obtain a statement from you, sufficient advance notice will be provided as to the date and time of your interview.  It is your right

1

OPS 011

to have a representative of your choice present with you during your interview.  It is your responsibility to arrange to have your chosen representative in attendance at the scheduled time.

You are ordered not to discuss, except with your legal counsel and/or representative, this administrative investigation, your testimony in this investigation, or any other testimony or evidence relevant to the administrative investigation of which you have knowledge until such time as this investigation is concluded.

(I have been provided a copy of Sections 112.532, 112.533 and 112.534 of the Florida Statutes (includes "Police Officer's Bill of Rights").  _____

                                                                                Initials


## ACKNOWLEDGEMENT OF RECEIPT


I, **Sgt. James Roberts** do hereby acknowledge receipt of this notice on the **15th** day of **February**, 2018.


_____          _____
**Signature**                                           **Signature (Witness)**


**Sgt. James Roberts**                    **Lt. Steven A. Pacheco**
**Printed Name**                              **Printed Name (Witness)**

2

OPS 011

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:        Sgt. James Roberts

FROM:    Lt. Steven Pacheco, OIC/OPS

DATE:     February 19, 2018

SUBJ:     EIR-18-006

During the month of January 2018, a complaint was submitted to the City of Lakeland Human Resources Department (HR) and the Office of Professional Standards regarding harassment in the workplace (hostile work environment).  As such, and following consultation with City of Lakeland HR, Chief of Police Larry Giddens authorized an Internal Affairs Administrative Investigation into these allegations. Pursuant to the Police Officer Bill of Rights (F.S.S. 112), OPS notified you in writing that you were a named subject member of this Internal Affairs Investigation.

As such, you are hereby noticed that any form of retaliation against the two department members who filed a bona fide complaint under the Cities Hostile Work Environment Policy is strictly prohibited.

Additionally, in accordance with LPD Policies regarding open internal affairs investigations, you are hereby reminded not to speak about this investigation with anyone other than your PBA Representative or chosen legal counsel.

By signing below, you are stating you understand this "official" notice I am issuing and that you have received a copy of the City of Lakeland's Hostile Work Environment policy.

_____
Sgt. James Roberts

February 19, 2018
Date

_____
Lt. Steven Pacheco, OIC/OPS

February 19, 2018
Date

# HOSTILE WORK ENVIRONMENT

Employees of the City of Lakeland are prohibited from acting in a hostile manner against any other employees, direct reports, or supervisors. Such conduct may result in disciplinary action, up to and including termination.

Managers are responsible for providing a work environment free from intimidation, fear, and threats, whether physical or career related. Employees who judge that they are subject to a hostile work environment are encouraged to first speak to their supervisors and are free to report the complaint to the Employee Relations Director or his/her designee. Disciplinary actions which are founded and positively administered are not considered hostile actions.

Any form of retaliation against any employee for filing a bona fide complaint under this policy or assisting in a complaint investigation is prohibited. However, if, after investigating any complaint of harassment or unlawful discrimination, it is determined that the complaint is not bona fide or that an employee has provided false information regarding the complaint, disciplinary action may be taken against the individual who filed the complaint or who gave false information, up to and including termination.

Questions pertaining to this policy should be directed to the Employee Relations Office.

**REFERENCE:** Administrative Directive
**ORIGINAL EFFECTIVE DATE:** January 1, 1989

**REVISED EFFECTIVE DATE:** February 1, 1994,

April 6, 2005

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:        Sgt. James Roberts

FROM:    Lt. Steven A. Pacheco #33

DATE:     March _9TH_, 2018

SUBJ:     **Amended** NOTICE OF ADMINISTRATIVE INVESTIGATION –
          **FILE# EIR-18-006**

Pursuant to Section 112.532 of the Florida Statutes, you are hereby notified of an Administrative Investigation being conducted in which your actions are under investigation for possible violation of Lakeland Police Department (LPD) and/or City of Lakeland polic(y)(ies) and/or procedures.   Chief Larry Giddens has ordered this Administrative Investigation.

The nature of the investigation is the search for, and marshalling of evidence of your actions and inactions, if any, that would support a finding of, or constitute (a) violation(s) of LPD or City polic(y)(ies). The scope of the investigation is defined by, but is not necessarily limited to, the specifics of the complaint against you. The complaint against you is summarized as follows:

**On February 15, 2018, you were served with a Notice of Administrative Investigation which stemmed from allegations you engaged in conduct which possibly created a hostile work environment, based primarily upon age, gender and medical discrimination. Additionally, you were also served with a notice of retaliation which included a copy of the City of Lakeland's Hostile Work Environment policy.**

**On March 5, 2018, the Office of Professional Standards discovered you taped the Notice of Investigation and Notice of Retaliation/Hostile Work Environment, to the front of your office desk. As such, the documents were "prominently" displayed for viewing by any person(s) who had access to, were invited therein to conduct any department business or who passed by the open office doorway.**

**If this allegation is proven to be true, it would be in violation of Lakeland Police Department G.O. 3-1, Code of Conduct.**

1

OPS 011

The complainant in this investigation is **Sgt. Terri Smith.**

The investigation is being conducted by **Lt. Steven Pacheco.**

In the event a formal interview is necessary to obtain a statement from you, sufficient advance notice will be provided as to the date and time of your interview.  It is your right to have a representative of your choice present with you during your interview.  It is your responsibility to arrange to have your chosen representative in attendance at the scheduled time.

You are ordered not to willfully disclose or discuss, except with your legal counsel and/or representative, this administrative investigation, your testimony in this investigation, or any other testimony or evidence relevant to the administrative investigation of which you have knowledge until such time as this investigation is concluded.

(I have been provided a copy of Sections 112.532, 112.533 and 112.534 of the Florida Statutes (includes "Police Officer's Bill of Rights"). _____

Initials

## ACKNOWLEDGEMENT OF RECEIPT

I, **Sgt. James Roberts** do hereby acknowledge receipt of this notice on the *9TH* day of March, 2018.

_____          _____
Signature                                       Signature (Witness)

**Sgt. James Roberts**                 **Lt. Steven A. Pacheco**
Printed Name                              Printed Name (Witness)

2

OPS 011

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:       Sgt. James Roberts

FROM:   Lt. Steven A. Pacheco

DATE:    June *12* , 2018

SUBJ:    NOTICE OF INVESTIGATIVE INTERVIEW – SUBJECT MEMBER

Your investigative interview for FILE # **EIR-18-006,** has been scheduled for **June *16* , 2018** at *0900* hrs. This interview will be conducted at the Office of Professional Standards.

You will be permitted to review the complaint, witness statements, and all existing evidence in relation to this administrative investigation immediately prior to your investigative interview.

If you intend to have a representative present, please advise the assigned investigator prior to the date of your investigative interview. It is your responsibility to have your representative with you at the time of this scheduled interview.

Your chosen representative is permitted to review the complaint, witness statements and all existing evidence related to this administrative investigation, immediately prior to your investigative interview.

Under certain circumstances, arrangements can be made to reschedule the investigative interview. However, unless we hear from you otherwise, we will be prepared to conduct this interview at the designated time.

Please report to the location listed in this notice on the designated date and time. Your promptness is expected and appreciated. Failure to comply with any portion of this notice may result in disciplinary action.

OPS 017

## ACKNOWLEDGEMENT OF RECEIPT

I, **Sgt. James Roberts** do hereby acknowledge receipt of this notice on the ___12TH___ day

of ___June, 2018.___

_____
Signature

_____
Signature (Witness)

___Sgt. James Roberts___
Printed Name

**Lt. Steven A. Pacheco**
Printed Name (Witness)

OPS 017



# LAKELAND POLICE DEPARTMENT
Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

**Lakeland Police Department**
**Garrity Warning**

You are hereby advised that I intend to question you as part of an official administrative investigation of the Lakeland Police Department. You will be asked questions specifically directed and narrowly related to the performance of your official duties or fitness for office. You are entitled to all the rights and privileges guaranteed by the laws and the Constitution of the State of Florida and the Constitution of the United States, including the right not to be compelled to incriminate yourself.

Pursuant to the Lakeland Police Department's General Orders, you are required to answer my questions fully and truthfully. If you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you may be subject to disciplinary action, to include termination. Your statements, if truthful, however, or any information or evidence gained by reason of your statements cannot be used against you in a criminal proceedings. However, your statements may be used against you in other administrative and/or disciplinary action(s) taken against you. As such, you are ordered to answer all questions truthfully.

## ACKNOWLEDGEMENT OF RECEIPT

I, __Sgt. James Roberts__ do hereby acknowledge receipt of this notice on the

__16TH__ day of __June__, 2018.

Signature

Signature (Witness)

**Sgt. James Roberts**
Printed Name

**Lt. Steven A. Pacheco**
Printed Name (Witness)

OPS FILE # __EIR-18-006__

OPS 021



**LAKELAND POLICE DEPARTMENT**
Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

## NOTICE OF FINAL AGENCY ACTION

### SGT. JASON PEREZ

### EIR 18-006

After careful consideration of the totality of relevant facts, policies, law, and information I learned in this matter, and after consideration of the recommendations of the chain of command, I have made the following determination:

1. G.O. 3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions); **Exonerated**

2. G.O. 3-1.14 Code of Conduct: Conduct Unbecoming; **Sustained**

      You will receive a Member Counseling for having violated the stated policy.

The case file will be retained by the Office of Professional Standards for a time period consistent with state and local Record Retention laws.

**Final agency action in this matter is the memorialization of my above-stated, final determination and the fact of your receipt of this Notice as evidenced below.**

ISSUED THIS 29th day of June 2018.

By Order of:

LARRY GIDDENS
CHIEF OF POLICE

1

OPS 038

## **ACKNOWLEDGEMENT OF RECEIPT**

I, Sgt. Jason Perez, hereby acknowledge receipt of this Notice on 29th day of June 2018.

_____

Sgt. Jason Perez #77

Witness:

_____
Signature

_____
Print name of witness here

2

OPS 038

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:         Sgt. Jason Perez

FROM:       Lt. Steven A. Pacheco #33

DATE:       February 15, 2018

SUBJ:       NOTICE OF ADMINISTRATIVE INVESTIGATION – **FILE# EIR-18-006**

Pursuant to Section 112.532 of the Florida Statutes, you are hereby notified of an Administrative Investigation being conducted in which your actions are under investigation for possible violation of Lakeland Police Department (LPD) and/or City of Lakeland polic(y)(ies) and/or procedures.   Chief Larry Giddens has ordered this Administrative Investigation.

The nature of the investigation is the search for, and marshalling of evidence of your actions and inactions, if any, that would support a finding of, or constitute (a) violation(s) of LPD or City polic(y)(ies). The scope of the investigation is defined by, but is not necessarily limited to, the specifics of the complaint against you. The complaint against you is summarized as follows:

**It is alleged that over the past ten months, you have engaged in conduct which has created a hostile work environment which is based primarily upon age, gender and medical discrimination. This conduct has affected and interfered with another member's performance.**

**If this allegation is proven to be true, it would be in violation of Lakeland Police Department G.O. 4-4, Harassment in the Workplace.**

The complainant in this investigation is **Sgt. Terri Smith.**

The investigation is being conducted by **Lt. Steven Pacheco.**

In the event a formal interview is necessary to obtain a statement from you, sufficient advance notice will be provided as to the date and time of your interview.  It is your right

1

to have a representative of your choice present with you during your interview.  It is your responsibility to arrange to have your chosen representative in attendance at the scheduled time.

You are ordered not to discuss, except with your legal counsel and/or representative, this administrative investigation, your testimony in this investigation, or any other testimony or evidence relevant to the administrative investigation of which you have knowledge until such time as this investigation is concluded.

(I have been provided a copy of Sections 112.532, 112.533 and 112.534 of the Florida Statutes (includes "Police Officer's Bill of Rights").   _JP_

Initials

## ACKNOWLEDGEMENT OF RECEIPT

I, **Sgt. Jason Perez** do hereby acknowledge receipt of this notice on the **15th** day of **February**, 2018.


_____
**Signature**

**Sgt. Jason Perez**
**Printed Name**


_____
**Signature (Witness)**

**Lt. Steven A. Pacheco**
**Printed Name (Witness)**

OPS 011

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:       Sgt. Jason Perez

FROM:   Lt. Steven Pacheco, OIC/OPS

DATE:    February 19, 2018

SUBJ:    EIR-18-006

During the month of January 2018, a complaint was submitted to the City of Lakeland Human Resources Department (HR) and the Office of Professional Standards regarding harassment in the workplace (hostile work environment).  As such, and following consultation with City of Lakeland HR, Chief of Police Larry Giddens authorized an Internal Affairs Administrative Investigation into these allegations. Pursuant to the Police Officer Bill of Rights (F.S.S. 112), OPS notified you in writing that you were a named subject member of this Internal Affairs Investigation.

As such, you are hereby noticed that any form of retaliation against the two department members who filed a bona fide complaint under the Cities Hostile Work Environment Policy is strictly prohibited.

Additionally, in accordance with LPD Policies regarding open internal affairs investigations, you are hereby reminded not to speak about this investigation with anyone other than your PBA Representative or chosen legal counsel.

By signing below, you are stating you understand this "official" notice I am issuing and that you have received a copy of the City of Lakeland's Hostile Work Environment policy.

Sgt. Jason Perez

Lt. Steven Pacheco, OIC/OPS

*February 21, 2018*
Date

*February 21, 2018*
Date

## HOSTILE WORK ENVIRONMENT

Employees of the City of Lakeland are prohibited from acting in a hostile manner against any other employees, direct reports, or supervisors. Such conduct may result in disciplinary action, up to and including termination.

Managers are responsible for providing a work environment free from intimidation, fear, and threats, whether physical or career related. Employees who judge that they are subject to a hostile work environment are encouraged to first speak to their supervisors and are free to report the complaint to the Employee Relations Director or his/her designee. Disciplinary actions which are founded and positively administered are not considered hostile actions.

Any form of retaliation against any employee for filing a bona fide complaint under this policy or assisting in a complaint investigation is prohibited. However, if, after investigating any complaint of harassment or unlawful discrimination, it is determined that the complaint is not bona fide or that an employee has provided false information regarding the complaint, disciplinary action may be taken against the individual who filed the complaint or who gave false information, up to and including termination.

Questions pertaining to this policy should be directed to the Employee Relations Office.

**REFERENCE:** Administrative Directive
**ORIGINAL EFFECTIVE DATE:** January 1, 1989

**REVISED EFFECTIVE DATE:** February 1, 1994,

April 6, 2005

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

TO:        Sgt. Jason Perez

Respect • Integrity • Teamwork • Excellence

FROM:      Lt. Steven A. Pacheco

DATE:      June _14_, 2018

SUBJ:      NOTICE OF INVESTIGATIVE INTERVIEW – SUBJECT MEMBER

Your investigative interview for FILE # __EIR-18-006,__ has been scheduled for **June _19_, 2018** at _1300_ hrs. This interview will be conducted at the Office of Professional Standards.

You will be permitted to review the complaint, witness statements, and all existing evidence in relation to this administrative investigation immediately prior to your investigative interview.

If you intend to have a representative present, please advise the assigned investigator prior to the date of your investigative interview. It is your responsibility to have your representative with you at the time of this scheduled interview.

Your chosen representative is permitted to review the complaint, witness statements and all existing evidence related to this administrative investigation, immediately prior to your investigative interview.

Under certain circumstances, arrangements can be made to reschedule the investigative interview. However, unless we hear from you otherwise, we will be prepared to conduct this interview at the designated time.

Please report to the location listed in this notice on the designated date and time. Your promptness is expected and appreciated. Failure to comply with any portion of this notice may result in disciplinary action.

OPS 017

## ACKNOWLEDGEMENT OF RECEIPT

I, **Sgt. Jason Perez** do hereby acknowledge receipt of this notice on the _14TH_ day of

**June, 2018.**

_____          _____
**Signature**                           **Signature (Witness)**


  **Sgt. Jason Perez**              **Lt. Steven A. Pacheco**
**Printed Name**                        **Printed Name (Witness)**

2

OPS 017



# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

**Lakeland Police Department**
**Garrity Warning**

You are hereby advised that I intend to question you as part of an official administrative investigation of the Lakeland Police Department. You will be asked questions specifically directed and narrowly related to the performance of your official duties or fitness for office. You are entitled to all the rights and privileges guaranteed by the laws and the Constitution of the State of Florida and the Constitution of the United States, including the right not to be compelled to incriminate yourself.

Pursuant to the Lakeland Police Department's General Orders, you are required to answer my questions fully and truthfully. If you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you may be subject to disciplinary action, to include termination. Your statements, if truthful, however, or any information or evidence gained by reason of your statements cannot be used against you in a criminal proceedings. However, your statements may be used against you in other administrative and/or disciplinary action(s) taken against you. As such, you are ordered to answer all questions truthfully.

### ACKNOWLEDGEMENT OF RECEIPT

I, **Sgt. Jason Perez** do hereby acknowledge receipt of this notice on the ___*19TH*___

day of __**June**__, 2018.

_____
Signature

_____
Signature (Witness)

**Sgt. Jason Perez**
Printed Name

**Lt. Steven A. Pacheco**
Printed Name (Witness)

OPS FILE # __**EIR-18-006**__

OPS 021



## LAKELAND POLICE DEPARTMENT
Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

### <u>NOTICE OF FINAL AGENCY ACTION</u>

LT. STEVEN SEALEY

EIR 18-006

After careful consideration of the totality of relevant facts, policies, law, and information I learned in this matter, and after consideration of the recommendations of the chain of command, I have made the following determination:

1. G.O. 1-4.1 Supervisor Duties: Supervisor's Responsibilities, G.O. 1-4.3 (C) Supervisor's Duties, G.O. 1-4.4 (G) Supervisory Command and Coordination, G.O. 1-4.6 (B,1) Disciplinary Action; **Other**

2. G.O. 3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions; G.O. 4-4.2 Supervisor's Responsibilities); **Exonerated**

3. G.O. 3-1.14 Code of Conduct: Conduct Unbecoming; **Sustained**

You will receive a Member Counseling for having violated the stated policy.

The case file will be retained by the Office of Professional Standards for a time period consistent with state and local Record Retention laws.

**Final agency action in this matter is the memorialization of my above-stated, final determination and the fact of your receipt of this Notice as evidenced below.**

ISSUED THIS 29th of June 2018.

By Order of:

LARRY GIDDENS
CHIEF OF POLICE

1

OPS 038

## ACKNOWLEDGEMENT OF RECEIPT

I, Lt. Steven Sealey, hereby acknowledge receipt of this Notice on 29th day of June 2018.

_____
Lt. Steven Sealey #27

Witness:

_____
Signature

_____
Print name of witness here

2

OPS 038

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:      Lt. Steven Sealey

FROM:    Lt. Steven A. Pacheco #33

DATE:    February 15, 2018

SUBJ:    NOTICE OF ADMINISTRATIVE INVESTIGATION – **FILE# EIR-18-006**

Pursuant to Section 112.532 of the Florida Statutes, you are hereby notified of an Administrative Investigation being conducted in which your actions are under investigation for possible violation of Lakeland Police Department (LPD) and/or City of Lakeland polic(y)(ies) and/or procedures. Chief Larry Giddens has ordered this Administrative Investigation.

The nature of the investigation is the search for, and marshalling of evidence of your actions and inactions, if any, that would support a finding of, or constitute (a) violation(s) of LPD or City polic(y)(ies). The scope of the investigation is defined by, but is not necessarily limited to, the specifics of the complaint against you. The complaint against you is summarized as follows:

**It is alleged that over the past ten months, you have engaged in conduct which has created a hostile work environment which is based primarily upon age, gender and medical discrimination. This conduct has affected and interfered with another member's performance.**

**If this allegation is proven to be true, it would be in violation of Lakeland Police Department G.O. 4-4, Harassment in the Workplace.**

The complainant in this investigation is **Sgt. Terri Smith**.

The investigation is being conducted by **Lt. Steven Pacheco**.

In the event a formal interview is necessary to obtain a statement from you, sufficient advance notice will be provided as to the date and time of your interview. It is your right

OPS 011

to have a representative of your choice present with you during your interview. It is your responsibility to arrange to have your chosen representative in attendance at the scheduled time.

You are ordered not to discuss, except with your legal counsel and/or representative, this administrative investigation, your testimony in this investigation, or any other testimony or evidence relevant to the administrative investigation of which you have knowledge until such time as this investigation is concluded.

(I have been provided a copy of Sections 112.532, 112.533 and 112.534 of the Florida Statutes (includes "Police Officer's Bill of Rights").

Initials

## ACKNOWLEDGEMENT OF RECEIPT

I, **Lt. Steven Sealey** do hereby acknowledge receipt of this notice on the **15th** day of **February**, 2018.

_____
Signature

**Lt. Steven Sealey**
**Printed Name**

_____
Signature (Witness)

**Lt. Steven A. Pacheco**
**Printed Name (Witness)**

2

OPS 011

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:        Lt. Steven Sealey

FROM:    Lt. Steven Pacheco, OIC/OPS

DATE:     February 19, 2018

SUBJ:     EIR-18-006

During the month of January 2018, a complaint was submitted to the City of Lakeland Human Resources Department (HR) and the Office of Professional Standards regarding harassment in the workplace (hostile work environment).  As such, and following consultation with City of Lakeland HR, Chief of Police Larry Giddens authorized an Internal Affairs Administrative Investigation into these allegations. Pursuant to the Police Officer Bill of Rights (F.S.S. 112), OPS notified you in writing that you were a named subject member of this Internal Affairs Investigation.

As such, you are hereby noticed that any form of retaliation against the two department members who filed a bona fide complaint under the Cities Hostile Work Environment Policy is strictly prohibited.

Additionally, in accordance with LPD Policies regarding open internal affairs investigations, you are hereby reminded not to speak about this investigation with anyone other than your PBA Representative or chosen legal counsel.

By signing below, you are stating you understand this "official" notice I am issuing and that you have received a copy of the City of Lakeland's Hostile Work Environment policy.

_____
Lt. Steven Sealey

_____
Lt. Steven Pacheco, OIC/OPS

*February 19, 2018*
Date

*February 19, 2018*
Date

# HOSTILE WORK ENVIRONMENT

Employees of the City of Lakeland are prohibited from acting in a hostile manner against any other employees, direct reports, or supervisors. Such conduct may result in disciplinary action, up to and including termination.

Managers are responsible for providing a work environment free from intimidation, fear, and threats, whether physical or career related. Employees who judge that they are subject to a hostile work environment are encouraged to first speak to their supervisors and are free to report the complaint to the Employee Relations Director or his/her designee. Disciplinary actions which are founded and positively administered are not considered hostile actions.

Any form of retaliation against any employee for filing a bona fide complaint under this policy or assisting in a complaint investigation is prohibited. However, if, after investigating any complaint of harassment or unlawful discrimination, it is determined that the complaint is not bona fide or that an employee has provided false information regarding the complaint, disciplinary action may be taken against the individual who filed the complaint or who gave false information, up to and including termination.

Questions pertaining to this policy should be directed to the Employee Relations Office.

**REFERENCE:** Administrative Directive
**ORIGINAL EFFECTIVE DATE:** January 1, 1989

**REVISED EFFECTIVE DATE:** February 1, 1994,

April 6, 2005

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:        Lt. Steven Sealey

FROM:      Lt. Steven A. Pacheco

DATE:      June _14_, 2018

SUBJ:      NOTICE OF INVESTIGATIVE INTERVIEW – SUBJECT MEMBER

Your investigative interview for FILE # **EIR-18-006,** has been scheduled for **June _20_, 2018** at _____hrs.  This interview will be conducted at the Office of Professional Standards.

You will be permitted to review the complaint, witness statements, and all existing evidence in relation to this administrative investigation immediately prior to your investigative interview.

If you intend to have a representative present, please advise the assigned investigator prior to the date of your investigative interview.  It is your responsibility to have your representative with you at the time of this scheduled interview.

Your chosen representative is permitted to review the complaint, witness statements and all existing evidence related to this administrative investigation, immediately prior to your investigative interview.

Under certain circumstances, arrangements can be made to reschedule the investigative interview. However, unless we hear from you otherwise, we will be prepared to conduct this interview at the designated time.

Please report to the location listed in this notice on the designated date and time.   Your promptness is expected and appreciated.  Failure to comply with any portion of this notice may result in disciplinary action.

1

OPS 017

## ACKNOWLEDGEMENT OF RECEIPT

I, **Lt. Steven Sealey** do hereby acknowledge receipt of this notice on the ___*14TH*___ day of

**June, 2018.**

_____          _____
**Signature**                                                         **Signature (Witness)**


___**Lt. Steven Sealey**___                                **Lt. Steven A. Pacheco**
**Printed Name**                                              **Printed Name (Witness)**

2

OPS 017



# LAKELAND POLICE DEPARTMENT
Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

**Lakeland Police Department**
**Garrity Warning**

      You are hereby advised that I intend to question you as part of an official administrative investigation of the Lakeland Police Department. You will be asked questions specifically directed and narrowly related to the performance of your official duties or fitness for office.  You are entitled to all the rights and privileges guaranteed by the laws and the Constitution of the State of Florida and the Constitution of the United States, including the right not to be compelled to incriminate yourself.

      Pursuant to the Lakeland Police Department's General Orders, you are required to answer my questions fully and truthfully. If you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you may be subject to disciplinary action, to include termination.   Your statements, if truthful, however, or any information or evidence gained by reason of your statements cannot be used against you in a criminal proceedings. However, your statements may be used against you in other administrative and/or disciplinary action(s) taken against you. As such, you are ordered to answer all questions truthfully.

<u>**ACKNOWLEDGEMENT OF RECEIPT**</u>

I, <u>**Lt. Steven Sealey**</u> do hereby acknowledge receipt of this notice on the _____ 20 TH

day of __June__ , 2018.

Signature

**Lt. Steven Sealey**
Printed Name

Signature (Witness)

**Lt. Steven A. Pacheco**
Printed Name (Witness)

OPS FILE # __EIR-18-006__

OPS 021



**LAKELAND POLICE DEPARTMENT**
Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

## NOTICE OF FINAL AGENCY ACTION

CAPT. HAROLD "HANS" LEHMAN

EIR 18-006

After careful consideration of the totality of relevant facts, policies, law, and information I learned in this matter, and after consideration of the recommendations of the chain of command, I have made the following determination:

1. G.O. 1-4.1 Supervisor Duties: Supervisor's Responsibilities, G.O. 1-4.3 (C) Supervisor's Duties, G.O. 1-4.4 (G) Supervisory Command and Coordination, G.O. 1-4.6 (B,1) Disciplinary Action; **Sustained**

2. G.O. 3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions; G.O. 4-4.2 Supervisor's Responsibilities); **Exonerated**

You will receive a Member Counseling for having violated the stated policy.

The case file will be retained by the Office of Professional Standards for a time period consistent with state and local Record Retention laws.

**Final agency action in this matter is the memorialization of my above-stated, final determination and the fact of your receipt of this Notice as evidenced below.**

ISSUED THIS 29th of June 2018.

By Order of:

LARRY GIDDENS
CHIEF OF POLICE

1

OPS 038

## ACKNOWLEDGEMENT OF RECEIPT

I, Capt. Harold "Hans" Lehman, hereby acknowledge receipt of this Notice on 29th day of June 2018.

_____
Capt. Harold "Hans" Lehman #8

Witness:

_____
Signature

_____
Print name of witness here

2



# LAKELAND POLICE DEPARTMENT
Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:      **Capt. Hans Lehman**

FROM:    Sgt. LeRon Strong #69 SUPV/IAU/OPS

DATE:    February 9, 2018

SUBJ:    Notice of Administrative Investigation –
         File#  **EIR-18-006**

Pursuant to Section 112.532 of the Florida Statutes, you are hereby notified of an Administrative Investigation being conducted in which your actions are under investigation for possible violation of Lakeland Police Department (LPD) and/or City of Lakeland polic(y)(ies) and/or procedures. Chief of Police Larry Giddens has ordered this Administrative Investigation.

The nature of the investigation is the search for, and marshalling of evidence of your actions and inactions, if any, that would support a finding of, or constitute (a) violation(s) of LPD or City polic(y)(ies). The scope of the investigation is defined by, but is not necessarily limited to, the specifics of the complaint against you. The complaint against you is summarized as follows:

**It is alleged that over the past ten (10) months, you have engaged in conduct which has created a hostile work environment that is based primarily upon age and gender discrimination.  This conduct has affected and interfered with another member's performance.**

**If this allegation is proven to be true, it would be in violation of Lakeland Police Department G.O. 4-4 Harassment in the Workplace.**

The complainant in this investigation is Chief Larry Giddens.

The investigation is being conducted by Lt. Steven Pacheco.

1

In the event a formal interview is necessary to obtain a statement from you, sufficient advance notice will be provided as to the date and time of your interview. It is your right to have a representative of your choice present with you during your interview.  It is your responsibility to arrange to have your chosen representative in attendance at the scheduled time.

You are ordered not to discuss, except with your legal counsel and/or representative, this administrative investigation, your testimony in this investigation, or any other testimony or evidence relevant to the administrative investigation of which you have knowledge until such time as this investigation is concluded.

(I have been provided a copy of Sections 112.532, 112.533 and 112.534 of the Florida Statutes (includes "Police Officer's Bill of Rights").

_____
Initials

### ACKNOWLEDGEMENT OF RECEIPT

I, **Hans Lehman** do hereby acknowledge receipt of this notice on the _____ day of _____, 20___.

_____
Signature

_____
Printed Name

_____
(Witness) Signature

_____
Printed Name



# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:        Capt. Hans Lehman

FROM:      Lt. Steven Pacheco, OIC/OPS

DATE:      February 19, 2018

SUBJ:      EIR-18-006

During the month of January 2018, a complaint was submitted to the City of Lakeland Human Resources Department (HR) and the Office of Professional Standards regarding harassment in the workplace (hostile work environment).  As such, and following consultation with City of Lakeland HR, Chief of Police Larry Giddens authorized an Internal Affairs Administrative Investigation into these allegations. Pursuant to the Police Officer Bill of Rights (F.S.S. 112), OPS notified you in writing that you were a named subject member of this Internal Affairs Investigation.

As such, you are hereby noticed that any form of retaliation against the two department members who filed a bona fide complaint under the Cities Hostile Work Environment Policy is strictly prohibited.

Additionally, in accordance with LPD Policies regarding open internal affairs investigations, you are hereby reminded not to speak about this investigation with anyone other than your PBA Representative or chosen legal counsel.

By signing below, you are stating you understand this "official" notice I am issuing and that you have received a copy of the City of Lakeland's Hostile Work Environment policy.

_____
Capt. Hans Lehman

_February 19, 2018_
Date

_____
Lt. Steven Pacheco, OIC/OPS

_February 19, 2018_
Date

## HOSTILE WORK ENVIRONMENT

Employees of the City of Lakeland are prohibited from acting in a hostile manner against any other employees, direct reports, or supervisors. Such conduct may result in disciplinary action, up to and including termination.

Managers are responsible for providing a work environment free from intimidation, fear, and threats, whether physical or career related. Employees who judge that they are subject to a hostile work environment are encouraged to first speak to their supervisors and are free to report the complaint to the Employee Relations Director or his/her designee. Disciplinary actions which are founded and positively administered are not considered hostile actions.

Any form of retaliation against any employee for filing a bona fide complaint under this policy or assisting in a complaint investigation is prohibited. However, if, after investigating any complaint of harassment or unlawful discrimination, it is determined that the complaint is not bona fide or that an employee has provided false information regarding the complaint, disciplinary action may be taken against the individual who filed the complaint or who gave false information, up to and including termination.

Questions pertaining to this policy should be directed to the Employee Relations Office.

**REFERENCE:** Administrative Directive
**ORIGINAL EFFECTIVE DATE:** January 1, 1989

**REVISED EFFECTIVE DATE:** February 1, 1994,

April 6, 2005

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:        Capt. Hans Lehman

FROM:      Lt. Steven A. Pacheco #33

DATE:      February 20, 2018

SUBJ:      **AMENDED** NOTICE OF ADMINISTRATIVE INVESTIGATION –
           **FILE# EIR-18-006**

---

Pursuant to Section 112.532 of the Florida Statutes, you are hereby notified of an Administrative Investigation being conducted in which your actions are under investigation for possible violation of Lakeland Police Department (LPD) and/or City of Lakeland polic(y)(ies) and/or procedures.   Chief Larry Giddens has ordered this Administrative Investigation.

The nature of the investigation is the search for, and marshalling of evidence of your actions and inactions, if any, that would support a finding of, or constitute (a) violation(s) of LPD or City polic(y)(ies). The scope of the investigation is defined by, but is not necessarily limited to, the specifics of the complaint against you. The complaint against you is summarized as follows:

**It is alleged that over the past ten months, you have engaged in conduct which has created a hostile work environment which is based primarily upon age, gender and medical discrimination. This conduct has affected and interfered with another member's performance.**

**If this allegation is proven to be true, it would be in violation of Lakeland Police Department G.O. 4-4, Harassment in the Workplace.**

The complainant in this investigation is **Sgt. Terri Smith**.

The investigation is being conducted by **Lt. Steven Pacheco**.

1

OPS 011

In the event a formal interview is necessary to obtain a statement from you, sufficient advance notice will be provided as to the date and time of your interview.  It is your right to have a representative of your choice present with you during your interview.  It is your responsibility to arrange to have your chosen representative in attendance at the scheduled time.

You are ordered not to discuss, except with your legal counsel and/or representative, this administrative investigation, your testimony in this investigation, or any other testimony or evidence relevant to the administrative investigation of which you have knowledge until such time as this investigation is concluded.

(I have been provided a copy of Sections 112.532, 112.533 and 112.534 of the Florida Statutes (includes "Police Officer's Bill of Rights"). _____
                                                                                                              Initials

## ACKNOWLEDGEMENT OF RECEIPT

I, **Capt. Hans Lehman** do hereby acknowledge receipt of this notice on the **20th** day of **February**, 2018.


_____
Signature

**Capt. Hans Lehman**
**Printed Name**


_____
Signature (Witness)

**Lt. Steven A. Pacheco**
**Printed Name (Witness)**

2

OPS 011

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:      Capt. Hans Lehman

FROM:    Lt. Steven A. Pacheco

DATE:    June _14_, 2018

SUBJ:    NOTICE OF INVESTIGATIVE INTERVIEW – SUBJECT MEMBER

Your investigative interview for FILE # __**EIR-18-006,**__ has been scheduled for **June _20_, 2018** at _____hrs.  This interview will be conducted at the Office of Professional Standards.

You will be permitted to review the complaint, witness statements, and all existing evidence in relation to this administrative investigation immediately prior to your investigative interview.

If you intend to have a representative present, please advise the assigned investigator prior to the date of your investigative interview.  It is your responsibility to have your representative with you at the time of this scheduled interview.

Your chosen representative is permitted to review the complaint, witness statements and all existing evidence related to this administrative investigation, immediately prior to your investigative interview.

Under certain circumstances, arrangements can be made to reschedule the investigative interview. However, unless we hear from you otherwise, we will be prepared to conduct this interview at the designated time.

Please report to the location listed in this notice on the designated date and time.   Your promptness is expected and appreciated.   Failure to comply with any portion of this notice may result in disciplinary action.

1

OPS 017

## ACKNOWLEDGEMENT OF RECEIPT

I, **Capt. Hans Lehman** do hereby acknowledge receipt of this notice on the _14TH_ day

of  **June, 2018.**

_____          _____
Signature                                                    Signature (Witness)


  **Capt. Hans Lehman**                          **Lt. Steven A. Pacheco**
Printed Name                                            Printed Name (Witness)

2

OPS 017



# LAKELAND POLICE DEPARTMENT
Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

**Lakeland Police Department
Garrity Warning**

You are hereby advised that I intend to question you as part of an official administrative investigation of the Lakeland Police Department. You will be asked questions specifically directed and narrowly related to the performance of your official duties or fitness for office. You are entitled to all the rights and privileges guaranteed by the laws and the Constitution of the State of Florida and the Constitution of the United States, including the right not to be compelled to incriminate yourself.

Pursuant to the Lakeland Police Department's General Orders, you are required to answer my questions fully and truthfully. If you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you may be subject to disciplinary action, to include termination. Your statements, if truthful, however, or any information or evidence gained by reason of your statements cannot be used against you in a criminal proceedings. However, your statements may be used against you in other administrative and/or disciplinary action(s) taken against you. As such, you are ordered to answer all questions truthfully.

## ACKNOWLEDGEMENT OF RECEIPT

I, **Capt. Hans Lehman** do hereby acknowledge receipt of this notice on the

_2o7H_ day of __June__ , 2018.

_Signature_
Signature

**Capt. Hans Lehman**
Printed Name

_Signature (Witness)_
Signature (Witness)

**Lt. Steven A. Pacheco**
Printed Name (Witness)

OPS FILE # __EIR-18-006__

OPS 021



# LAKELAND POLICE DEPARTMENT
Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

## NOTICE OF FINAL AGENCY ACTION

### ACOP MICHAEL LINK

### EIR 18-006

After careful consideration of the totality of relevant facts, policies, law, and information I learned in this matter, and after consideration of the recommendations of the chain of command, I have determined the incident that occurred was lawful and proper. I hereby close this case with a finding of Exonerated.

1. G.O. 3-1.7 Code of Conduct: Harassment in the Workplace (G.O. 4-4.1 Harassment in the Workplace: Prohibited Actions

This case file will be retained by the Office of Professional Standards for a time period consistent with state and local records retention laws.

**Final agency action in this matter is the memorialization of my above-stated, final determination and the fact of your receipt of this Notice as evidenced below.**

ISSUED THIS 29th day of June 2018.

By Order of:

LARRY GIDDENS
CHIEF OF POLICE

1

OPS 038

## ACKNOWLEDGEMENT OF RECEIPT

I, ACOP Micheal Link, hereby acknowledge receipt of this Notice on 29th day of June 2018.

_____
ACOP Michael Link #2

Witness:

_____
Signature

_____
Print name of witness here

2

# LAKELAND POLICE DEPARTMENT
## Office of Professional Standards

Respect • Integrity • Teamwork • Excellence

TO:        ACOP Mike Link

FROM:   Lt. Steven A. Pacheco #33

DATE:    February 15, 2018

SUBJ:    NOTICE OF ADMINISTRATIVE INVESTIGATION – **FILE# EIR-18-006**

Pursuant to Section 112.532 of the Florida Statutes, you are hereby notified of an Administrative Investigation being conducted in which your actions are under investigation for possible violation of Lakeland Police Department (LPD) and/or City of Lakeland polic(y)(ies) and/or procedures.   Chief Larry Giddens has ordered this Administrative Investigation.

The nature of the investigation is the search for, and marshalling of evidence of your actions and inactions, if any, that would support a finding of, or constitute (a) violation(s) of LPD or City polic(y)(ies). The scope of the investigation is defined by, but is not necessarily limited to, the specifics of the complaint against you. The complaint against you is summarized as follows:

**It is alleged that over the past ten months, you have engaged in conduct which has created a hostile work environment which is based primarily upon age, gender and medical discrimination. This conduct has affected and interfered with another member's performance.**

**If this allegation is proven to be true, it would be in violation of Lakeland Police Department G.O. 4-4, Harassment in the Workplace.**

The complainant in this investigation is **Sgt. Terri Smith**.

The investigation is being conducted by **Lt. Steven Pacheco**.

In the event a formal interview is necessary to obtain a statement from you, sufficient advance notice will be provided as to the date and time of your interview.  It is your right

1

OPS 011

to have a representative of your choice present with you during your interview.  It is your responsibility to arrange to have your chosen representative in attendance at the scheduled time.

You are ordered not to discuss, except with your legal counsel and/or representative, this administrative investigation, your testimony in this investigation, or any other testimony or evidence relevant to the administrative investigation of which you have knowledge until such time as this investigation is concluded.

(I have been provided a copy of Sections 112.532, 112.533 and 112.534 of the Florida Statutes (includes "Police Officer's Bill of Rights").

Initials

**ACKNOWLEDGEMENT OF RECEIPT**

I, **ACOP Mike Link** do hereby acknowledge receipt of this notice on the **15th** day of **February**, 2018.

<br>

_____
Signature

**ACOP Mike Link**
**Printed Name**

_____
**Signature (Witness)**

**Lt. Steven A. Pacheco**
**Printed Name (Witness)**

2

OPS 011

## Pacheco, Steven

| | |
|---|---|
| **m:** | Pacheco, Steven |
| **Sent:** | Friday, May 18, 2018 1:39 PM |
| **To:** | 'OLIVIA ESCOBEDO' |
| **Subject:** | RE: Request for an interview |

Olivia,

First, there was no offense taken from our conversation, as my only intent was to seek your voluntary participation in this investigation at the request of the subject officers.  Second, thank you for explaining the reason why you wish not to participate as a witness in this investigation. Your formal response is acknowledged and will be conveyed to the subject officers who provided your name to me to seek your testimony.

Good luck and take care of yourself.

Respectfully,
Lt. Pacheco

-----Original Message-----
From: OLIVIA ESCOBEDO [mailt
Sent: Thursday, May 17, 2018 2:32 PM
To: Pacheco, Steven <Steven.Pacheco@lakelandgov.net>
Cc: oescobedo@vol.com
    ject: Request for an interview

Good afternoon, Lt. Pacheco,

Allow me to first apologize for going "postal" on you yesterday afternoon. Anytime I hear Terri Smith or Brenda Wallace's names mentioned in a sentence I become highly incensed and agitated. You did not deserve the volatile anger and wrath I spewed at you. I am deeply sorry and embarrassed by my behavior toward you; I take full responsibility. Please accept my humble apologies.

Regarding our telephone conversation on May 16, 2018 that included a request for an interview pertaining to an on-going investigation involving Terri Smith and Brenda Wallace. Being a former investigator, I looked up Terri Smith and Brenda Wallace on the Lakeland Ledger website. I located an article dated March 9, 2018 regarding Smith's complaint with the COL Human Resources Department. I did not locate any news articles naming Brenda Wallace.

The fact that both of them simultaneously filed a complaint, at the exact same time, leads me to be extremely suspect of their agenda. It doesn't surprise me though, that they are BOTH claiming to having issue(s) with other officers. I would surmise that more than likely the officers must have called them out about something and they didn't like it. They don't like to be challenged. It's always been their way or the highway. I know this personally. The manner in which they always derail a situation is to seek a way to retaliate. That's their MO. "Together we stand, divided we fall." Only they never fall. They are the department's "protected species"; they can do no wrong and no one ever lifts a finger against them.

You did explain that this investigation is NOT about what they perpetrated against me, it is about them being "offended". I understand. I get it. However, please allow me the opportunity to preface my final decision with the following statements.

I have personally experienced Smith's and Wallace's outright hostility and unpleasantness in the workplace. They always acted in sync when they subjected me to a hostile workplace environment.   In my opinion they are two of the most manipulative, self-serving, vile and cruel people I have ever known.

As I pointed out yesterday, when I was having my difficulties, I complained and complained; and complained. I'd bring it up to my supervisor's attentions; but nothing constructive or punitive was ever done to Terri Smith. Before being appointed COP, Larry Giddings was aware of the issues between Smith and I and nothing was done. NOTHING!!!! Harry Katt was one of Smith's biggest advocates; I was verbally chastised by him numerous times because of Smith's complaints against me. The only people who stood up to Terri Smith on my behalf was Lt. Ralph Schrader, Lt. Al Wilson and Capt. Randy Harrison. The rest of my supervisors attempted to placate me and shove it under the rug or had me moved to a different assignment.(Capt. Tom Brown/Lt. Victor White).

So, now Smith and Wallace complain and all of a sudden they are the victims and the administration gives them a platform? Ridiculous. Like I sarcastically said previously, "protected species".

In my opinion, I wasn't the bad person here, but the department, on a corporate whole, made me feel inferior, and worthless. I was made to feel that I didn't belong. I always wondered why. Was it because of my ethnicity, a Hispanic who needed to be put in her place? Was it my gender?  Or was it the fact that I was an outsider coming in from an out of state agency? Was it because I had been a Sergeant in my former career life? Yes, I used all my law enforcement skills, training and leadership qualities; but I never stepped out of bounds in dealing with my peers.

I don't know which four officers feel  I may know or may have witnessed any behavior between them Smith and Wallace. I'm baffled, because when I was employed at LPD, I intentionally made it my personal practice to limit my time "socializing" with other LPD members. I can honestly say I had limited interactions with my peers unless it was in a professional capacity and I was communicating information to them; discussing a case, soliciting additional information, etc. It was a rare occasion when I would "visit" anyone just for the sake of visiting socially. As I told you yesterday, even on my worst days, and there were many, when Smith was badgering me, belittling me, or harassing me, I maintained my professionalism; I held my head up high, sat at my desk, performed my duties, "sucked it up" and did an excellent job. I have always taken great pride in my work product and I always tendered nothing less.

I don't wish to be interviewed and here's the specific reason for my decision. From the time I got your call I have searched my mind. I could not sleep at all last night, I spent the entire night awake right up to present time thinking about anything/everything that I could have witnessed involving Terri Smith or Brenda Wallace with any other officers where Smith or Wallace may have been subjected to any mistreatment by any officers. With all confidence and truthfulness I can say, I have not ever been in a position where I was present in that environment whereby I personally observed Smith or Wallace being mistreated, etc in an unprofessional manner.  When I was employed there, I purposely and intentionally steered away from these two contemptible women and any/all interactions they may have been engaged in with any other LPD members.

In closing, I want to say, that I do have a handful of some very special and close friends at LPD (yourself included), they are the ones who stood by me and gave me the moral support, strength and courage to maintain a professional course of action. I will be forever grateful to each of them; they hold a special place in my heart. Additionally, I don't wish to disrespect or diminish the officers who offered up my name, as a possible witness in their time of need. The fact is, I have nothing. I am giving you permission to discuss my letter with them if you are able to do so. Help them understand, that I don't have any personal knowledge other than MY own personal experiences with these two complainants. Please convey to them, that I thank them for their service, I care very much about them and I am deeply pained and hurt that they find themselves in this situation. Please let them know they are always in my prayers. I hope that they will understand why I respectfully decline to be interviewed and my hope and prayer is that they won't hold it against me.

Respectfully,

Olivia Escobedo (Retired, COL # 16326)
(Electronic signature being submitted in lieu of a written cursive legal signature)

Sent from my iPad

_____

*****WARNING: This is an email from an external sender. DO NOT click on links or attachments unless you know the content is safe. If you are unsure about an email, contact 4ISHELP.*****